**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>DELAWARE BSA, LLC,[1]<br><br>Reorganized Debtor. | Chapter 11<br><br>Case No. 20-10342 (LSS) |

**DECLARATION OF GLEN POUNDER**
**IN RESPONSE TO THE MOTION OF THE**
**FUTURE CLAIMANTS' REPRESENTATIVE FOR**
**JUDICIAL RESOLUTION OF PAYMENT PERCENTAGE DISPUTE**

I, Glen Pounder, pursuant to 28 U.S.C. § 1746, declare that the following is true and correct to the best of my knowledge, information, and belief:

1. I am the Chief Safeguarding Officer of Scouting America, formerly known as the Boy Scouts of America (together with Scouting America, "**BSA**"). In this role, I am responsible for leading all youth safeguarding activities nationwide, including policy development, training, external partnerships, legislative engagement, and direct engagement with survivor communities.

2. I submit this Declaration in response to the *Motion of the Future Claimants' Representative for Judicial Resolution of Payment Percentage Dispute* [D.I. 13460] (the "**Motion**"). This Declaration is based on my personal knowledge, my review of Scouting America's records and materials maintained in the ordinary course, and my professional

---

[1] The last four digits of the tax identification number of Reorganized Debtor Delaware BSA, LLC ("**Delaware BSA**") are 4311. The Reorganized Debtor's mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038. On March 13, 2026, the Court entered a final decree closing the chapter 11 case of Boy Scouts of America. *See* Docket No. 13530 in Case No. 20-10343. Commencing on March 13, 2026, all motions, notices, and other pleadings relating to the Reorganized Debtors shall be filed and administered in the remaining chapter 11 case of Delaware BSA, LLC Case No. 20-10342.

experience in law enforcement and youth safeguarding and abuse prevention. If called as a witness, I could and would testify competently to the matters stated herein.

3.     The purpose of this Declaration is to provide the Court with a description of the safeguarding environment that existed when potential Future Abuse Claimants would have participated in Scouting, to explain why that environment is materially different from the one that generated the overwhelming majority of prepetition claims, and to address certain considerations that bear on the likely volume and severity of Future Abuse Claims.  Much of the data and research discussed herein was previously shared with the Future Claimants' Representative prior to filing of the Motion.

4.     I understand that Future Abuse Claims are defined as claims arising from abuse that occurred before the February 18, 2020 Petition Date, held by individuals who were under eighteen years old as of that date. I understand that potential Future Abuse Claimants would have participated in Scouting primarily between approximately 2005 and 2018. The safeguarding environment during that specific window is directly relevant to the Court's assessment of the likely volume and severity of Future Abuse Claims.

### A.     Professional Background

5.     Before joining Scouting America, I spent thirty-one years in law enforcement. Throughout much of my career in law enforcement and my subsequent work in the nonprofit sector, my focus has been exclusively on child protection—both pursuing criminal pedophiles at scale and helping government entities and other institutions develop systemic approaches to preventing child exploitation. My resume is attached hereto as **Exhibit A.**

6.     I served for over twenty-five years with the United Kingdom's National Crime Agency and HM Revenue & Customs, including tenures as International Liaison Officer for Portugal, North America, the Northern Caribbean, Switzerland, and Liechtenstein. In those roles,

I coordinated with international law-enforcement agencies on investigations involving child sexual exploitation and abuse, drug trafficking, money laundering, corruption, fraud, and firearms trafficking.

7.    I then served as Chief Operating Officer of the Child Rescue Coalition, a nonprofit organization that develops and deploys technology to identify and apprehend child predators online. In connection with that role, I co-authored a peer-reviewed article recently published in *Child Maltreatment: Journal of the American Professional Society on the Abuse of Children*, concerning characteristics of child sexual abuse material in peer-to-peer networks and predictors of severity.

8.    In 2022, I co-founded Raven, a nonprofit advocacy organization focused on ending child exploitation in the United States. I currently serve as a founding Board Member. Through Raven, I have advocated for federal and state legislative solutions to address the persistent underfunding of child exploitation investigations.

9.    In 2017, I received the Investigator of the Year Award from the Child Rescue Coalition in recognition of my work combating child sexual exploitation worldwide. In May 2023, I received the Visionary Child Protection Practitioner Award from the Policing Institute for the Eastern Region at Anglia Ruskin University in recognition of my contribution to the global fight against child sexual abuse.

10.    In April 2023, I joined Scouting America as Youth Protection Executive and subsequently assumed the role of Executive Vice President and Chief Safeguarding Officer, with responsibilities spanning policy development and enforcement, mandatory training, overseeing the Youth Protection Committee, supporting the Safeguarding Youth Committee (National board governance), managing external partnerships with child safety and prevention organizations,

engaging with state and federal legislators on youth protection legislation, and engaging with survivors.

11.     In addition to my responsibilities at Scouting America, I remain actively engaged in the broader child protection community. I recently served as a keynote speaker at the University of Wisconsin-Whitewater Youth Safety Summit and participated as a panelist at the International Association of Chiefs of Police annual conference. In 2021, I was appointed to Care.com's Safety Advisory Council, advising the platform on safety protocols to protect children and families using its caregiving marketplace.

**B.      The Historical Youth Protection Framework**

12.     The overwhelming majority of prepetition claims arose from a historical environment that had been fundamentally altered before the 2005–2018 period relevant to potential Future Abuse Claimants. I understand that more than fifty percent of prepetition claims allege first abuse before 1974, and the concentration of claims rises sharply into the 1970s, peaks in the mid-1970s, and then declines over time. That bell-shaped incidence curve is not unique to Scouting. It is consistent with what has been observed in abuse data across institutional settings: incidence rises under conditions that allow repeated, unsupervised adult access to children, peaks, and then declines as structural barriers, awareness, reporting obligations, and prevention measures are adopted.

13.     Prior to 1985, BSA operated without many of the safeguards that are now standard in youth-serving organizations. There was not a uniform system of safeguards such as mandatory youth protection training, comprehensive criminal background checks and mandatory reporting obligation to law enforcement. Perhaps most importantly, BSA did not have a universal prohibition on one-on-one adult youth interactions. Those conditions made it possible to have private,

repeated, and unsupervised access to children—precisely the conditions that research and law-enforcement experience consistently identify as enabling grooming and severe institutional abuse.

14.     By 1990, BSA prohibited one-on-one interaction between adults and youth who were not their own child. This is a critical prohibition. At that time, the policy required that Scouting activities and interactions involving youth be conducted so as to avoid isolated, private one-on-one contact between an adult and a youth, through the use of shared supervision and participation by others. The requirement applied across program activities, including events, travel, and transportation, as well as to communications between adults and youth. In my opinion, this single measure was among the most consequential changes in Scouting's safeguarding history because it directly disrupted the grooming pathway through which the most severe and repeated abuse occurs. Grooming requires access, privacy, time, and repeated opportunity. Removing those conditions does not eliminate all risk, but it materially changes both the likelihood and the potential severity of abuse.

**C.     BSA's Modern Youth Protection Framework**

15.     By the time potential Future Abuse Claimants participated in Scouting—principally from approximately 2005 through 2018—the structural conditions that had enabled peak-era abuse no longer existed. BSA had implemented a comprehensive, multi-layered safeguarding model. That framework included: the development and ongoing expansion of the volunteer screening database; prohibition of one-on-one adult-youth contact; implementation of third-party criminal background checks; mandatory recurring Youth Protection Training; mandatory reporting requirements; anonymous and online reporting mechanisms; youth-focused prevention education; parent-facing resources; and expert governance oversight.

16.    Between 2005 and 2018 specifically, safeguards in Scouting included:

- Since 1990, BSA's two-deep leadership policy, requiring a minimum of two registered adults at all Scouting activities and prohibiting one-on-one adult-youth interaction of any kind, thereby eliminating the unsupervised access that enables grooming;

- BSA initiated criminal background checks for new volunteers in 2003 and expanded those checks to all existing volunteers in 2008;

- Beginning in 2010, BSA required all registered adults to complete Youth Protection Training, with annual renewal obligations, providing structured instruction on recognizing grooming behaviors, understanding barrier policies, and fulfilling reporting obligations;

- BSA required that any suspicion of abuse must be reported to law enforcement and established dedicated reporting channels to support that obligation, including online tools and the Scouts First Helpline; and

- BSA also maintained physical and environmental barriers, including rules governing sleeping arrangements, visibility, parental involvement, and other operational safeguards designed to reduce opportunities for abuse.

17.    These measures are significant not because any single measure is perfect in isolation, but because safeguarding works through layers. Screening limits access by bad actors. Two-deep leadership reduces or eliminates opportunity. Training enables earlier recognition of concerning conduct. Reporting channels increase the likelihood of disclosure and intervention. Governance oversight promotes accountability and continuous improvement. Together, these protections create an environment that is materially safer than one in which they are absent.

18.     The Centers for Disease Control and Prevention validated this layered approach, identifying screening, training, monitoring, and reporting as best practice prevention measures for youth-serving organizations.[2]

19.     Consistent with that approach, a 2020 guide for youth-serving organizations published through the Johns Hopkins Bloomberg School of Public Health explains that extensive prevention and response efforts have contributed to substantial declines in child sexual abuse rates.[3] In the United States, for example, child sexual abuse rates declined most sharply in the 1990s, continued to decline more gradually in the 2000s, and then largely leveled off in the 2010s.[4] Consistent with that pattern, lifetime rates of child sexual abuse among adolescents ages 14–17 fell by 22% between 2009 and 2015.[5] Data in the United Kingdom reflects a similar decline over time, consistent with the historical absence of safeguarding rules in earlier periods, including supervision standards that are now widely regarded as foundational to abuse prevention.[6] While researchers continue to evaluate which specific practices are most effective, the overall pattern reflected in this literature suggests that prevention is achievable when institutions adopt sustained, multi-layered safeguarding measures.

20.     I also understand that an analysis of proof of claim submissions in the chapter 11 cases shows a pronounced and sustained decline in reported abuse-incidence rates over time—

---

[2]     *See* U.S. Dept. of Health and Human Services, Centers for Disease Control and Prevention, Preventing Child Sexual Abuse within Youth-serving Organizations: Getting Started on Policies and Procedures (2007).

[3]     *See* Moore Center for the Prevention of Child Sexual Abuse, Johns Hopkins Bloomberg School of Public Health*:* Preventing And Addressing Child Sexual Abuse In Youth Serving Organizations: A Desk Guide For Organizational Leaders (2020).

[4]     *Id.* (citing Finkelhor, D., Saito, K., & Jones, L., Updated Trends in Child Maltreatment, 2018 (Crimes Against Children Research Center, Univ. of New Hampshire 2020).

[5]     *See id*.

[6]     *See* Independent Inquiry into Child Sexual Abuse (IICSA), The Report of the Independent Inquiry into Child Sexual Abuse: Data Compendium (available at https://www.iicsa.org.uk/document/report-independent-inquiry-child-sexual-abuse-data-compendium.html).

from 6.6 incidents per 10,000 participants in 1970–1974, to 4.3 in 1985–1989, to 1.3 in 2000–2004, to 0.4 in 2010–2014, and to 0.2 in 2015–2019. The historical bell curve reflected in the claims data is consistent with broader, independent research showing peak abuse incidence in earlier decades and decline as enabling conditions, such as one-on-one adult and youth interactions, were removed.

21.     In my opinion, any projection of Future Abuse Claims must account for that transformed environment. The majority of prepetition claims arose from an era without mandatory training, background screening, two-deep leadership, or mandatory reporting.  In contrast, the period most relevant to potential Future Abuse Claimants incorporated a multi-layered prevention framework specifically designed to eliminate access, increase detection, and require reporting.  I believe that projecting Future Abuse Claims without accounting for those enhanced youth protection measures would be materially misleading.

**D.     Grooming, Offender Dynamics, and Disclosure Considerations**

22.     Based on my professional experience in child-protection investigations and institutional safeguarding, an assessment of potential undisclosed abuse arising from the modern Scouting period necessarily turns on offender dynamics rather than historical incident volume alone.

23.     Child sexual abuse in institutional settings most commonly develops through a grooming process, which involves a pattern of boundary testing, normalization, and escalation over time. That process depends on sustained access to a child, opportunities for privacy, repetition, and continuity of relationship. These conditions historically enabled the most severe and repeated forms of abuse and also created powerful psychological barriers to disclosure.

24.     Within this framework, practitioners and researchers commonly distinguish between preferential offenders, who demonstrate a sustained sexual interest in children and

8

deliberately seek circumstances that allow prolonged access, and situational offenders, whose behavior arises from opportunity or impaired judgment rather than a fixed sexual preference. This distinction is relevant not only to abuse risk but also to disclosure dynamics.

25. Preferential offenders typically rely on extended grooming processes to establish secrecy, fear, loyalty, shame, or emotional dependence. These dynamics can significantly delay disclosure, sometimes for decades, particularly when abuse occurs in environments with limited oversight or reporting expectations.

26. Situational offenders, by contrast, generally do not engage in prolonged relational manipulation. Because they have not cultivated dependency-based or fear-based control over a child, they are less able to rely on grooming-related psychological barriers to prevent or delay disclosure once concerning conduct occurs or is suspected.

27. In a safeguarding environment characterized by structured supervision, prohibitions on one-on-one contact, mandatory training on boundary violations, reporting obligations to law enforcement, and multiple reporting channels, these differences are consequential. In my experience, conduct arising from situational offending in such environments is more likely to be observed, interrupted, or disclosed within a comparatively shorter timeframe.

28. Accordingly, to the extent that there remains any residual risk of undisclosed abuse arising from the modern Scouting period, that risk would not reasonably be expected to reflect the historical patterns associated with situational opportunity combined with institutional inattention. Rather, any remaining exposure would be more logically concentrated in cases involving preferential offenders who, despite layered safeguards, sought to exploit positions of trust over time.

9

29.     Even in those circumstances, the modern safeguarding framework materially constrains the access, privacy, and duration necessary for the most severe and repeated forms of abuse and increases the likelihood of earlier detection and disclosure.

### E.    Additional Abuse Incidence and Disclosure Data

30.     I am currently reviewing BSA's records regarding post-petition abuse allegations and intend to supplement this declaration to provide a summary of those materials. Based on my review to date and my direct experience at BSA, I am aware of only a handful of allegations of adult on youth abuse claims that have occurred during the post-petition period. (Any such allegation results in immediate revocation from Scouting and referral to law enforcement.) We maintain zero tolerance for abuse, and safeguarding is an ongoing, enterprise-wide responsibility. Our multifaceted framework is comprehensive and highly effective, designed to prevent abuse before it occurs.

31.     In my experience, individuals who intend to exploit positions of trust typically begin by testing boundaries rather than engaging immediately in overt abuse. Systems that train adults, children and parents to recognize barrier violations, respond consistently, and enforce consequences are therefore essential because they interrupt grooming *before* it escalates to abuse.

32.     I also believe that recent research regarding disclosure trends is relevant to the Motion. A nationally representative Australian study found that 70.5% of those aged 16–24 who experienced child sexual abuse disclosed during their lifetime, compared with 61.9% of those aged 25–44 and 46.2% of those aged 45 and over.[7] Research published in the *Journal of Interpersonal Violence* attributed increased disclosure rates among younger cohorts to heightened societal

---

[7]    Mathews, B., Finkelhor, D., Collin-Vézina, D., Malacova, E., Thomas, H. J., Scott, J. G., Higgins, D. J., Meinck, F., Pacella, R., Erskine, H. E., Haslam, D. M., & Lawrence, D. Disclosure and non-disclosure of childhood sexual abuse in Australia: Results from a national survey. Child Abuse & Neglect, 160, 107183 (2025).

awareness, mandatory reporting legislation, and the expansion of prevention programming.[8] A meta-analysis conducted in 2021 further confirmed that school-based prevention programs produce measurable effects on children's disclosure intentions and confidence, as well as significant effects on knowledge about abuse and self-protection skills. This evidence collectively demonstrates that prevention programs—widespread in schools since the 1980s—measurably increase children's self-reported readiness to disclose abuse.[9] Accordingly, I believe that assumptions derived from older cohorts and the social conditions of earlier decades may substantially overstate the extent to which abuse in the 2005-2018 period would remain undisclosed.

33.     I believe there are additional factors that are specific to Scouting, which also bear on the likelihood and timing of disclosure of abuse. First, abuse alleged to have occurred in Scouting is unlikely to present the same family and relational dynamics that complicate disclosure in cases of intra-familial abuse. Second, BSA's bankruptcy and the claims bar date were widely publicized through substantial noticing and advertising efforts, which, in my opinion, created an unusual and significant opportunity for individuals to come forward and submit claims through a confidential process. In addition, that process reduced the public exposure and risk of re-traumatization often associated with traditional litigation, including the possibility of confronting the alleged perpetrator.

34.     For all of these reasons, it is my view that the Court's assessment of the Motion should be grounded in the actual safeguarding environment in which Future Abuse Claims would

---

[8]     McGill, L. & McElvaney, R., Adult and Adolescent Disclosures of Child Sexual Abuse: A Comparative Analysis, Journal of Interpersonal Violence (2023).

[9]     Gubbels, J., van der Put, C.E., & Assink, M. Effective Components of School-Based Prevention Programs for Child Abuse: A Meta-Analytic Review, Journal of Child Sexual Abuse. (2021).

have arisen, rather than in the historical conditions that produced the vast majority of prepetition claims.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  April 10, 2026
Irving, Texas

Respectfully submitted,

*/s/ Glen Pounder*

Glen Pounder
Executive Vice President & Chief Safeguarding
Officer, Scouting America