**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| DELAWARE BSA, LLC, | Case No. 20-10342 (LSS) |
| Reorganized Debtor.[1] | **Re: Case No. 20-10343, Docket No. 13451** |

**DECLARATION OF JAMES L. PATTON, JR. IN SUPPORT OF MOTION OF THE
FUTURE CLAIMANTS' REPRESENTATIVE FOR JUDICIAL RESOLUTION OF
<u>PAYMENT PERCENTAGE DISPUTE</u>**

I, James L. Patton, Jr., the legal representative for future claimants under the Trust Agreement (defined below) (the "<u>Future Claimants' Representative</u>" or "<u>FCR</u>"), pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. I submit this declaration in support of the *Motion of the Future Claimants' Representative for Judicial Resolution of Payment Percentage Dispute* [Docket No. 13451] (the "<u>Payment Percentage Dispute Motion</u>").[2]

2. This declaration is based upon my personal knowledge and experience in these chapter 11 cases, my review of various documents, discussions with my professional advisors, discussions with the Trustee and her advisors, and other due diligence. This declaration describes my recollection and analysis at this time based on the information currently available to me. It does not attempt to capture every detail of every topic addressed. I reserve the right to revise,

---

[1] The last four digits of the tax identification number of Reorganized Debtor Delaware BSA, LLC are 4311. The Reorganized Debtor's mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038. On March 13, 2026, the Court entered a final decree closing the chapter 11 case of Boy Scouts of America. *See* Case No. 20-10343, Docket No. 13530. Commencing on March 13, 2026, all motions, notices, and other pleadings relating to the Reorganized Debtors shall be filed and administered in the remaining chapter 11 case of Delaware BSA, LLC, Case No. 20-10342.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Payment Percentage Dispute Motion or the Plan (as defined below).

34035534.6

amend, and/or supplement my declaration as appropriate in my judgment to address other matters or to the extent additional or updated information becomes available to me.

## I.   Qualifications

3.      I have more than 30 years of experience with asbestos litigation, mass tort bankruptcies, and settlement trusts.  I am Chairman Emeritus of the law firm Young Conaway Stargatt & Taylor, LLP ("Young Conaway") and a partner in its Bankruptcy and Corporate Restructuring section.  I specialize in corporate restructurings, mass tort insolvencies and complex asbestos bankruptcies, and post-confirmation settlement trusts.

4.      Since May 8, 2006, I have served as the future claimants' representative for the Celotex Asbestos Settlement Trust.  I also served as the future claimants' representative in the bankruptcy cases of *In re Leslie Controls, Inc.*, Case No. 10-12199 (CSS) (Bankr. D. Del.), following my appointment on July 12, 2010; *In re United Gilsonite Labs*, Case No. 5:11-bk-02032 (RNO) (Bankr. M.D. Pa.), following my appointment on June 30, 2011; *In re Yarway Corp.*, Case No. 13-11025 (BLS) (Bankr. D. Del.), following my appointment on April 22, 2013; *In re Maremont Corp.*, Case No. 19-10118 (KJC) (Bankr. D. Del.), following my appointment on March 13, 2019; *In re The Fairbanks Co.*, Case No. 18-41768 (PWB) (Bankr. N.D. Ga.), following my appointment on April 17, 2019; and *In re Paddock Enterprises, LLC*, Case No. 20-10025 (LSS) (Bankr. D. Del.), following my appointment on June 18, 2020.  I continue to serve as the future claimants' representative for the asbestos personal injury settlement trusts established in connection with those cases.  On October 23, 2024, I was appointed as the successor future claimants' representative of the trust established in connection with *In re Met-Coil Systems Corporation*, Case No. 03-12676 (MFW) (Bankr. D. Del.).  In addition, I currently serve as the

34035534.6

future claimants' representative in the pending bankruptcy cases of *In re Imerys Talc America, Inc.*, Case No. 19-10289 (LSS) (Bankr. D. Del.), following my appointment on June 3, 2019.

5.  In addition, my firm and I have represented the future claimants' representatives in numerous mass tort bankruptcy cases (cases denoted with an asterisk are those in which I serve(d) as the FCR):

a.  Young Conaway represented the future claimants' representative in the following asbestos bankruptcy cases that reached confirmation: *In re Paddock Enterprises, LLC*, Case No. 20-10028 (LSS) (Bankr. D. Del.)\*; *In re The Fairbanks Co.*, Case No. 18-41768 (PWB) (Bankr. N.D. Ga. 2021)\*; *In re Maremont Corp.*, Case No. 19-10118 (KJC) (Bankr. D. Del. 2019)\*; *In re Duro Dyne Nat'l Corp.*, Case No. 18-27963 (MBK) (Bankr. D.N.J. 2018); *In re Sepco Corp.*, Case No. 16-50058 (AMK) (Bankr. N.D. Ohio 2016); *In re Kaiser Gypsum Co., Inc.*, Case No. 16-31602 (JCW) (Bankr. W.D.N.C. 2016); *In re Yarway Corp.*, Case No. 13-11025 (BLS) (Bankr. D. Del. 2013)\*; *In re Metex Mfg. Corp.*, Case No. 12-14554 (BRL) (Bankr. S.D.N.Y. 2012); *In re Rapid-Am. Corp.*, Case No. 13-10687 (SMB) (Bankr. S.D.N.Y. 2013); *In re United Gilsonite Labs*, Case No. 11-2032 (Bankr. M.D. Pa. 2011)\*; *In re Specialty Prods. Holding Corp.*, Case No. 10-11780 (JKF) (Bankr. D. Del. 2010); *In re Leslie Controls, Inc.*, Case No. 10-12199 (CSS) (Bankr. D. Del. 2010)\*; *In re Durabla Mfg. Co.*, Case No. 09-14415 (MFW) (Bankr. D. Del. 2009); *In re Porter-Hayden Co.*, Case No. 02-54152-SD (Bankr. D. Md. 2006); *In re The Flintkote Co.*, Case No. 04-11300 (JKF) (Bankr. D. Del. 2004); *In re Mid-Valley, Inc.*, Case No. 03-35592 (JKF) (Bankr. W.D. Pa. 2003); *In re ACandS Inc.*, Case No. 02-12687 (RJN) (Bankr. D. Del. 2002); *In re Kaiser Aluminum Corp.*, Case No. 02-10429 (JKF) (Bankr. D. Del. 2002); *In re N. Am. Refractories Co.*, Case No. 02-20198 (JKF) (Bankr. W.D. Pa. 2002); *In re Glob. Indus. Techs.*, Inc., Case No. 02-21626 (JKF) (Bankr. W.D. Pa. 2002); *In re Federal-Mogul Glob. Inc.*, Case No. 01-10578 (Bankr. D. Del. 2001); *In re USG Corp.*, Case No. 01-2094 (RJN) (Bankr. D. Del 2001); *In re Armstrong World Indus.*, Inc., Case No. 00-4471 (Bankr. D. Del. 2000); *In re The Babcock & Wilcox Co.*, Case No. 00-10092 (Bankr. E.D. La. 2000); *In re Owens Corning*, Case No. 00-3837 (Bankr. D. Del. 2000); *In re Pittsburgh Corning Corp.*, Case No. 00-22876 (JKF) (Bankr. W.D. Pa. 2000); and *In re The Celotex Corp.*, Case No. 90-100016-8B1 (Bankr. M.D. Fla. 1996).  In addition, Young Conaway represented the future claimants representative for claimants exposed to tetrochloroethylene in *In re Met-Coil Sys. Corp.*, Case No. 03-12676 (MFW) (Bankr. D. Del. 2003).  Young Conaway also represented the future claimants' representative for opioid victims in *In re Mallinckrodt PLC*, Case No. 20-12522 (JTD) and *In re Endo International plc*, Case No. 22-22549 (JLG), both of which reached confirmation.

34035534.6

b.  Young Conaway currently represents the future claimants' representative in the pending bankruptcy cases of *In re Presperse Corporation*, Case No. 24-18921 (MBK) (Bankr. D.N.J.); *In re Kidde-Fenwal, Inc.*, Case No. 23-10638 (LSS) (Bankr. D. Del.); *In re Barretts Minerals Inc.,* Case No. 23-90794 (MI) (Bankr. S.D. Tex.); *In re DBMP LLC*, Case No. 20-30080 (JCW) (Bankr. W.D.N.C.); *In re Imerys Talc America, Inc.*, Case No. 19-10289 (LSS) (Bankr. D. Del.)*; *In re Bestwall LLC*, Case No. 17-31795 (LTB) (Bankr. W.D.N.C. 2017).

c.  Young Conaway represents the future claimants' representative in connection with asbestos personal injury settlement trusts established from the *ACandS*, *Babcock & Wilcox*, *Celotex*, *Federal-Mogul*, *Kaiser Aluminum*, *Porter-Hayden*, *Pittsburgh Corning*, *Flintkote*, *SPHC*, *UGL*, *Durabla*, *Leslie Controls*, *APG*, *NARCO*, *Metex*, *Yarway*, *Fairbanks*, *Duro Dyne*, *Sepco*, *Rapid American*, and *Maremont* bankruptcy cases. In addition, Young Conaway represents the future claimants' representative in connection with the asbestos and silica settlement trusts established from the *Mid-Valley* (DII Industries, LLC) bankruptcy case, the future claimants' representative in connection with the asbestos settlement trust established from the bankruptcy case of *In re Quigley Co.*, Case No. 04-15739 (SMB) (Bankr. S.D.N.Y. 2004), and the future claimants representative in connection with the Met-Coil TCE Trust. Young Conaway also represents the State Insulation Corporation Asbestos Personal Injury Trust.  Finally, Young Conaway represents the future claimants' representative for opioid victims in connection with the trust established from the *Endo International plc* bankruptcy cases.

d.  Young Conaway represented the debtor in the asbestos-related chapter 11 case of *In re Fuller-Austin Insulation Co.*, Case No. 98-2038 (JJF) (Bankr. D. Del. 1998), for which a plan was confirmed in 1998.

6.  My firm and I also represented the Catholic Diocese of Wilmington in its bankruptcy case stemming from clerical sexual abuse.  The Catholic Diocese of Wilmington filed for bankruptcy on October 18, 2009, and its plan of reorganization went effective on September 26, 2011.

## II.    <u>Appointment as the Future Claimants' Representative in These Chapter 11 Cases</u>

7.  On March 18, 2020, the Debtors filed the *Debtors' Motion for Entry of an Order Appointing James L. Patton, Jr., as Legal Representative for Future Claimants, Nunc Pro Tunc to the Petition Date* [Docket No. 223].  On April 24, 2020, the Bankruptcy Court entered an order approving my appointment as the Future Claimants' Representative in these chapter 11 cases.  *See*

34035534.6

4

Docket No. 486.  In addition, following confirmation of the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (with Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* [D.I. 10296] (the "Plan"), I was designated as the future claimants' representative for the purpose of the BSA Settlement Trust (the "Trust") pursuant to Article 7.1 of the *BSA Settlement Trust Agreement* (the "Trust Agreement").

8.    In my capacity as Future Claimants' Representative, I represent the interests of "Future Abuse Claims" for the purpose of protecting the rights of such persons.  "Future Abuse Claim" is defined in the Plan as:

> any Direct Abuse Claim against any Protected Party, Limited Protected Party, or an Opt-Out Chartered Organization that is attributable to, arises from, is based upon, relates to, or results from, in whole or in part, directly, indirectly, or derivatively, alleged Abuse that occurred prior to the Petition Date but which, as of the date immediately preceding the Petition Date, was held by a Person who, as of such date, (a) had not attained the age of eighteen (18) years of age, or (b) was not aware of such Direct Abuse Claim as a result of "repressed memory," to the extent the concept of repressed memory is recognized by the highest appellate court of the state or territory where the claim arose[.]

Plan Art. I.A.134.

9.    My constituency largely consists of Persons who, as of the date immediately preceding the Petition Date, had not attained the age of eighteen.[3]  Additionally, I anticipate that some "repressed memory" claims may also be filed in the future.  Future Abuse Claims were not subject to the Bar Date (as defined in the Plan), and there currently exists no deadline by which they must be submitted.[4]

---

[3]  My professionals have estimated that the average age of first Abuse is eleven years old.

[4]  Statutes of limitation and repose apply to Abuse Claims, and Abuse Claims filed after such deadlines are not barred, but are subject to a scaling factor set forth in the Trust Distribution Procedures.

34035534.6

### III.   Forecast of Future Abuse Claims

10.     Prior to the hearing to consider confirmation of the Plan (the "Confirmation Hearing"), Ankura Consulting Group LLC ("Ankura"), acting as my claims evaluation and financial valuation consultant, prepared a preliminary forecast of compensable Future Abuse Claims that will be asserted against the Trust, which I reviewed and determined was reasonable.

11.     My counsel at Young Conaway and I subsequently retained Ankura on May 15, 2023, to further (i) analyze claims data to estimate the indemnity of pending and future sexual abuse claims; (ii) assist with evaluating trust distribution procedures and any modifications thereto as counsel deems necessary; and (iii) upon my counsel's request, perform any and all other functions as are reasonably necessary to assist my counsel in providing legal advice to me in my efforts to effectively represent the interests of the future abuse claimants.

12.     In June 2024, I, along with Ankura, participated in a videoconference with the Trustee regarding Ankura's forecast of Future Abuse Claims (the "Ankura Presentation") and shared certain materials with the Trustee following that teleconference that supported the Ankura Presentation.   The Ankura Presentation estimated that there would be approximately 11,300 compensable Future Abuse Claims asserted against the Trust.

13.     After receiving the Trustee's request to modify the Initial Payment Percentage in December of 2025, Ankura updated the Ankura Presentation to reflect actual Trust experience to date (the "Ankura Expert Report").   The Ankura Expert Report estimates that there will be approximately 11,000 compensable Future Abuse Claims, in addition to those already filed with the Trust.[5]

---

[5] Notably, actual Trust filing data aligns with the Ankura Expert Report.  As of the date the Payment Percentage Dispute Motion was filed, 123 Future Abuse Claims have already been submitted to the Trust.  This data very closely comports with the expected number of Future Abuse Claims that my professionals predicted in the Ankura Expert Report, lending credence to the Ankura Expert Report rather than the PwC Forecast (as defined below).

34035534.6

14.     In contrast, PricewaterhouseCoopers LLP ("PwC"), one of the professionals retained by the Trustee, prepared a forecast of Future Abuse Claims projecting that there would be approximately 500 Future Abuse Claims (the "PwC Forecast") submitted to the Trust, in addition to those already asserted.

15.     Ankura worked diligently to understand PwC's methodology, even experimenting by adopting PwC's method while correcting PwC's errors.  Nevertheless, the two sides remained far apart and there is a large delta between the forecast reflected in the Ankura Expert Report and the PwC Forecast.

## IV.     The Payment Percentage Dispute

16.     The Trust Agreement authorizes the Trustee, with the consent of the Settlement Trust Advisory Committee (the "STAC") and FCR, to establish an Initial Payment Percentage with respect to distributions to Allowed Abuse Claims and to adjust the Initial Payment Percentage as set forth in the Trust Agreement.  The Trustee, with the consent of the FCR and STAC, established the Initial Payment Percentage as 1.5% of the amount of Allowed Abuse Claims.  The Initial Payment Percentage did not account for any forecasts of Future Abuse Claims.  Rather, it was premised upon the notion that certain substantial insurance settlement funds held in escrow would become available once the Confirmation Order was final, after which the parties could set a new Payment Percentage, which took into consideration the forecasts of Future Abuse Claims. Therefore, I believed it was appropriate to consent to the Initial Payment Percentage so that the Trust could promptly begin processing claims and making payments to as many survivors as possible.

17.     On December 12, 2025, the Trustee requested that the STAC and FCR consent to an increase in the Initial Payment Percentage by an incremental 4.5%, resulting in an aggregate

34035534.6

Payment Percentage of 6%. I understood that the Trustee's proposed Payment Percentage increase was based upon the PwC Forecast discussed above, as well as certain other estimates made by PWC regarding the Trust's operations. I believe, however, that PwC's analysis suffers from several significant flaws. Notably, PwC makes assumptions about the data used to calibrate its model that are arbitrary and not supported by either the data or the relevant literature. The PwC Forecast also fails to account for the effects on claim values of inflation as required by the Trust Distribution Procedures. Finally, the PwC Forecast assumes that the Trust will terminate five years from now.

18.    During the five-day consent period provided under the Trust Agreement for the FCR to consider the Trustee's proposed 6% payment percentage, the Trust's professionals gave Ankura and me a presentation regarding the Trustee's analysis and rationale behind the Trust's proposed Payment Percentage increase. After consulting with Ankura, I determined that the proposed 6% payment percentage was likely too high to provide reasonable assurance that the Trust will value, and be in a financial position to pay, present Abuse Claims and Future Abuse Claims in substantially the same manner. I informed the Trustee within the five-day consent period that I was unwilling and unable to consent to the Trust's proposed increase. The Trustee declined to extend the five-day consent period, thereby triggering the informal dispute resolution procedures in the Trust Agreement.

19.    The Trustee and I, and our respective professionals, subsequently engaged in discussions regarding the proposed Payment Percentage increase, and the Trustee and I agreed to several extensions of the informal dispute resolution period, with the final extension ending on February 11, 2026. During the informal dispute resolution period, the Trustee, BSA, and I held several meetings, along with our respective professionals, to address the payment percentage issue.

34035534.6

8

I requested that the Trust, BSA, and FCR's professionals work together to understand each other's methodologies and the nature of their differences.[6]  I hoped during this process that the full exchange of information would allow the Trustee and me to find common ground regarding an appropriate increase to the Payment Percentage.  In an effort to avoid litigation and increase payments to holders of Abuse Claims, I proposed to resolve the dispute by consensually increasing the Initial Payment Percentage by 3.2% to an aggregate Payment Percentage of 4.7%, an increase that I submit is appropriate to provide reasonable assurance of substantially similar treatment to all holders of Abuse Claims.  Ultimately, despite numerous discussions between the parties, the Trustee did not modify her proposal and declared impasse.  As a result, I advised the Trustee that I could not consent to the Trustee's proposal, because it is premised on multiple flawed assumptions utilized by PwC, as described in further detail below and in the Ankura Expert Report.

20.     The Trustee subsequently proposed, and I agreed, to increase the Payment Percentage to 4.7% effective immediately while the Court decides the appropriateness of a further increase in the Payment Percentage at this time.  The Trustee slightly reduced her proposed increase to the Payment Percentage from 6% to 5.9% (the "<u>Requested Payment Percentage</u>").  This reduction is due to the Trustee implementing the claim inflation required by Article VIII.A of the Trust Distribution Procedures, which was not considered in the Trustee's initial proposal to increase the Initial Payment Percentage.

**V.     <u>Flaws in the PwC Forecast</u>**

21.     I recognize the significance of my decision to withhold consent regarding the Requested Payment Percentage, and I did not reach this decision lightly.  I believe that I acted

---

[6] For the avoidance of doubt, the only forecast of Future Abuse Claims that my professionals and I received was the PwC Forecast.

34035534.6

reasonably in withholding my consent, as the Trustee's analysis in arriving at the Requested

Payment Percentage contains numerous errors, including:

a. The PwC Forecast does not account for historical tort experience, which I believe is critical for a proper forecast of Future Abuse Claims. Instead, the PwC Forecast is based on an extrapolation of observed Trust filings. Among the problems with reliance on this limited sample is that virtually no Trust claims have been filed by minors, even though nearly 15% of tort cases initiated against the Debtors before the Petition Date were by victims within that demographic. I believe that a proper analysis must consider both the Trust data and tort data, which, together imply that additional Future Abuse Claims will be filed by claimants who were minors as of the Petition Date.

b. The PwC Forecast relies on the count of claims filed with the Trust, by first year of Abuse. A critical assumption PwC makes is that every victim who was first abused during or before 2006 came forward and submitted a claim with the Trust. However, this ignores the empirical evidence and academic consensus that there exists a significant delay from Abuse to filing for victims of Abuse. PwC fails to consider this delay in their analysis. Since the count of Trust claims filed from abuse year 2006 is incomplete, the PwC Forecast—based on these unadjusted counts—is necessarily an under-prediction of Future Abuse Claims.

c. The PwC Forecast is based on arbitrary assumptions, including, among other things, that there will be a decrease in Trust submissions of 5 percentage points per year of Abuse between 2007 and 2020. PwC offered no justification for this rationale.

d. The entire PwC Forecast is based on a single data point: claims received by the Trust for Abuse year 2006.

e. The PwC Forecast assumes that there was virtually no Abuse in the years immediately prior to the bankruptcy. I, along with my professionals, agree that BSA has made significant changes over the last decade to combat Abuse. However, Abuse continued to occur leading up to the Petition Date, and there is uncertainty regarding the size of the reduction of Abuse. There is no viable, statistical basis for PwC's assumption that abuse was almost entirely eliminated.

f. The PwC Forecast fails to adjust for inflation when valuing claim payments notwithstanding that this adjustment is required by the Trust Distribution Procedures. When corrected, the actual amount needed to pay all claimants the Requested Payment Percentage is at least $38 million higher than estimated by the Trust.

g. In determining the Requested Payment Percentage, the Trustee assumed that the Trust would cease operating in the next five years. Yet, a sizable portion of my

34035534.6

10

constituency is not subject to a statute of limitations for filing Abuse Claims. Thus, the assumption is flawed, as I believe that the Trust needs to continue well into the future to ensure that all Future Claimants have ample opportunity to receive compensation for the abuse they suffered.

h. The Trustee's analysis is supported by a five-year operating budget for the Trust. This budget does not account for expenses beyond this five-year time period. While it is often difficult to predict what the operating expenses of a trust will be more than five years into the future, predicting that there will be zero expenses is inappropriate.

i. Victims who were abused in 2006 would have been between the ages of 18 and 31 at the Bar Date. It is precisely this age range for which it is the least likely for a victim to file an Abuse Claim. Yet, this is the very age group that the PwC Forecast uses in its calibration period.

## VI.    **Withholding My Consent to the Requested Payment Percentage was Reasonable**

22.    Given the numerous flaws in the analysis and reasoning used by the Trustee and her professionals in arriving at the Requested Payment Percentage, I had no choice but to withhold consent to the Requested Payment Percentage. I believe that the Requested Payment Percentage puts all the risk of underpayment on holders of Future Abuse Claims. Indeed, if the PwC Forecast is off by even three hundred Future Abuse Claims, the Trust would not have sufficient funds to pay all Future Abuse Claims at the Requested Payment Percentage. I believe that the Requested Payment Percentage jeopardizes the amount available to pay holders of Future Abuse Claims, and risks leaving them with nothing, or a payment at a drastically lower Payment Percentage.

23.    I believe that the Requested Payment Percentage is simply too high and makes payments to holders of Future Abuse Claims merely speculative, as opposed to probable, in contravention of the "reasonable assurance" requirement applicable to the evaluation of the Requested Payment Percentage and the policies underlying the Bankruptcy Code. There is no assurance, let alone a reasonable assurance, that the Requested Payment Percentage will allow for equal treatment of all Abuse Claims considering the deficiencies discussed above. If distributions

34035534.6

were made to claimants at the Requested Payment Percentage, those payments would be impossible to recover if the Trustee's assumptions prove to be incorrect. On the other hand, I believe that a lower Payment Percentage would result in holders of Future Abuse Claims being treated the same as current Abuse Claims. Moreover, if the Trustee's analysis in determining the Requested Payment Percentage proves to be correct, all claimants could receive further distributions. I believe that any possible harm caused to current Abuse Claimants in the form of payment delay is incomparable with the possible prejudice from reduced payment amounts, or no payment at all, that holders of Future Abuse Claims could suffer if the Requested Payment Percentage were implemented.

24.     I have worked with the Trustee to find a middle ground, recognizing that the process of estimating Future Abuse Claims is imperfect and litigation is disfavored. To that end, I continue to support a Payment Percentage of 4.7%. This Payment Percentage is in the best interests of all parties at this relatively early stage as it will best position the Trust to be able to pay present and future Abuse Claims in substantially the same manner.

25.     Accordingly, I believe that I acted reasonably in withholding my consent to the Requested Payment Percentage and that it is in the best interests of the Trust and its beneficiaries to adopt a Payment Percentage of 4.7%.

34035534.6

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: April 20, 2026

*/s/ James L. Patton, Jr.*
James L. Patton, Jr.

34035534.6