**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| DELAWARE BSA, LLC,[1] | Case No. 20-10342 (LSS) |
| Reorganized Debtor. | **Re: D.I. 136** |

**SUPPLEMENTAL DECLARATION OF GLEN POUNDER
IN RESPONSE TO THE MOTION OF THE
FUTURE CLAIMANTS' REPRESENTATIVE FOR
<u>JUDICIAL RESOLUTION OF PAYMENT PERCENTAGE DISPUTE</u>**

I, Glen Pounder, pursuant to 28 U.S.C. § 1746, declare that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am the Chief Safeguarding Officer of Scouting America, formerly known as the Boy Scouts of America (together with Scouting America, "**BSA**"). In this role, I am responsible for leading all youth safeguarding activities nationwide, including policy development, training, external partnerships, legislative engagement, and direct engagement with survivor communities.

2.      I submit this Supplemental Declaration in response to the *Motion of the Future Claimants' Representative for Judicial Resolution of Payment Percentage Dispute* [D.I. 13460] (the "**Motion**"). This Declaration is based on my personal knowledge, my review of Scouting America's records and materials maintained in the ordinary course, and my professional

---

[1]     The last four digits of the tax identification number of Reorganized Debtor Delaware BSA, LLC ("**Delaware BSA**") are 4311. The Reorganized Debtor's mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038. On March 13, 2026, the Court entered a final decree closing the chapter 11 case of Boy Scouts of America. *See* Docket No. 13530 in Case No. 20-10343. Commencing on March 13, 2026, all motions, notices, and other pleadings relating to the Reorganized Debtors shall be filed and administered in the remaining chapter 11 case of Delaware BSA, LLC Case No. 20-10342.

experience in law enforcement and youth safeguarding and abuse prevention. If called as a witness, I could and would testify competently to the matters stated herein.

3. The purpose of this Supplemental Declaration is to provide the Court with a summary of the BSA's records regarding post-petition abuse allegations, as I noted my intention to do in my previous Declaration.

4. For this Supplemental Declaration, I specifically reviewed summary records from BSA's Volunteer Screening Database ("**VSD**"), which BSA maintains as part of its youth-protection screening system. Our approach encourages candid, proactive reporting of barrier violations such as prohibited one-on-one contact or violations of two-deep leadership requirements even where no abuse is alleged, reflecting a prevention system designed to intervene before concerning conduct escalates. There are no evidentiary thresholds—any suspicion of abuse or concerning conduct, regardless of whether it would be sufficient to launch a law enforcement investigation or support a conviction, results in revocation of membership.

5. At my request, on or about April 10, 2026, a report was generated from the VSD including records related to safeguarding for potential abuse as well as actual or alleged abuse from January 1, 2020 through around April 8, 2026. Specifically, I identified VSD records assigned with codes for "CSA" (Child Sexual Abuse), "CSAM" (Child Sexual Abuse Material), "YPV" (egregious violations of Scouting America's Safeguarding Youth policies or otherwise concerning behavior), and "L" (demonstrations of poor leadership, including inappropriate behavior and comments). For the CSA and CSAM entries, I further filtered them to capture those incidents which alleged a nexus to Scouting. For the CSA, CSAM, and YPV entries, I also included the "Y," or youth-perpetrated, versions. I then manually reviewed each of these entries

2

to determine whether they involved conduct that could lead to abuse, as well as actual or alleged abuse. The entries that I reviewed are attached as Ex. A.

6. At a high level, the 2020–2026 VSD data reflects safeguarding activity within a program serving roughly 400,000 registered adults and approximately one million children and youth each year. Against that scale, the number of adult-on-youth sexual abuse incidents occurring inside Scouting activities during this period is very limited, averaging only a small number of cases annually. Any instance of abuse is unacceptable; however, assessed relative to participation volume and exposure, it is analytically fair to describe sexual abuse inside Scouting programming as rare, and the data does not reflect patterns consistent with widespread or systemic abuse occurring within Scouting activities.

7. What the data most clearly shows is prevention in action. Of roughly 633 safeguarding records arising from incidents inside Scouting activities during this period, the vast majority involve preventive enforcement or early intervention—such as boundary violations, supervision failures, or access related concerns—while only about 152 involve known or alleged abuse of any kind, including approximately 43 adult-on-youth cases and 109 youth-on-youth cases. In other words, most safeguarding activity inside Scouting occurs upstream of harm, not after abuse has escalated.

8. Although the dataset lacks a standardized severity metric, a conservative review of incident narratives suggests that severe, prolonged, or concealed abuse within Scouting activities is very uncommon. When abuse does occur, it more often reflects earlier detection and a shorter duration rather than long term concealment. Youth-on-youth cases are clearly identified, typically detected through supervision or peer reporting, and addressed through separation and required reporting, indicating active identification rather than minimization.

9.      Further, because the purpose of the VSD is first and foremost to document and prevent abuse before it can escalate, at least some of the 152 "abuse related" entries I have identified may not have resulted in any abuse that would lead an individual to have a claim under BSA's bankruptcy Plan.  That is supported by the fact that, during the same period of the VSD entries I reviewed (2020–2026), only seven lawsuits were initiated against Scouting America alleging any form of abuse.

10.     Taken together, the numbers reflect a safeguarding system that is intentionally active and iterative, with frequent intervention at lower thresholds of concern, continuous reinforcement of barriers, and a prevention model that limits access, interrupts risk early and materially reduces both the likelihood and severity of harm, rather than relying on after the fact disclosure.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.


Dated:  April 17, 2026                    Respectfully submitted,
Wilmington, Delaware

                                          */s/ Glen Pounder*
                                          _____
                                          Glen Pounder
                                          Executive Vice President & Chief Safeguarding
                                          Officer, Scouting America