# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>DELAWARE BSA, LLC,[1]<br><br>Reorganized Debtor. | Chapter 11<br><br>Case No. 20-10342 (LSS) |

**STATEMENT OF THE REORGANIZED DEBTORS IN RESPONSE
TO THE MOTION OF THE FUTURE CLAIMANTS' REPRESENTATIVE
FOR JUDICIAL RESOLUTION OF PAYMENT PERCENTAGE DISPUTE**

Scouting America, formerly known as Boy Scouts of America, (together with Delaware BSA, LLC, "**Scouting America**" or the "**Reorganized Debtors**") in the above-captioned chapter 11 cases, by and through their undersigned counsel, hereby submit this statement in response to the *Motion of the Future Claimants' Representative for Judicial Resolution of Payment Percentage Dispute* [D.I. 13451][2] (the "**Motion**").[3]

**STATEMENT**

1.      While the Reorganized Debtors are not parties to the dispute currently before the Court regarding the appropriate Payment Percentage under the BSA Settlement Trust (the "**Trust**"), the Reorganized Debtors submit this statement because they have a direct and

---

[1]    The last four digits of the tax identification number of Reorganized Debtor Delaware BSA, LLC ("**Delaware BSA**") are 4311. The Reorganized Debtor's mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038. On March 13, 2026, the Court entered a final decree closing the chapter 11 case of Boy Scouts of America. *See* Docket No. 13530 in Case No. 20-10343.  Commencing on March 13, 2026, all motions, notices, and other pleadings relating to the Reorganized Debtors shall be filed and administered in the remaining chapter 11 case of Delaware BSA, LLC Case No. 20-10342.

[2]    The Future Claimants' Representative filed a redacted version of the Motion at D.I. 13460.

[3]    Capitalized terms that are used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* [D.I. 10296] (as such may be amended or modified from time to time, the "**Plan**"), as applicable.

meaningful interest in ensuring the Court has an accurate, complete, and contextually grounded factual record regarding two matters that bear directly on the dispute: (1) Scouting America's past and current Youth Protection efforts; and (2) Scouting America's six years of post-petition and post-emergence abuse-related reporting experience. These matters are highly relevant to the key factual question driving the Payment Percentage dispute— the projected volume of Future Abuse Claims— and Scouting America is uniquely positioned to provide the Court with firsthand institutional knowledge on these subjects. Indeed, the Reorganized Debtors are the only parties in interest that can provide information regarding post-petition and post-emergence incidence reporting.

2.      To that end, the Reorganized Debtors have submitted two declarations from Glen Pounder, the Executive Vice President and Chief Safeguarding Officer of Scouting America, who is responsible for leading all youth safeguarding activities nationwide, including policy development, training, external partnerships, legislative engagement, and direct engagement with survivor communities. *See* D.I. 166 (the "**Pounder Declaration**"); D.I. 196 (the **"Supplemental Pounder Declaration**"). The Reorganized Debtors look forward to presenting Mr. Pounder to the Court and to answering any questions the Court may have regarding these matters.

3.      For the reasons that follow, the Reorganized Debtors respectfully request that the Court decline to adopt any Future Abuse Claims projection that relies on historical abuse incidence or historical reporting-lag assumptions without accounting for the materially different safeguarding environment in which potential Future Abuse Claims would have arisen, the bankruptcy process relevant to disclosure and claim filing, and the six years of probative post-petition and post-emergence reporting data now available.

**I.** **The Confirmation Record Addressed the Youth Protection Program and the Declining Trajectory of Abuse in Scouting**

4. This Court is not approaching these issues for the first time. Scouting America's youth protection history and safeguarding framework were addressed extensively during confirmation. At confirmation, the Court heard evidence on the two issues most relevant to the projection of Future Abuse Claims: the evolution of Scouting America's youth protection framework and the corresponding decline in reported abuse incidence over time. That record included expert testimony, historical claims data, evidence of structural safeguards implemented before the Petition Date, and prospective Plan enhancements developed with significant input from survivor constituencies, including appointing of a Youth Protection Executive and a Youth Protection Committee with survivor representation. In confirming the Plan, the Court found that Scouting America's existing youth protection program, together with the enhancements adopted in connection with the Plan, "meet or exceed industry standards" and acknowledged Scouting America's stated goal of becoming the gold standard in abuse prevention. *In re Boy Scouts of Am.*, 642 B.R. 504, 549 (Bankr. D. Del. 2022).

5. Specifically, the Court heard expert testimony from Aaron Lundberg, a Praesidium executive with more than twenty years of experience in risk management and sexual abuse prevention work with hundreds of organizations. Mr. Lundberg's unrebutted expert testimony demonstrated that Scouting's youth protection program met or exceeded industry standards in four areas: screening and selection of adult volunteers; training of staff; policies governing higher-risk activities; and reporting and responding to concerning behavior, suspected abuse, and abuse allegations.[4]

---

[4] *See* D.I. 9497 (Conf. Day 10) Hr'g Tr. at 77:20–78:10, 81:1–19, 82:5–23, 88:3–25, 89:3–90:3 (Lundberg testimony); *see also* D.I. 9616 (Conf. Day 17) Hr'g Tr. at 10:5–11:9; *In re Boy Scouts of Am*. 642 B.R. at 549.

6.      Mr. Lundberg concluded that Scouting's youth protection program, including its barriers to abuse, was comprehensive and well developed and that Scouting had undertaken substantial work to continue developing and improving its youth protection framework.[5] In reaching those conclusions, Mr. Lundberg met with national Scouting representatives at multiple levels, including volunteer leadership, management, and employees responsible for implementing and administering the youth protection program; met with local council representatives and the survivor working group; and reviewed Scouting's youth protection policies, incident reports, and third-party materials.[6]

7.      Moreover, Bruce Griggs, Scouting America's prepetition national coordinating counsel, testified that youth protection standards in earlier decades differed fundamentally from those applicable today.[7] Dr. Charles Bates of Bates White LLC placed claims data in historical context, explaining a significant decline in reported abuse claims beginning as early as the 1980s, after Scouting began implementing improved youth protection measures, including expanded training, educational resources, and volunteer screening and tracking capabilities.[8] Consistent with that downward trend, Dr. Bates also testified at confirmation that his regression analysis projected approximately 400 future claims.[9]

---

[5]   *See* D.I. 9497 (Conf. Day 10) Hr'g Tr. at 86:1–88:25 (Lundberg testimony); *see also* D.I. 9616 (Conf. Day 17).

[6]   *See* D.I. 9497 (Conf. Day 10) Hr'g Tr. at 82:5–83:25 (Lundberg testimony); *see also* D.I. 9616 (Conf. Day 17) Hr'g Tr. at 11:6–14.

[7]   *See* D.I. 9354 (Conf. Day 2) Hr'g Tr. at 116:11–25 (Griggs testimony).

[8]   *See* D.I. 9454 (Conf. Day 6) Hr'g Tr. at 196:12–197:22 (Bates testimony); *see also* D.I. 9616 (Conf. Day 17) Hr'g Tr. at 11:15–12:3.

[9]   *See In re Boy Scouts of Am.* 642 B.R. at 556, n. 246 ("To determine the impact of future abuse claimants (a plus factor) on his Benchmark Valuation, Dr. Bates performed a regression analysis and estimated that 400 future claims would be asserted. Day 6 Hr'g Tr. 198:20-25-199:1-19. He testified this followed the downward trend in the trajectory of claims since the 1960s. Certain objectors sought to seize on Mr. Patton's testimony that the FCR believes there are 11,000 future claimants. I give no evidentiary weight to that testimony. Mr. Patton was not offered for this purpose, he is not an expert, and there was no support offered for this position.").

8.      The Reorganized Debtors further illustrated this trend through a demonstrative reproduced below[10] comparing abuse proof-of-claim counts by year of first abuse from 1970 through 2019 against average annual participation during the same period.  The unrefuted evidence presented at confirmation established that reported abuse declined in absolute terms and relative to participation after Scouting began implementing and expanding youth-protection measures in the 1980s.

### BSA Abuse Proof Of Claims: 1970-2019

| Year of First Abuse | Average Count of POC Reported Abuse Incidence Per Year | Average Annual Participation | Abuse Incidence Rate Per 10,000 Participants | |
|---|---|---|---|---|
| 1970-1974 | 2,822 | 4,284,186 | 6.6 | |
| 1975-1979 | 2,227 | 3,092,400 | 7.2 | |
| 1980-1984 | 1,681 | 2,755,823 | 6.1 | Increased YP Measures |
| 1985-1989 | 1,298 | 2,989,841 | 4.3 | |
| 1990-1994 | 986 | 3,022,346 | 3.3 | |
| 1995-1999 | 690 | 3,058,123 | 2.3 | |
| 2000-2004 | 371 | 2,922,168 | 1.3 | |
| 2005-2009 | 182 | 2,532,200 | 0.7 | |
| 2010-2014 | 84 | 2,315,425 | 0.4 | |
| 2015-2019 | 36 | 2,086,565 | 0.2 | Decreased Claims and Rates |

JTX 4036.

More recent Trust data reflect the same trajectory: potentially compensable Scouting-related claims have declined materially over time, both in number and relative to participation.[11]

## II.      The Safeguarding Context Relevant to Future Abuse Claimants

### A.      Glen Pounder's Background

9.      Before joining Scouting America, Mr. Pounder spent thirty-one years in law enforcement, with much of that career and his subsequent work in the nonprofit sector focused

---

[10]   D.I. 9616 (Conf. Day 17) Hr'g Tr. at 12:7-18; 13:1-11 (Closing Argument) (citing JTX 4036).

[11]   *See Declaration of the Honorable Barbara J. Houser (Ret.) in Support of Her Opposition to the Motion of the Future Claimants' Representative for Judicial Resolution of Payment Percentage Dispute* [D.I. 327-1] ¶ 19; *Declaration of Carrie Vos* [D.I. 328-1] at ¶¶ 13–14.

exclusively on child protection— both pursuing criminal pedophiles at scale and helping government entities and other institutions develop systemic approaches to preventing child exploitation. *See* Pounder Decl. ¶ 5.

10. Mr. Pounder served for over twenty-five years with the United Kingdom's National Crime Agency and HM Revenue & Customs, including tenures as International Liaison Officer for Portugal, North America, the Northern Caribbean, Switzerland, and Liechtenstein, coordinating with international law-enforcement agencies on investigations involving child sexual exploitation and abuse. *See* Pounder Decl. ¶ 6.

11. He thereafter served as Chief Operating Officer of the Child Rescue Coalition, a nonprofit organization that develops and deploys technology to identify and apprehend child predators online, and in that role co-authored a peer-reviewed article published in Child Maltreatment: Journal of the American Professional Society on the Abuse of Children, concerning characteristics of child sexual abuse material in peer-to-peer networks and predictors of severity. *See* Pounder Decl. ¶ 7.

12. In 2022, Mr. Pounder co-founded Raven, a nonprofit advocacy organization focused on ending child exploitation in the United States, and currently serves as a founding Board Member, advocating for federal and state legislative solutions to address the persistent underfunding of child exploitation investigations. *See* Pounder Decl. ¶ 8.

13. In 2017, Mr. Pounder received the Investigator of the Year Award from the Child Rescue Coalition in recognition of his work combating child sexual exploitation worldwide, and in May 2023 received the Visionary Child Protection Practitioner Award from the Policing Institute for the Eastern Region at Anglia Ruskin University in recognition of his contribution to the global fight against child sexual abuse. *See* Pounder Decl. ¶ 9.

14. In April 2023, Mr. Pounder joined Scouting America as Youth Protection Executive and subsequently assumed the role of Executive Vice President and Chief Safeguarding Officer, with responsibilities spanning policy development and enforcement, mandatory training, overseeing the Youth Protection Committee, supporting the Safeguarding Youth Committee of Scouting America's National Executive Board, managing external partnerships with child safety and prevention organizations, engaging with state and federal legislators on youth protection legislation, and engaging with survivors. *See* Pounder Decl. ¶ 10.

15. Mr. Pounder is the only expert whose testimony related to this dispute is being proffered on youth protection. His declarations reflect both a lifetime of expertise in child protection and an unparalleled understanding of Scouting America's institutional safeguarding framework. His testimony is offered not to advocate for any particular Payment Percentage outcome, but to ensure that the Court's assessment of the likely volume and severity of Future Abuse Claims is informed by accurate, first-hand institutional knowledge.

**B.    Scouting America's Safeguarding Environment and the Decline of Abuse**

16. As described below, potential Future Abuse Claimants, the majority of whom would have participated in Scouting between 2006 and 2020,[12] would have experienced a materially different safeguarding environment in Scouting compared to earlier historical Abuse Claimants. *See* Pounder Decl. ¶ 15–17. Any projection of Future Abuse Claims should account for the changed conditions rather than treating earlier historical claims as a direct proxy.

---

[12]    *See Declaration of the Honorable Barbara J. Houser (Ret.) in Support of Her Opposition to the Motion of the Future Claimants' Representative for Judicial Resolution of Payment Percentage Dispute* [D.I. 327-1] ¶ 19; *Declaration of Carrie Vos* [D.I. 328-1] at ¶¶ 12.

17.    Before 1985, Scouting operated without many of the safeguards that are now standard in youth-serving organizations.  There was no uniform system of mandatory youth protection training, no comprehensive criminal-background-check program, and no uniform Scouting policy requiring reports to law enforcement.  *See* Pounder Decl. ¶¶ 13–15.  Most significantly, Scouting did not yet have a universal prohibition on one-on-one adult-youth interactions.  Those conditions allowed for the potential of private, repeated, and unsupervised access to children— the conditions that Mr. Pounder identifies as enabling grooming and severe institutional abuse.  *See* Pounder Decl. ¶ 13.

18.    By the period most relevant to potential Future Abuse Claimants, those structural conditions had changed.[13]  By 1990, Scouting America had prohibited one-on-one adult-youth interaction, a measure Mr. Pounder describes as among the most consequential in Scouting's safeguarding history because it disrupted the grooming pathway through which severe and repeated abuse occurs.  *See* Pounder Decl. ¶ 14.  By the 2000s, Scouting America had implemented a multi-layered safeguarding model that included volunteer screening, background checks, recurring Youth Protection Training, mandatory reporting, anonymous and online reporting mechanisms, youth and parent education, and expert oversight.  *See* Pounder Decl. ¶¶ 15–17.  These measures were designed to limit access, reduce opportunity, improve detection, facilitate intervention, and promote accountability.  *See* Pounder Decl. ¶ 17.  The point is not that safeguards eliminate all risk, but that a forecast premised on historical abuse and reporting patterns should

---

[13]    Mr. Pounder refers to 2005–2018 as the approximate period during which the vast majority of potential Future Abuse Claimants would have primarily participated in Scouting.  *See* Pounder Decl. ¶ 4.  That period follows from the definition of Future Abuse Claims as claims held by individuals who were under eighteen as of the February 18, 2020 Petition Date, together with the fact that youth participants generally age out of Scouting by ages 17-18.

adjust for the materially different conditions under which potential Future Abuse Claims would have arisen.[14]

19.     As Mr. Pounder explains, the decline in reported abuse incidence is not unique to Scouting America.  The bell-shaped incidence curve reflected in Scouting is consistent with abuse data from other youth-serving organizations and institutional settings: incidence rises under conditions permitting repeated, unsupervised adult access to children, peaks, and then declines as structural barriers, awareness, reporting obligations, and prevention measures are adopted.  *See* Pounder Decl. ¶ 12.  That pattern is also consistent with Mr. Pounder's explanation of broader child-protection principles recognizing the role of layered prevention measures— including screening, training, monitoring, and reporting—in reducing risk in youth-serving organizations. This context bears on whether historical abuse patterns formed under materially different safeguarding conditions are a reliable proxy for Future Abuse Claims.  *See* Pounder Decl. ¶¶ 12, 18–21.

### C.     Factors Affecting the Reporting-Lag Analysis

20.     The FCR's forecast also applies historical reporting-lag assumptions to potential Future Abuse Claimants, even though that cohort differs in important respects from the historical Abuse Claimant population.  The Reorganized Debtors do not dispute that many survivors of child sexual abuse have historically delayed disclosure, or that disclosure is complex and individualized.

---

[14]     The FCR's proffered expert relies on a narrow set of prepetition tort complaints to challenge the effectiveness of Scouting America's safeguarding measures.  That methodology is fundamentally flawed.  In the first instance, projecting 11,000 Future Abuse Cases from a sampling of less than 50 filings over a range of 20 years and an even wider range of alleged abuse dates is not only unscientific, it defies logic.  Moreover, tort complaints contain untested allegations, not findings of fact or empirical data.  The analysis ignores how those cases were resolved, whether through a judgment, dismissal, or settlement, and instead treats the mere filing of a complaint as evidence that a safeguard failed.  Allegations of abuse are consistent with the practical reality that no safeguarding program eliminates all risk.  Such allegations do not establish whether any particular safeguard failed or how the rate of abuse changed as those measures were implemented.

*See* Pounder Decl. ¶¶ 22–23.  Critically, however, the modern Scouting program changed several conditions historically associated with delayed disclosure, including sustained private access, grooming, secrecy, and continuing unsupervised adult-youth relationships.  *See* Pounder Decl. ¶¶ 13–17, 21.  The Reorganized Debtors respectfully submit that any model using historical lag patterns should be appropriately adjusted to account for those changed conditions when forecasting Future Abuse Claims.  The model on which the FCR's forecast relies fails to reflect any such adjustment.

21.    The bankruptcy notice and claims bar date process further distinguish the relevant cohorts for purposes of any reporting-lag analysis.  The Reorganized Debtors' bar date notice program was designed to reach approximately 95.9% of men age fifty and older in the United States an average of 6.5 times—the cohort most likely to hold historically delayed claims.[15]  The bar date order and noticing program afforded survivors a formal mechanism to file claims and advised that untimely claims could be barred.[16]  This process addressed several barriers that historically delay abuse reporting, including that claim submissions would be confidential.  *See* Pounder Decl. ¶ 25.[17]  Those circumstances should also be accounted for in any forecast that relies on historical reporting-lag assumptions. In addition, the Court is well aware of the avalanche of advertising that ran parallel to the notice program.[18]

---

[15]    *See In re Boy Scouts of Am.* 642 B.R. at 536, 600.

[16]    *See id.*

[17]    *See id*. (highlighting factors contributing to increased claims filings, including "lower barriers to entry in bankruptcy (regardless of advertising), a more welcoming environment for the assertion of Abuse claims (*i.e.* less stigmatization of Abuse victims; the 'me too' movement), opening of statute of limitations windows, solace in numbers (*i.e.* the knowledge that you are not the only Abuse victim) and the Bar Date itself (which both invited Abuse survivors to file claims and established a deadline by which claims had to be filed or be potentially barred forever.")).

[18]    *See In re Boy Scouts of Am.*, 642 B.R. 504,642 B.R. at 533–34 ("The plaintiffs' bar also played an active (some have argued aggressive) role in targeting potential claimants by instituting a massive advertising campaign of its own."); *See also Supplemental Order to Order, Pursuant to 11 U.S.C. § 502(b)(9), Bankruptcy Rules 2002 and 3003(c)(3), and Local Rules 2002-1€, 3001-1, and 3003-1, (I) Establishing Deadlines for Filing Proofs of Claim,*

### III.    Scouting America's Postpetition and Post-Emergence Records Confirm an Active, Preventive Safeguarding System

22.    At the FCR's request, Scouting America reviewed and produced postpetition and post-emergence records from its Volunteer Screening Database relating to potential abuse, actual or alleged abuse, and serious safeguarding concerns from January 1, 2020 through approximately April 8, 2026.[19]    The Volunteer Screening Database (the "**VSD**"), which Scouting America maintains as part of its youth-protection screening system, encourages candid, proactive reporting of barrier violations— such as prohibited one-on-one contact or violations of two-deep leadership requirements— even where no abuse is alleged.  *See* Suppl. Pounder Decl. ¶ 4.  The system is designed to intervene before concerning conduct escalates.  *See id*.  Moreover, there are no evidentiary thresholds: any suspicion of abuse or concerning behavior, regardless of whether it would be sufficient to launch a law enforcement investigation or support a conviction, results in revocation of membership.  *See id*.

23.    The postpetition VSD records do not show a pattern of widespread or systemic adult-on-youth sexual abuse within Scouting activities.  In a program serving more than 400,000 registered adults and approximately one million youth each year, the number of adult-on-youth abuse incidents occurring in connection with Scouting was "very limited," averaging only a small number of cases annually.  *See* Suppl. Pounder Decl. ¶ 6.  The VSD data for the 2020-2026 period showed approximately 633 safeguarding records arising from incidents inside Scouting activities,

---

*(II) Establishing the Form and Manner of Notice Thereof, (III) Approving Procedures for providing Notice of Bar Date and Other Important Information to Abuse Survivors, and (IV) Approving Confidentiality Procedures for Abuse Survivors (D.I. 695)* [D.I. 1331] (addressing advertising by plaintiffs' law firms specifically directed to potential Abuse Claimants).

[19]    *See Requests for the Production of Documents Directed to the Reorganized Debtors* [D.I. 13518].

11

of which approximately 152 reflect alleged adult-on-youth or youth-on-youth abusive conduct. *See* Suppl. Pounder Decl. ¶ 7.

24.    The 633-record count reflects the output of an intentionally low-threshold prevention database designed to capture and respond to an array of safeguarding concerns before harm occurs. *See* Suppl. Pounder Decl. ¶ 7. These records include 481 entries coded as leadership concerns, adult youth-protection violations, and youth-perpetrated youth-protection violations. They capture conduct such as prohibited one-on-one adult-youth contact, two-deep-leadership violations, supervision or tenting concerns, boundary violations, grooming-type communications, inappropriate texts or social-media contact with youth, inappropriate comments or photographs, bullying, physical discipline, unsafe or unsuitable leadership behavior, and other access-related concerns. *See* Suppl. Pounder Decl. ¶¶ 4, 7; Suppl. Pounder Decl. Ex. A. These entries are significant because they demonstrate Scouting America's safeguards operating as intended—identifying barrier violations and interrupting inappropriate conduct before it escalates into abuse. Allegations of such violations lead to removal from Scouting. *See* Pounder Decl. ¶ 30.

25.    The remaining approximately 152 entries are an overinclusive abuse-related subset, not a specific count of allowed claims, confirmed abuse incidents, or compensable Future Abuse Claims. *See* Suppl. Pounder Decl. ¶ 7. Most of the entries involve youth-on-youth conduct rather than adult institutional abuse, and the subset also includes potential abuse, suspicion-based reports, or incomplete or no-detail entries. *See* Suppl. Pounder Decl. ¶¶ 4, 9. Mr. Pounder explains that at least some of those entries "may not have resulted in any abuse that would lead an individual to have a claim under BSA's bankruptcy Plan." *See* Suppl. Pounder Decl. ¶ 9.[20]

---

[20] ████████████████████████████████████████████████

26.     Actual litigation activity during the same period confirms that Scouting's safeguarding function is working.  During the 2020-2026 period covered by the VSD review, only seven lawsuits were filed against Scouting America alleging some form of abuse.  *See* Suppl. Pounder Decl. ¶ 9.

27.     To be clear, even one instance of abuse is unacceptable, and—as this Court recognized at confirmation and as Mr. Pounder emphasized in his testimony—"enough is never enough" when it comes to youth protection.[21]  Nevertheless, any forecast of Future Abuse Claims should account for the most recent six years of post-petition and post-emergence VSD records and the materially different safeguarding environment in which those claims would have arisen, rather than assuming that historical abuse and reporting patterns continue to apply unchanged.

### CONCLUSION

WHEREFORE, the Reorganized Debtors respectfully request that the Court decline to adopt any Future Abuse Claims projection that relies on historical abuse incidence or historical reporting-lag assumptions without accounting for the materially different safeguarding environment in which potential Future Abuse Claims would have arisen, the bankruptcy process relevant to disclosure and claim filing, and the six years of highly probative post-petition and post-emergence reporting data now available.

---

[21]     *In re Boy Scouts of Am.* 642 B.R. at 549.

Dated:  June 2, 2026
 Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Sophie Rogers Churchill*

Derek C. Abbott (No. 3376)
Andrew R. Remming (No. 5120)
Sophie Rogers Churchill (No. 6905)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:  (302) 658-9200
Email: dabbott@morrisnichols.com
      aremming@morrisnichols.com
      srchurchill@morrisnichols.com

*– and –*

**WHITE & CASE LLP**
Michael C. Andolina (admitted *pro hac vice*)
Matthew E. Linder (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice)*
300 N. LaSalle Drive
Chicago, Illinois 60654
Telephone:  (312) 881-5400
Email: mandolina@whitecase.com
      mlinder@whitecase.com
      laura.baccash@whitecase.com

*Attorneys for the Reorganized Debtors*