**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| DELAWARE BSA, LLC, | Case No. 20-10342 (LSS) |
| Debtor.[1] | **Related D.I. Nos.: 13451/13460[2]** |

**OPPOSITION OF THE HONORABLE BARBARA J. HOUSER (RET.), IN HER
CAPACITY AS TRUSTEE OF THE BSA SETTLEMENT TRUST, TO THE MOTION
OF THE FUTURE CLAIMANTS' REPRESENTATIVE FOR JUDICIAL RESOLUTION
OF PAYMENT PERCENTAGE DISPUTE**

The Honorable Barbara J. Houser (Ret.) (the "Trustee"), in her capacity as trustee of the

BSA Settlement Trust (the "Trust"), hereby submits this opposition to the Motion of the Future

Claimants' Representative for Judicial Resolution of Payment Percentage Dispute (the "Motion"),

and respectfully states and alleges as follows:

**<u>INTRODUCTION</u>**

Under the terms of the Trust Agreement, the Trustee is given the power to establish a

Payment Percentage, which establishes the size of distributions to holders of Allowed Abuse

Claims.  The Trustee's decision to establish a Payment Percentage is subject to the consent of the

Settlement Trust Advisory Committee ("STAC") and the FCR, but consent cannot be unreasonably

withheld.

---

[1] The last four digits of the tax identification number of Reorganized Debtor Delaware BSA, LLC ("Delaware BSA") are 4311.  The Reorganized Debtor's mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038.  On March 13, 2026, the Court entered a final decree closing the chapter 11 case of Boy Scouts of America.  *See* Dkt. No. 13530 in Case No. 20-10343.  Commencing on March 13, 2026, all motions, notices, and other pleadings relating to the Reorganized Debtors shall be filed and administered in the remaining chapter 11 case of Delaware BSA, LLC Case No. 20-10342.

[2] The Future Claimants' Representative ("FCR") filed this Motion on the docket of the Chapter 11 Case captioned *In re Boy Scouts of America*, Case No. 20-10343 before it was closed on March 13, 2026.  Accordingly, the docket numbers above relate to pleadings on the 20-10343 docket.

The present Motion stems from the Trustee's proposal to increase the Payment Percentage for distributions to holders of Allowed Abuse Claims from 1.5% (which was previously approved by the STAC and FCR) to 5.7%.  While the STAC has consented to this increase, the FCR will not consent to an increase beyond 4.7%.  Accordingly, pursuant to the terms of the Trust Agreement, the FCR filed the Motion.

The Trustee opposes the Motion on two general grounds.  First, the FCR has not carried his burden to show that he reasonably withheld consent to the Trustee's proposed increase.  While the FCR cites eight alleged errors with the Trustee's proposal, an examination of each of these demonstrates that they are without merit and certainly do not provide a reasonable basis for the FCR to withhold consent.  Second, even if the FCR reasonably withheld consent, the Court must determine which of the two proposals regarding the Payment Percentage is in the best interests of the Trust and its Beneficiaries.  As shown below, the Trustee's proposed increase is in the best interests of the Trust and its Beneficiaries as it maximizes distributions to current holders of Allowed Abuse Claims while preserving an adequate reserve for Future Abuse Claims.  The Trustee's proposal also ensures that the Trust's tax liability is minimized, which is beneficial to all Claimants.  In contrast, the FCR's proposal is based on speculation (both in terms of the number of Future Abuse Claims and when they will file their Claims) and minimizes recovery for current holders of Allowed Claims in order to preserve funds on the chance the FCR's predicted amount of Future Abuse Claims file Claims at some unspecified point in the future (with the overwhelming majority forecasted to be submitted after 2040) and those claims become Allowed Claims.

## FACTUAL BACKGROUND

### I.      The Boy Scouts of America Bankruptcy Cases

The Debtors commenced these cases on February 18, 2020.  Voluntary Petition [D.I. 1]. The chapter 11 cases were jointly administered for procedural purposes pursuant to Rule 1015(b)

of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 1015-1. Order (1) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief [D.I. 3].

On September 8, 2022, the United States Bankruptcy Court for the District of Delaware (the "Court") entered the Supplemental *Findings of Fact and Conclusions of Law and Order Confirming the Third Modified Fifth Amended Chapter 11 Plan of Reorganization (with Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* [D.I. 10316] (the "Initial Confirmation Order") confirming the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (with Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* [D.I. 10296] (the "Plan"). *See* Initial Confirmation Order. On March 28, 2023, the United States District Court for the District of Delaware entered the Order [D.I. 11057] affirming the Initial Confirmation Order. The Effective Date of the Plan occurred on April 19, 2023. Notice of Entry of Confirmation Order and Occurrence of Effective Date of Third Modified Fifth Amended Chapter 11 Plan of Reorganization (with Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC, Case No. 20-10343 [D.I. 11119].

On July 21, 2025, this Court entered an agreed order modifying the Initial Confirmation Order in the manner directed by the United States Court of Appeals for the Third Circuit (the "Third Circuit"). *See* Order, Pursuant to May 13, 2025 Decision of the United States Court of Appeals for the Third Circuit, Modifying Supplemental Findings of Fact and Conclusions of Law and Order Confirming the Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC, Case No. 20-10243 [D.I. 12966] (together with the Initial Confirmation Order, the "Confirmation Order").

On October 13, 2025, a group of claimants filed a Petition for Writ of Certiorari with the United States Supreme Court requesting that the Supreme Court review the decision of the Third Circuit in connection with their appeal of the Confirmation Order.  Petition for Writ of Certiorari, *Lujan Claimants v. Boy Scouts of Am.*, No. 25-490 (Oct. 13, 2025).  The Supreme Court denied the Petition for Writ of Certiorari on January 12, 2026, and the time to seek rehearing has expired. Accordingly, the Confirmation Order became final on February 7, 2026.

## II.      The Trustee's Powers and Obligations Under the Trust Agreement

The Trust was established pursuant to the Confirmation Order and the Plan and is governed by the *BSA Settlement Trust Agreement* (the "Trust Agreement").

Under Section 1.2 of the Trust Agreement, the purposes of the Trust are to (i) assume all liability for the Channeled Claims[3]; (ii) administer the Channeled Claims; and (iii) make distributions to holders of compensable Abuse Claims, in each case in accordance with the Trust Distributions Procedures for Abuse Claims (the "TDP").  *See* Trust Agreement § 1.2.  In connection therewith, the Trust holds, manages, protects and monetizes the Trust Assets in accordance with the terms of the Trust Documents for the benefit of the Beneficiaries.  *Id.*

Section 2.1 of the Trust Agreement provides that the Trustee (i) is and shall act as a fiduciary in accordance with the provisions of the Trust Agreement, (ii) shall administer the Trust, the Trust Assets, and any other amounts to be received under the terms of the Trust Documents in accordance with the purposes set forth in Section 1.2 and in the manner prescribed by the Trust Documents, and (iii) subject to the limitations set forth in the Trust Documents, shall have the power to take any and all actions as necessary or advisable to fulfill the purposes of the Trust.  *Id.* § 2.1.

---

[3] Capitalized Terms not otherwise defined herein have their meanings set forth in the Plan and Trust Documents.

4

Section 2.1(d)(iii) of the Trust Agreement states that the Trustee shall have the power to establish an initial payment percentage (the "Initial Payment Percentage") with respect to Allowed Abuse Claims and adjust the Initial Payment Percentage and any subsequent Payment Percentage as set forth in Section 4.2. *Id*. §§ 2.1(d)(iii); 4.2.

Section 4.2 of the Trust Agreement states that the Trustee shall determine from time to time the percentage of value that holders of present and future Allowed Abuse Claims are likely to receive from the Trust Assets available for distribution on account of compensable Allowed Abuse Claims. *Id*. § 4.2.

Section 4.2(d) provides that the Trustee shall base the determination of any Payment Percentage on current estimates of the number, types, and values of present and future Allowed Abuse Claims, the current Trust Assets, all anticipated Trust Operating Expenses, and any other material matters that are reasonably likely to affect the sufficiency of Trust Assets available to pay the present and future holders of Allowed Abuse Claims. *Id*. § 4.2 (d).

Section 7.7 of the Trust Agreement sets forth procedures for obtaining the consent of the FCR pursuant to the Trust Documents. *Id*. § 7.7. Specifically, in the event the Trustee is required to obtain the consent of the FCR, the Trustee shall provide the FCR with written notice describing in detail the nature and scope of the action the Trustee proposes to take, among other things. *Id*. § 7.7(b)(i). The FCR must advise the Trustee of his consent or objection to the proposed action within five business days of receiving the request for consent from the Trustee, unless the Trustee extends the time for such response. *Id*. § 7.7(b)(ii).

The FCR may not withhold his consent unreasonably. *Id.*; *see also id.* § 8.16(d). If the FCR decides to withhold consent, he must explain in detail his objections to the proposed actions. *Id.* § 7.7(b)(ii). If, after following the foregoing procedures, the FCR continues to object to the

proposed action and withhold his consent, the FCR and Trustee shall resolve their dispute pursuant to section 8.16 of the Trust Agreement. *Id*. § 7.7(b)(iii).

Section 8.16 of the Trust Agreement provides that any dispute under the Trust Agreement shall first be the subject of informal negotiations, which shall not exceed fifteen days from the date a notice of dispute is received by the counterparty unless such period is modified by written agreement. *Id*. § 8.16 (b). If the disputing party and the counterparty cannot resolve the dispute by informal negotiations, then the disputing party may invoke the formal dispute resolution procedures set forth in section 8.16 of the Trust Agreement. *Id*. Specifically, a disputing party may seek judicial review of the dispute by filing with the Court a motion requesting judicial resolution of the dispute. *Id*. § 8.16 (d). Any such motion "shall contain a written statement of the disputing party's position on the matter in dispute, including any supporting factual data, analysis, opinion, documentation and legal authorities, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly administration of the Trust." *Id.* The Court shall initially determine, by a preponderance of the evidence, whether the party who withheld consent was reasonable in such action. *Id.* If the Court so determines, it will then decide whether the requested action is in the best interests of the Trust and its Beneficiaries. *Id.*

## III.    The Initial Payment Percentage

In early 2024, in accordance with Section 2.1 of the Trust Agreement, the Trustee established the Initial Payment Percentage as 1.5% of the amount of Allowed Abuse Claims. *See* Declaration of the Honorable Barbara J. Houser (Ret.), in Support of Her Opposition to Motion of the Future Claimants' Representative for Judicial Resolution of Payment Percentage Dispute ¶ 16 [D.I. 175] ("Houser Decl."). The Initial Payment Percentage was established based on the limited assets held by the Trust at that time, but with the expectation that certain substantial insurance settlement funds (approximately $1.65 billion) held in escrow would become available once the

Confirmation Order became final, after which the Trustee expected to set a new Payment Percentage, subject to the consent of the STAC and the FCR. *Id.*

**IV.    The 2025 Proposed Supplemental Payment Percentage**

In the fall of 2025, the Trustee anticipated the Confirmation Order potentially becoming final in early 2026. Houser Decl. ¶ 17. As a result, she engaged the Trust's consultants at PricewaterhouseCoopers Advisory Services LLC ("PwC") to assist her in analyzing whether the Trust could make a supplemental distribution from Trust Assets to holders of Allowed Abuse Claims, including through analyses regarding: (1) the number, type, and value of claims that had been presented to the Trust; (2) the number, type, and value of Future Abuse Claims expected to be presented to the Trust; and (3) the Trust's anticipated budget and operating expenses. *Id.* In the event that the Supreme Court denied certiorari, the Trustee wanted to be able to begin making a supplemental payment to holders of Allowed Abuse Claims as soon as possible following the Trust's receipt of certain funds that had been escrowed under the Plan for payment to the Trust when the Order confirming the Plan became final. *Id.*

In December 2025, the Trustee shared a forecast, that PwC assisted her in developing, with the STAC and FCR. *Id.* ¶ 18; *see also* Ex. A to Houser Decl. (the "December 2025 Analysis"). In the December 2025 Analysis PwC estimated the number of Allowable Claims (by type) and estimated aggregate Allowed Claim Amounts as follows:

| Claim Type | Estimated Number of Allowable Claims | Estimated Aggregate Allowed Claim Amounts (Millions USD) |
| --- | --- | --- |
| Expedited Distribution Claims | 6,002 | $21 |
| Independent Review Option ("IRO") Claims | 198 | $189 |
| Matrix Claims | 55,779 | $34,508 |
| Indirect Abuse Claims | 150 | $89 |
| Future Abuse Claims | 510 | $274 |

7

| Other Protected Party ("OPP") Claims | 990 | $586 |
|---|---|---|
| **Total Estimated Aggregate Allowed Claim Amounts** | | **$35,667** |

*Id.* ¶ 18.

To estimate the number of Future Abuse Claims for minors, PwC summarized the number of claims filed with the Trust at or around the years in which an Abuse Claimant may have been of an age to be a minor on the Petition Date. *See* Declaration of Carrie Vos ¶ 9, [D.I. 176] ("Vos Decl."). PwC first identified the abuse years that could reasonably result in an eligible Future Abuse Claim based on the range of ages eligible to be in Scouts and the ages of such Scouts as of the Petition Date (in 2020). *Id.* ¶ 10. Based on PwC's research and understanding, the age of five (5) is the youngest age at which an individual could have been a registered Scout in the 2000s. *Id.* A limited number of Abuse Claimants may have been younger than five years old at the time they suffered abuse, but those cases are uncommon and treated as exceptions. *Id.* Applying these assumptions, PwC determined that the abuse years that could result in potentially eligible Future Abuse Claims for minors were 2007–2020. *Id.*

PwC then used data from Matrix Abuse Claims filed with the Trust, which it determined was the most appropriate data set for the applied methodology, to estimate the total number of Abuse Claims that may be asserted based on abuse beginning between 2007 and 2020 using an assumed 5% decrease in Abuse Claims year over year with 2006 as the baseline year. *Id.* ¶ 11. PwC selected 2006 as the baseline year for its analysis because it is the last abuse year for which all potential Abuse Claimants would have been 18 years of age by the Petition Date and therefore assumed to be fully represented in the population of Abuse Claims filed with the Trust. *Id.* ¶ 12. In other words, since the youngest age of a Scouting Abuse Claimant was five (5), a five-year old Abuse Claimant who suffered abuse in 2006 would have been at least eighteen (18) years old—an

adult—by the Petition Date. *Id*. In addition, these Claimants would have been required to submit a timely Proof of Claim ("POC") and Claims Questionnaire ("CQ") by the applicable deadlines. *Id*. Accordingly, PwC assumed that the Abuse Claims submitted to the Trust for claimants who had suffered abuse in 2006 should include all or nearly all of the claimant population for that year as there would not be any minors with Claims (i.e., Future Abuse Claims), and any non-minor claimant who failed to file a Claim would be barred from doing so in the future. *Id*. As of the date of the analysis, a total of 127 Abuse Claimants who had submitted Abuse Claims to the Trust (pursuant to the Matrix option) alleged abuse beginning in 2006. *Id*.

PwC then analyzed historic Matrix claims submitted to the Trust for the period 2000 to 2006 to determine trends in the number of Abuse Claims that allege abuse beginning in each of these years. *Id*. ¶ 13. PwC chose 2000 through 2006 because those years represent a population of Abuse Claimants who, assuming age five (5) as the earliest reasonable age of abuse, would have been eighteen (18) years old or older as of the Petition Date and therefore would have had to file a timely POC and submit a Claims Questionnaire to the Trust prior to the Trust's filing deadlines. *Id*. Across these years, Matrix claims alleging abuse beginning in 2000 compared to 2001 then to 2002, etc. demonstrate an average year-over-year decrease in the number of claims filed with the Trust of approximately 14%. *Id*. PwC attributed this year-over-year decline in Abuse Claims submitted to the Trust alleging abuse from 2000 to 2001 and then each subsequent year up through 2006 to improvements in BSA's youth protection services, procedures, and controls and a general decline in the number of enrolled Scouts. *Id*. ¶ 14; *see also* Declaration of Glen Pounder in Response to the Motion of the Future Claimants' Representative for Judicial Resolution of Payment Percentage Dispute ¶¶ 3, 13–17, [D.I. 136] ("Pounder Decl.").

Despite observing an average 14% year-over-year decline in Abuse Claims submitted to the Trust alleging abuse beginning in each year from 2000 through 2006, PwC conservatively assumed an annual decrease in Abuse Claims alleging abuse beginning in each year from 2007 through 2020 of only 5% to estimate the expected total number of claims that would arise from abuse beginning in each of those years.  Vos Decl. ¶ 15.  PwC then compared the expected claims forecast for each abuse year to the actual number of Abuse Claims submitted to the Trust (for Matrix claims) for abuse years 2007–2020.  *Id.* ¶ 16; *see also id.* at Ex. B.  The aggregate difference between these figures represents the estimated population of potential Future Abuse Claims for minors that have not yet been submitted to the Trust, including for abuse in the years immediately preceding the bankruptcy filing.  *Id.* ¶ 16.

For abuse years 2007 through 2012, any potential Abuse Claimant who was between five (5) and nine (9) years old at the time of abuse and a minor as of the Petition Date would have reached age 18 by 2025, and therefore as of 2025 would have been legally eligible to submit a Future Abuse Claim to the Trust without a legally authorized representative.  *Id.* ¶ 17.  Since the Trust's inception in 2023, only two eligible Future Abuse Claims have been submitted to the Trust.  *See* Houser Decl. ¶ 19; Vos Decl. ¶ 17.

Based on the assumptions and methodology described above, PwC forecast that there will be 510 Future Abuse Claims submitted to the Trust; 503 of which are estimated to be Future Abuse Claims for minors and 7 of which are estimated to be Future Abuse Claims for "repressed memory."  Vos Decl. ¶ 18.

The Trustee determined that this estimate was well-reasoned, appropriately supported by the Trust's claims experience to date, and used that projection of Future Abuse Claims in analyzing

whether the Trust could make a supplemental distribution to holders of Allowed Abuse Claims. Houser Decl. ¶ 19.

With respect to the estimated Future Abuse Claims, PwC estimated the aggregate Allowed Claim Amounts for Future Abuse Claims as approximately $274 million. *Id*. ¶ 20. For purposes of its estimate of the Future Abuse Claim values, the Trustee directed PwC to assume a similar distribution of Expedited, IRO, and Matrix claim elections as seen in the general claim population. *Id*. The claim value of Future Abuse Claims that elected to receive an Expedited Distribution was $3,500. *Id*. The estimated claim value for IRO elections was $1 million, as the Trust is responsible to pay the first $1 million of an accepted Settlement Recommendation. *Id*. Finally, PwC's estimated claim value for Matrix elections was the average value of an allowed Matrix claim. *Id*. The Trustee determined that these estimates were well-reasoned, appropriately supported by the Trust's claims experience to date, and used PwC's projection of Future Abuse Claim values in determining whether to recommend that the Trust make a supplemental distribution to holders of Allowed Abuse Claims. *Id*.

Separately, the Trustee prepared a detailed operating budget for the Trust for the next five years. *Id*. ¶ 21; *see also* Ex. A to Houser Decl. at 5. The initially prepared operating budget reflected operating costs for December 2025 through 2030. *Id*. The Trustee's operating budget was prepared based on a review of historical operating costs and estimates of future expenses she obtained from professionals who are providing services to the Trust. Houser Decl. ¶ 21. This budget anticipated that the Trust will collect proceeds through the liquidation of all tangible assets assigned to the Trust under the Plan, with the exception of certain Local Council real properties that were not under contract at the time. *Id*.[4]

---

[4] As of December 12, 2025, these properties had been on the market for over two years, and no offer to purchase the

(continued …)

The initially prepared operating budget also anticipated that the Trust would receive all monies from the Settling Insurers that had been placed in separate escrow accounts under the terms of the Plan totaling, in the aggregate, approximately $1.659 billion (comprised of approximately $1.474 billion in initial funding plus approximately $184.9 million in cumulative growth) (the "Insurance Escrowed Funds"). *Id.* ¶ 22. The budget did not include amounts that the Trust seeks to recover from those insurers who refused to settle with BSA during the bankruptcy case. *Id.* ¶ 23.[5]

The five-year operating budget that was prepared in December 2025 anticipated that:

- the Trust will collect income from various sources including, but not limited to, the liquidation of its tangible assets, including the Insurance Escrowed Funds;

- the Trust will incur expenses annually in connection with its administrative costs and the costs of its professionals who provide services to the Trust;

- the Trust may incur reimbursement obligations to one or more Settling Insurers on the accrued interest earned as part of the Insurance Escrowed Funds if those Settling Insurers were required to pay income tax on their respective escrowed funds; and

- the Trust would distribute $1.844 billion to claimants in 2026 comprised of (i) approximately $240.1 million to pay remaining Expedited Claims and/or the initial 1.5% distribution to Matrix and IRO Claimants whose claims had either not yet been determined by the Trust or who had not yet submitted a release; and (ii) approximately $1.604 billion to pay a supplemental distribution of 4.5% to all holders of Allowable Abuse Claims against the Trust.

*See id.* ¶ 26.

---

properties had been received by the applicable Local Council. *Id*. While the Trust continues to work with the Local Councils, it is unclear when these properties may sell and, if they do sell, for what dollar value. *Id*.

[5] Under the Plan, the Trust was assigned over 3,000 insurance policies issued to BSA and its Local Councils, which are believed to provide as much as $4 billion of coverage for allowed Abuse Claims. *Id*. ¶ 23. The Trust's rights under these insurance policies are currently the subject of a comprehensive insurance coverage litigation filed by the Trustee in the United States District Court for the Northern District of Texas (the "Insurance Litigation"). *Id*. ¶ 24. Motions to dismiss filed by the insurers in the Insurance Litigation have been fully briefed and are currently under advisement. *Id*. No trial date has yet been set by the Court. *Id*. Given the uncertainty as to when the Insurance Litigation will proceed to trial and the possible outcomes of that litigation, including collections of proceeds through settlements, it is not possible to estimate that asset's actual value to the Trust. *Id*. ¶ 25. Given these realities, the Trustee believed, and continues to believe, that the Trust must reserve sufficient operating funds from the liquidation of the Trust's tangible assets to ensure that the Trust can operate throughout its expected life and aggressively litigate its rights under the assigned insurance policies against the insurers in the Insurance Litigation. *Id*.

Based on all of the above, the Trustee determined that the Trust would have sufficient assets to make a supplemental distribution of 4.5% on each Allowed Abuse Claim once the Insurance Escrowed Funds were released to the Trust upon the entry of a final Confirmation Order and pursuant to the terms of the relevant escrow agreements. *Id*. ¶ 27. A supplemental distribution of 4.5%, when combined with the 1.5% Initial Payment Percentage, would result in an aggregate Payment Percentage of 6%. *Id*.

## V.    The Trustee's Interactions with the FCR Regarding the Increased Payment Percentage

On December 12, 2025, the Trustee provided her analysis of the Trust's claims, Future Abuse Claims, assets, and estimated operating expenses to the STAC and FCR and requested that the STAC and FCR consent to the Trust making a supplemental payment to holders of Allowed Abuse Claims of 4.5% of their Allowed Claim Amount, resulting in an aggregate Payment Percentage of 6%. Houser Decl. ¶ 28.

The STAC consented to the Trustee's proposal to make a supplemental 4.5% distribution payment to holders of Allowed Abuse Claims resulting in an aggregate Payment Percentage of 6%. *Id*. ¶ 29. During the five-day consent period provided under the Trust Agreement for the FCR to consider the Trustee's proposed 6% Payment Percentage, the Trust gave the FCR and its consultant, Ankura, a presentation regarding the Trust's analysis and recommendation. *Id*. ¶ 30. Ultimately, after consulting with Ankura, the FCR informed the Trustee that he did not consent to the Trustee's proposal to make a 4.5% supplemental payment to holders of Allowed Abuse Claims, resulting in an aggregate Payment Percentage of 6%. *Id*. ¶ 31.

During discussions between the Trustee and FCR, the FCR asserted that the Trust's estimate of Future Abuse Claims was too low and did not appropriately take into account that Abuse Claimants historically delayed reporting their Abuse, often for several decades, and that

this "lag" in reporting was not reflected in the Trust's analysis.  *Id*. ¶ 33.  The FCR also questioned the Trustee's use of a five-year projection period for the operating budget as too short a window of time to utilize.  *Id*. ¶ 34.  The Trustee rebutted these assertions during the informal resolution window to no avail, and ultimately the FCR and Trustee concluded that no agreement could be reached, leading to the filing of the Motion.  *Id*. ¶ 35.

Despite the pendency of the dispute as to the overall Payment Percentage, the Trustee and FCR negotiated a partial resolution of their dispute.  *Id*. ¶ 36.  Ultimately, the FCR, STAC, and Trustee agreed that a supplemental distribution in the amount of 3.2% of a Claimant's Allowed Abuse Claim could be made by the Trust, subject to adjustment following this Court's determination of the FCR's Motion.  *Id*.  Under this agreed partial resolution, Claimants with Allowed Abuse Claims are receiving an aggregate distribution of 4.7% (a 1.5% initial distribution and the agreed 3.2% supplemental distribution).  *Id*.

## VI.    The Trust's April 13, 2026 Updated Analysis of the Payment Percentage

In April 2026, the Trustee updated her analysis of the Payment Percentage based on several developments that impacted her financial forecasts and evaluation of what the Trust can afford to pay to Claimants while reserving sufficient funds to continue Trust operations.  *See* Houser Decl. ¶ 37.

First, the Trustee adjusted the Allowed Abuse Claim values pursuant to the Consumer Price Index, as required by Article VIII.A of the TDP.[6]  This 3% adjustment, when applied across the claim population resulted in a 0.1% reduction to the 6% aggregate payment percentage the Trustee had recommended to the STAC and the FCR in December 2025.  *Id*. ¶ 38.  Second, the Trust did

---

[6] Specifically, Article VIII.A of the TDP states: "Commencing on the second anniversary of the Effective Date, the Settlement Trust shall adjust the valuation amounts for yearly inflation based on the CPI-U.  The CPI-U adjustment may not exceed 3% annually, and the first adjustment shall not be cumulative."

not receive the accumulated interest on the Insurance Escrowed Funds in the amount of $184.9 million, due to a dispute between the Trust and the Settling Insurers regarding what entity is entitled to these funds. *Id.* ¶ 39.

Third, the Trust has continued to determine Matrix and IRO claims since December 2025 and, accordingly, the estimated number of Allowable Abuse Claims and Estimated Aggregate Allowed Claim Amounts have been updated as follows (as of March 16, 2026):

| Claim Type | Estimated Number of Allowable Claims | Estimated Aggregate Allowed Claim Amounts (Millions USD) |
|---|---|---|
| Expedited Claims | 6,002 | $21 |
| Independent Review Option ("IRO") Claims | 204 | $196 |
| Matrix Claims | 55,395 | $34,523 |
| Indirect Abuse Claims | 150 | $92 |
| Future Abuse Claims | 510 | $284 |
| Other Protected Party ("OPP") Claims | 990 | $403 |
| **Total Estimated Aggregate Allowed Claim Amounts** | | **$35,518** |

*See id.* ¶ 40.

The loss of these escrowed interest funds, at least temporarily, along with the adjusted Estimated Aggregate Allowed Claim Amounts, resulted in a further 0.2% reduction to the 6% aggregate payment percentage the Trustee had recommended to the STAC and the FCR in December 2025. *Id.* ¶ 39. Based on all of these developments, the Trustee determined to revise the proposed Payment Percentage to 5.7% of the respective Allowed Claim Amounts instead of the 6% she had recommended to the STAC and the FCR in December 2025. *Id.*

Based on these developments, and with the assistance of PwC, the Trustee prepared an updated analysis that was provided to the STAC and FCR on April 13, 2026. *Id.* ¶¶ 41, 49; *see also id.* at Ex. B. The April analysis applied the same methodology by which PwC had estimated the number of claims, and their value remains the same as that applied by PwC in its December

2025 estimates, with adjustments to account for (1) subsequent determinations and developments regarding claims; and (2) adjustments for inflation required by the TDP as discussed above.  *Id.* ¶¶ 41–46.[7]

While the April analysis reflected developments to certain categories of claims, the number of forecast Future Abuse Claims is the same in both analyses.  *Id*. ¶ 47; *compare id.* at Ex. A with Ex. B.  In both the December 2025 and April 2026 analyses PwC applied the same methodology and estimated there will be 510 Allowable Future Abuse Claims.  *Id.* ¶ 47.

Based on the foregoing, the Trustee concluded that the Trust can make a supplemental distribution to holders of Allowed Abuse Claims of an incremental 4.2% of their respective Allowed Abuse Claim Amounts for a total distribution from the Trust's tangible assets of 5.7% (the 1.5% initial distribution and a 4.2% supplemental distribution).  *Id.* ¶ 55.  At this aggregate Payment Percentage, the Trustee believes the Trust will be in a financial position to pay present and future holders of similar Allowed Abuse Claims in substantially the same manner as required by the TDP.  *Id.*[8]

## STANDARD OF REVIEW

This dispute is governed by Articles 7 and 8 of the Trust Agreement.  Under the terms of the Trust Agreement, Section 8.16 is the "exclusive mechanism to resolve any dispute between or among the parties hereto . . . arising under or with respect to this Trust Agreement."  Trust Agreement § 8.16.  As the dispute addressed by the Motion arises pursuant to the consent

---

[7] In connection with the April Analysis, the Trustee reviewed the Trust's projected expenses in its Operational Budget and updated them to remove expenses incurred and/or paid by the Trust in December 2026 and for the first two months of 2026.  Houser Decl. ¶ 48.  These adjustments with respect to the Trust's operational expenses reflected in the December 2025 and April 2026 analyses are relatively minor and did not require any adjustment to the aggregate Payment Percentage the Trustee proposed.  *Id.*

[8] While the Trustee expects that the Trust will be able to make further distribution(s) to holders of Allowed Abuse Claims from proceeds received in the Texas Insurance Litigation, either through settlement or continued litigation, it is not possible to predict at this time when such further distribution(s) may be made or in what amounts.  Houser Decl. ¶ 56.

provisions set forth in Section 4.2(c), as a threshold matter, the Court must initially determine, by a preponderance of the evidence, whether the FCR, as the party withholding consent, was reasonable in doing so.  *Id.* § 8.16(d).

If the Court determines that the FCR was reasonable in withholding his consent, the Court must determine "whether the requested action is in the best interests of the Trust and its Beneficiaries." *Id*.

**ARGUMENT**

The FCR's Motion should be denied.  As a threshold matter, the FCR cannot carry his burden, under Section 8.16 of the Trust Agreement, to show that he reasonably withheld consent to the Trustee's proposed increase to the Payment Percentage.  However, even if the Court were to conclude that the FCR reasonably withheld consent, the Motion should still be denied as the Trust's proposed increase to the Payment Percentage "is in the best interests of the Trust and its Beneficiaries." *Id*.

**I.      The FCR Unreasonably Withheld His Consent**

While the FCR asserts "numerous critical errors" in the Trustee's analysis that he argues supports a finding that he was reasonable in withholding his consent, an examination of these alleged "errors" demonstrates they are without merit.  Accordingly, there was no valid basis for the FCR to withhold his consent, and the Motion should be denied as the FCR has not carried his burden.

The FCR cites eight alleged errors with the Trustee's analysis that he argues supports the notion that he was reasonable in withholding his consent.  Each of these are discussed below.

A. **First Alleged Error─The Trustee's Forecast Does Not Account for Historical Tort Experience.**

The FCR argues that the Trust improperly relied solely on Claims submitted to the Trust and, instead, should have taken into account BSA's "historical tort experience." Motion at 10. The FCR makes no attempt to explain why BSA's historical tort experience is relevant to predicting the volume of Future Abuse Claims the Trust might receive in the future. The Trustee's position is that the best data set to analyze is the universe of Claims filed with the Trust. Merely examining complaints filed in the tort system prior to BSA's bankruptcy filing is not relevant as it does not take into account various factors, such as whether the action was dismissed or the time at which the complaint was filed. The Trustee determined that the best predictor of Future Abuse Claims asserted against the Trust is the volume of Direct Abuse Claims the Trust has experienced. Accordingly, there is no error in her using this data as part of the forecast used to develop the proposed Payment Percentage increase—especially where it is the FCR's burden to show that he reasonably withheld his consent to the proposed Payment Percentage increase on this ground.

B. **Second Alleged Error—The Trustee's Forecast Fails to Account for a Lag Between the Date of Abuse and the Date of the Filing of a Claim.**

The FCR next argues his refusal to consent to the increased Payment Percentage was reasonable because the Trustee's Forecast failed to account for a so-called "lag" between the time a Claimant was abused and the date on which that Claimant chooses to file a Claim. Motion at 10. The notion that the Trustee failed to consider the FCR's contentions regarding a "lag" in reporting of Future Abuse Claims is incorrect. The Trust considered the FCR's contentions, but disagreed for three primary reasons. Houser Decl. ¶ 33. First, delays in reporting sexual abuse are less prevalent today than in the past given societal changes and education. *Id*. The Trustee believes that victims of abuse are more willing to come forward and, importantly, those to whom the abuse is shared are more willing to hear about the abuse and take action. *Id*. Second, the process for

asserting Abuse Claims has been materially altered by the Bankruptcy Case and the now confirmed Plan. *Id*. Whereas pursuing an Abuse Claim against BSA in the past generally required a Claimant to do so publicly, including by hiring a lawyer and filing a lawsuit against BSA among others, the claims processes established by the Plan (i) simplifies the process for claim submission, as a Claimant can submit a claim without the need to hire counsel, and (ii) requires that the Trust treat all claim submissions confidentially. *Id*. The availability of a simplified, confidential process to pursue a Future Abuse Claim makes it more likely that Future Abuse Claimants will come forward with their Claims without waiting decades to do so. *Id*. Finally, the Court established a Bar Date that required Abuse Claimants to file their claims or risk being barred from pursuing them in the future. *Id*. Over 82,000 Abuse Claims were submitted in response to the Bar Date during the Bankruptcy Case. *Id*. The establishment of a Bar Date during the Bankruptcy Case, which was highly publicized, created incentives for Abuse Claimants to assert their claims, and not wait to do so at a future point in time. *Id*. While there is no bar date yet for the submission of Future Abuse Claims, at some point (presumably when assets transferred to the Trust have been liquidated or their liquidation can reasonably be predicted) the Trustee will establish such a bar date so that the Trust can wind down its operations and distribute its remaining cash to holders of Allowed Abuse Claims in accordance with the Trust Agreement. *Id*.

> **C.      Third Alleged Error—The Trustee's Forecast Is Based on Arbitrary Assumptions.**

Next, the FCR argues that the Trustee's forecast is flawed because it is based on "arbitrary assumptions," but then proceeds to take issue with only a single assumption—"that there will be a decrease in Trust submissions of 5 percentage points per year of Abuse between 2007 and 2020." Motion at 10. The FCR argues that "PwC offered no justification for this rationale." *Id*.

The FCR's contention is untrue. The Trust applied this assumption after analyzing historic Matrix claims submitted to the Trust for the period 2000 to 2006 to determine trends in the number of Abuse Claims that allege abuse beginning in each of these years. *See* Vos. Decl. ¶ 13. The Trust chose 2000 through 2006 because those years represent a population of Abuse Claimants who, assuming age five (5) as the earliest reasonable age of abuse in Scouting, would have been eighteen (18) years old or older as of the Petition Date and therefore would have had to file a timely POC and submit a Claims Questionnaire to the Trust prior to the Trust's filing deadlines. *Id*. Across these years, Matrix claims alleging abuse beginning in 2000 compared to 2001 then to 2002, etc. demonstrate an average year-over-year decrease in the number of claims filed with the Trust of approximately 14%. *Id*. This decrease was not surprising given improvements BSA made to its youth protection services, procedures, and controls and a general decline in the number of enrolled Scouts. *Id* ¶ 14; *see also* Pounder Decl. ¶¶ 3, 13–17.

Despite the observed 14% year-over-year decline in Abuse Claims submitted to the Trust alleging abuse beginning in each year from 2000 through 2006, the Trust conservatively assumed an annual decrease in Abuse Claims alleging abuse beginning in each year from 2007 through 2020 of only 5% to estimate the expected total number of claims that would arise from abuse beginning in each of those years. *See* Vos Decl. ¶ 15. Thus, there is nothing arbitrary about the assumption applied by the Trust—it is based on the Trust's review of historic data and is actually a conservative assumption.

D.    **Fourth Alleged Error—The Trustee's Forecast Is Based on a Single Data Point: Claims Received by the Trust for Abuse Year 2006.**

The FCR next alleged error is that the "entire PwC Forecast is based on a single data point: claims received by the Trust for Abuse year 2006." Motion at 10. The FCR makes no attempt to demonstrate why this is an error in the Motion. As the FCR has the burden to show why this

alleged error demonstrates his reasonableness in withholding consent, the Court should reject the FCR's arguments on this point.

In any event, the Trustee had a valid basis for using 2006 as the baseline year for her forecast—2006 was the last abuse year for which all potential Abuse Claimants would have been over 18 years of age and therefore assumed to be fully represented in the population of Abuse Claims filed with the Trust. *See supra* at Factual Background § IV; *see also* Vos Decl. ¶¶ 11–12. Accordingly, while the FCR makes no attempt to argue why the Trustee's use of 2006 as a baseline year was in error, the Trustee has demonstrated a valid basis for using that year as a baseline.

### E.    Fifth Alleged Error—The Trustee's Forecast Assumes There Was No Remaining Abuse in the Years Immediately Prior to the Bankruptcy.

The FCR next argues that the Trustee's Forecast erred in assuming "that there was no remaining Abuse in the years immediately prior to the bankruptcy." Motion at 10. This alleged error is simply inaccurate. As demonstrated by the Trustee's forecast, and in particular Exhibit B to Ms. Vos's Declaration, the Trustee projected that there were 503 total Abuse Claims that involved allegations of Abuse beginning in the years between 2007 and 2020. *See* Vos Decl. at Ex. B. Additionally, the FCR's criticism misunderstands the purpose of the Trustee's forecast, which was not meant to estimate the amount of abuse that occurred in any given year, but was to estimate the number of claims that would come forward in the future and meet the eligibility criteria of a Future Abuse Claim. Based on the foregoing, this alleged error is not a valid basis for the FCR's decision to withhold consent—much less a reasonable basis for doing so.

### F.    Sixth Alleged Error—The Trustee's Forecast Fails to Adjust for Inflation.

The Motion states that the Trustee's Forecast fails to adjust for inflation when valuing claim payments. This is simply untrue. The TDP requires that claim values be adjusted annually starting on the second anniversary of the Effective Date. *See* Trust Agreement § 4.2. The Trustee

21

began adjusting claim values at that time.  And, with the FCR's consent, the Trustee adjusted claim values earlier than the third anniversary of the Effective Date (April 19, 2026) in order in ensure that when she began making the agreed upon Supplemental Distributions of 3.2% of an Allowed Claim, she was doing so based upon adjusted claim values for all Claimants with Allowed Claims. The April 2026 analysis includes the inflation adjusted claim values and this objection lacks merit. Additionally, the creation of the claim distribution reserve in the April 2026 operations budget has an assumed 3% yearly interest earned, which counterbalances the 3% cap on yearly inflation.  *See* Ex. C to Vos Decl.

**G.      Seventh and Eighth Alleged Errors—(A) The Trustee's Forecast Assumed That the Trust Would Cease Operating in the Next Five Years; and (B) The Trust's Failure to Account for Expenses Beyond Five Years Is "Inappropriate."**

The FCR's final two alleged errors relate to the Trustee's use of a five-year operating budget as part of her forecast.  First, the FCR apparently misinterprets the Trustee's use of a five-year operating budget as a suggestion that the Trustee intends to cease operations by the end of 2030.  Motion at 11.  This is simply untrue, and the Trustee has never indicated that she intends for the Trust to cease operations by the end of 2030.  Indeed, predicting when the Trust will be able to cease operations is entirely speculative and will depend on a number of factors, including when the Insurance Litigation (and any resulting appeals) is concluded, and when the Trust has completed distributions of available funds to Claimants.  Accordingly, the FCR's seventh alleged error is not a valid or reasonable basis for his withholding of consent.

Finally, the FCR calls the Trustee's use of a five-year operating budget as "inappropriate" because it does not account for any expenses beyond the five-year period.  Motion at 11.  Through her forty-eight years' experience with bankruptcy cases, it is the Trustee's experience that longer term projections of income and expenses for an entity become more unreliable beyond a reasonable

projection period. Houser Decl. ¶ 34. Given that experience, she concluded that a reasonable projection period for the Trust was five years. *Id*. Among other things, the Trustee expects that the processing of the claims filed initially with the Trust to be completed during this time period so that Trust expenses will drop significantly. This does not mean that the Trustee expects income and operating costs to be eliminated after this five-year period, and the Trustee expects to update this five-year operating budget on an annual basis so that it reflects the most current actual income and expense figures available to her. *Id*.

As demonstrated above, while the FCR cites eight alleged errors with the Trustee's analysis, an examination of each of these alleged errors demonstrates that they are not valid or reasonable bases for the FCR's decision to withhold his consent to the increased Payment Percentage. The FCR has the burden to show he reasonably withheld consent, and he has failed to meet that burden. For this reason alone, the Motion should be denied.

## II.    The Trustee's Proposed Payment Percentage Increase Is in the Best Interests of the Trust and Its Beneficiaries

Under the terms of the Trust Agreement, in the event that the Court finds that the FCR carried his burden to show that he reasonably withheld consent to the Trustee's proposed increase to the Payment Percentage, the Court must then determine which proposal is in the best interests of the Trust and its Beneficiaries. While the FCR criticizes the Trustee's proposal throughout the Motion, at no point does the FCR attempt to argue or demonstrate why his proposed course of action is in the best interests of the Trust and its Beneficiaries.

The Trustee's proposed increase to the Payment Percentage is the only course of action that is in the best interests of the Trust and *all* of its Beneficiaries—current and future. In recommending a 5.7% aggregate Payment Percentage, the Trustee sought to maximize distributions to current holders of Allowed Abuse Claims while reserving sufficient funds for

23

holders of Allowed Future Abuse Claims. In contrast, the FCR's proposal (i.e., leaving the Payment Percentage at 4.7%) is based on numerous levels of speculation, including that there will be over 11,000 Future Abuse Claimants, and that the Trust will continue operations years into the future—perhaps as long as 2050—solely to wait for additional Future Abuse Claims to be submitted rather than setting a bar date for the submission of such claims at an appropriate time. Indeed, the FCR's analysis includes projections that over 10,000 of the over 11,000 forecasted claims will not be filed until sometime after 2040. *See* January 2026 Ankura Forecast of Future Claims by Minors at 9, attached as Ex. A. A one percent increase in distributions is significant to holders of Allowed Abuse Claims. For example, a Claimant who received a $1,000,000 Allowed Claim Amount would receive an additional $10,000 payment from the Trust.

Further, through her analysis and ultimate proposed Payment Percentage, the Trustee took steps to reserve adequate funding for potential Allowed Future Abuse Claims, while minimizing the Trust's future tax liability. Indeed, the Trustee examined various scenarios when the Payment Percentage was increased to 5.7% and when it remained at 4.7%. Houser Decl. ¶ 53. However, if greater amounts of funds are held in reserve by the Trust, the interest on those funds will likewise increase. *Id.* When that interest (along with other taxable income earned by the Trust) exceeds the Trust's operating expenses in a given year, the Trust will likely have net taxable income for the year. *Id.* In the scenarios the Trustee examined where a 5.7% Payment Percentage was used, the Trust was not projected to be a tax payor between 2026 and 2030. *Id.* ¶ 54. However, when a 4.7% Payment Percentage (i.e., the FCR's proposal) was used, the Trust was forecasted to have tax obligations beginning in 2027 or 2028. *Id.* Any tax liability incurred by the Trust is money that will not go to Claimants with Allowed Abuse Claims.

The FCR argues that Section 524(g) of the Bankruptcy Code sets the standard by which proposed changes to the Payment Percentage should be evaluated.  Motion at 12.  Even if the FCR is correct that Section 524(g) applies to a non-asbestos trust, the Trustee's proposed increase to the Payment Percentage and corresponding analysis provide "*reasonable assurance* that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner."  *Id.*  As described throughout, the Trustee's proposed increase to the Payment Percentage was based on a careful analysis of the Trust's experience with claims and the valuation of those claims as well as a realistic prediction of the volume of Future Abuse Claims the Trust expects to receive.

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that the Court deny the FCR's Motion and approve the Trustee's decision to increase the Payment Percentage to an aggregate 5.7%.

Dated:  June 2, 2026
Wilmington, Delaware

**A.M. SACCULLO LEGAL, LLC**

*/s/ Mark T. Hurford*

Mark T. Hurford (DE Bar No. 3299)
27 Crimson King Drive
Bear, DE 19701
Telephone:  (302) 836-8877
Facsimile:  (302) 836-8787
Email:  mark@saccullolegal.com

– AND –

**GILBERT LLP**
Kami E. Quinn (admission *pro hac vice*)
Emily P. Grim (admission *pro hac vice*)
Michael B. Rush (admission *pro hac vice*)
Brittney M. Welch (admission *pro hac vice*)
700 Pennsylvania Avenue, SE

25

Suite 400
Washington, DC  20003
Telephone:  (202) 772-2200
Facsimile:  (202) 772-3333
Email:  quinnk@gilbertlegal.com
         grime@gilbertlegal.com
         rushm@gilbertlegal.com
         welchb@gilbertlegal.com

*Attorneys for the Honorable Barbara J. Houser
(Ret.), in her capacity as Trustee of the BSA
Settlement Trust*