**EXHIBIT A**

CONFIDENTIAL - FILED UNDER SEAL

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| DELAWARE BSA, LLC[1] | Case No. 20-10342 (LSS) |
| Reorganized Debtors. | **Re: Case No-20-10343, Docket No. 13451** |

**SETTLEMENT TRUST ADVISORY COMMITTEE'S OBJECTION TO**
**THE FUTURE CLAIMANTS' REPRESENTATIVE'S MOTION FOR**
**JUDICIAL RESOLUTION OF PAYMENT PERCENTAGE DISPUTE**

The Settlement Trust Advisory Committee (the "STAC"), by and through its undersigned counsel, hereby submit this objection (the "Objection")[2] to the *Motion of the Future Claimants' Representative for Judicial Resolution of Payment Percentage Dispute* [Case No. 20-10343; Docket No. 13451] (the "Motion"). In support of this Objection, the STAC relies on the *Declaration of the Honorable Barbara J. Houser (Ret.), in Support of Her Opposition to Motion of the Future Claimants' Representative for Judicial Resolution of Payment Percentage Dispute* [Docket No. 175] (the "Houser Declaration" or "Houser Decl."), the *Declaration of Carrie Vos* [Docket No. 176] (the "Vos Declaration" or "Vos Decl."), the *Declaration of Glen Pounder in Response to the Motion of the Future Claimants' Representative for Judicial Resolution of*

---

[1]   The last four digits of the tax identification number of Reorganized Debtor Delaware BSA, LLC are 4311. The Reorganized Debtor's mailing address is 1325 West Walnut Hill Lane, Irving, Texas 75038. On March 13, 2026, the Court entered a final decree closing the chapter 11 case of Boy Scouts of America. *See* Case No. 20-10343, Docket No. 13530. Commencing on March 13, 2026, all motions, notices, and other pleadings relating to the Reorganized Debtors shall be filed and administered in the remaining chapter 11 case of Delaware BSA, LLC, Case No. 20-10342.

[2]   All capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Court's Opinion [Case No. 20-10343; Docket No. 10136], the Motion (defined below), the Confirmation Order (defined below), the Plan (defined below), the Trust Agreement (defined below), or the Houser Declaration (defined below), as applicable.

CONFIDENTIAL - FILED UNDER SEAL

*Payment Percentage Dispute* [Docket No. 136] (the "Pounder Declaration" or "Pounder Decl."), the *Supplemental Declaration of Glen Pounder in Response to the Motion of the Future Claimants' Representative for Judicial Resolution of Payment Percentage Dispute* [Docket No. 166] the "Supplemental Pounder Declaration" or "Supp. Pounder Decl."), the *Affirmative Expert Report of Andrew R. Evans Regarding the Motion for The Future Claimants' Representative for Judicial Resolution of Payment Percentage Dispute* (the "Evans Affirmative Report") (attached hereto as Exhibit A, and the *Expert Rebuttal Report of Andrew R. Evans Regarding the Motion for The Future Claimants' Representative for Judicial Resolution of Payment Percentage Dispute* (the "Evans Rebuttal Report") (attached hereto as Exhibit B), and respectfully states as follows:

## PRELIMINARY STATEMENT

1.      There are two questions before the Court.  First, has the FCR been reasonable in its objection to the Requested Payment Percentage proposed by the Trustee?  Second, if the Court finds that the FCR's objection is reasonable, was the Trustee's decision in the best interests of the BSA Settlement Trust and its beneficiaries?  *See* Trustee Obj. at p. 6.

2.      Central to the answer to both of those questions is a fundamental disagreement over the number of Future Abuse Claims that will be asserted.  Claims which both parties agree will be almost entirely asserted by survivors who were minors as of the Petition Date on February 18, 2020 (*i.e.*, those born after February 20, 2002) and participated in Scouting between 2007 and the Petition Date (the "Future Claims Period").

3.       The Trustee, acting as a fiduciary to all beneficiaries, conducted a thorough process in 2025 to determine what would be an appropriate supplemental distribution to make to Current Claimants.  As part of that process, she directed PwC to conduct its own independent forecast of that provided a conservative estimate of the number of Future Abuse Claims that might be asserted

2

CONFIDENTIAL - FILED UNDER SEAL

against the Trust.  Both the Trustee and PwC relied on the data Allowed Trust Claims, not the filed Proofs of Claims, along the experience of the Trust with respect to Future Abuse Claims actually allowed by the Trust, which is only 2 Future Abuse Claims in 5 years.

4.      In December 2025, utilizing PwC's independent analysis, the Trustee in her reasonable exercise of business judgment determined that a supplemental distribution of an additional 4.5% of an Allowed Abuse Claim was appropriate.[3]

5.      In contrast, the FCR has stuck with an estimate of roughly 11,000 Future Abuse Claims that he and Ankura first arrived at in 2021 when they were relying on the Proof of Claim data.  The FCR's own counsel has characterized the FCR's 2021 estimate as "shooting from the hip." Apr. 29, 2026 Hrg. Tr. at 12:8.  Remarkably, that 11,000+ claim estimate has remained consistent over the past 5 years.  That estimate remains consistent (x) notwithstanding the dramatic changes in the data on which FCR and Ankura relied - the claims pool shrunk from 82,000 unique filed Proofs of Claim to 64,000 Trust Claims; and (y)  notwithstanding that, in the first 5 years following the Bar Date, the actual experience is that only 2 Future Abuse Claims have been allowed.

6.      To put any credence in this 11,000+ Future Abuse Claim forecast, the FCR and Ankura ask this Court to:

- Ignore the actual experiential data of the Trust over the past 5 years to date with respect to Future Abuse Claims;

- Ignore that Ankura's own model forecasts that approximately a hundred of Future Abuse Claims should have been filed between 2023 and now;

---

[3]   The Trustee has since reduced the supplemental distribution to 4.2% because (i) there was a required change in projections under the TDP to account for 2025 inflation, a figure not available until 2026, and (ii) an unexpected dispute between the Trust and the Settling Insurers on interest earned on the Insurance Escrowed Funds.

CONFIDENTIAL - FILED UNDER SEAL

- Ignore the commonly accepted view among experts (including the literature upon which Ankura relied) that the epidemic of sexual abuse peaked in the late 1970's – early 1980's;

- Believe that abuse in Scouting never declined and, in fact, dramatically increased during the Future Claims Period;

- Believe that 975 five-year-olds were abused in the year preceding the Petition Date and will file Future Abuse Claims; and

- Believe that the Bar Date was wholly ineffective and that, notwithstanding the overwhelming amount of Proofs of Claims filed, believe the vast of majority survivors born between 1975 and 2002 did not file proofs of claim.  Ankura asserts that approximately 23,000 additional claims would have filed in the 20 years after the Bar Date and are therefore "missing" claims.

7.      Relying on these unreasonable and unsupported assumptions, the FCR asks this Court to set aside nearly $450 million for these potential Future Abuse Claims and wait at least 40 years, and potentially 70 years, to see what, if any, Future Abuse Claims are asserted and allowed. The majority of the holders of Allowed Abuse Claims are not a young population.  Forty years is not a delay in payment, it will be a denial of compensation for the abuse they suffered.

8.      The FCR's estimates and logical leaps are not supported by any empirical data and are just speculation.  That cannot be a reasonable basis to deny payments that will benefit survivors now.

4

CONFIDENTIAL - FILED UNDER SEAL

## BACKGROUND

### I.   General Background

9.   On the Petition Date, February 18, 2020, the Debtors filed a voluntary petition for relief under the Bankruptcy Code and the cases were jointly administered for procedural purposes.

10.   On September 8, 2022, the Court entered the *Supplemental Findings of Fact and Conclusions of Law and Order Confirming the Third Modified Fifth Amended Chapter 11 Plan of Reorganization (with Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* [Case No. 20-10343; Docket No. 10316] (the "Initial Confirmation Order") confirming the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* [Case No. 20-10343; Docket No. 10296] (the "Plan").  On July 21, 2025, the Court entered the Supplemental Confirmation Order [Case No. 20-10343; Docket No. 12966] (together with the Initial Confirmation Order, the "Confirmation Order").  On October 13, 2025, certain parties filed a Petition for Writ of Certiorari with the United States Supreme Court requesting that the Supreme Court review the decision of the Third Circuit in connection with their appeal of the Confirmation Order.  The Supreme Court denied the Petition for Writ of Certiorari on January 12, 2026, and the time to seek rehearing has expired, so the Confirmation Order is final.

11.   The Plan and Confirmation Order established the BSA Settlement Trust governed by the BSA Settlement Trust Agreement (the "Trust Agreement"), and designated James L. Patton, Jr. as the Future Claimants' Representative (the "Future Claimants' Representative" or "FCR"). The Debtors conducted a confirmation process culminating in a multi-day confirmation hearing at which, among other things, competing estimates of Future Abuse Claims were presented.

12.   In connection with the confirmation, the Debtors also filed certain expert reports by Bates White, LLC ("Bates White"), the Debtors' Abuse Claims consultant and advisor.  During

5

CONFIDENTIAL - FILED UNDER SEAL

the hearing to consider confirmation of the Plan, Charles E. Bates ("Dr. Bates") estimated that 400 to 600 Future Abuse Claims would be asserted. *See* Mar. 21, 2022, Day 6 Hr'g Tr. at 198:20 – 199:19 [Case No. 20-10343; Docket No. 9454]. In contrast, the FCR, assisted by Ankura Consulting Group LLC ("Ankura"), estimated approximately 11,000 Future Abuse Claims, and counsel noted that resolution of the disparity for purposes of setting the payment percentage would be determined in the future. *See* Mar. 21, 2022, Day 6 Hr'g Tr. at 144:12-16, 256:14-20 [Case No. 20-10343; Docket No. 9454].

## II.   The Payment Percentage Dispute and FCR's Motion

13.   In early 2024, the Trustee, with consent of the STAC and FCR, established an Initial Payment Percentage of 1.5% to enable prompt processing and payment of Allowed Abuse Claims pending finality of the Confirmation Order and availability of substantial insurance settlement funds. The Initial Payment Percentage was established based on the limited assets held by the Trust at that time, but with the expectation that certain substantial insurance settlement funds (approximately $1.65 billion) held in escrow would become available once the Confirmation Order became final.

14.   After finality, on December 12, 2025, the Trustee engaged PricewaterhouseCoopers Advisory Services LLC ("PwC") to advise whether the Trust could make a supplemental distribution from Trust Assets to holders of Allowed Abuse Claims, including through analyses regarding: (1) the number, type, and value of claims that had been presented to the Trust; (2) the number, type, and value of Future Abuse Claims expected to be presented to the Trust; and (3) the Trust's anticipated budget and operating expenses. Houser Decl. ¶17; Vos Decl. ¶¶6-7.

15.   The Trustee also prepared a detailed operating budget for the Trust for the next five years (the "Trust Budget"), which is attached as Exhibit A at page 5 of the Houser Declaration.

6

CONFIDENTIAL - FILED UNDER SEAL

Houser Decl. ¶21.  The Trustee expected to refresh that five-year operating budget at least annually to incorporate the most current income and expense information and to inform distribution decisions.  Houser Decl. ¶34.

16.     PwC's December 2025 forecast delivered estimates of allowable claims and aggregate allowed claim amounts by claim type and forecasted Future Abuse Claims at 510 with an aggregate allowed amount of $274 million, based on filed claim volumes tied to likely minors on the petition date and strict repressed-memory criteria.  Houser Decl. ¶¶19, 40, 47; Vos Decl. ¶7.  To date, since the establishment of the Trust, only two (2) Future Abuse Claims have been found to be eligible to submit a Claims Questionnaire to the Trust, both of which were minors on the Petition Date.  Houser Decl. ¶19.  The dearth of Future Abuse Claims is further supported by a recent poll of the STAC members in which only one law firm identified a single potential Future Claim under current representation.  *See* Evans Rebuttal Report, at 70.  Based on the PwC analysis, which the Trustee found to be well-reasoned, appropriately supported by the Trust's claims experience to date, and the Trust Budget, the Trustee determined that the Trust would have sufficient assets to make a supplemental distribution of 4.5% on each Allowed Abuse Claim, which when combined with the 1.5% Initial Payment Percentage, would result in an aggregate Payment Percentage of 6%.  Houser Decl.  ¶¶20, 27.

17.     On December 12, 2025, the Trustee provided her analysis to the STAC and FCR and requested consent to the Payment Percentage Increase.  Houser Decl. ¶28.  However, the FCR withheld consent within the Trust Agreement's five-business-day period, and the parties engaged in informal dispute resolution with agreed extensions through February 11, 2026.  Pending judicial resolution, the Trustee and the FCR agreed to implement an interim aggregate Payment Percentage of 4.7% effective immediately.  Houser Decl. ¶36.

18.     On February 20, 2026, the FCR filed the Motion, asserting that the Trustee's requested increase in the Payment Percentage is not in the best interests of the Trust and its beneficiaries and requesting adoption of a 4.7% Payment Percentage.  That Motion relies almost exclusively upon the work of Ankura, including the Initial Ankura Report (a draft document which was never finalized, Northeim Tr. 151:13-25 – 152:1-5)[4] and Revised Ankura Report (appended to the Motion and dated February 17, 2026—in existence for only 3 days before the Motion was filed),[5] in estimating the number of future claims that will be filed relating to claims of abuse occurring prior to the Petition Date ("Future Abuse Claims").

19.     The Trustee disagreed with the FCR and its professionals' assertion that the Trust's estimate of Future Abuse Claims was too low and did not appropriately take into account that Abuse Claimants historically delayed reporting their Abuse, often for several decades, and that this "lag" in reporting was not reflected in the Trust's analysis.  Houser Decl. ¶33.

20.     In April 2026, after further developments affecting financial forecasts and affordability, the Trustee determined that the Trust could make a supplemental distribution to holders of Allowed Abuse Claims of an incremental 4.2% of their respective Allowed Abuse Claim

---

[4]   Counsel for the FCR also disclaimed any value in that "Initial Report" stating "we don't think the 2024 presentation or the underlying materials should be like the proper focus of the rebuttal report . . . ." and further disclaimed that the 2024 "Initial Report" was a reliable expert report at all, stating "unless it's not already made clear by the FCR, the report attached to the motion is the FCR's report.  I think there was an unfortunate misnomer in the motion about the 2024 presentation we tried to clear that up in our response letter."  Apr. 29, 2026 Hr'g Tr. at 13:23-24, 33:17-23; *see also id.* at 15:17-20 ("I don't think it would be helpful to waste pages and pages of rebuttal reports addressing things that happened years ago when that is not the affirmative testimony before the Court.").  Of course, the February 17, 2026 "Revised Ankura Report" did not exist at the time of the FCR's refusal to consent to the Trust's Proposed Payment Percentage.

[5]   On June 3, 2026 the FCR provided a previously unproduced presentation from January 26, 2026 and only then in response to an inquiry from the Trustee, which circulated the document and asked if it had been produced because the Trust intended to, and did, append that report to the Trustee Objection.  Despite multiple discovery requests requiring the FCR to produce all documents the FCR relied upon in his decision to object to the Proposed Payment Percentage and prior assurances from the FCR's counsel that all non-privileged documents had been produced, the FCR stated that he had chosen no to produce it to the STAC because he assumed that Bates White had already received the document in January 2026.  It bears noting that Bates White was not employed by the STAC in January 2026.

Amounts for a total distribution from the Trust's tangible assets of 5.7% (the 1.5% initial distribution and a 4.2% supplemental distribution) (the "Proposed Payment Percentage"), while reserving sufficient funds for operations and Future Abuse Claims, and therefore, adjusted her recommended aggregate Payment Percentage downward to 5.7%.  Houser Decl. ¶ ¶39- 55.  The key developments informing the April 2026 adjustment included application of the TDP-required annual CPI-U adjustment (capped at 3%), which reduced the prior 6% aggregate proposal by approximately 0.1%, non-receipt of approximately $200 million in accrued interest on Insurance Escrowed Funds, which remain in escrow pending a dispute, contributing to an additional 0.2% reduction, updated PwC analyses reflecting continued determinations of Matrix and IRO claims and refreshed estimates of the number and value of Allowable Abuse Claims, using the same methodology as December 2025 and incorporating the CPI-U adjustment, and updates to operating budget/expense actuals that removed incurred expenses through early 2026, which the Trustee concluded did not, by themselves, require further adjustment to the aggregate Payment Percentage. Houser Decl. ¶¶37-41; Vos Decl. ¶¶36-37.

## ARGUMENT

I.  **The Trustee Exercised Sound Business Judgment in Determining the Proposed Payment Percentage and the Court Should Defer to the Trustee's Exercise of Business Judgment**

21.     The Trustee has made a decision on the Proposed Payment Percentage.  The Court is being asked to weigh whether that decision is in the best interests of the Trust's Beneficiaries. The Trust itself is silent on what standard the Court should use in making that determination.

22.     The STAC submits that under analogous provisions of the Bankruptcy Code and long-established Delaware law, which governs the Settlement Trust, the Court should defer to the Trustee's business judgment so long as there is a clear record that the exercise of business judgment was sound and reasonable.  Such is the case here.

CONFIDENTIAL - FILED UNDER SEAL

### A.    *The Trustee is a Fiduciary to the Trust Beneficiaries*

23.    As a fiduciary for the creditors—the Trust's Beneficiaries—the Trustee is obligated to act in their best interests.  That fiduciary duty is the same as the duty owed by a trustee or a debtor in possession.

24.    This Court and the Third Circuit have consistently held that trustees of claimant trust in post-confirmation bankruptcy proceedings act as fiduciaries to creditor beneficiaries.  *See, e.g.*, *In re AIO US, Inc.*, 677 B.R. 509 (Bankr. D. Del. Aug. 21, 2025); *In re Imperial "400" Nat., Inc.*, 456 F.2d 926 (3d Cir. 1972); *In re Brockway Pressed Metals, Inc.*, 363 B.R. 431 (Bankr. W.D. Pa. 2007).

25.    In *In re AIO US, Inc.*, the Delaware Bankruptcy Court held that "the trustee of a post-confirmation trust, like the trustee of any trust, owes a fiduciary duty to the beneficiaries of the trust, which includes taking appropriate steps to maximize the corpus of the trust."  677 B.R. 509 at 549.  The court likened this duty to corporate directors' obligations to maximize shareholder value. *Id*. at 550.  Similarly, in *In re Imperial "400" Nat., Inc.*, the Third Circuit recognized trustees in reorganization of a bankrupt company as officers of the court with a "special fiduciary position."  456 F.2d at 929.  The Bankruptcy Court for the Western District of Pennsylvania reinforced this, stating trustees must treat all parties fairly and owe a duty of loyalty to the debtor's estate and creditors.  *In re Brockway Pressed Metals, Inc.*, 363 B.R. at 444 n.14.  These cases establish the Trustee's role as a fiduciary, bound by obligations of good faith, trust, and loyalty. Section 2.1 of the Trust Agreement also provides that the Trustee is and shall act as a fiduciary in accordance with the provisions of the Trust Agreement.

**B.** **Application of the Business Judgment Standard is Well Recognized When the Bankruptcy Court is Required to Evaluate the Decision Making of an Estate Fiduciary**

26. Section 363(b)(1) of the Bankruptcy Code authorizes the bankruptcy trustee, "after notice and a hearing, … [to] use, sell, or lease … property of the estate." 11 U.S.C. § 363(b)(1). When the contemplated transactions fall outside the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code, courts consider whether to approve use of estate property under the deferential business judgment standard. *See*, *e.g.*, *In re Kidde-Fenwal, Inc.*, No. 23-10638 (LSS), 2023 Bankr. LEXIS 3065, at *15 (Bankr. D. Del. Nov. 8, 2023) (noting that "[t]he court may approve a request under section 363 if it is a proper exercise of the debtor's business judgment," and noting that where the debtor's decision is an operational one "greater deference may be owed"); *In re BSA*, 137 F.4th 126, 158 n.18 (3d Cir. 2025) (noting that "[t]o approve a sale under § 363(b), courts require only that the debtor exact its sound business judgment in good faith" when explaining that approval of a plan is more stringent); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (explaining that under section 363, "under normal circumstances the court would defer to the trustee's judgment so long as there is a legitimate business justification"); *In re Enron Corp.*, 335 B.R. 22, 27-28 (S.D.N.Y. 2005) (quoting *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983)) ("For a court to approve an application under § 363(b), it must 'expressly find from the evidence presented before [it] at the hearing a good business reason to grant such an application.'"); *see also In re BSA*, 137 F. 4th 126, at 157 (3d Cir. 2025) (acknowledging that section 363(b) applies a business judgment standard).

27. "Business judgment does not mean that the Debtors dotted every 'i' and crossed every 't' – it means that the Debtors explored their options, thought through the alternatives, and made a rational decision based on the information available." *In re Extraction Oil & Gas*, 622 B.R. 608, 620 (Bankr. D. Del. 2020). Under section 363(b), "[w]here the debtor articulates a

CONFIDENTIAL - FILED UNDER SEAL

reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").

28.     Bankruptcy courts will consider a number of factors, "which essentially represent a 'business judgment test,'" in evaluating a proposed sale. *In re Montgomery Ward Holding Corp*., 242 B.R. 147, 153 (D. Del. 1999). Such factors include: the proportionate value of the asset to the bankruptcy estate as a whole; the amount of elapsed time since the filing; the effect of a proposed distribution; the difference between the proceeds to be realized versus the appraised value of the property; and whether the asset is increasing or decreasing in value. *See In re Dura Auto. Sys., Inc.*, Civ. A. 06-11202, 2007 WL 7728109, at *92 (Bankr. D. Del. Aug. 15, 2007); *see also In re Montgomery Ward Corp.*, 242 B.R. at 155.

29.     Once the bankruptcy trustee "articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the [trustee's] conduct." *In re Dura Auto. Sys., Inc.*, 2007 WL 7728109, at *92 (quoting *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986)). There is a presumption that "in making a business decision [the bankruptcy trustee] acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the [debtor]." *Id.* (quoting *In re Integrated Res., Inc*., 147 B.R. 650, 656 (S.D.N.Y. 1992)). If the bankruptcy trustee's decision evidence a sound business purpose, then the court should approve the sale. *See id.*

CONFIDENTIAL - FILED UNDER SEAL

30.     In deciding whether to approve settlements under Bankruptcy Rule 9019, the Third Circuit has instructed that one of the factors that a Bankruptcy Court must consider is whether the proposed action is in the paramount interests of creditors. *In re Martin*, 91 F.3d at 393.  That is the language closest to what the Settlement Trust asks this Court to decide, which is whether the Trustee's action is in the best interest of the Trust Beneficiaries.

31.     The STAC does not suggest that the standard for the current dispute is the lowest range of reasonableness.  Rather the STAC relies on the premise that when evaluating a settlement under *Martin*, the established caselaw instructs that where there is a record of a reasonable or careful exercise of business judgment, the court should not substitute its own business judgment but should instead defer to the fiduciary's business judgment. *See, e.g.*, *In re Martin*, 91 F.3d at 393-95; *In re Decade, S.A.C., LLC*, 2020 WL 564903, at *4 (D. Del. Feb. 5, 2020) ("[C]ourts generally defer to a trustee's business judgment when there is a legitimate business justification for the trustee's decision to settle.") (citing *In re Martin*, 91 F.3d at 393-95).

32.     Thus, so long as the there is a clear record of a sound exercise of business judgment, this Court should defer to the Trustee's decision on the Proposed Payment Percentage.  The Court need not decide the question of the FRC's reasonableness in objecting nor does the Court need to make a determination on what the likelihood of the number of Future Abuse Claims will be.

**C.     *There is a Clear and Uncontroverted Record that the Trustee Exercised Sound Business Judgment***

33.     Delaware law is clear on what factors a court should look to when deciding whether there has been a sound or reasonable exercise of business judgment by a fiduciary.  In the corporate law context, Delaware courts apply the business judgment rule to uphold decisions of corporate officers and directors where the record shows they acted on an informed basis with the assistance of professional advisors and relied, in part, on that advice in exercising their own independent

13

CONFIDENTIAL - FILED UNDER SEAL

business judgment. *Citron v. E I Du Pont de Nemours & Co.*, 584 A.2d 490, 512 (Del Ch. 1990). The directors bear the responsibility "to make the ultimate business judgment" weighing all the facts known to them, including the opinions of their advisors. *Id.*

34.     Indeed, the Delaware General Corporation Law has codified this rule at section 141(e), which provides:

> (e) A member of the board of directors, or a member of any committee designated by the board of directors, shall, in the performance of such member's duties, be fully protected in relying in good faith upon the records of the corporation and upon such information, opinions, reports or statements presented to the corporation by any of the corporation's officers or employees, or committees of the board of directors, or by any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation.

8 *Del. C.* §141(e).

35.     The Proposed Payment Percentage reflects the Trustee's sound business judgment exercised for the benefit of all beneficiaries and consistent with the Trust Agreement's mandate to ensure substantially similar treatment of present and future holders of Allowed Abuse Claims. Acting pursuant to her fiduciary obligations under the Trust Agreement, the Trustee directed PwC in the fall of 2025 to analyze, among other things, the number, type, and value of present and projected Abuse Claims, anticipated Trust operating expenses, and forecasting scenarios relevant to distributions. Houser Decl. ¶17; Vos Decl. ¶¶6-7.

36.     PwC engaged in a detailed and thorough process. They first undertook the effort to identify the population from which Future Abuse Claims might arise. Vos Decl. ¶¶9-10. PwC then made a determination to rely on Matrix Abuse Claims for the empirical data set from which to base its estimate of Future Abuse Claims. Vos Decl. ¶11. PwC then used 2006 as a baseline year of Matrix Abuse Claims from which to estimate potential Future Abuse Claims because it

CONFIDENTIAL - FILED UNDER SEAL

was the last full year in which the entirety of the Scouting population would have been over 18 as of the Petition Date. Vos Decl. ¶12.[6]

37.     PwC determined that it was appropriate to then apply an annual decline in forecasted claims as the empirical data for the previous six years (2000 – 2006) showed a year over year decline in Matrix Claims. Vos Decl. ¶13. PwC attributed the year over year decline due to several factors including the decline in Scouting population and the continued implementation of youth protection measures. Vos Decl. ¶14. Rather than use the actual 14% year over year decline from 2000 – 2006, PwC employed a more conservative 5% annual decline. Vos Decl. ¶¶13-15.

38.     Finally, after arriving at the total number of potential Future Abuse Claims (e.g. the likely number of claims for abuse in the years 2007 – 2020), PwC then subtracted the claims that had already been asserted for that time period as part of the Trust Claim process. Vos Decl. ¶16. That allowed PwC to estimate the Future Abuse Claims that could be expected to be filed in the future. *Id.*

39.     Finally, PwC looked to the actual empirical data of how many claims for the years 2007 – 2020 had been submitted after the Trust was established in 2023. Vos Decl. ¶17. Only 2 claims had been filed. *Id.* In keeping with this trend, the STAC's recent poll of the abuse plaintiff attorneys comprising roughly half of the STAC members revealed that potentially one 1 claim currently remains to be filed by these attorneys. *See*, Evans Rebuttal Report, at 70.

---

[6]     Ankura takes issue with using 2006 because Ankura contends the data for that year is incomplete. Ankura believes there are "missing" claims for 2006 because of lag and self-censoring by survivors. However, Ankura believes that all years prior to 2006 contain "missing" claims for the same reasons. Under Ankura's logic, all years are incomplete. If that view was accepted, then the entirety of the Trust's empirical data is unreliable, and no expert should rely on any of the Trust data unless a fictional gross up of claims is performed. Ankura's hypothetical and self-determined gross-up method used to adjust the PwC and Bates White forecasts backs into the same number of Future Abuse Claims that Ankura predicted using an entirely different and much larger data set from unique Proofs of Claim.

CONFIDENTIAL - FILED UNDER SEAL

40.    Based on that analysis, PwC arrived at its estimate of 510 Future Abuse Claims that might be filed against and allowed by the Trust in the coming years.  Vos Decl. ¶18.  PwC then applied this analysis, valued the potential Future Claims, and determined an appropriate amount to be reserved for the payment of those Future Abuse Claims along with funds sufficient to administer the Trust.  Vos Decl. ¶¶19-22.  Finally, PwC recommended to the Trustee that the Trust could distribute an additional 4.5% to Current Claimants (which has subsequently been revised by the Trustee to 4.2% based on subsequent developments).  Vos Decl. ¶¶23-37.

41.    In December 2025, PwC's forecast and related exhibits, which reflected estimated claim volumes and aggregate allowed amounts by claim type, were shared with the STAC and the FCR.  Houser Decl. ¶18.  The Trustee also developed, and thereafter refreshed, a multi-year operating budget as part of her judgment process to evaluate Trust assets, anticipated operating expenses, and projected claim payments, allowing the Trustee to calibrate near-term distributions while reserving for ongoing administration and future claims.  Houser Decl. ¶¶21–22, 26, 34.

42.    Based on these analyses and a detailed five-year operating budget the Trustee prepared and updated, she initially proposed increasing the aggregate Payment Percentage to 6% (from 1.5% via a 4.5% supplemental distribution), but later updated the proposal to 5.7% to account for the CPI-U adjustment required by the TDP and the temporary unavailability of approximately $200 million in escrow interest, thereby preserving liquidity while delivering meaningful near-term value to beneficiaries.  Houser Decl. ¶¶27, 38–39; Vos Decl. ¶37.  These changes show that the Trustee's framework maintains needed flexibility to adjust the Payment Percentage as circumstances evolve, including developments in claim determinations, operating needs, interest disputes on escrowed funds, and insurance litigation progress, thereby protecting present and future beneficiaries.

CONFIDENTIAL - FILED UNDER SEAL

43. Throughout, the Trustee also consulted other professional advisors, including Bates White, on Abuse-claim issues, and considered viable alternatives and implementation timing in light of evolving claim determinations and asset receipts.

44. The Trustee's decision was grounded in multi-year budgeting, professional financial analyses by PwC, and consideration of litigation timing and costs, evidencing a rigorous, independent process undertaken in good faith, and the FCR has not adduced evidence sufficient to overcome the presumption afforded to a Trustee's sound business judgment. *See In re Dura Auto. Sys., Inc.*, 2007 WL 7728109, at \*92. The Trustee remains persuaded that the Proposed Payment Percentage best maximizes near-term recoveries while maintaining inter-generational equity for Current and Future Abuse Claimants. Houser Decl. ¶¶50-51, 55; Vos Decl. ¶¶37-39.

45. Ultimately, the Trustee was faced with a choice. How much should she distribute to the known set of current Trust Claimants and how much should she hold back on the chance that an unprecedented number of Future Claimants might come forward? With both the number of Future Claimants and timing of them coming forward being at best an estimate, this question required an exercise of business judgment. If the Trustee erred in favor of Future Claimants and is wrong, the Current Claimants will incur the cost of delayed payment and with a substantial risk that many will not be alive to receive a further distribution.

46. Relying on PwC's sound analysis, the relevant empirical data, and the demonstrated experience of the Trust to date of few Future Abuse Claims, the Trustee exercised her business judgment and chose a prudent Proposed Payment Percentage that provided compensation to 64,000 known Allowed Abuse Claims and responsibly and conservatively reserved funds for 500 potential Future Abuse Claimants. These are survivors who are in their

17

CONFIDENTIAL - FILED UNDER SEAL

50s, 60s, 70s and beyond, most of whom have been waiting many decades for recompense. She erred on the side of the known versus the unknown but did so only after careful consideration and reliance on thorough advice and analysis of her professionals. The FCR, in contrast, seeks to withhold funds from these current survivors and asks the Trust to remain open and wait for 40 years to see if his hypothesis may come true.

47.    For the foregoing reasons, the STAC submits that the Court decide that the Trustee's Proposed Payment Percentage is in the best interests of the Trust's beneficiaries, both those known to exist know and those who may come forward at some point in the future.

## II.    The Independent Analysis of Bates White Confirms the Reasonableness of the PwC Forecast

48.    The PwC forecast is reinforced and verified by the independent work of Bates White. Dr. Bates issued an expert report, dated December 5, 2021 (the "Dr. Bates Expert Report"), that projected the likely amount of future claims based on the 82,000 Proofs of Claim. In that report, Dr. Bates concluded that there were likely to be 400-600 Future Abuse Claims filed against the Trust. Dr. Bates reiterated that conclusion during his testimony at the confirmation hearing ins 2022. *See* Mar. 21, 2022, Day 6 Hr'g Tr. at 198:20 – 199:19.

49.    In 2026, Bates White was engaged by the STAC in response to the FCR Motion. Bates White was requested to provide both an affirmative estimate of the likely count of Future Claims and to assess the Trustee's proposed Payment Percentage. The Bates White team, now led by Mr. Andrew Evans, who assisted on the Dr. Bates Expert Report, made the same determination as in 2021 that the best method to analyze the Trust Data and forecast future claims was to use a regression time-series analysis that factored in Scouting participation along with the changing rate of abuse amongst that set of individuals over time (specifically by birth year and month) of Trust Claimants. Evans Dec. at ¶ 28. The time dimension (birth year and month) is important because

CONFIDENTIAL - FILED UNDER SEAL

it is heavily correlated with when abuse occurred and allows for a clear demarcation between Current and Future Claims. While abuse occurred against survivors at all ages of Scouting, analyzing by time allows Bates White to analyze when abuse was occurring, the amount of abuse that was occurring, and whether rates of abuse have changed over time. Future Claimants must have been under the age of 18 as of the Petition Date and therefore are associated with claimants born February 2002 or later.

50.    Once the Trust Claims have been plotted, a regression analysis statistically identifies the pattern of changes in incidences of abuse over an observed time period and forecasts Future Claims by extrapolating that identified relationship. This regression captures the unmistakable decline in the prevalence of abuse in BSA over time in the Trust Data.[7] This is best shown by two charts. The first plots the entirety of Trust Claims by year of first abuse in is Figure 6 from the Evans Affirmative Report.

---

[7]    The Proof of Claim data show a similar decline.

19

CONFIDENTIAL - FILED UNDER SEAL



51.    The Trust Data shows a clear pattern of Trust Claims where the number of compensable abuse claims peaked in the 1970's and then began a pattern of decline.  The actual regression analysis was performed by birth year and month.  As the Court can see from the chart below, Fig. 12 from the Evans Affirmative Report, the shape is the same.

CONFIDENTIAL - FILED UNDER SEAL



Figure 12: Count of potentially compensable Current Claims from the Trust Data by birth year and month

52.    Figure 2 from the Evans Affirmative focuses on Trust Claims born after 1990. The chart focuses on this time period because it makes it visually easier to see the experience of the most recent time periods in relation to the forecasting of future time periods. The blue bars show the count of Trust Claims for those that were over 18 as of the Petition Date. The green bars reflect Trust Claims filed by claimants who were minors as of the Petition Date and filed claims either as Future Claims or opted-in to the POC process. Finally, the light blue line is the extrapolated curve of the regression analysis used to forecast Future Claims. For the years reflected in blue, if the bar exceeds the curve, that means Trust Claims exceeded the amount that the regression analysis' estimate for that period. For the blue bars that fall below the curve, which means Trust Claims were less than what the regression analysis estimated. It is normal and expected that in any particular year results will fall above or below the curve because data contain natural variation and

21

will never align perfectly with a mathematical equation.[8]    This variation and uncertainty underscores the relevance of the range of results predicted by the regression analysis (presented as error bars around the light blue line above the green bars).

**Figure 2: My forecast of Future Claims graphed alongside Current Claims for 1990–2015**

53.    As the Court can see, for the years with green bars, where Scouts were under the age of 18 as the Bar Date, the curve is above the green bars.  The curve is the estimate of total abuse claims for each of those birth years, the green bars are for those Trust Claimants who have already come forward.  The space between each green bar and the curve represents the expected number of claims that did not file Trust Claims yet but will do so in the future – the Future Claims.

---

[8]    A real-world example are coin flips.  There is a 50% probability a flip will be heads and a 50% probability a flip will be tails.  But if you did 10 sets of 100-coin flips per set, each set will not be equally split between heads and tails.  Some sets will be 52 heads, some sets will be 47 heads.  With enough intervals however, the average will be 50% heads.

22

54.     Mr. Evans' work estimates 232 Future claims with a range of 144 to 351 total claims for abuse by Scouts who were under 18 as of the Petition Date, meaning that he forecasts there will be between 96 and 215 additional Future Claims.[9]

55.     Mr. Evans' forecast is an independent confirmation, using an entirely different methodology, that PwC's forecast of Future Claims is reasonable and reliable for setting a payment percentage.  In addition, based on Mr. Evans' forecast, there is also confirmation that PwC's higher forecast number, which was intended to be a conservative estimate of the number of Future Claims, is in fact a conservative estimate.

## III.    The Basic Ankura Methodology and Conclusions are Unreasonable

56.     The entirety of the FCR's decision rests with his reliance on Ankura's estimate of approximately 11,000 Future Abuse Claims.  As discussed below and as will be demonstrated by the testimony of Andrew Evans of Bates White, the Ankura methodology is deeply flawed, internally inconsistent and unreasonable.  In addition, the FCR's estimate is heavily reliant on assumptions about the behavior of survivors of sexual abuse for which Ankura has no expertise and was not qualified to make.  This is particularly troubling because the literature Ankura relied upon to support its non-expert opinions on the behavioral science directly contradict the assumptions Ankura puts forth and specifically cautions against the very generalizations that Ankura makes. *See, e.g.,* Lucy McGill and Rosaleen McElvaney, "Adult and Adolescent Disclosures of Child Sexual Abuse: A Comparative Analysis," *Journal of Interpersonal Violence* 38, no. 1-2 (2023): 1164 ("While there is a high prevalence of first time disclosures during

---

[9]    The point estimate and upper end of the range (stated at a 95% confidence level) is most relevant for the payment percentage. The difference between Mr. Evans' forecast counting 136 already filed Future Claims and the Trust Data of 123 already filed Future Claims is that (i) 2 Future Claims have already been received and will not be filed in the future, and (ii) the analysis performed by Mr. Evans modeled the entire month of Trust Claims February 2002 rather than only those Trust Claims for survivors born after the Petition Date.

CONFIDENTIAL - FILED UNDER SEAL

adulthood, these adult studies do not reflect societal changes and raised awareness of sexual abuse in recent years. Research with children and young people suggest that the increased focus on child abuse over the past few decades may account for findings that children are more likely to disclose abuse within two to three years following the experience of abuse than at any other time in childhood (up to 18 years). Thus, it may be that children are beginning to disclose more promptly but more research is needed on both child and adult cohorts to examine this further.").

57.    Ankura's assignment in 2021 was to estimate how many claims might be filed in the future by Scouts who (a) were not 18 as of the Petition Date, meaning Scouts who participated in Scouting between 2007 and 2020, or (b) had repressed memory claims (which all sides believe is highly unlikely).

58.    To build its first model and first draft forecast in 2021, Ankura looked at data from the tort system with respect to suits filed against BSA and compared that against the POC Data. Ankura calculated the percentage of "younger filers" and all others in the Tort Data, ultimately concluding that younger filers comprise 14.7% of the claimants in the Tort Data. Despite the differences in the Trust and Tort data sets, this 14.7% was then applied to the Trust Data to calculate how many expected younger filers are still to come. In other words, by lumping together the prior 20 years of tort data, Ankura made a simplistic assumption that for abuse claims filed in a particular time period, it is expected that 14.7% of the claims will be filed by Survivors within 5 years of their abuse (Ankura refers to them as younger filers, in this Objection they will be referred to as "Near In Time Claims" or "Near in Time Suits") and 85.3% of claims would be filed by the adult survivor population. Essentially, this is a ratio of minor filed claims to adult filed claims derived from the Tort Data only. Ankura further decided that this 14.7% was fixed and could be

24

applied to any year despite there being no empirical support for a fixed ratio as the percentage of young filers continually changed over time.

59.     A major problem with this assumption is that the ratio of Near In Time Claim filings to adult claim filings in a particular year has never been fixed.  The empirical Tort Data show a ratio that steadily dropped over time – from essentially 100% of Near In Time Claims in the 1970's to 8% Near In Time Claims filed in 2019.

60.     There were over 82,000 unique Proofs of Claim filed by the adult survivor population in the BSA Case.  All but 200 were adult filed claims.  According to Ankura's ratio theory, the 82,000 only represented 85.7% of the expected claims pool and, to get to 100%, there should have been over 14,000 Near In Time Claims filed.

61.     Ankura, certain that there were 14,000 incidents of abuse during the Future Claims Period that would result in claims, then speculated that they just weren't filed as part of the Bar Date but would be filed sometime later as Future Abuse Claims.  The only major adjustment Ankura made to the gross number of 14,000 is a determination that about 2,800 of the missing claims would not be allowed due to statute of limitations issues.  Ankura hypothesized that the Trust would see the missing 11,000+ Near In Time Claims filed as Future Abuse Claims after the Trust was established.

62.     In arriving at its 2021 estimate:

a.     Ankura did no independent analysis of the impact of whether BSA's youth protection initiatives may have had an impact such that abuse in Scouting had been significantly reduced in 2007 – 2020 as compared to the 1960's through the early 1980s.

b.     The Ankura team, none of which have any expertise in child sexual abuse disclosures or protection policies, performed internet searches to locate literature. The research available in 2021 uniformly agrees that the crisis of childhood sexual abuse peaked in the 1960s and 1970s and had been in steady decline ever since.  Indeed, Mr. Northeim admitted that "I believe that abuse has declined over – over the last several decades . . . ." Northeim Tr. 36:3-5.

c.      Similarly, the Ankura team did not account for the manner of submitting a claim to the Trust.  A confidential claims process which puts disclosure fully within the control of the survivor acts as a facilitator for disclosure, undercutting Ankura's broad concept of lag.

d.      Compounding Ankura's errors, Ankura made no adjustment for the fact that only a subset of Scouting could fit in the definition of a Future Claim in the 2007 – 2020 time period.[10]

63.      Ankura's 2024 work, culminating in an "Initial Ankura Report" presentation deck, performed the same core calculations and suffered the same flaws as its 2021 work. It too relied on the POC Data, applied a fixed 14.7% to identify young filers, estimated minor claims and repressed memory claims, and excluded a subset of claims for statute of limitations reasons. It too performed no analysis on the impact of BSA's youth protection program and failed to incorporate declining abuse rates, declining Scouting population, and limited years of potential exposure for Future Claims. It does state that its "forecast recognizes and adjusts for the BSA anti-abuse initiatives that started in 1987" (Initial Ankura Report, p. 4), but its calculations do not, and as discussed later its resulting abuse rates have not declined. The 2024 work is updated to include claim values. However, there was still no analysis of when the forecasted Future Claims would file

64.      Since that time, there was a dramatic change in the data that could be used to estimate Future Abuse Claims.  Rather than rely on the 82,000 Proofs of Claim, there was a better and more refined data set.  The Trust Claims data, which had 64,000 allowed Trust Claims, of which all but 130 were filed by adult survivors.  In 2026, Ankura again applied the 14.7% / 85.3% ratio.  That math arrived at a nearly identical conclusion that there should have been 11,000+ Near

---

[10]   To have a Future Claim, a Scout had to have been under the age of 18 as of February 20, 2020.  Thus, for Scouting year 2007, only 5-year-olds could potentially be future Claimants.  In 2008, only 5- and 6-year-olds.  2013 was the first year where 11-year-old Scouts could have been under 18 as of the Petition Date, which is the age Ankura relies on as being the average of first abuse.

CONFIDENTIAL - FILED UNDER SEAL

In Time Claims that were missing and would be filed as Future Abuse Claims.  The only major difference Ankura employed in 2026 for estimating these potential Future Abuse Claims was to stop making a downward adjustment for statute of limitations issue and kept the simple math as their forecasted number.

65.  In order for there to be 11,000 Future Abuse Claims during the Future Abuse Claims period, (i) abuse rates in scouting during the Future Abuse Claims period would have to exceed all historical rates of abuse of Scouts despite the data showing a clear decline in abuse claims starting in the late 1980s and, (ii) that Scouts who were being abused were no longer were coming forward with Near In Time Claims, despite tort system data that showed a clear trend of increasing Near In Time Claims in the 30 years leading up to the Petition Date.

## A.    *Ankura Ignores the Empirical Realities of the Tort Data, which Realities are Reinforced by the Trust Data*

66.  While Ankura's approach to the data from the tort system was overly simplistic, a careful review of the data shows that there has been a clear and unmistakable decline in abuse claims since the peak period of the 1960s – early 1980s.  In response, Ankura makes two assumptions not rooted in the empirical data but instead, are behavioral science concepts for which Ankura has no qualifications to apply and for which there is no support in the literature on which Ankura relied.

67.  First, starting in the early 2000s young adult survivors became more reticent to come forward as youths and instead began to "self-censor" disclosure until adulthood.  Second, the easing of statutes of limitations in 2002 and 2010 was only effective with respect to survivors in their 40s and beyond and that adult survivors younger than their 40s self-censored.

68.  Those two assumptions allow Ankura to assume that the tort system data was inherently unreliable and, instead, Ankura could project tens of thousands of missing claims.  If

27

CONFIDENTIAL - FILED UNDER SEAL

those missing claims are to be believed, while incidents of abuse may have declined, the actual rates of abuse per 10,000 Scouts never declined over the past 40 years, *and during the Future Claim Period rates of abuse rose to a level that exceed the peak abuse of the 1970s.*

### B.    A Review of the Tort Data

69.    The narrative of abuse told by the empirical data from the tort system does not support Ankura's claim forecast.

70.    For suits brought in the 1970s and through 1999, nearly 100% of the suits were Near In Time Suits brought by minors.  On average, those survivors brought suit around 5 years from the time that they suffered abuse.

71.    That observation makes sense because the average age of abuse of a Scout was around 11 years old.  Mr. Northeim has admitted as such in his deposition.  Northeim Tr. 100:24 – 101:3, *see also*, Ankura Rebuttal Report, at 33 n.57.  Statutes of limitations barred actions not long after a Scout would reach the age of majority (18 years).  Thus, suits either had to be brought at or near the age of minority or they were barred.

72.    Starting in the mid to late 1980s there became an awareness that there was a significant amount of child sexual abuse taking place, far more than what the tort system data showed.  This was an issue not just in BSA but in many youth serving organizations and faith-based organizations, most notably, the Catholic Church.  *See e.g.*, John Jay College of Criminal Justice, *The Nature and Scope of sexual Abuse of Minors by the Catholic Priests and Deacons in the United States 1950 – 2002* (2004) [hereinafter 2004 Study], https://www.bishop-accountability.org/reports/2004_02_27_JohnJay_revised/2004_02_27_John_Jay_Main_Report_Optimized.pdf; John Jay College Research Team, *The Causes and Context of Sexual Abuse of Minors by Catholic Priests in the United States, 1950-2002* (2011) [hereinafter 2011 Study],

28

CONFIDENTIAL - FILED UNDER SEAL

https://www.usccb.org/sites/default/files/issues-and-action/child-and-youth-protection/upload/The-Causes-and-Context-of-Sexual-Abuse-of-Minors-by-Catholic-Priests-in-the-United-States-1950-2010.pdf (both studying the incidences of sexual abuse in the Catholic Church in the United States and concluding that childhood sexual abuse peaked in the 1970s and began to decrease starting around 1985 in part due to the implementation of youth protection measures); *see also* Pounder Decl. ¶¶1, 18-19 (and literature cited to therein).

73.     Two major things happened in response to that awareness. Most importantly, organizations such as BSA and the Catholic Church began to implement far more stringent and effective youth protection measures. Second, societal awareness of abuse decreased the stigma of coming forward and there was an increase in claims being filed. These are commonly accepted in the behavioral science literature studying historical sexual abuse of children. *See e.g.*, the 2004 Study; the 2011 Study; Dafna Tener and Sharon B. Murphy, *Adult Disclosure of Child Sexual Abuse: A Literature Review*, Trauma Violence, & Abuse 16, no. 4 (2014): 398; McGill, L. and McElvaney, R. (2023), *Adult and Adolescent Disclosures of Child Sexual Abuse: A Comparative Analysis*, Journal of Interpersonal Violence, 2023, Vol. 38(1-2).

74.     Below is a chart that shows in 5-year cohorts from 1975 through 1999 the number of Near In Time Claims filed, along with all suits filed and the average lag from abuse to filing for all suits. What this shows is that during this 1975-1999 nearly every suit brought was either a Near In Time Suit (within 5 years of abuse) or a suit brough not much later – e.g. the other suits were still being filed at or near the time of abuse.

| Filing year cohort | Near In Time Suits | All tort claims | Average Lag in Years to Filing |
|---|---|---|---|
| 1975–1979 | 2 | 2 | 0 |
| 1980–1984 | 44 | 47 | 1 |

29

CONFIDENTIAL - FILED UNDER SEAL

| | | | |
|---|---|---|---|
| 1985–1989 | 106 | 113 | 2 |
| 1990–1994 | 91 | 131 | 5 |
| 1995–1999 | 55 | 94 | 7[11] |

75.     An explanation for the increase in Near In Time Suits as compared with the 1970's is that, beginning in the mid 1980's, youth survivors of abuse felt more comfortable coming forward with claims of abuse.  That conclusion is supported by the literature on which Ankura relies.  *See, e.g.*, Dafna Tener and Sharon B. Murphy, *Adult Disclosure of Child Sexual Abuse: A Literature Review*, Trauma Violence, & Abuse 16, no. 4 (2014): 398; McGill, L. and McElvaney, R. (2023), *Adult and Adolescent Disclosures of Child Sexual Abuse: A Comparative Analysis*, Journal of Interpersonal Violence, 2023, Vol. 38(1-2).

76.     Looking next at the four 5-year cohorts leading up to the Petition Date, the data shows a continued decline of Near In Time Suits.  While the total number suits filed in the 2000-2004 and 2005 – 2009 cohorts are similar, the majority of suits were being filed by much older survivors and, as expected, the average lag begins to significantly rise.  Ankura acknowledges the rise in lag was due to major initiatives in 2002 and 2010 that eased statues of limitations and allowed survivors to come forward.

| Filing year cohort | Near In Time Suits | All tort claims | Average Lag in Years to Filing |
|---|---|---|---|
| 2000–2004 | 45 | 110 | 16 |
| 2005–2009 | 27 | 92 | 17 |
| 2010–2014 | 36 | 371 | 31 |

---

[11] While the 7 years of lag for this cohort exceeds the Near In Time Claim lag period, given the average age of abuse of 11 and the existence of statutes of limitation, a lag of 7 years still places those filers at or near the age of minority at the time the suit was filed.

CONFIDENTIAL - FILED UNDER SEAL

| 2015–2019 | 30 | 363 | 38 |
|-----------|----|-----|----|

77. Empirically, two trends are observable. First, as compared to the 1985-89 and 1990–94 cohorts (Scouts from the 1980s), Near In Time Suits had declined by over 66%. That is consistent with the implementation of youth protection measures and consistent with all of the literature that acknowledges the crisis of abuse peaked in the 1970s and was in decline beginning around 1985.

78. However, Ankura's estimate of 11,000 Future Abuse Claims for 2007 – 2020 requires a disregard of the empirical data showing a decline in abuse claims and requires an assumption that youth survivors reversed a two-decade trend of coming forward and instead began to self-censor.

79. The second trend is that there is clear empirical evidence that the rise in lag involves suits for which the abuse was alleged to have occurred in the 1960s and 1970s. Below is a bar chart, adapted from Fig. 55 of the Evans Rebuttal Report, which shows the four 5-year filing cohorts from the 2000's – when statutes of limitations were eased – and plots for each cohort the years of abuse identified in the suits filed for each cohort.

CONFIDENTIAL - FILED UNDER SEAL



80.    For suits alleging historical abuse, the overwhelming majority of suits related to 1984 and earlier.  The chart above shows a steep decline in suits alleging abuse after 1985.

81.    Ankura again chose to ignore the empirical data supporting a decline of abuse claims filed in the tort system.  Instead, Ankura posits that the same behavioral stimulus – the easing of statute of limitations for adult survivors – is generally only effective for those in their late 40s and older and that the exact same stimulus was ineffective in encouraging younger adult survivors to come forward.  This allows Ankura to assume that abuse rates did not meaningfully decline.  Instead, Ankura asserts the data are incomplete because claims are missing.

82.    This is another conclusion that can only be based in behavioral science, not economic science, because it requires the willful ignorance and disregard of the empirical data.

CONFIDENTIAL - FILED UNDER SEAL

Ankura, of course, has no expertise in behavioral science relating to the historical sex abuse of children.[12]

83.     Having ignored the clear, empirical data showing a decline in abuse, Ankura can rely on its hypothesis that abuse has continued unabated and in every year in which claims are asserted, there should be a fixed ratio of Near In Time Claims and claims relating to historical abuse.

84.     That hypothesis yields difficult to believe assertions when Ankura applies the hypothesis to the Trust Data.

C.     *Ankura's Forecast Implies that Abuse Never Abated and Actually Increased in the 2000s*

85.     In his deposition, Mr. Northeim testified that his model estimated a 40% - 50% decline in abuse for BSA during the Future Claims Period.  Northeim Tr at 125:7-11.  That decline is not mentioned anywhere in his expert reports.  To the contrary, when analyzing his forecast of Future Abuse Claims, it implies at least a 15% higher rate of abuse in the Future Claims Period compared to the 1970's peak of abuse.

86.     The reason for this is that Mr. Northeim's projections do not consider that youth participation in Scouting significantly declined from the 1970's to the Future Claims Period. Second, Mr. Northeim does not account for the fact that during the Future Claims Period, only a subset of the Scouting population could have a Future Abuse Claim. [13]

---

[12]  While Ankura does cite to literature that speaks to survivors of abuse tending to not come forward until later in life, those studies are not studies based specifically on participants in the tort system, let alone in response to situations following the deliberate removal of a barrier to coming forward with allegations, such as the easing of statutes of limitation.

[13]  To repeat a prior footnote, in order have a Future Claim, a Scout had to have been under the age of 18 as of February 20, 2020.  Thus, for Scouting year 2007, only 5-year-olds could potentially be future Claimants.  In 2008, only 5- and 6-year-olds. 2013 was the first year where 11-year-old Scouts (the average age of abuse) could have been under 18 as of the Petition Date.  There is only one year, 2020, where all years of scouts (ages 5 – 17) could potentially have Future Claims.

CONFIDENTIAL - FILED UNDER SEAL

87.    Below is a chart adapted from Mr. Evans' Rebuttal Report, Fig. 27, which shows the rates of abuse per 10,000 Scouts in 5-year cohorts starting in 1970 through 2004 using the Trust Data.

88.    The last line of the chart sets out the rates of abuse implied in Ankura's forecast. For the Ankura projection line, which is for the rates of abuse per 10,000 Scouts among those who could have a Future Abuse Claim, the total Scouting population has to be adjusted to reflect only the population of Scouts who would fit the definition of Future Claimants in each year of the Future Claims Period.

| Year of first abuse | Average count of Trust reported abuse incidence per year | Average annual participation | Classes of Scouting eligible as Current Claims | Adjusted at-risk Scouting Population | Abuse incidence rate per 10,000 eligible participants | Percent of historical max |
|---|---|---|---|---|---|---|
| 1970-1974 | 2,468 | 4,284,186 | 100% | 4,284,186 | 5.8 | 88% |
| 1975-1979 | 2,023 | 3,092,400 | 100% | 3,092,400 | 6.5 | 100% |
| 1980-1984 | 1,499 | 2,755,823 | 100% | 2,755,823 | 5.4 | 83% |
| 1985-1989 | 1,124 | 2,989,841 | 100% | 2,989,841 | 3.8 | 57% |
| 1990-1994 | 771 | 3,022,346 | 100% | 3,022,346 | 2.6 | 39% |
| 1995-1999 | 540 | 3,058,123 | 100% | 3,058,123 | 1.8 | 27% |
| 2000-2004 | 267 | 2,922,168 | 100% | 2,922,168 | 0.9 | 14% |
| **2007-2019** | **854** | **2,277,427** | **50%** | **1,138,713** | **7.5** | **115%** |

| Ankura Forecast | | | | | |
|---|---|---|---|---|---|
| | | | | | |

89.    The historical abuse rate per 10,000 Scouts was the highest for the 1975 5-year cohort, when 6.5 Scouts per 10,000 reported incidences of abuse to the Trust.  The Ankura forecast indicates that there will be 7.5 incidences of abuse per 10,000 Scouts within the Future Claimant subset of the Scouting population.  The math on Ankura's projections is simply inconsistent with Mr. Northeim's statement that he adjusted abuse rates down 40% from the peak.  If that were true, his forecast would be predicting 3.9 incidences of abuse per 10,000 Scouts.  That would imply abuse rates virtually unchanged from the 1985 5-year cohort when abuse prevention mechanisms were implemented and well above the abuse rates observed beginning in 1990, which is when all literature agrees that abuse rates were in decline.

90.    It must also be noted that Mr. Evan's chart assumes that the population of Scouting classes is level and that each class is 1/14th of the total Scouting population.  The reality is that the Scouting population skews heavily towards Cub Scouts.  Below is an excerpt from the BSA 2012 Annual Report which breaks out Scouting population by category.  Boy Scouts of America, *2012 Annual Report* 23 (2012), https://filestore.scouting.org/filestore/annualreport/2012/324-168_2012annualreport.pdf.

CONFIDENTIAL - FILED UNDER SEAL

## BOY SCOUTS OF AMERICA TRADITIONAL MEMBERSHIP SUMMARY

| REGISTERED YOUTH | 2011 | 2012 | GAIN/LOSS |
|---|---|---|---|
| Tiger Cubs | 223,003 | 212,677 | -4.6% |
| Cub Scouts | 747,429 | 726,775 | -2.8% |
| Webelos Scouts | 612,734 | 589,221 | -3.8% |
| Total Cub Scout–age youth | 1,583,166 | 1,528,673 | -3.4% |
| Boy Scouts | 848,291 | 848,236 | 0.0% |
| Varsity Scouts | 61,285 | 62,432 | 1.9% |
| Total Boy Scout–age youth | 909,576 | 910,668 | 0.1% |
| Venturers | 231,127 | 219,453 | -5.1% |
| TOTAL TRADITIONAL SCOUTS | 2,723,869 | 2,658,794 | -2.4% |

91.  As the Court can see, the majority of the Scouting population are Cub Scouts, comprising Kindergartners through 5th Grade (5 – 11-year-olds), for whom it is mandatory that a parent (for Tiger Scouts) or an adult partner (Cub and Webelo Scouts) be present at all meetings and activities.  Those stringent youth protections are the type on which Mr. Pounder relies when he testifies that youth protection measures have greatly reduced the rates of abuse in Scouting.

92.  The presence of a parent or adult partner is meant to, and should, virtually eliminate the probability of Cub Scout abuse, the Cub Scout population cannot credibly be considered as part of Ankura's at-risk population. If they were to be removed from consideration that would virtually eliminate the 2006-2011 Scouting populations in the Future Claims Period, which is comprised almost entirely of Scouts 11 and under.  Realistically then, Ankura's estimate of approximately 11,000 Future Abuse Claims will have to come from the 2012 – 2020 period and from just the 12 to 17-year-old age cohort.  Basic math implies that if the population of at-risk Scouts during the Future Abuse Claims period is cut in half while keeping projected claims the same, the rate of abuse per 10,000 Scouts would more than double.

36

CONFIDENTIAL - FILED UNDER SEAL

**D.    *Ankura's Forecast Leads to Other Implausible Results***

93.    In his rebuttal report, Dr. Evans uses Ankura's work papers to tabulate forecast abuse by birth year.  Evans Rebuttal Report, at V.B.2.  Figure 29 in that section sets out that tabulation showing each population's birth year, the age at which the population would have to have been first abused and the total amount of forecast claim for each of those birth years.

94.    The Court need only look at the first line of the chart.  Ankura's work papers forecast that in the year prior to the Petition Date, 975 5-year-olds would have been abused.  For context, in the entirety of the Trust Data spanning over 80 years there were 2,106 claims involving Scouts 5 or younger.

| Birth year | Age at first abuse | Potential years of abuse | Ankura Future Claims |
|---|---|---|---|
| 2015 | <=5 | 1 | 975 |
| 2014 | <=6 | 2 | 975 |
| 2013 | <=7 | 3 | 975 |
| 2012 | <=8 | 4 | 975 |
| 2011 | <=9 | 5 | 975 |
| 2010 | <=10 | 6 | 1,024 |
| 2009 | <=11 | 7 | 805 |
| 2008 | <=12 | 8 | 711 |
| 2007 | <=13 | 9 | 711 |
| 2006 | <=14 | 10 | 744 |
| 2005 | <=15 | 11 | 744 |
| 2004 | <=16 | 12 | 744 |
| 2003 | <=17 | 13 | 744 |
| Total | | | 11,103 |

**E.    *Ankura's Lag Theory Would Mean that the Bar Date Was Ineffective***

95.    In 2026 Ankura's assignment also required it to predict when the 11,000 Future Abuse Claims would be filed.  At that point it introduced its theory of "lag."  Their belief was that all of the self-censoring Scouts with Future Abuse Claims would predominately wait until their late 40's and beyond to assert their Future Abuse Claims in a predictable pattern.  To develop that pattern, Ankura again lumped together the tort data from 2000 – 2019 and graphed the distribution

CONFIDENTIAL - FILED UNDER SEAL

of suits filed at the age of filing.  They then overlaid that with the distribution of Trust Claims by age of filing the Trust Claim.



96.    The left side of the chart in blue comprise the 14.7% of Near In Time Claim filers from the tort system that Ankura hypothesizes should have filed Proofs of Claim.  Because the Trust Data in orange does not have that population of younger filers, those become the "missing" claims that will be filed as the 11,000+ Future Abuse Claims against the Trust.  Ankura then assumes the Future Abuse Claims will file later in life using the right-hand side of the blue from the Tort Claim Data starting at age 20.  For those born in 2005, 10 survivors or about 1.4% of that group will file a Future Abuse Claim at age 20 (or in 2025), 18 about 2.4% will file a claim at age 41 (or in 2045) and 20 about 2.8% of that group will file a claim at age 60 (or in 2064).

97.    This is Ankura's lag theory – (1) abuse never declined, (2) the claims exist, (3) believe those claims are missing from the data, (3) believe they will file later in life using the same age distribution of other filers.  How does Ankura know the claims are missing – because lag theory tells them so.  How will the Trust know if lag theory is correct – wait 40 more years.

98.    If "lag theory" were truly valid, and abuse was unabated, the Trust Data should have an expected number of claims consistent with the theory.  Since those claims are not in the

CONFIDENTIAL - FILED UNDER SEAL

Trust Data, they are "missing." Ankura performs a 20- and 25-year lag adjustment to the PwC

forecasts but only performs a 20-year lag adjustment to the Bates White forecast. Below is a chart

from Ankura's work papers for its rebuttal report graphing Trust Claims by claimants' birth year

with an adjustment for 25 years of additional lag (the corresponding 20-year adjustment was

presented in the Ankura Rebuttal Report).



Figure III.3
Trust Claims by Claimants' Birth Year

99.      The blue bars represent the Trust Data and show a decline in claims such that by

1985, Allowed Abuse Claims from survivors born in 1985 are 1/3 of the number of claims from

the peak. That is consistent with the Tort Data, which shows a significant decline in Near In Time

and historical abuse claims beginning 1985. *See* Evans Rebuttal Report ¶¶95–96 and

accompanying Fig. 1.1 above. Lag theory, because it relies on continued abuse rates, should not

show such a drop off. Hence, Ankura adds the orange bars, which represent the "missing" claims.

CONFIDENTIAL - FILED UNDER SEAL

100.    In Ankura's 25-year lag model, there are 55,000+ claims from the 1970's through 2001 that are missing from the Trust Data.[14]  They exist Ankura says, but because the Bar Date was in 2020, the 25-year lag period, after which the survivors would have come forward, was cut off.  The Court can see that "lag theory" would mean that in the early 2000s incidences of abuse would have exceeded the 1960s and 1970s at a time when the Scouting population had significantly decline.  It is another visual depiction of Ankura's work product implying unprecedented rates of abuse in Scouting.

101.    That also implies that the Bar Date was a near complete failure with respect to survivors who were in their mid-40's and younger as of the Bar Date.  That conclusion is hard to square with the actual experience in the BSA bankruptcy when prior to the bar date there were around 1,300 known claims for abuse and after the Bar Date there were 82,000 unique Proofs of Claim that resulted in 64,000 Trust Claims.  As set out in the BSA Objection, the Bar Date noticing process and the heavy involvement of the plaintiff's bar in initiating a massive advertising campaign to reach survivors was staggeringly ineffective with respect to certain ages of survivors. *See*, BSA Objection at ¶21.

102.    Ankura's chart below illustrates the degree to which Ankura believes the Bar Date was ineffective.  The blue A1 area represents Trust Claims asserted by birth year for those who were between the ages 18- 30 as of the Bar Date.  The orange A2 area is a depiction of all of the survivors that Ankura posits existed but did not respond to the Bar Date.

---

[14]    In Ankura's 20-year lag model, there are 19,000+ claims from the 1980's through 2001 that are missing from the Trust Data.

CONFIDENTIAL - FILED UNDER SEAL



103.    Ankura's basic model has existed since 2021.  If that model implied the Bar Date was wholly ineffective in 2021, why has the FCR chosen to wait until now to make that claim?

### F.    *Ankura Is Unaware of Diocesan Bankruptcies and the Diocesan Bankruptcy Experience of Very Few Future Abuse Claims*

104.    At his deposition, Mr. Northeim was asked if he was aware if any data or literature he relied on involved or studied confidential submission of sexual abuse claims to a settlement trust.  His response was "I don't believe so.  I don't think there's been a trust like this historically. So in many ways this is the experiment right now."  Northeim Tr. 190:11 – 20.

105.    That assertion because shows a complete unawareness of the many Diocesan bankruptcies that have taken place in the United States.  Most of those bankruptcies have involved plans which established trusts that provided for the submission of future claims.  The Settlement Trust is not the first of its kind, it is not an experiment. It is, unfortunately, one of many such trusts to compensate victims of childhood sexual abuse.

106.    The future claim experiences of many of those trusts are publicly available.  That publicly available data underscores the reasonableness of the work of PwC, Bates White and the

CONFIDENTIAL - FILED UNDER SEAL

sound decision of Judge Houser that the likely incidence of Future Abuse Claims for the Settlement Trust is low.

107.    On the docket in the bankruptcy case of *In re: The Norwich Roman Catholic Diocesan Corporation*, Case No. 21-20687 (JJT) (Bankr. D. Conn) is the Unknown Claims Representative's Second Revised Report and Recommendations, Docket No. 1880 (the "UCR Report" attached hereto as Exhibit C), which sets out his opinion on the likely occurrence of future claims in that case and lays out the future claims experience of 11 prior diocesan bankruptcy cases.

108.    The Unknown Claims Representative ("UCR")[15] in the Norwich case is the Hon. Michael R. Hogan (Ret.) a former judge for the United States District Court for the District of Oregon.  Judge Hogan has been involved in 16 mass child abuse bankruptcy cases as a mediator or UCR.  UCR Report at p. 5.

109.    Judge Hogan states a primary place to find extensive research to inform claims of abuse in diocesan cases are two papers published by the John Jay College of Criminal Justice, the 2004 Study and 2011 Study referenced *supra*.  Judge Hogan notes that, based on his experience, the two studies are a remarkable predictive tool in child sex abuse bankruptcy cases.

110.    As Judge Hogan notes, the 2011 showed a consistent distribution of abuse across dioceses and that there was a pattern of abuse in the Catholic Church that increased steadily through the 1970's and early 1980's with a sharp drop off in 1985.  UCR Report at 6.  An observation consistent with empirical data of the Settlement Trust and the literature on which Ankura relied.

111.    What is most illustrative about the UCR Report is the Appendix A to the report, in which Judge Hogan charts the future claim experience of 11 diocesan bankruptcies where he has

---

[15]    In diocesan bankruptcies the future claimants representative is referred to as the unknown claims representative.

served as the UCR. Across those 11 trusts there were less than 150 total allowed future claims as of January 24, 2025. In multiple trusts there had been no allowed future claims paid and the highest number of future claims allowed was 47.

112. Importantly, the definition of future claims in those diocesan cases is similar to, and more expansive than the definition of Future Abuse Claims here. Attached as Exhibit D is a chart that sets out the definitions of future claims in each of the diocesan cases noted in Appendix A to the UCR Report.

113. Contrary to Mr. Northeim's testimony, the Settlement Trust is not the test case for future claims in mass tort abuse cases. It is just one of a number of similar trusts. And the experience of the Settlement Trust mirrors the experience in the diocesan cases – there are dozens, not tens of thousands, of future claims being filed.

114. The experience of the Trust here is remarkably similar to what has taken place in 11 prior trusts for childhood sexual abuse. The actual experience of the diocesan bankruptcies is completely consistent with the forecasts of PwC and Bates White. There will be some Future Abuse Claims, but nowhere close to 11,000.

## IV. The FCR's Objection Is Unreasonable

115. The STAC appreciates that the FCR takes his job as a fiduciary seriously and is legitimately trying to protect the interests of Future Abuse Claimants. However, such intentions do not mean that all of the FCR's actions are reasonable. In this case, they are not.

116. The FCR relied on Ankura's work product in 2021 when he was shooting from hip. There were enormous pressures at stake during the confirmation process and the STAC recognizes that, at that time, the need to act and take positions was paramount.

117.    But nearly 5 years have elapsed since then.  The FCR has had the benefit of significantly revised data and years of experience where only 2 Future Abuse Claims have been filed, yet ignores that actual experience.  That is not reasonable.

118.    The FCR relies on a methodology that, when the empirical data does not support the assertion, assumes the data is wrong – thousands and thousands of claims exist but will never be seen because of the Bar Date.  That is not reasonable.

119.    The FCR and his experts ignore the experience of diocesan bankruptcies within the Catholic Church.  Those experience confirm the Trust's forecasts and directly contravene Ankura's projections. Yet the FCR points to his representation of the Diocese of Wilmington as relevant experience for his qualifications.   That is not reasonable.

## CONCLUSION

WHEREFORE, for the reasons set forth in this Objection, the STAC respectfully request that the Court deny the FCR's Motion and find that the Trustee's Proposed Payment Percentage is in the best interests of the Trust and its beneficiaries.

Dated: June 4, 2026                    Respectfully submitted,
        Wilmington, Delaware

                                       _/s/ Jeremy W. Ryan_
                                       Jeremy W. Ryan (No. 4057)
                                       Jesse L. Noa (No. 5973)
                                       Andrew L. Brown (No. 6766)
                                       Sameen Rizvi (No. 6902)
                                       **POTTER ANDERSON & CORROON LLP**
                                       1313 N. Market Street, 6th Floor
                                       Wilmington, Delaware 19801
                                       Telephone: (302) 984-6000
                                       Facsimile: (302) 658-1192
                                       Email:   jryan@potteranderson.com
                                                jnoa@potteranderson.com
                                                abrown@potteranderson.com
                                                srizvi@potteranderson.com

                                       *Counsel for the Settlement Trust Advisory Committee*

44

CONFIDENTIAL - FILED UNDER SEAL

**EXHIBIT A**

**Evans Affirmative Report**

# FILED UNDER SEAL

CONFIDENTIAL - FILED UNDER SEAL

CONFIDENTIAL - FILED UNDER SEAL

**EXHIBIT B**

**Evans Rebuttal Report**

# FILED UNDER SEAL

CONFIDENTIAL - FILED UNDER SEAL

**<u>EXHIBIT C</u>**

**<u>UCR Report</u>**

CONFIDENTIAL- FILED UNDER SEAL

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| In re: | Chapter 11 |
| THE NORWICH ROMAN CATHOLIC DIOCESAN CORPORATION,[1] | Case No: 21-20687 (JJT) |
| Debtor. | |

## UNKNOWN CLAIMS REPRESENTATIVE'S SECOND REVISED REPORT AND RECOMMENDATIONS

Michael R. Hogan, the Unknown Claims Representative ("UCR"), makes the following revised Report and Recommendations on behalf of the Unknown Abuse Claimants.

On July 18, 2022, the Debtor filed the Debtor's (I) Motion to Appoint an Unknown Claims Representative and (II) Application to Employ Michael R. Hogan as the Unknown Claims Representative (the "UCR Motion") (Dkt. 720) in the above-titled proceeding pending before the Bankruptcy Court for the District of Connecticut, Hartford Division. On August 8, 2022, the Bankruptcy Court entered its order appointing me to serve as the Unknown Claims Representative (the "UCR Order") (Dkt. 753) in Bankruptcy Case. On January 16, 2024, the Debtor filed the UCR's initial Report and Recommendations (Dkt. 1622). Shortly thereafter, the Bankruptcy Court entered an Order scheduling a hearing to consider the report and hear the testimony of the UCR regarding the report, which hearing was scheduled for March 26, 2024. (Dkt. 1640 and 1716). On March 6, 2024, the UCR filed a revised Report and Recommendations (the "Report") (Dkt. 1712). The UCR testified at the March 26, 2024 hearing on the Report. After the hearing, the Bankruptcy Court determined that the Report was not complete and entered an order requiring the Debtor to

---

[1] The Debtor in this chapter 11 case is The Norwich Roman Catholic Diocesan Corporation, a/k/a The Roman Catholic Diocese of Norwich. The last four digits of the Debtor's federal tax identification number are 7373.

1

CONFIDENTIAL- FILED UNDER SEAL

produce a record of documentation regarding allegations of substance of sexual abuse of a minor (Dkt. 1739). In July and August, 2024, in response to a subpoena served by UCR's counsel, the UCR received over 15,000 pages of documents from the Debtor regarding allegations of sexual abuse of a minor. Over the past several months the UCR has reviewed the documentation produced by the Debtor, and engaged in several discussions with the Debtor and its representatives regarding the documentation. In addition, the UCR and his counsel participated in numerous mediation sessions with the Debtor, the Committee, the Court appointed mediator Judge Joan Feeney and other parties regarding the terms of an amended plan and the proposed treatment of Unknown Abuse Claims. After the conclusion of the mediation with Judge Feeney, my discussions with numerous parties, and my scrutiny of the documentation submitted by the Debtor and other documentation as described below, I submit this revised Report and Recommendations.

This proceeding was filed by the Norwich Roman Catholic Diocesan Corporation under Chapter 11 of the United States Bankruptcy Code, in part to provide compensation for the unresolved claims of the approximately 143 claims of survivors of sexual abuse, including those survivors who have not yet come forward. As UCR, I serve as the fiduciary for any Unknown Abuse Claimants who have not yet identified themselves by filing a claim form.

On November 19, 2021, the Court entered an order (Dkt. 386) establishing March 15, 2022, as the last date on which proofs of claim could be timely filed (the "Claims Bar Date"), which also provided for publication by which the Debtor could provide notice to potential claimants, both actual and constructive. In total, individuals filed 143 timely non-duplicative[2] proofs of claim in the Diocese's Bankruptcy Case alleging Abuse Claims.

---

[2] Duplicative proofs of claim have been disregarded for this Report.

CONFIDENTIAL- FILED UNDER SEAL

As the representative of the Unknown Abuse Claimants, and in accordance with the UCR Motion and UCR Order, I have undertaken an investigation and analysis to advocate and negotiate for the Unknown Abuse Claimants and the estimated reserve funds necessary to compensate for the Unknown Abuse Claims held by the Unknown Abuse Claimants. I have also, among other tasks, negotiated with the Debtor, the Committee and other appropriate parties the treatment of Unknown Abuse Claims through the Plan and the Unknown Abuse Claims Trust (the "UCT") Distribution Plan for the evaluation, determination and number and amounts of Abuse Claims of Unknown Abuse Claimants. Specifically, in a comprehensive effort to determine a fair UCT, I have, among other things:

1.    Reviewed the experiences of other dioceses and other religious orders that have reorganized under Chapter 11 of the Bankruptcy Code in response to large numbers of child sex abuse claims;

2.    Reviewed the extensive outreach of plaintiffs' counsel in Connecticut;

3.    Reviewed the actual notice and publication efforts concerning possible claims and the Claims Bar Date, as proposed by the Debtor and Committee and ordered by the Bankruptcy Court;

4.    Read every claim and studied the pattern of claims, the timing of claims in relation to incidents of abuse, and the relative dates of incidents of abuse, particularly in regard to the perpetrators with the highest incidences of abuse;

5.    Considered the number and pattern of pre-petition claims, the number and pattern of claims filed since the bankruptcy petition was filed, and the number of claims filed since the last date established by the Bankruptcy Court for creditors to file timely claims;

CONFIDENTIAL- FILED UNDER SEAL

6.      Considered the efforts by the Debtor to encourage potential abuse claimants to file claims;

7.      Considered the nature and allegations of the timely claims filed in this proceeding;

8.      Considered the 2004 and 2011 reports by the John Jay College of Criminal Justice concerning the sexual abuse of minors;

9.      Interviewed the Director and Bishop's Delegate for the Diocese's Office for Safe Environments on the programs enacted to safeguard children at diocesan parishes and schools;

10.     Reviewed third party audit records from 2003 to 2024, measuring compliance with *Charter for the Protection of Children and Young People*[3], promulgated by the United States Conference of Catholic Bishops in 2002;

11.     Interviewed the Chair of the Diocese's volunteer board of lay professionals who review allegations of abuse and the primary investigator of such allegations;

12.     Reviewed the "List of Clergy with Allegations of Substance of Sexual Abuse of a Minor[4]" published and maintained on the Diocese of Norwich website and compared it to the priests who have been accused by claimants in this proceeding;

13.     Reviewed the complete confidential personnel files of the Diocese of Norwich and all other documentation produced by the Debtor in response to the UCR's subpoena in July, 2024 (*see* Appendix C for a full discussion); and

---

[3] Available at: https://www.usccb.org/offices/child-and-youth-protection/charter-protection-children-and-young-people
[4] Available at: https://www.norwichdiocese.org/Find/Accused-Clergy

CONFIDENTIAL- FILED UNDER SEAL

14. Communicated extensively with lawyers for both the Debtor and Committee and negotiated over multiple days of mediations with the help of both Judge Joan Feeney and Judge Christopher Droney.

Additionally, I have background experience as a mediator for hundreds of child sex abuse cases involving faith-based institutions. I was a principal mediator for a similar proceeding concerning the Diocese of Portland (Oregon) several years ago, which was handled differently than this proposed settlement in that most of the money to pay claims was recovered through the settlement of ten insurance coverage cases and each of the approximately 150 abuse claims was settled individually[5]. A Chapter 11 proceeding was then built around those mediated settlements.

In addition, after the similar Spokane Diocese Chapter 11 was confirmed, it became apparent that more than 30 child sex abuse claims had not been resolved. I was then asked to mediate each of those cases to a satisfactory conclusion.

This is the sixteenth (16) catholic mass child abuse bankruptcy proceeding in which I have participated, usually as a future or unknown claims representative or similar role. I have provided a Report such as this one for thirteen (13) proceedings, including this one, and twelve (12) have been accepted as part of a confirmed plan to date[6].

| Archdiocese/Diocese/Order | Appointment | Report | Plan Confirmation |
| --- | --- | --- | --- |
| Helena (and Ursuline Order) | 4/9/2014 | 3/2/15 | 3/5/2015 |
| Gallup | 12/12/2015 | 6/16/2016 | 6/23/2016 |
| St. Paul and Minneapolis | 2/14/2017 | 9/21/2018 | 9/25/2018 |
| Crosier Fathers and Brothers | 7/20/2017 | 3/12/2018 | 4/6/2018 |
| Duluth | 1/14/2018 | 8/14/2019 | 10/21/2019 |
| Great Falls - Billings | 6/17/2018 | 7/24/2018 | 8/22/2018 |
| Agana | 2/21/2020 | 7/8/2022 | 10/20/2022 |
| St. Cloud | 6/18/2020 | 11/19/2020 | 12/4/2020 |
| Camden | 2/28/2021 | 7/26/2022 | 3/14/2024 |

---

[5] Note: I have only worked for Catholic institutions in these two capacities: as a UCR (or similar) or a mediator.
[6] I have not yet been required to qualify as an expert witness in any of these previous cases.

CONFIDENTIAL- FILED UNDER SEAL

| Winona-Rochester | 5/28/2021 | 6/21/2021 | 10/14/2021 |
|---|---|---|---|
| New Orleans | 7/26/2021 | | |
| Harrisburg | 11/16/2021 | 1/20/2023 | 2/17/2023 |
| Rockville Center (as advisor to UCR Hon. Robert Gerber) | 12/16/2021 | N/A | 12/4/2024 |
| Santa Fe | 6/13/2022 | 12/24/2022 | 12/28/2022 |
| Norwich | 8/8/2022 | Update | Pending |
| Santa Rosa | 10/19/2023 | | |
| Oakland | 12/20/2024 | | |

(*see also* Appendix A)

One primary place to begin analysis of the claims filed in this process is a comparison with the extensive research reflected in the John Jay College Criminal Justice papers on this general subject: "The Nature and Scope of Sexual Abuse of Minors by Catholic Priests and Deacons in the United States 1950-2002[7]" (the "2004 Study") and "The Causes and Context of Sexual Abuse of Minors by Catholic Priests in the United States, 1950-2002[8]" (the "2011 Study"). I have learned in reviewing the many cases in which I've served as UCR that these two studies are a remarkable predictive tool, absent some unusual circumstances.

One remarkable observation from the 2011 Study concerned the consistent distribution of incidents across region, year, and size of diocese. For almost every diocese, the incidents of abuse increased steadily in the 1970s and early 1980s, then fell sharply in 1985. This observation was consistent across region and size of diocese with a few glaring exceptions. After 1985, the rate of institutional abuse has been almost universally much lower. In this proceeding, when removing the claims from Mount Saint John School from the analysis, over 80% of the claims I am aware of are for abuse alleged to have begun in the 1970s or earlier. This falls in line with expectations.

---

[7] Available at: https://www.loc.gov/item/2019667266/
[8] Available at: https://www.usccb.org/sites/default/files/issues-and-action/child-and-youth-protection/upload/The-Causes-and-Context-of-Sexual-Abuse-of-Minors-by-Catholic-Priests-in-the-United-States-1950-2010.pdf

CONFIDENTIAL- FILED UNDER SEAL

Based on my document reviews and interviews with diocesan representatives, I think there is a very low chance of seeing a large group of credible claims come out of the period beginning after the early 2000s. By then, the Diocese had established new policies and programs to meet organizational goals set by the *Charter for the Protection of Children and Young People*[9]. Allegations of sex abuse against children have been extremely rare since that time. Indeed, the most recent allegation of any type of child sex abuse by a Diocesan-linked individual was in 2012 (arrest for the possession of child pornography). Thankfully there have been no allegations since then.

Overall, the claims in this matter follow the usual, and unfortunately predictable, pattern until approximately 1990, when new administrators were hired for the Mount Saint John School for boys, located in Deep River, CT. That year, a Christian Brother named Brother McGlade, who was from the Oceania province in Australia, was appointed Executive Director.

That is when the situation at Mount Saint John School took a horrible turn for the worse. There are approximately 162 total non-duplicative Abuse Claims filed in this proceeding (timely plus late-filed), and fully 77 name Brother McGlade as at least one of the perpetrators. Also, most of these claims arose in the 1990s. For the period from 1944-1985, there were 11 Mount Saint John School claims and 47 others. For the period from 1986-2007, there were 83 Mount Saint John School claims and 11 others.

This is very unusual. By the 1990s, there was a substantial increase in knowledge and understanding in American society about victimization and the harms of child sexual abuse. Changes were made in statutes related to rape and sexual abuse of children and reporting

---

[9] The NO GO TELL curriculum, for instance, has been required for all youth participating in parochial schools, high school, parish and ministry activities in the Diocese since 2019. The curriculum is taught each year to around 15,000 children, who learn about appropriate behaviors, identifying abusive situations and building skills to remain safe.

CONFIDENTIAL- FILED UNDER SEAL

requirements of child abuse and neglect, an understanding of the cause of sexual offending advanced and research related to the treatment of sexual offenders expanded. It has been uncanny how consistent this reduction has been in the cases that I have reviewed.

One striking conclusion from the 2004 Study was how serial offenders – those who abused 10 or more victims – accounted for a very disproportionate quantity of instances of abuse. While this group constituted only about 3.4% of abusers, they were responsible for a full 26% of the overall abuse. I have observed that the higher the percentage of serial abusers in a group case, the more potential there is for a higher quantity of future claims. As noted here, Brother McGlade is alleged to have committed approximately half of the abuse and Christian Brother Pascal Alfred – also from Australia and operating at Mount Saint John – is named by 23 survivors. While these Brothers have now passed away, many of their victims are still alive, and we have already seen a number of late-filed claims that list one of them as the abuser. Indeed, the lion's share of late-filed claims originate from Mount Saint John's.

The latest claims that name Brother McGlade as the abuser in this proceeding are from abuse in 2001. Based on my review of the claims filed and documentation provided to me, it is likely that this was the end of the terrible abuse timeline at that school. The latest timely claim in the entire proceeding is from a 2007 incident, alleging abuse by an unnamed teacher at Mount Saint John. My review of the claims in this case as well as the confidential files of the Diocese (*see* Appendix C) did not reveal a trove of either likely abuse victims or abusers beyond 2000. In fact, the Diocese records described in Appendix C provided little evidence of allegations that could lead to claims that occurred after the early 2000s. Moreover, the statute of limitations window for the terrible period at Mount Saint John is now dwindling.

The situation here is unfortunately like a throwback to the bad old days of child sex abuse in the church. Evidently, there was no appropriate supervision and the folks in charge at Mount Saint John created a normalized culture of child sex abuse by both adult male and female teachers and workers there. The situation at Mount Saint John during the 1990s is an extreme outlier when looking at the nationwide trend. When controlling for that outlier, the percentages for all other non-Mount Saint John claims falls much closer to the nationwide trends found in the 2011 Study from John Jay College.

From my experience evaluating the potential for future claims in over a dozen mass tort cases involving Catholic groups, the exposure to future claims can often be roughly predicted by anticipating a percentage of the timely-filed claims. That method is less appropriate here because of the mix of claims present. As previously indicated, a large percentage of the claims name two individuals. In addition, while there are 143 timely-filed Abuse Claims, there are approximately 22 Late-Filed Abuse Claims filed after the Bar Date[10]. Finally, 51 other timely filed claims would not ordinarily be compensable in most cases because they were filed after time had expired on the applicable statute of limitations, which is 30 years after the victim reaches age of majority.

Moving on to the question of notice of the Claims Bar Date and the opportunity to file timely claims, I have found that the Debtor did undertake a substantial effort. They publicized the Bar Date to potential claimants both nationally and regionally, posted flyers in all parish churches, and made announcements from all pulpits.

Based on interviews with Debtor's counsel and representatives of the Debtor I learned that the Debtor undertook a thorough review of both the Diocese's common and confidential personnel files that included records from approximately 1955 through 2023. They recorded allegations of

---

[10] As of the date of this Report, I am aware of 3 more possible late claims, but do not know why they have not been filed.

CONFIDENTIAL- FILED UNDER SEAL

abuse that may possibly support a claim in these proceedings and attempted to directly notify those individuals using updated diocesan records. In my opinion, this was a vital step and I am satisfied that it was an appropriately thorough undertaking.

Notice issues around potential abuse claims from Mount Saint John are substantial. The school was not like a typical catholic school with regular parental involvement and stable home addresses. It was run by a board of directors and the state placed students at the school, usually because they were out of options. Ordinarily, notice of a proceeding like this one is quite good because there is a full roster of names and addresses for notice. Here, there was a roster, but finding current addresses for former students for notice was a challenge – their home address was often listed as the address of the state agency that placed them at the school. Some were basically on the streets, making notice unlikely until a potential claimant learned of another former student filing a claim or receiving a check. This requires a somewhat larger future claims trust reserve fund.

The final challenge for all claimants, timely and future alike, is the extent of assets available to pay claims. Some institutions have plenty, while others are poor. The resources available here to compensate claimants are extremely limited, especially because the proposed amended plan will provide for partial payment of time-barred claims. This also puts pressure on making resources available to pay partial recovery benefits to Unknown Abuse Claimants, which is necessary in order to obtain the benefits of a channeling injunction for those claims.

An Unknown Abuse Claim for the purposes of the proposed amended plan here is any abuse claim that arises from the abuse of an abuse claimant when such an abuse claimant was a minor for which proof of claim was not filed before the claims bar date and such person: (a) was under a disability (such as minority, mental disability, or alienage) on the Petition Date, (b) neither discovered, nor reasonably should have discovered before the Claims Bar Date that their childhood

10

CONFIDENTIAL- FILED UNDER SEAL

injury was caused by an act of Abuse, or (c) such claim was barred by the applicable statute of limitations as of the Claims Bar Date, but is no longer barred by the applicable statute of limitations for any reason.

In general, survivor claims may be subject to affirmative defenses, including the following:

1.      Potential liability on the basis of negligence may require proof of foreseeability. The following type of questions could be posed: Would a prudent person see abuse as likely to occur, possibly from a 1960s or 1970s perspective? Would liability be imposed only after a finding of custody or control?

2.      Would respondeat superior liability require a finding that abuse has been committed in the course and scope of a special relationship?

3.      Would there be joint-and-several liability for acts of persons in other religious orders?

4.      Would a finding of diocesan control be required for liability of the Debtor?

5.      Were claimants fully compensated by awards from other religious orders?

6.      Does the doctrine of laches limit certain claims?

7.      Did claimants mitigate damages?

8.      Is some evidence of claims excluded under the First Amendment to the United States Constitution?

9.      Is there sufficient admissible evidence to allow the estate of a deceased claimant to pursue a claim on their behalf under Connecticut law?

10.     Has a claimant filed a bankruptcy petition in the past, which may result in an abuse claim for damages constituting an asset of the bankruptcy estate?

CONFIDENTIAL- FILED UNDER SEAL

And Unknown Abuse Claims would be subject to additional potential defenses that are not applicable to claims filed by the Claims Bar Date, which was the last date by which claims could be timely-filed in this proceeding.

As noted, there are both an unusual mix of claims and limited resources in this proceeding. With that in mind, and based on my extensive investigation, analysis and experience in these cases, I recommend that approximately 6% of the available compensation funds be set aside for Unknown Abuse Claims in this Bankruptcy case. When compared to other cases where I have recommended an amount for Unknown Abuse Claims, the situation at Mount Saint John represents an outlier, thus the amount I am recommending here is higher than all but one of the recommendations in those other cases. Also, because Unknown Abuse Claims are often valued lower than timely claims, this number should allow for distributions to a number of Unknown Abuse Claims that is larger than 6% of the timely claims. This amount should be sufficient to provide for payment of approximately 10 Unknown Abuse Claims, which is a relatively high amount compared to the amount of claims already filed in this proceeding. Based on my experience in these type of cases, my review of the claims and documents produced to me, and my review of the noticing efforts by the Debtor and Plaintiff's counsel to date, I anticipate 8-10 Unknown Abuse Claims to be filed over the next five years and that most of these claims will arise from conduct prior to 2001. This figure is consistent with the number of unknown abuse claims I have seen filed in other mass tort cases involving Catholic groups in which there has been a significant level of noticing activity prior to or during the bankruptcy proceeding.

Further, in order to better account for the known existence of additional late-filed claims arising out of Mount Saint John School, I have negotiated for all late-filed claims to be treated as

Class 4 claims under an amended plan. This will allow the funds set aside for Unknown Claims to be available to address claims that are truly not known at the time of Plan Confirmation.

My goal is also to see Unknown Abuse Claims paid as quickly as possible while safeguarding the UCT for later Unknown Abuse Claims. To achieve this, Unknown Abuse Claims should be paid a percentage of their award immediately, then receive regular installment payments yearly until a final payment is made at the close of the UCT. This will allow for immediate and regular relief for Unknown Abuse Claimants, as well as allowing for full funding of the trust over a reasonable time period.

Based on the foregoing, I make the following recommendations with regard to establishing the fund for the Unknown Abuse Claims to be distributed through the UCT and, in particular, the UCT Distribution Plan to be appended to the amended plan, and other parameters. I specifically reserve the right to revise these recommendations and to modify them after full review of any changes to the Plan containing the provisions concerning any such UCT or the treatment of Unknown Abuse Claims:

1. It is fair and appropriate for the UCT to be in an amount that recognizes claims at the higher end of the value range I have used previously because of the factors summarized above and based on the estimated number of Unknown Abuse Claims set forth above[11].

2. I recommend that the adjudication of these claims be handled in the same manner and means as timely-filed claims albeit through the UCT Distribution Plan, assuming that Abuse Claims Reviewer is willing and able to serve.

---

[11] Also see Appendix A.

13

CONFIDENTIAL- FILED UNDER SEAL

3.    I further recommend that the UCT be established and funded in a manner that safeguards the entire balance held in trust, and that the UCT be established in a manner that specifically provides for the distribution to any claimants determined by the Abuse Claims Reviewer to be valid, in such a manner that equitably preserves the balance of the Unknown Abuse Claims for the remainder of the term of the UCT.

4.    Based upon my evaluation of previous future claims resolutions in other cases, I recommend that Unknown Abuse Claims must be filed within five (5) years of the Effective Date and that the trust have a termination date of seven (7) years from the date of the establishment of the UCT.

5.    I recommend that the UCT be funded up to the amount of $1,800,000 as set forth in an amended plan. $100,000 should be funded within 30 days of the Effective Date, with an additional $200,000 added on the first, second and third anniversaries of the Effective Date, with an additional $300,000 added on the fourth anniversary of the Effective Date, and with an additional $400,000 added on the fifth and sixth anniversaries of the Effective Date.

6.    The Unknown Abuse Claimants shall be paid based on the points determined by the Abuse Claim Reviewer on a 100-point scale applying the evaluative factors and other adjustments provided for in the UCT Distribution Plan. The Unknown Abuse Claims Trustee will make distributions to the Unknown Abuse Claimants, as provided in the UCT Distribution Plan, up to the amount of the UCT, which fund will represent the sole recovery available to Unknown Abuse Claimants.

CONFIDENTIAL- FILED UNDER SEAL

    a.   I am willing to consent to a maximum 50% discount for payment of Unknown Abuse claims relative to timely-filed claims.

7.    Unknown Abuse Claimants shall be paid 10% of their award upon approval and scoring as an Unknown Abuse Claimant, an additional 10% payment each year through year five (5) of the UCT, and with the balance paid by equal payments made in years six (6) and seven (7) of the UCT.

8.    I specifically reserve the right to modify these recommendations based upon facts and circumstances brought to my attention, including any changes in the Disclosure Statement and Plan, as well as any information provided by parties in interest in those cases, including, but not limited to the Debtor, the Official Unsecured Creditors Committee, the insurance carriers, the U.S. Trustee, or any other party in interest.

Respectfully submitted this 22nd day of January, 2025.


Michael R. Hogan

CONFIDENTIAL- FILED UNDER SEAL

## Appendix A

## History of the UCR's Plan-Confirmed Similar Proceedings[12]

| Archdiocese/Diocese/Order | Plan Confirmation | Timely Claims | Anticipated Plan Total[13] | UCR Recommendation | Claims/Paid Out | Unknown Fund Status |
|---|---|---|---|---|---|---|
| Helena (and Ursuline Order) | March 2015 | Approx 360 | $21.5M | $920,000 (4.28%) | 24 claims, $495,588 total | Closed |
| Gallup | June 2016 | 58 | $19M | $1.8M (9.47%) | 47 claims, $1,082,171 total | Expires June 2024 |
| St. Paul and Minneapolis | Sept. 2018 | 444 | $190M | $7M (3.68%) | 45 claims, $2,250,000 total | Expires 2026 |
| Crosier Fathers and Brothers | April 2018 | 44 | $23.5-24M | $1,187,500 (Approx 5%) | 1 claim, $50,000 total | Expires 2025 |
| Duluth | Oct. 2019 | Approx 125 | $39 | $1.2M (3.08%) | None paid yet | Open |
| Great Falls - Billings | Aug. 2018 | 86 | $20M | $1M (5%) | 28 claims, $409,510 total | Expires 2026 |
| Agana | Oct. 2022 | 255 | $44M | $1.5M (3.41%) | 4 claims filed, none approved yet | Not yet funded, Expires 2027 |
| St. Cloud | Dec. 2020 | Approx 100 | $22.5M | $500,000 (2.22%) | No claims made yet | Expires June 2024 |
| Winona-Rochester | Oct. 2021 | 147 | $21.5M | $750,000 (3.49%) | 6 claims, $120,000 total | Expires 2027 |
| Harrisburg | Feb. 2023 | 66 | $18.25M | $600,000 (3.29%) | No claims yet | |
| Santa Fe | Dec. 2022 | 404 | $121.5M | $2.5M (2.06%) | No approved claims yet | Just recently funded |

---

[12] As of March 5, 2024.

[13] Anticipated total settlement funds at the time of my Report. Actual totals have tended to be slightly higher.

Notes on this chart:

- As far as I have been able to ascertain, all of my recommendations have thus far provided sufficient funds to cover all of the unknown claims that have subsequently come forward.

- Recommended dollar figures are rounded up for ease of management and to provide an additional safety factor.

- The recommendation for Norwich falls in an upper-middle range compared to others. This reflects a pattern of abuse that skews later than the typical pattern, but necessarily takes into account the reality of a less-flush-than-average diocese.

- The patterns surrounding the Norwich abuse claims are not so far out of the ordinary to justify a much higher number, such as I employed for the Gallup unknown claims fund.

**Brief Notes on Similar Proceedings**

The variety of the following identified Chapter 11 child abuse cases have served to season my recommendation concerning provision for future claims.

Roman Catholic Bishop of Helena, Montana

The Diocese of Helena Chapter 11 proceeding actually addressed three institutions – one of those being the Diocese itself. A substantial majority of the claimants also had claims against the Western Province of Jesuits, and those claimants had received a substantial distribution prior to the Diocese of Helena bankruptcy. There were also numerous lawsuits, and later proofs of claim, that alleged abuse by the Ursuline Order of nuns, who made a substantial contribution and obtained a channeling injunction in the case. These claims were based on the operation of school and other services on Indian Reservations in Montana.

CONFIDENTIAL- FILED UNDER SEAL

Diocese of Gallup

This 2016 child sex abuse Chapter 11 case was filed against the Diocese of Gallup, a sparsely populated 55,000-acre diocese located in northwest New Mexico and northeast Arizona. The Navajo Nation is located in the New Mexico portion and members of the White Mountain Apache people live in Arizona. Many residents do not speak English, which complicated thorough notice to those who could file claims. Because of this suspected defect in noticing, I recommended a larger percentage of the total settlement to be held back for future claims.

I recommended a 10% set-aside for future claims, which was secured with a $1,800,000 certificate by the Catholic Mutual Insurance Company. $1,100,000 has been paid out and it is now past the time when more future claims can be filed.

Archdiocese of St. Paul and Minneapolis

This 2019 child sex abuse Chapter 11 case was filed to resolve 444 cases. In this case I recommended the future claims trust fund be established in the amount of $7,000,000. To date, $2,250,000 has been distributed to 45 future claimants.

Crosier Fathers and Brothers Province

This 2016 child sex abuse Chapter 11 case was filed to resolve claims against the Crosier Fathers of Onamia. There were 44 claims and I recommended that 5% of the settlement fund, or $1,187,500 be set aside for future claims.

Diocese of Duluth

This 2019 child sex abuse Chapter 11 case was filed to resolve 125 claims. I recommended that a future claims fund be funded initially for $200,000, then replenished if necessary, up to a

18

CONFIDENTIAL- FILED UNDER SEAL

maximum total of $1,200,000. I know of two future claims that have recently or will soon be paid from this fund. These will be the first payments.

### Roman Catholic Bishop of Great Falls, Montana

This 2018 child sex abuse Chapter 11 case was filed to resolve approximately 86 cases in western Montana. Only one incident of abuse was alleged to have occurred as late as the 1990s, however there were also issues of noticing potential claimants in this case. I recommended that 5% of the settlement fund be set aside for future claims.

### Archdiocese of Agana

This Chapter 11 was filed to resolve approximately 255 child sex abuse cases on the island of Guam. Noticing to potential claimants was excellent because of the limited-size island setting. The case was very well known. The Archdiocese is poor in relation to others and one priest was named as the perpetrator for half of the cases. The lack of supervision is highlighted by the nine claims against the Archbishop himself. There are now four pending future claims, some of which may qualify as valid unknown claims.

### Diocese of St. Cloud

This 2020 child sex abuse Chapter 11 case was filed to resolve approximately 100 claims. In this case, the reorganized debtor was required to distribute money to unknown claimants up to a total of $500,000. No future claims were filed and the period to file future claims has closed.

### Diocese of Winona-Rochester, Minnesota

This Chapter 11 proceeding was filed to resolve approximately 147 child sex abuse claims. This case was complicated by a scout leader perpetrator who guided 100 boys to achieve eagle

CONFIDENTIAL- FILED UNDER SEAL

scout rank while probably abusing most of them in some manner. One Minnesota law firm represented 111 of the claimants. $120,000 has thus far been distributed from the future claims trust fund, and $630,000 remains in the fund. The trust will expire in 2027.

Harrisburg Diocese

This Chapter 11 proceeding was filed to resolve approximately 66 child sex abuse cases in this diocese. Harrisburg had the most effective pre-petition voluntary settlement program of any diocese I have worked with.

The Pennsylvania legislature had also passed a window-opening legislation for filing child sex abuse cases, but the Secretary of State failed to register it, so it did not become law.

I ultimately did set aside a fund for unknown claims, but limited it to $600,000 due to the effective pre-filing settlements.

Archdiocese of Santa Fe

This Chapter 11 proceeding was filed to resolve approximately 404 child sex abuse cases. The Archdiocese had engaged in a strong effort to seek voluntary settlement of child sex abuse cases before the petition was filed. These efforts were complicated by the presence of a small group of priests called the Servants of the Paraclete. This Order had focused on drug and alcohol rehabilitation for priests. This Order then purported to be able to cure pedophilia, so a large number of priests were sent to their facility. The treatment turned out to be totally ineffective, but many of the participants settled in northern New Mexico instead of returning to their home dioceses. Fortunately, a subsequent Archbishop had taken the problem seriously and gotten it substantially under control. The Archdiocese had also voluntarily settled many cases prior to pursuing a Chapter

CONFIDENTIAL- FILED UNDER SEAL

11 proceeding. I recommended that a total of $2,500,000 be designated to compensate unknown claimants.

<u>Diocese of Rockville Centre, New York</u>

This Chapter 11 proceeding was filed to resolve over 600 child sex abuse claims. Difficulties in obtaining timely funding of the entire fund were resolved partially by delaying funding of Future Claims, but giving Future Claims first priority in claiming a full portion of the delayed funds. This was a unique structure, but has the potential to award Future Claims at a higher rate than would have been achievable otherwise.

CONFIDENTIAL- FILED UNDER SEAL

**Appendix C**

**Report on Diocesan Confidential Personnel Files**

In an effort to better understand breadth of the child sex abuse problem that was present in the Diocese of Norwich from the latter half of the 20th century up to now, my office undertook a page-by-page review of the confidential files of the Diocese produced during the summer of 2024 in response to the UCR's subpoena. Through this review, I was able to understand the Diocese's approach to making records, investigating the claims of alleged victims, and managing priests who may have committed abuse. The files we reviewed are a record of the better part of 100 years of Diocese history.

The intent of this report is to explain my investigation of these documents while maintaining essential confidentiality. The content is descriptive but not necessarily quantitative.

Overall, the goals for the investigation were clear: to assess the risk that a greater-than-expected amount of Unknown Claimants may come forward after the amended Bankruptcy Plan is approved by the Court. To accomplish that goal, I focused on identifying:

- Likely victims – especially paying attention to linked groups of possible victims from the late 90s onward;

- Likely abusers;

- Actions of the Diocese – especially in its approach to investigating allegations of child sex abuse, and its attempts to safeguard constituents from accused abusers; and

- Completeness and responsiveness of the Diocese files.

CONFIDENTIAL- FILED UNDER SEAL

It is also important to note that these files do not include records of clergy or employees from the Mount Saint John School, as that school was not managed by the Diocese of Norwich.

Summary

By the numbers, my office reviewed over 15,000 pages of documents, comprising 207 named files, mostly filed under individual priest names, but also some churches, schools, lay staff, lay members, and complainants. The files included records from about 1955 until 2023.

By and large, the type of documents that were saved in the files were:

- Correspondence to or from the Bishop who was in office at the time;

- Connecticut Department of Children and Families ("DCF") alleged abuse reporting forms from the 1980s until 2023;

- Internal investigation notes for the eyes of the Bishop, investigators or members of internal abuse review boards;

- Legal documents; and

- Copies of newspaper articles.

Likely Victims

The files demonstrate that by the early 1990s, the Diocese was both making regular reports to DCF when a possible child sex abuse allegation was brought to its attention, and conducting responsible independent investigations into those allegations. Many such DCF reporting documents were present in the files, all of which had documents evidencing some level of investigation into the priests and situations involved. In general, the investigations appeared to be thorough and unbiased

CONFIDENTIAL- FILED UNDER SEAL

enough to be relied upon. Nearly all of the reported allegations since 2000 have been reporting older incidents of abuse, from the 1960s and '70s. We did not see evidence of a large group of claimants that is likely to come forward in the future. There were a few alleged incidents during the 1990s that have not resulted in claims, and that number is less than a handful[14].

It's worth specifically noting that of the allegations of abuse that are present in the files, but that do not have a corresponding claim in this proceeding, all or predominantly all would not be eligible to join the Unknown Abuse Claims group due to failing the test of not having discovered the abuse by the Claims Bar Date.

Likely Abusers

The large amount of documents we reviewed was not narrowly constructed around only claims in this proceeding. There were many files relating to priests who have not been the subject of a claim. Our focus was on looking for evidence of an unknown priest who may have been a multiple abuser and who was operating in the Diocese from the 90s onward. I did not find evidence of an unknown priest like this.

Actions of the Diocese

My office also looked at how the files reflected procedures in the Diocese, and whether there may be a greater risk of Unknown Abuse Claims arising out of incidents from the 1990s onward.

---

[14] The most recent allegation was a priest arrested and charged with possession of child pornography in 2012. This was a very widely publicized situation, and the priest died within a year of being charged. There was no evidence in the files that this priest produced child pornography or otherwise personally abused other children inside or outside of the Diocese.

CONFIDENTIAL- FILED UNDER SEAL

Starting in the mid-1980s, incidents of alleged abuse within the Diocese resulted in more formal investigations and record-keeping, which are evident in the files. There were additional layers of professionality added to the Diocese's handling of abuse allegations in the mid-1990s and in 2003, such as internally utilizing investigators who had a legal or law enforcement background. The revelations that were revealed and broadly publicized about the Archdiocese of Boston in 2002 led to large changes in the Catholic Church as a whole, which is also reflected in documents here. The records here reflect that a surge of allegations were reported to the Diocese in the years immediately after 2002. The Diocese's procedures were notably professionalized in those years, and DCF reports were filed and their root allegations investigated internally. It is evident from the files that these investigations have remained at a high level through the last two decades as well.

Additionally, the files show evidence of the Diocese treating allegations seriously and moving quickly to protect potential victims. There are many letters ordering an accused priest to leave their current ministry and physically move away from their home church due to an allegation – even prior to taking the next stops in an internal investigation.

Completeness and Responsiveness of the Files

One important topic to probe is the extent of inclusion of confidential files that the Diocese produced for our review. The Code of Canon Law contains an edict ordering Bishops to maintain a secret archive separate from the common archive[15]. Only the Bishop is supposed to have a key

---

[15] Code of Canon Law, c. 489 §1. In the diocesan curia there is also to be a secret archive, or at least in the common archive there is to be a safe or cabinet, completely closed and locked, which cannot be removed; in it documents to be kept secret are to be protected most securely. [Code of Canon Law. https://www.vatican.va/archive/cod-iuris-canonici/eng/documents/cic_lib2-cann460-572_en.html]

CONFIDENTIAL- FILED UNDER SEAL

to this archive. I am confident that we have indeed seen the contents of the secret archive during this review process for the following reasons:

- First, files produced here quite frequently had a leading page with a scanned sticky note directing that the document be added to the individual's confidential file (e.g. "C. 489", "489," "Canon 489 File," "Confidential File," etc.). References like these were present throughout the years, from the oldest files to the newest;

- Second, Debtor's counsel have confirmed that the files that were produced to us were, by and large, Canon 489 files and included all of the confidential files; and

- Third, the content of the files seemed to be forthcoming and not manicured. The kind of notes made included ones that would seem to be made for an internal audience, including many for the Bishop's eyes only.

The second section of Canon 489 is an instruction to regularly cull and summarize certain documents in the confidential archives.[16] I can only comment that we did not see a difference in the types of records being held in the confidential files from the early days to the more recent files.

Overall, the files do not contain the entire universe of employee records, but do contain the most sensitive kinds of personnel information. The files were not perfectly complete, but we did not

---

[16] Code of Canon Law, c. 489, §2. Each year documents of criminal cases in matters of morals, in which the accused parties have died or ten years have elapsed from the condemnatory sentence, are to be destroyed. A brief summary of what occurred along with the text of the definitive sentence is to be retained. [Code of Canon Law. https://www.vatican.va/archive/cod-iuris-canonici/eng/documents/cic_lib2-cann460-572_en.html]

detect a sign of deceptive intent. They seemed like honest record keeping that was made with a purpose – to be useful to those making the records and to the organization.

Finally, the files did not appear to have been overly redacted. Direct notes from the Diocese's attorneys were appropriately redacted, but there was sufficient information to identify the privileged relationship.

### List of Credibly Accused Clergy

Our review was partially guided by a focus on the list of credibly accused clergy published on the Diocese of Norwich's website[17]. The "List of Clergy with Allegations of Substance of Sexual Abuse of a Minor" has been published on the Diocese website since 2019. The current version of the list has been displayed since May 12, 2021. Almost two-thirds of the listed priests or brothers are named as the alleged abuser in one of the claims filed in this proceeding. On the other hand, listed priests who are not listed in a claim in this proceeding (about 1/3 of the total list) all have files in the database we reviewed. These files are consistent with the other files we reviewed, in that each apparent allegation had a corresponding DCF reporting form, all of which had been mined for purposes of providing specific notice in this proceeding.

However, not every allegation that resulted in a mandatory DCF filing led to the listed clergy being included on this list. From reviewing the personnel files closely, we can say that priests were included on these lists primarily because:

- The Diocese of Norwich was subject to a lawsuit by an alleged child sex abuse victim;

---

[17] Available at: https://www.norwichdiocese.org/Find/Accused-Clergy

CONFIDENTIAL- FILED UNDER SEAL

o Many of these – though not all – were covered to varying degrees by local newspapers, some very extensively. Even when these suits were concluded in favor of the Diocese, the priest involved was included on the credibly accused list.

- The Diocese internally investigated allegations reported to them and came to a conclusion that the allegations had merit; and

- The Diocese received correspondence from another diocese or institution that a priest who had been credibly accused of abuse while working in the other diocese or institution.

There are four subsections of credibly accused clergy included:

1. Twenty-four (24) incardinated priests of priests of the Diocese of Norwich. Representing priests that had active ministries from the mid-1930s up to 2012.

   a. Files on all of these priests were present in the database provided for the UCR's review.

2. Two (2) priests incardinated in another diocese who then served in the Diocese of Norwich.

   a. The database included files on both of these priests.

3. Six (6) priests belonging to a religious order who served in the Diocese of Norwich.

   a. The database included files on all of these priests.

4. Eighteen (18) priests who served in the Diocese of Norwich who had allegations in other places but not in the Diocese of Norwich.

   a. There were files for seven (7) of these priests, but not for the other eleven (11).

28

CONFIDENTIAL - FILED UNDER SEAL

**EXHIBIT D**

**Definitions of Future Claims Chart**

CONFIDENTIAL- FILED UNDER SEAL

| Child Abuse Bankruptcy Cases | Plan Confirmation | Claims/Paid Out | Future Claims Definition |
|---|---|---|---|
| BSA (20-10343) | Sept. 2022 | N/A | "**Future Abuse Claim**" means any Direct Abuse Claim against any Protected Party, Limited Protected Party, or an Opt-Out Chartered Organization that is attributable to, arises from, is based upon, relates to, or results from, in whole or in part, directly, indirectly, or derivatively, alleged Abuse that occurred prior to the Petition Date but which, as of the date immediately preceding the Petition Date, was held by a Person who, as of such date, (a) had not attained eighteen (18) years of age, or (b) was not aware of such Direct Abuse Claim as a result of "repressed memory," to the extent the concept of repressed memory is recognized by the highest appellate court of the state or territory where the claim arose; provided further, however, that with respect to any Participating Chartered Organization, the term "Future Abuse Claim" shall be limited to Post-1975 Chartered Organization Abuse Claims and Pre-1976 Chartered Organization Abuse Claims that satisfy either (a) or (b), and with respect to any Opt-Out Chartered Organization, the term "Future Abuse Claim" shall be limited to Opt-Out Chartered Organization Abuse Claims that satisfy either (a) or (b). For the avoidance of doubt, no Claim alleging Abuse shall be a "Future Abuse Claim" against a Contributing Chartered Organization, a Participating Chartered Organization, or an Opt-Out Chartered Organization if such Claim is wholly unrelated to Scouting. |
| Helena (14-60074) | March 2015 | 24 claims, $495,588 | "**Future Tort Claim**" means a Tort Claim relating to Abuse that happened before the Petition Date for which (a) no proof of Claim is filed or deemed filed on or before the Claims Bar Date; (b) a proof of Claim is filed after the Claims Bar Date, if the Entity asserting the Tort Claim (i) is under eighteen years of age on the Claims Bar Date, (ii) neither discovered nor reasonably should have discovered before the Claims Bar Date that his or her injury was caused by Abuse; or (iii) has a Tort Claim that was barred by the applicable statute of limitations as of the Bar Date bust is no longer barred by the applicable statute of limitations for any reason, including, for example, the passage of legislation that revives such previously time-barred Tort Claims; or (c) is asserted against the Province as provided in Section 7.2 of the Plan. |

CONFIDENTIAL- FILED UNDER SEAL

| Child Abuse Bankruptcy Cases | Plan Confirmation | Claims/Paid Out | Future Claims Definition |
|---|---|---|---|
| Gallup (13-13676) | June 2016 | 47 claims, $1,082,171 | "**Unknown Tort Claim**" means any Tort Claim for which no Proof of Claim is filed or deemed filed on or before the Bar Date by a Tort Claimant (as opposed to the Proof of Claim filed by the Unknown Claims Representative) or for which a Proof of claim is filed after the Bar Date if the Person asserting the Tort Claim: <br> (a) Has a Tort Claim that was barred by the applicable statute of limitations as of the Bar Date but is no longer barred by the applicable statute of limitations for any reason, including for example the passage of legislation that revives such preciously time-barred Tort Claims; or <br> (b) Turns 18 on or after July 11, 2014 (the date which is 30 days prior to the generally applicable Bar Date in the Reorganization Cases of August 11, 2014); or <br> (c) Has a Tort Claim for which the applicable Arizona or New Mexico tort claim statute of limitations, for any reason, has not expired or has been tolled as of July 11, 2014, as determined under applicable Arizona or New Mexico federal law, but without regard to federal bankruptcy law; and <br> (d) Submits a Proof of Claim in accordance with the procedures set forth in the Plan, the Confirmation Order and the Unknown Tort Claims Allocation Protocol. |
| St. Paul and Minneapolis (15-30125) | Sept. 2018 | 45 claims, $2,250,000 | "**Future Tort Claim**" means any Tort Claim that was neither filed, nor deemed filed, by May 25, 2016, and is held by (i) an individual who was at the time of the Petition Date under a disability recognized by Minn. Stat. § 541.15, subds. 1, 2 and 3 (or other applicable law suspending the running of the limitation period, if any, other than Minn. Stat. § 541.15, subd. 4); (ii) an individual who experienced Abuse through and including the Effective Date and whose Claim is timely under Minn. Stat. § 541.073 subd. 2 as amended in 2013; (iii) an individual who has a Tort Claim that was barred by the statute of limitations as of the Claims Filing Date but is no longer barred by the applicable statute of limitations for any reason, including the enactment of legislation that revises previously time-barred Tort Claims; or (iv) any other individual or class of individuals the Future Tort Claim Representative can identify that would |

CONFIDENTIAL- FILED UNDER SEAL

| Child Abuse Bankruptcy Cases | Plan Confirmation | Claims/Paid Out | Future Claims Definition |
|---|---|---|---|
| | | | have a Tort Claim on or prior to the Effective Date. |
| Crosier Fathers and Brothers (17-41681) | April 2018 | 1 claim, $50,000 | "**Unknown Tort Claim**" means any Tort Claim for which no Proof of Claim is filed or deemed filed on or before the Proof of Claim Deadline by a Tort Claimant (as opposed to the Proof of Claim filed by the Unknown Claims Representative) or for which a Proof of Claim is filed after the Proof of Claim Deadline if the Person asserting the Tort Claim: <br><br>(i) Has a Tort Claim that was barred by the applicable statute of limitations as of the Proof of Claim Deadline but is no longer barred by the applicable statute of limitations for any reason, including for example the passage of legislation that revives such previously time-barred Tort Claims; or <br><br>(ii) Attains the age of eighteen (18) on or after the date which is thirty (30) days prior to the generally applicable Proof of Claim Deadline in the Reorganization Cases; or <br><br>(iii) As to which the applicable tort claim statute of limitations, for any reason, has not expired or has been tolled as of the date which is thirty (30) days prior to the generally applicable Proof of Claim Deadline in the Reorganization Cases, as determined under applicable law, but without regard to federal bankruptcy law; and <br><br>(iv) Submits a Proof of Claim in accordance with the procedures set forth in the Plan or the Confirmation Order. |
| Duluth (15-50792) | Oct. 2019 | None paid yet | "**Unknown Tort Claim**" means any Tort Claim that was neither filed, nor deemed filed by the Claims Filing Date, and is held by (i) an individual who was at the time of the Petition Date under a disability recognized by Minn. Stat. § 541.15, subds. 1, 2 and 3 (or other applicable law suspending the running of the limitation period, if any, other than Minn. Stat. § 541.15, subd. 4); (ii) an individual who experienced Abuse prior to and including the Effective Date and whose Claim is timely under Minn. Stat. § 541.073 subd. 2 as amended in 2013; (iii) an individual who has a Tort Claim that was barred |

CONFIDENTIAL- FILED UNDER SEAL

| Child Abuse Bankruptcy Cases | Plan Confirmation | Claims/Paid Out | Future Claims Definition |
|---|---|---|---|
| | | | by the statute of limitations as of the Claims Filing Date but is no longer barred by the applicable statute of limitations for any reason as of the Effective Date, including the enactment of legislation that revises previously time-barred Tort Claims; (iv) Tort Claims that the holder was incapable of knowing of the existence of his or her Tort Claim as of the Effective Date for any reason, including memory repression or memory suppression; or (v) any other individual or class of individuals the Unknown Tort Claim Representative can identify that would have a Tort Claim on or prior to the Effective Date. |
| Great Falls – Billings (12-60271) | Aug. 2018 | 28 claims, $409,510 | "**Unknown Tort Claim**" means a Tort Claim relating to Abuse that occurred on or before the Effective Date for which (a) no proof of Claim is filed or deemed filed on or before the Claims Bar Date; (b) a proof of Claim is filed after the Claims Bar Date, if the Entity asserting the Tort Claim (i) is under eighteen years of age on the Claims Bar Date; (ii) neither discovered nor reasonably should have discovered before the Claims Bar Date that his or her injury was caused by Abuse; (iii) has a Tort Claim that was barred by the applicable statute of limitations as of the Claims Bar Date but is no longer barred by the applicable statute of limitations for any reason, including, for example, the passage of legislation that revives such previously time-barred Tort Claims; or (iv) any other individual or class of individuals the Unknown Claim Representative can identify that would have a Claim prior to the Effective Date. |
| Agana (19-00010) | Oct. 2022 | 4 claims filed, none approved yet | "**Unknown Tort Claim**" means a Tort Claim relating to Abuse that occurred on or before the Effective Date for which no proof of Claim is filed or deemed filed on or before the Claims Bar Date and one of the following condition applies (a) the Claimant is under eighteen years of age on the Claims Bar Date; or (b) the Claimant neither discovered nor reasonably should have discovered before the Claims Bar Date that his or her injury was caused by Abuse on account of one of the following: (i) Claimant's insanity or other mental illness; or (ii) the Claimant was a member of the United States Armed Services deployed in active duty on the Claims Bar Date. For the avoidance of doubt, an Unknown Tort Claim does not include any claim filed after the Claims Bar Date which |

CONFIDENTIAL- FILED UNDER SEAL

| Child Abuse Bankruptcy Cases | Plan Confirmation | Claims/Paid Out | Future Claims Definition |
|---|---|---|---|
| | | | does not satisfy either (a) or (b) of the proceeding sentence. |
| St. Cloud (20-60337) | Dec. 2020 | No claims made yet | "**Unknown Tort Claim**" means any Tort Claim based on acts or omissions that occurred prior to the Effective Date and for which no Proof of Claim is filed or deemed filed on or before the Proof of Claim Deadline by a Tort Claimant (as opposed to a Proof of Claim filed by the Unknown Claims Representative) or for which a Proof of Claim is filed after the Proof of Claim Deadline if the Person asserting the Tort Claim: 2.124.1 Has a Tort Claim that was barred by the applicable statute of limitations as of the Proof of Claim Deadline but is no longer barred by the applicable statute of limitations for any reason, including, for example, the passage of legislation that revives such previously time-barred Tort Claim; or 2.124.2 Attains the age of eighteen (18) on or after the date that is thirty (30) days prior to the generally applicable Proof of Claim Deadline in the Reorganization Case; or 2.124.3 As to which the applicable tort claim statute of limitations, for any reason, has not expired or has been tolled as of the date that is thirty (30) days prior to the generally applicable Proof of Claim Deadline in the Reorganization Case, as determined under applicable law, but without regard to federal bankruptcy law; and 2.124.4 Submits a Proof of Claim in accordance with the procedures set forth in the Plan, the Confirmation Order, or the Unknown Tort Claims Allocation Protocol. |
| Winona – Rochester (18-33707) | Oct. 2021 | 6 claims, $120,000 | "**Impaired Unknown Tort Claim**" means any Tort Claim that arose prior to July 1, 2002, which was neither filed, nor deemed filed, by the Claims Filing Date, and is held by an individual (1) who, at the time of the Claims Filing Date, was under a disability recognized by Minn. Stat. § 541.15, subds. 1, 2 and 3, or other applicable law suspending the running of the limitation period, if any, other than Minn. Stat. § 541.15, subd. 4; or (2) who was barred by the statute of limitations as of the Claims Filing Date but is no longer barred by the applicable statute of limitations for any |

CONFIDENTIAL- FILED UNDER SEAL

| Child Abuse Bankruptcy Cases | Plan Confirmation | Claims/Paid Out | Future Claims Definition |
|---|---|---|---|
| | | | reason including the enactment of legislation; or (3) whom the Unknown Claims Representative identifies as having a Tort Claim as of July 1, 2002, and who was under a disability preventing such individual from filing a Claim in this case before and on the Claims Filing Date. "**Unimpaired Unknown Tort Claim**" means any Claim against any of the Protected Parties or the Non-Implicated Insurer alleging Abuse that occurred prior to the Effective Date but after June 30, 2002, which Claim was neither filed, nor deemed filed, by the Claims Filing Date. |
| Harrisburg (20-00599) | Feb. 2023 | No claims made yet | "**Unknown Survivor Claim**" means any Survivor Claim alleging Abuse prior to the Effective Date, but neither filed nor deemed filed in the Chapter 11 Case, nor otherwise allowed by the Court by the Effective Date, and is held by an individual who was at the time of the Filing Date under a disability or other condition recognized by Pennsylvania law, or other applicable law suspending the running of the statute of limitation period, that would toll the statute of limitations on such Survivor Claim. |
| Santa Fe (18-13027) | Dec. 2022 | No approved claims yet | "**Unknown Tort Claim**" means a Tort Claim that arises from, relates to, or arises in connection with Abuse, the earliest incident of which occurred before the Petition Date: (i) for which no Proof of Claim is filed or deemed filed on or before the Bankruptcy Plan Effective Date or which is not otherwise allowed by the Bankruptcy Court by the Bankruptcy Plan Effective Date, and (ii) which is held by a Person who at the time of the Claims Bar Date was under a disability or other condition recognized by New Mexico law, or other applicable law, suspending the running of the statute of limitations period, that would toll the statute of limitations for such Claim. |

CONFIDENTIAL- FILED UNDER SEAL

## CERTIFICATE OF SERVICE

I, Jeremy W. Ryan, do hereby certify that on June 4, 2026, a copy of the foregoing *Settlement Trust Advisory Committee's Objection to the Future Claimants' Representative Motion for Judicial Resolution of Payment Percentage Dispute* was served upon the parties listed below by electronic mail.

*/s/ Jeremy W. Ryan*
Jeremy W. Ryan (No. 4057)

**Counsel to Future Claimants' Representative**

Robert S. Brady, Esq.
Edwin J. Harron, Esq.
Kenneth J. Enos, Esq.
Michael S. Neiburg, Esq.
Christopher M. Lambe, Esq.
YOUNG CONAWAY STARGATT &
TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Email: rbrady@ycst.com
          eharron@ycst.com
          kenos@ycst.com
          mneiburg@ycst.com
          clambe@ycst.com

**Counsel for the Reorganized Debtor**

Derek C. Abbott, Esq.
Sophie Rogers Churchill, Esq.
MORRIS, NICHOLS, ARSHT &
TUNNELL LLP
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Email: dabbott@morrisnichols.com
          srchurchill@morrisnichols.com

**Counsel for the Reorganized Debtor**

Michael C. Andolina, Esq.
WHITE & CASE LLP
111 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 881-5400
Email: mandolina@whitecase.com

Christopher T. Hurley, Esq.
HURLEY, MCKENNA & MERTZ P.C.
20 S. Clark Street, Suite 2250
Chicago, Illinois 6060
Email: churley@hurley-law.com

CONFIDENTIAL- FILED UNDER SEAL

**Counsel for the Honorable Barbara J. Houser (Ret), Trustee**

Mark T. Hurford, Esq.
A.M. SACCULLO LEGAL, LLC
27 Crimson King Drive
Bear, DE 19701
Email: mark@saccullolegal.com

**Counsel for the Honorable Barbara J. Houser (Ret), Trustee**

W. Hunter Winstead, Esq.
Kami E. Quinn, Esq.
Emily P. Grim, Esq.
Michael B. Rush, Esq.
Stephanie Seymour, Esq.
Jacob Bullis, Esq.
Sam Shirzadi, Esq.
GILBERT LEGAL
700 Pennsylvania Avenue, SE
Suite 400
Washington, DC 20003
Email: winsteadh@gilbertlegal.com
        quinnk@gilbertlegal.com
        grime@gilberlegal.com
        rushm@gilbertlegal.com
        seymours@gilbertlegal.com
        bullisj@gilbertlegal.com
        shirzadis@gilbertlegal.com