# **EXHIBIT 1**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>DELAWARE BSA, LLC,<br><br>      Debtor. | Chapter 11<br><br>Case No. 20-10342 (LSS)<br><br>RE: D.I. 688<br><br>**Hearing Date: August 19, 2026, at 10:00 am (ET)**<br>**Objection Deadline: August 12, 2026 at 4:00 pm (ET)** |

**CLAIMANT'S INDEX OF EXHIBITS IN SUPPORT OF MOTION FOR RELIEF**
**FROM ORDER PURSUANT TO FRCP 60(B)**

Claimant J.G.B. hereby submits this Index of Exhibits of his Motion for Relief from Order

Pursuant to Federal Rule of Civil Procedure 60(b), made applicable by Federal Rule of Bankruptcy

Procedure 9024.

| Exhibit | Description |
|---|---|
| Exhibit 1 | October 1, 2024 IRO Hearing Transcript |
| Exhibit 2 | October 7, 2024 Order by Hon. Patricia Cowett (Ret.) recommending dismissal of Claimant Redacted IRO hearing, Claim No. Redacted. |
| Exhibit 3 | October 30, 2024 Participating Insurers' Response to Claimant's Response And Objection to Neutral's Settlement Recommendation |
| Exhibit 4 | November 22, 2024 Decision on Settlement Recommendation: Accepted, issued by Hon. Barbara J. Houser (Ret.), Trustee of the Scouting Settlement Trust, regarding Claimant Redacted, Redacted. |
| Exhibit 5 | December 20, 2024 Amended Decision on Settlement Recommendation: Accepted, issued by Hon. Barbara J. Houser (Ret.), Trustee of the Scouting Settlement Trust, regarding Claimant Redacted, Redacted. |
| Exhibit 6 | February 10, 2026 correspondence from counsel for the Settlement Trust regarding Redacted v. BSA, Claim No. Redacted, including Trust's position that Claimant may not proceed through the Matrix process. |
| Exhibit 7 | February 13, 2026 Complaint filed in J.G.B. v. Ahrens Law, APC, Superior Court of California, County of San Diego, Case No. 26CU009101C. |
| Exhibit 8 | Excerpts from the Scouting Settlement Trust Attorney's Guide and/or Trust Distribution Procedures |

| Exhibit | Description |
|---------|-------------|
| Exhibit 9 | Boy Scouts of America Trust Distribution Procedures for Abuse Claims |
| Exhibit 10 | Scouting Settlement Trust Frequently Asked Question – 8.11 |
| Exhibit 11 | Defendant Ahrens Law, Apc's Amended Response to Plaintiff J.G.B.'S Request For Production of Documents, Set One |

DATED: July 29, 2026       **GELLERT SEITZ BUSENKELL & BROWN, LLC**

*/s/Charles J. Brown, III*
Charles J. Brown, III (3368)
1201 N. Orange St., Ste. 300
Wilmington, DE  19801
Phone: (302) 425-5800
Fax:    (302) 425-5814
cbrown@gsbblaw.com

**STALWART LAW GROUP**

Dylan Ruga (SBN 235969)
*dylan@stalwartlaw.com*
N. Ben Cramer (SBN 261767)
*ben@stalwartlaw.com*
1327 N. Broadway
Santa Ana, CA 92706 (mailing)
11100 Santa Monica Blvd., Ste. 780,
Los Angeles, CA 90025 (physical)
Telephone: 310.954.2000
Facsimile: 310.943.0303

*Counsel for  J.G.B*

# **EXHIBIT 1**

IRO HEARING

- - -

In Re:                              )
                                    )
The matter of Redacted              ) CASE NO: Redacted
                                    )   NAM ID: 277972
              Claimant,             )
                                    )
                                    )
                                    )
                                    )

VIDEOCONFERENCE IRO HEARING PROCEEDINGS

TAKEN BEFORE

THE HONORABLE PATRICIA COWETT

CALIFORNIA

OCTOBER 1, 2024

REPORTED BY:   ANNA MARIE SPINELLI, CSR NO. 11805

FILE NO:   6927911

Page 2

IRO HEARING

- - -

In Re:                    )
                          )
The matter of Redacted ,) CASE NO: Redacted
                          )    NAM ID: 277972
          Claimant,    )
                          )
                          )
                          )
                          )

IRO Hearing proceedings taken before Her Honorable PATRICIA COWETT, at Zoom video conferencing, California, commencing at 9:03 a.m., Tuesday, October 1, 2024, before Anna Marie Spinelli, CSR No. 11805.

Page 4

919 East Main Street
Suite 1300
Richmond Virginia, VA 23219
(804) 788-7768
acleary@eckertseamans.com


FOR ARGONAUT INSURANCE:

KAUFMAN BORGEEST & RYAN
BY:  DAVID BLOOM, ESQ.
200 Summit Lake Drive
1st Floor
Valhalla, New York 10595
(914) 449-1000
dbloom@kbrlaw.com


FOR LONDON MARKET INSURER:

CLYDE & CO
BY:  JOSHUA HALLIDAY, ESQ.
30 South Wacker Drive
Suite 2600
Chicago, Illinois 60606
(312) 635-7000
josh.halliday@clydeco.us


ALSO PRESENT:

Redacted    Claimant

Page 3

A P P E A R A N C E S:


(ALL PARTIES APPEARING VIA VIDEO CONFERENCING)

PRESIDING HONORABLE JUDGE:
Patricia Cowett
(619) 341-4353
patricia.cowett@gmail.com


FOR CLAIMANT:
AHRENS LAW, APC
BY:  KIMBERLY AHRENS, ESQ.
2173 Salk Avenue
Suite 250
Carlsbad, California 92008
(760) 448-5651


FOR AIG INSURER:
GORDON REES
BY:  JASON F. MEYER, ESQ.
   OLIVER NOURANI, ESQ
101 West Broadway
Suite 2000
San Diego, California 92101
(619) 230-7767

FOR ALLIANCE INSURANCE:
ECKERT SEAMANS
BY:  ANNEMARIE CLEARY, ESQ.
   NOAH McCLEMENT, ESQ.

Page 5

ZOOM, CALIFORNIA; TUESDAY, OCTOBER 1, 2024; 9:03 A.M.

-oOo-




JUDGE COWETT:  So, on the record.

This is Patricia Cowett the Hearing Officer in this matter Redacted versus BSA and I'd like to put on the record the appearances.

The record should reflect that Anna M. Spinelli, S-p-i-n-e-l-l-i, from Veritext is recording these proceedings.

We will start with you Ms. Ahrens, please, your appearance?

MS. AHRENS:  Yes, your Honor.  Thank you.

Kimberly Ahrens on behalf of the Claimant Redacted

JUDGE COWETT:  All right.

And, Redacted do you want to state your name for the record so that we know you're, also, here in these proceedings.

THE WITNESS:  Redacted the 3rd.

JUDGE COWETT:  All right.  Thank you.

And then, Mr. Bloom, please.

MR. BLOOM:  Good morning, your Honor.  David

2 (Pages 2 - 5)

Page 6

Bloom, Kaufman Borgeest & Ryan appearing on behalf of the Argonaut Insurance Company.

JUDGE COWETT: All right. Thank you.

And Mr. Meyer and Mr. Nourani.

MR. MEYER: Good morning, your Honor. Jason Meyer on behalf of the AIG/FT's (phonetic).

MR. NOURANI: Good morning, your Honor. Oliver Nourani on behalf of AIG.

JUDGE COWETT: All right. Thank you.

Ms. Cleary and Mr. McClement, please.

MS. CLEARY: Good morning, your Honor. Annemarie Cleary with Eckert Seamans on behalf of the Alliance Insurers.

MR. McCLEMENT: Good morning, your Honor. Megan McClement, though, my name is Noah, also, with Eckert Seamans and, also, on behalf of the Alliance Insurers.

JUDGE COWETT: So, what name do you want to have on the record, both?

MR. McCLEMENT: If I could use Noah that would be great.

My reference name is Megan so I just don't want anyone to think I'm practicing under a different name.

JUDGE COWETT: All right. Noah will be fine. Thank you, Mr. McClement.

Page 7

All right. So, is anyone expecting anybody else, at this point?

All right. Hearing nothing, we will --

MR. HALLIDAY: Your Honor, if I could --

JUDGE COWETT: I'm sorry.

MR. HALLIDAY: Your Honor, if I can make my appearance as well.

Joshua Halliday with London Market Insurers.

JUDGE COWETT: I'm sorry, with what?

MR. HALLIDAY: London Market Insurers.

JUDGE COWETT: Okay.

MR. HALLIDAY: Thank you.

JUDGE COWETT: London, can you spell the second word after London?

MR. HALLIDAY: Market, M-a-r-k-e-t.

JUDGE COWETT: Oh, Market. Okay. Sorry.

And again, your full name, please?

MR. HALLIDAY: Joshua Halliday.

JUDGE COWETT: J-o-s-h-u-a.

MR. HALLIDAY: H-a-l-l-i-d-a-y.

JUDGE COWETT: H-a-l-l-i-d-a-y?

MR. HALLIDAY: Yes.

JUDGE COWETT: Okay. And you're an Essex insurer?

MR. HALLIDAY: Yes.

Page 8

JUDGE COWETT: Okay. And then, anyone else that I can't see?

Okay. So, let me just reiterate, this is the matter of [Redacted] versus BSA.

There are some preliminary motions that won't count as the eight hours that I will serve here, but we have some other issues so -- there are a couple of issues.

One, we do need to deal with the various claimant motions to continue both the discovery cutoff and the hearing which -- and further, we have the question of if you wanted to call Ms. Louisa she should have been available today.

But if she is going to be allowed to testify, which I'm leaning to since the insurers have had the opportunity to talk to her even without a report which a report is too late to be admitted, if there even is one yet.

That they have a right to designate if they choose, they don't have to, but they can choose a designated counter expert and that part of the hearing might have to be continued for that purpose with notice to claimant of any report that is prepared.

And then, we can have her testify on cross and direct and then have closing arguments in the second

Page 9

session.

But all of that, all of that hearing needs to be part of the eight hours so we have to talk about how much time will be allowed or saved for that half of the hearing if it occurs.

And so, obviously, I -- you know, going to the motions and, Ms. Ahrens, you can briefly please address it, obviously, I've continued the hearing once before, I've extended discovery and, you know, it is obvious that today is set for the hearing and if I had intended to continue it or hear the motion, really, on the merits to continue, I would have set it for such a hearing.

But you know, it's really not a basis that, you know, there are continuing things that you want to get as far as discovery from, say, the repository because they've, frankly, given you some things and that's all they're going to give and that's been known for a couple of weeks.

And so, the same thing is true, frankly, with Dr. Louisa who, in my opinion, since she had the opportunity to discuss at whatever length you or she wished with [Redacted] did not have to wait for his deposition and his deposition could have been taken earlier, anyway.

So, you know, I'm not inclined to grant an

3 (Pages 6 - 9)

Page 10

extension of discovery, except to the extent that if insurers do not have a problem with her testifying, which I, frankly, think she could be allowed to testify, I agree with you, Ms. Ahrens, that the requirements of an expert doesn't necessarily mean that it has to be a written report.

And so -- so, I think she should be allowed to testify as part of this hearing, but I would, also, say that she should have been available today and I still haven't seen her and I will accommodate her, take her out of order any time today, but she needs to be available.

And if you wanted her, you should have made it clear to her that she should have been available today.

Anyway, briefly, Ms. Ahrens, go ahead. Put on the record what you want about your motions, please.

MS. AHRENS: Yes, thank you, your Honor.

First of all, I'm not sure if anyone else is experiencing difficulty hearing you, but you were cutting in and out.

So, first, I want to confirm that the Court reporter was able to a hear everything?

THE REPORTER: Yes, I was. She was very low, but I did hear it and you did cut out, but I heard what you had said.

Page 11

MS. AHRENS: Okay. If, at any time, you're having difficulty just, please, let us know.

THE REPORTER: Okay.

MS. AHRENS: Pointing to the motions, there are two pending motions: One, is the motion to reconsider the Order excluding Dr. Louisa's report and the second one is --

JUDGE COWETT: Is it available right now and has it been given to the other side?

MS. AHRENS: No, your Honor. It is not available. The basis of --

JUDGE COWETT: Go ahead.

MS. AHRENS: The basis of our motion to continue the expert discovery was to permit her time to finish her report, which she would have had done by September 26th.

During the November 18th hearing --

JUDGE COWETT: Well, but it's past September 26th and if it's not ready now, why -- on what basis would there be for me to allow it to come in who knows when?

Is it ready or not? Is the report ready or not?

MS. AHRENS: Your Honor, may I make my record?

JUDGE COWETT: You may, but you need to answer

Page 12

my question: Is the report ready or not?

MS. AHRENS: The report is not ready.

JUDGE COWETT: All right.

MS. AHRENS: Now, may I make my record?

JUDGE COWETT: Go ahead, please.

MS. AHRENS: Thank you.

As I was saying, the motion to continue expert discovery solely was to permit Dr. Louisa the time to finish her report.

In my moving papers it stated her report would be finished by September 26th I, also, notified --

JUDGE COWETT: It wasn't. Go ahead.

MS. AHRENS: May I -- thank you.

JUDGE COWETT: Yes, go ahead.

MS. AHRENS: During the September 18th hearing your Honor denied the motion and ordered that the -- any expert report not finished by the following day would be excluded.

I informed the Court it was impossible for the expert to complete the report by the following day and the reason for the motion to continue expert discovery was based on her inability to finish the report before September 26th.

The Order then ordered the expert to appear for deposition so ordered expert discovery for the other

Page 13

side.

We complied. We produced her for deposition -- other deposition. She testified she was going to have --

JUDGE COWETT: Ma'am, I read everything that is in your written paper so you don't need to reiterate it and it is part of the record your motions.

Let me just say, I've already said I think she should be allowed to testify.

I'm not going to wait for however long before this report is prepared to allow it to be an exhibit in the case, but I am going to allow her to testify in this matter at some point.

And I'm even allowing her to do it on a different date, unless you call her and say, well, appear at some time today so she is going to be able to testify.

I told you I agree with you that she -- now that the other side has had the opportunity to talk to her at some length about what her opinions are, then, it is only appropriate for the --

MS. CLEARY: Your Honor.

JUDGE COWETT: -- the case and for Redacted benefit to be able to testify.

So, we don't need to put all this on the

4 (Pages 10 - 13)

Page 14

record. We can't go on forever about these motions.

MS. CLEARY: Your Honor, may we be heard on that point, though?

JUDGE COWETT: You will be, as soon as she makes a record --

MS. CLEARY: Thank you, your Honor.

JUDGE COWETT: -- but I just don't want her to -- I'm sorry, Ms. Ahrens, we don't have in this process the ability to go over and over and over again the same issues.

So, I've read what your motions say if you have something to add to them, fine, you can put that on the record.

MS. AHRENS: Understood. Thank you.

So, what I would add is your Honor mentioned permitting the other side to designate a counter expert even though they haven't designated an expert.

If they are --

JUDGE COWETT: They have that right because your expert had not produced a report and until they have a report or the opportunity, now, to talk to her, they don't have the ability to decide whether or not to choose to have their own expert.

They may say no, Judge, we don't need it. I don't know that yet.

Page 15

But if they do, they have a right to designate an expert after you designate and have a report or now I'm allowing the interview to satisfy the requirement rather than have a report.

Which I agree with you it is a little bit unclear whether or not it has to be a written report, so I don't quite think their ability to have interviewed your witnesses, frankly, is sufficient.

But I'll listen to the argument counter, yes.

MS. AHRENS: I was just going to ask your Honor that if the other side does designate an expert, we would be permitted to depose that expert prior to Phase 2 of the hearing.

JUDGE COWETT: All right. May I hear from any responsible insurer about this issue or from Ms. Cleary.

MS. CLEARY: Yes, your Honor.

JUDGE COWETT: Yes, go ahead.

MS. CLEARY: Annemarie Cleary with Eckert Seamans for Alliance.

JUDGE COWETT: Yes.

MS. CLEARY: Your Honor, we would strongly object to any of this.

Dr. Louisa -- the rules are very clear that an expert must -- that damages must be supported by an expert report, not expert testimony.

Page 16

And the rules discuss testimony, clearly, testimony and report are two different things.

We did not receive a report from Dr. Louisa, in any way, shape or form. What we did learn yesterday interestingly enough that Dr. Louisa was retained back in July and but did not meet with Redacted until August 26th after -- and then, again, on September 17th, after the expert deadline had already passed.

The expert deadline, the last expert deadline was August 22nd. So, the insurers, as I've said before, your Honor, we are complying.

We are attempting to comply with these rules, we are attempting to abide by the structure that it has been established for these proceedings and claimant persists in disregarding them.

Claimant is on his own program and it is highly prejudicial to the responsible insurers -- responding insurers, excuse me, to have to work -- prepare for a hearing under these circumstances.

Dr. Louisa was designated as an in-person witness, a live witness. The fact that she appeared yesterday for at deposition, the day before the hearing was prejudicial in and of itself in that we couldn't explore her opinions and her testing in any amount of detail, in any amount of time that was reasonable for us

Page 17

to prepare for this hearing.

We would -- we object strenuously to you receiving Dr. Louisa's testimony, either in the form of her transcript or in person for that matter.

The deadlines are established for a reason. We abided by those deadlines. And as you've correctly point out, we didn't retain an expert because we didn't have a report to have an expert review.

And by virtue of having been offered deposition dates for Dr. Louisa of the 29th and 30th of September, nothing sooner, your Honor, we were deprived of an opportunity to learn her opinions and prepare for this hearing in that respect and should not be further prejudiced by the Claimant's approach to these proceedings.

The Claimant has had ample time having retained Dr. Louisa back in July to conduct the testing that needed to be conducted to provide the documents Dr. Louisa need and to formulate the opinions in an report and to file all of those by the August 22nd deadline.

There was even the general discovery deadline, I believe, was September 5th, she didn't even get it done by then, your Honor.

She didn't meet with Redacted until the second time on September 17th with the expectation that your

5 (Pages 14 - 17)

Page 18

Honor was going to grant, yet, another extension of the deadline.

And so, we would strongly oppose your Honor receiving Dr. Louisa's testimony in any form today and a continuance of these -- of the proceedings.

We, instead, would ask that the Court dismiss Redacted IRO claim and send him back to the Matrix.

Because we are all working under the same set of rules and those rules clearly provide that damages must be supported by an expert report, not just expert testimony, by and expert report and that was not done, your Honor.

MR. BLOOM:  Your Honor, if I may just supplement?

JUDGE COWETT:  Yes, just a minute.

Yes.  All right.  Were you finished, ma'am.

MS. CLEARY:  Yes, your Honor.  Thank you.

JUDGE COWETT:  All right.  Thank you.

All right.  Mr. Bloom.

MR. BLOOM:  Your Honor, thank you.

On behalf of Argonaut David Bloom here.  Just to supplement what Ms. Cleary clearly explained a couple of additional points.

We learned -- first of all, Dr. Louisa was made available yesterday, okay, for a deposition.

Page 19

First of all, we do not have a certified transcript.  So even if Ms. Ahrens can't produce Dr. Louisa for live testimony today and even if she wants to rely on her testimony, the transcript over her testimony yesterday, all we have is an uncertified rough draft, okay.  We do not have a certified transcript, that is Number One.

Number Two, what we learned yesterday was that Dr. Louisa met with Redacted both at the end of August and for a second time on September 17th, which was the day before we had our pre-hearing conference.

At the pre-hearing conference on September 18th, your Honor allowed the Claimant's attorney to submit Dr. Louisa's report within, let's say, what, 6 p.m. Pacific Time the following day on September 19th.

Dr. Louisa had already completed her clinic interview, alright.  All we know is that from Ms. Ahrens is that she just did not have time to complete her review, but she did have time to complete her report.

It is an unsubstantiated and vague excuse that she couldn't get her report done until August 26th, when the interview was done the day before the hearing.

So, she's had, at the very least, sufficient time to, at least, put in a partial report, but she did not even do that.

Page 20

Not only did she not have -- complete her report by then, she did not complete her report by the 26th self-imposed deadline that Ms. Ahrens explained.

And even to this day, as of yesterday Dr. Louisa explained that she wasn't even asked to complete a report.  She never did her report.

So, I would just that add that the record reflect all of that and we would echo and reiterate Ms. Cleary's objections to all this and we would ask that this claim be dismissed and converted to Matrix.

It is severely prejudicial and we do not want to adjourn this hearing.  I have no availability.  I just can't do it, we have too many of these, Judge.

JUDGE COWETT:  Yes, we discussed that once before.

All right.  Mr. Meyer and Mr. Nourani on behalf of AIG?

MR. MEYER:  Your Honor, we don't have anything to add.

JUDGE COWETT:  Okay.

MS. AHRENS:  Your Honor, may I be heard on a couple of items?

JUDGE COWETT:  Yes.

MS. AHRENS:  First of all the testimony of Dr. Louisa was misstated by both counsel.

Page 21

She testified that she was instructed to prepare a report back in July to start the process and that she was going to and in the process of creating a report by the 26th.

In addition, the argument that she could prepare a report within 24 hours --

JUDGE COWETT:  It was more than that.  It was almost -- it was more like 30 hours.  I mean, you know, that was --

MS. AHRENS:  It was --

THE REPORTER:  Sorry.

JUDGE COWETT:  Go ahead.  I'm sorry, I keep on interrupting you.

MS. AHRENS:  I just want to make it clear that some of the testimony is misstated.

JUDGE COWETT:  You know, this -- I have 11 of these cases.  This is the only case where there is all these problems related to, as I see it, an attempt to get further discovery to continue to do this on what Claimant believes ought to be their time schedule.

That is not this procedure.  That is not this. You know, I mean, there is a choice to use this process or not.

And, you know, frankly, the responsible insurers are correct.  I have gone out of my way to

6 (Pages 18 - 21)

Page 22

allow for continuances to try to be fair to [Redacted] who, apparently, has a case and who, you know, in fairness, ought to be able to present it.

But he needs to be able to have you help him comply with the rules and, you know, at a certain point I, frankly, should just say no.

I'm trying -- bending over backwards to try to help you and [Redacted] so that he has an opportunity to present his case to have the merits of this case decided in this process.

But there is a process and, you know, at a certain point, I'm sorry, but, you know, this is like we've been pushed to the max to try and accommodate.

If you didn't want to comply, Ms. Ahrens, with the rules that you have known about since, at least, July or whenever you were retained, then, fine.

But you know, if there is no report even now from Ms. Louisa, you know, I'm really hard pressed to allow [Redacted] case in.

And Ms. Cleary is right it does state a report. I was already bending the rules to say, well, okay, since they had an opportunity to talk to her we can do it by testimony, but, frankly, that is not allowed.

So, I mean, you know, I've talked to the representatives of the Trust and they say this case

Page 23

should, frankly, be dismissed and go back to the Matrix and that is, certainly, an option that is still available.

And on top of that, they allowed the late filing of the whatever that $10,000 deposit needed to be, they have gone over -- bent over backwards to respond to your request.

In a normal case, fine. But this is not a normal case, it has been known from day one it's not a normal procedure and, you know, I'm, frankly, at my wit's end, you know, because the witness is not even available today.

And so, you know, it should have been obvious I was not really going to grant these motions because I insisted that we continue and we were sent notice of today being the hearing date.

So, at a minimum, you should have had her available to testify today that even wouldn't comply with rules and be prejudicial to the defense, but I may well have allowed that.

But if she is not available, you know, these are not your rules that we're going by and I'm sorry but that has been the history of this case from day one.

So, the one thing that I will allow is will you please -- I'll have you try to contact Louisa.

Page 24

If she is available, I will consider some process; but if she is not, I'm sorry, but I think this case, certainly, by the rules, should go back to the Matrix at your choice.

But really, this IRO process I don't think should proceed because none of the rules have been complied with or very few of the rules have been complied with.

And litigants aren't able to make up their own rules, you know. I mean, this is not a regular court proceeding.

It is not a Federal Court proceedings, it's not a State Court proceeding, it's an IRO process that is, clearly, an expedited limited proceeding.

And if those aren't the rules that you want to comply with, then, it shouldn't be allowed to have the benefit of the process.

So, do you want to try and contact this woman or not?

MS. AHRENS: The expert Ms. Louisa is not --

JUDGE COWETT: Yes.

MS. AHRENS: -- available.

JUDGE COWETT: Why don't you ask her if she is? She might be.

MS. AHRENS: Your Honor, because I've already

Page 25

confirmed with here that she is not. And she was --

JUDGE COWETT: Well, if she is not available, then, how would you -- you know, even if I had said you could proceed by testimony, she is not available on the hearing date, then, how can they proceed, you know?

So, if you are not wanting the opportunity to make sure that she knows that this is going to be dismissed unless she is available, then, I really don't have a choice but to dismiss this.

Which I don't want to do because I'm trying to be fair to [Redacted] but when there has been no compliance with what there ought to be, then, I'm sorry.

Just, you know, the Matrix is a good process so it's not as if I'm not -- I'm precluding [Redacted] from having a process to pursue this claim and, you know, I'll only go so far as bending the rules on your behalf.

So, do you want to call this witness or not?

MS. AHRENS: Your Honor, I'm e-mailing her now.

I know she's not available today. I'm sure she could be available another day. She is, also, available through her deposition that was taken yesterday.

JUDGE COWETT: Well, that is insufficient. She needs to be cross-examined at the hearing, which is set for today.

MS. AHRENS: Well, during --

7 (Pages 22 - 25)

Page 26

JUDGE COWETT: I'll wait for -- I'll wait for her -- for you to get a response from her.

I'll wait for about 20 minutes and, then, if we don't hear a response, I'm sorry, but my tentative is to dismiss this hearing and you can go back to the Matrix if you wish.

I'm going to mute myself.

THE REPORTER: Is it okay if I undo my video, your Honor?

JUDGE COWETT: Yes. We will be in recess until 9:45 and then we'll see what the situation is then.

MR. MEYER: Thank you, your Honor.

THE REPORTER: Thank you.

(A recess is taken at this time.)

JUDGE COWETT: Anything from Louisa?

MS. AHRENS: No. I have not received a response from her. Again, she can be available --

JUDGE COWETT: Did you choose to call her?

MS. AHRENS: I'm sorry.

JUDGE COWETT: I'm sure you have a telephone number.

MS. AHRENS: Yes. I contacted her, your Honor.

JUDGE COWETT: By e-mail or text but not call her; right?

MS. AHRENS: Well, we --

Page 27

JUDGE COWETT: Why don't you just call her and see if she's available?

MS. AHRENS: I did --

JUDGE COWETT: So, since she is not available --

MS. AHRENS: Are we on the record, your Honor?

JUDGE COWETT: -- we can proceed with the hearing with just Redacted testimony and other witnesses that have been identified, if any, that's one option.

Or you are welcome to have this case dismissed and go to the Matrix, I'm sorry those are the only choices.

MS. AHRENS: We are not agreeing to the dismissal. We oppose it. However --

JUDGE COWETT: I understand that.

MS. AHRENS: What is your Honor ruling?

JUDGE COWETT: I told you. Here are the options: You can proceed with the hearing, Redacted is available he can testify.

You can put in other exhibits like the other exhibits that are once I rule on what is admissible and you can present opening statements, you can present closing arguments and we can proceed without an expert, although, that's probable not allowed either.

Page 28

MS. CLEARY: Your Honor -- we would object to that proposal, your Honor.

I think the only option at this point since there is no expert report is dismissal.

It would be inappropriate for you to take any other evidence if we know that there is no expert report to support the damages which are required for a settlement recommendation.

JUDGE COWETT: Yeah. You know, I can't disagree with you. The rules are the rules. I didn't make up these rules.

I'm not, you know, I just have to -- you know, I've agreed to play by the rules and so does everybody else have to.

MR. BLOOM: Your Honor, David Bloom here for Argonaut. I want to state that I do agree with Ms. Cleary it is inappropriate to proceed with the hearing based solely on the Claimant's testimony.

I mean, it's a waste of time and money, frankly. I mean, the insurers are spending, you know, defense costs in a matter which --

JUDGE COWETT: Right.

MR. BLOOM: -- you know, should not be allowed to proceed without an expert so I would object to proceeding without an available expert at this point.

Page 29

MR. MEYER: And, your Honor, Jason Meyer with AIG --

JUDGE COWETT: Yes.

MR. MEYER: -- we agree as to those comments, but I won't bore you with repeating all of those same objections.

JUDGE COWETT: All right. I mean, the record should reflect: Number One, there have been several continuances not only of the -- well, at least, two.

Continuances of the hearing date as well as extensions of discovery.

It was made clear at the last hearing on September 18th that we needed the expert report and it is clear today that the expert report is still not available, nor is the witness available even, if I were to allow that.

Nor -- and I agree, the rules say you have to have an expert that was known from day one whatever this is retention on behalf of Redacted or is accomplished which appears to be, at least, back in July, it is now October.

You know, there -- there is really no choice I have. And Ms. Ahrens, you are not even willing to call her and say, you know, does she have like a draft report or something, then, you know, I'm sorry, there is no

8 (Pages 26 - 29)

Page 30

option but to dismiss this case.

So, I am going to let you put on the record what you want to put on the record, but that is my tentative ruling.

MS. AHRENS: We believe the record is clear.

JUDGE COWETT: All right. So, I'm going to go ahead and dismiss this IRO hearing.

You are welcome to go back to the Matrix process which is a very -- it is actually a really good process and it is, definitely, still available to you as it always has been.

But still dismissing this proceeding does not in any way prejudice you from using the Matrix to whatever extent you wish to do so and I would encourage you, frankly, to do so.

And so, is there anything else you want to put on the record?

MS. AHRENS: Yeah, your Honor. Can we get an Order on the motion for reconsideration? A written Order and on the motion to dismiss?

JUDGE COWETT: Sure.

MS. AHRENS: Thank you.

JUDGE COWETT: I mean, I'm denying the motion to continue discovery, the motion to continue the hearing and I'm dismissing the hearing at this time

Page 31

based on what I just stated.

All right. Any one of the insurers wish to put anything on the record, please?

MR. BLOOM: No. Thank you, your Honor. And, you know, we appreciate your time and we wish nothing but the best of luck to Redacted and Ms. Ahrens.

JUDGE COWETT: Yeah, Redacted are you -- I think you're here?

THE WITNESS: Yes, I'm here.

JUDGE COWETT: I'm very sorry but there are special rules related to this kind of a proceeding and they just haven't been followed in my opinion.

So, I would encourage you to continue to work with Ms. Ahrens and to utilize the Matrix process to the extent that you wish to.

All right. Thank you very much. I'm going to call -- I'm going to ask, Ms. Court Reporter, Ms. Spinelli?

THE REPORTER: Yes.

JUDGE COWETT: I don't think I need to have your transcript before I put my orders denying these motions on issuing the orders of putting them in the portal.

But maybe, counsel wants to have -- does any of the counsel wish a transcript?

Page 32

I'm sure Ms. Ahrens does, any of the defense?

MR. BLOOM: Yes, your Honor. At least, on behalf of Argonaut, I would like to order a full transcript.

JUDGE COWETT: Okay.

MS. CLEARY: As would Alliance, your Honor.

JUDGE COWETT: All right.

MR. MEYER: Ms. Spinelli, AIG would, also, through Gordon and Rees order the transcript for me. Thank you.

THE REPORTER: I'm sorry.

JUDGE COWETT: Ms. Spinelli, go ahead.

THE REPORTER: I didn't hear what you said, Ms. Cleary.

MS. CLEARY: We do. Alliance does want one. Yes, thank you, Ms. Spinelli.

THE REPORTER: Okay.

JUDGE COWETT: All right. Anyone else, please.

All right. Thank you very much. This hearing will be concluded.

We didn't ever start the IRO hearing, this was hearing on the motions so it is 9:56 a.m.

All right. Thank you very much.

MS. CLEARY: Thank you, your Honor.

MR. BLOOM: Thank you, your Honor.

Page 33

MR. MEYER: Thank you, your Honor.

THE REPORTER: Thank you.

(The foregoing hearing concluded at 9:56 a.m.)

Veritext Legal Solutions

800-567-8658                                                     973-410-4098

Page 34

REPORTER'S CERTIFICATE

I, ANNA MARIE SPINELLI, CSR No. 11805, a Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me.

That the questions propounded and all objections and statements made at the time of the foregoing proceedings were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

ANNA MARIE SPINELLI, CSR NO. 11805

10 (Page 34)

# **EXHIBIT 2**

**Claimant**

*Case #* Redacted *– NAM ID 277972*

## Order

Hon. Patricia Cowett, (Ret.) the undersigned was to conduct the Virtual IRO Hearing regarding the above matter on October 1, 2024 starting at 9:00 AM PACIFIC via Zoom.

The following Order is entered:

1. Appearances:

   a. Claimant:
      i.   Kimberly Ahrens, Esq,
      ii.  Redacted  Claimant

   b. Responsible Insurers:
      i.    David Bloom, Esq, for Argonaut
      ii.   Jason Meyer, Esq. and Oliver Nourani, Esq, for AIG
      iii.  Annmarie McCleary, Esq. for Allianz
      iv.   Joshua Halliday, Esq, for excess carrier London Market

2. Orders: Prior to the IRO hearing set for today at 9:00 AM Pacific there was a hearing on the claimant's outstanding motions for another continuance of discovery for the purpose of receiving the expert report from Francesca Luizza, Pys.D., and to continue the IRO hearing itself found at 17:14:21.028 and 01:17:21.734. Both motions are denied: even as of today October 1, 2024, there still is no expert report and the expert is not available to testify at today's hearing at any time, even out of order, claimant being given the opportunity to contact the expert to check again for her availability. Article XIII G of the Trust Distribution Procedures for Abuse Claims titled "Requirements for Obtaining a Settlement Recommendation" provides: "To Obtain a Settlement Recommendation, each Direct Abuse Claimant who proceeds through the Independent Review shall provide the following:" Direct Abuse Claimant provides evidence that one or more of the BSA, Local Council or Chartered Organization was negligent or is otherwise liable on account of a Direct Abuse Claim, and evidence regarding the Direct Abuse Claimant's damages (such as medical and counseling records and/or a sworn statement from a family member, significant other, or relative who, in each case, will agree to a deposition by the Neutral) or benchmark judgments or settlements relevant to the damages claimed. Damages must be supported by an expert report (the cost of which shall be paid by the Direct Abuse Claimant);" Defense did have an opportunity to interview the expert yesterday September 30, 2024, but have no formal transcript as of yet. Defense counsel all opposed a further continuance of discovery and continuance of the hearing for the lack of any written report

1

as the rules clearly require the undersigned to recommend to the Settlement Trustee that the requested dismissal be granted. In this matter the hearing was set and then continued as well as the deadlines for completion of discovery. Claimant's counsel leaves me with no alternative but to recommend dismissal of this IRO hearing in order to comply with applicable rules and in fairness to the parties.

3.  The recommendation to the Settlement Trustee is that this case be dismissed since Claimant has failed to prove damages which are a necessary and indispensable element of his case.

4.  Miscellaneous

    a.  As per Notice of Stenographic Record for Hearing, doc 22:58:14.079 The party(s) that engaged a court reporter to record this conference, shall upload a copy of the transcript to Claimant's portal when it becomes available.

Date: 10/7/2024

By:

DocuSigned by:

*PATRICIA A. COWETT*

EF3C13B3D71D4FF...

Hon. Patricia Cowett, (Ret.)

2

# **EXHIBIT 3**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

In re:

DELAWARE BSA, LLC,

　　　Reorganized Debtor.

Chapter 11

Case No. 20-10342 (LSS)

**EXHIBIT 3**

**REDACTED IN FULL**

# **EXHIBIT 4**

Scouting Settlement Trust

**Decision on Settlement Recommendation: Accepted**
**Claimant Redacted (Redacted )**

Based upon my detailed review of the Settlement Recommendation, along with other relevant submissions by those parties given the opportunity to participate in the IRO hearing, I have determined that the Settlement Recommendation is reasonable and consistent with the Trust Distribution Procedures (the "TDP"), and therefore is accepted. My acceptance of the Settlement Recommendation is conditioned on the Claimant's provision of a release, which, in accordance with Article XIII. A. of the TDP, contains an assignment of the Claimant's Direct Abuse Claim against any Chartered Organization and all other rights and claims arising out of the Claimant's Direct Abuse Claim to the Settlement Trust.

Respectfully,

/s/ Hon. Barbara J. Houser (Ret.)

Hon. Barbara J. Houser (Ret.) Trustee
Scouting Settlement Trust

# **EXHIBIT 5**

Scouting Settlement Trust

**Amended Decision on Settlement Recommendation: Accepted**

**Claimant** Redacted    (Redacted )

Based upon my detailed review of the Settlement Recommendation, along with other relevant submissions by those parties given the opportunity to participate in the IRO hearing, I have determined that the Settlement Recommendation is reasonable and consistent with the Trust Distribution Procedures (the "TDP"), and therefore is accepted.

This Amended Decision omits language from the original decision that conditioned acceptance of the Settlement Recommendation on the Claimant's provision of a release. This language was surplusage given my acceptance of the Settlement Recommendation that dismissed the claim.

Respectfully,

/s/ Hon. Barbara J. Houser (Ret.)

Hon. Barbara J. Houser (Ret.) Trustee
Scouting Settlement Trust

December 20, 2024

# **EXHIBIT 6**

**From:** **Grim, Emily P.** grime@gilbertlegal.com 📎
**Subject:** RE: <span style="background:black;color:red">Redacted</span> v. BSA (Claim No <span style="background:black;color:red">Redacted</span> )
**Date:** February 10, 2026 at 12:58 PM
**To:** Michael Reagan ClaimsAdminMJR@scoutingsettlementtrust.com, Ben Cramer ben@stalwartlaw.com,
Scouting Settlement Trust Info Info@scoutingsettlementtrust.com
**Cc:** Amanda Bloom amanda@stalwartlaw.com

Dear Mr. Cramer,

Our firm is counsel to the Settlement Trust.  We write to respond to your email below, in which you asked whether your client was eligible to resolve his claim through the Trust's Matrix process.  Unfortunately, the TDP does not permit this.

Article XIII.D of the TDP states:  "If the Neutral [in an IRO proceeding] makes an Accepted Settlement Recommendation of $0 due to the statute of limitations or a finding of no liability, the Direct Abuse Claimant shall receive nothing from the Trust and shall remain barred from proceeding against any Protected Party on account of their claim."  Here, as you note in your email, the Neutral concluded in her Settlement Recommendation that <span style="background:black;color:red">Redacted</span> claim must be dismissed without an award due to his failure to prove his claim.  Upon careful review of the record, the Trustee accepted this Settlement Recommendation.  Accordingly, <span style="background:black;color:red">Redacted</span> is not entitled to receive funds from the Trust, and he is barred from pursuing any additional review of his claim under the TDP, including via the Matrix process.

The Trust's [website](#) similarly makes clear that Claimants may not transfer their claim to the Matrix process after the due date for their second $10,000 administrative payment has passed:

**Question 8.11**
What happens to my claim if I change my mind and decide not to pursue the IRO?

**Answer**
You may change your mind at any time up to the due date for your second $10,000 administrative fee payment and your claim will return to the TDP Matrix process as though no IRO election had been made.

The Trust is sensitive to the financial and emotional burdens that the IRO process may impose on Claimants.  However, the Trust is required to apply the TDP as written.

Sincerely,



**Emily P. Grim**
grime@gilbertlegal.com
O 202.772.3926

700 Pennsylvania Ave., SE
Suite 400
Washington, DC  20003
**GilbertLegal.com**

This email and any attachments may contain confidential information that is privileged at law. If you are not a named recipient or have received this communication by error, please notify the sender immediately and destroy this email and its attachments, and all copies thereof, without further distributing or copying them.

# EXHIBIT 7

Dylan Ruga (SBN 235969)
*dylan@stalwartlaw.com*
N. Ben Cramer (SBN 261767)
*ben@stalwartlaw.com*
**STALWART LAW GROUP**
1327 N. Broadway, Santa Ana, CA 92706 (mailing)
11100 Santa Monica Blvd., Ste. 780, Los Angeles, CA 90025 (physical)
Telephone: 310.954.2000
Facsimile: 310.943.0303

Attorneys for Plaintiff, J.G.B.

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego
2/13/2026 3:48:22 PM

Clerk of the Superior Court
By F. Gonzalez        ,Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### FOR THE COUNTY OF SAN DIEGO

| | |
|---|---|
| J.G.B., | Case No.:  **26CU009101C** |
| Plaintiff, | **COMPLAINT FOR:** |
| vs. | **(1) LEGAL MALPRACTICE;** |
| AHRENS LAW, APC, a California Corporation; and DOES 1-20, inclusive, | **(2) BREACH OF CONTRACT;** |
| | **(3) BREACH OF FIDUCIARY DUTY** |
| Defendants. | **DEMAND FOR JURY TRIAL** |

Plaintiff, J.G.B.[1] ("Plaintiff"), an individual, alleges as follows for his Complaint:

### THE PARTIES

1. At all times mentioned herein, Plaintiff was an individual and was at all times mentioned in this Complaint an adult residing in the county of San Diego, California.

2. Plaintiff is informed and believes, and based thereon alleges, that Defendant, AHRENS LAW, APC ("Defendant" or "AHRENS LAW") is and was a professional corporation with its principal place of business located at 2173 Salk Avenue, Suite 250, Carlsbad, CA 92008, in the County of San Diego, State of California.

///

---

[1] Since this case involves claims of sexual harassment f{nd sexual abuse, to protect the privacy of Plaintiff, he is identified in this Complaint only by his initials.

**COMPLAINT**

3.      The true names and capacities, whether individual, corporate, partnership, associate, or otherwise of the Defendants named herein as DOES 1 through 20, inclusive, are presently unknown to Plaintiff who therefore sues these Defendants by fictitious names.  Plaintiff is informed and believes, and based thereon alleges, that each of the Defendants designated herein as a DOE is legally responsible in some manner for the events and happenings referred to herein, and caused injury and damage proximately thereby to Plaintiff as hereinafter alleged. Plaintiff will seek leave of this Court to amend this Complaint to show the true names and capacities of these DOE Defendants once ascertained.   Whenever in this Complaint reference is made to "Defendants," such allegation shall be deemed to mean the acts of Defendants acting individually, jointly, and/or severally.

4.      Plaintiff is informed and believes, and based thereon alleges, that Defendants, and each of them, including the DOE Defendants, were the agents, employees and/or representatives of each of the remaining Defendants and were, at all times material hereto, acting within the purposes and scope of such agency, employment, contract and/or representation, and that each of them are jointly and severally liable to Plaintiff.

5.      Defendants, AHRENS LAW, APC and DOES 1 through 20, collectively shall be referred to herein as "Defendants."

**VENUE**

6.      Venue is proper in the Superior Court of San Diego County because AHRENS LAW, APC's principal place of business is located in the County of San Diego, State of California.

**GENERAL ALLEGATIONS**

7.      This is a legal malpractice action arising from a lawyer and her law firm's failure to prosecute a claim under The Boy Scouts of America Trust Distribution Procedures (hereinafter "TDP"), which was established for evaluating and paying sexual abuse claims against the Boy Scouts of America following its Chapter 11 bankruptcy. Plaintiff's claim against The Boy Scouts of America resulted in a dismissal with prejudice of the case and no monetary compensation paid to Plaintiff. To put it bluntly, Plaintiff was victimized twice.  This lawsuit was filed within one year from when the legal representation with Defendants ended on or about February 27, 2025.

**COMPLAINT**

*UNDERLYING LAWSUIT*

8.      On November 16, 2020, Plaintiff timely submitted a Sexual Abuse Survivor Claim in the matter of Boy Scouts of America.  He was assigned a claim number.

9.      On December 30, 2022, Plaintiff, by and through Defendants, timely filed a Complaint for Damages – Sexual Assault of a Minor and Negligence in the Superior Court of California – County of Los Angeles.

10.      On September 28, 2023, Plaintiff, by and through Defendants, submitted a Scouting Settlement Trust Change of Attorney Representation Status Form.  Plaintiff designated Defendants as his new attorney to assist with his Abuse Claim.  He authorized the Trust to contact his newly retained attorney about his Abuse Claim.

11.      On October 18, 2023, Plaintiff, by and through Defendants, submitted a Trust Claims Questionnaire.  Plaintiff vividly described sexual harassment and abuse that occurred to him from approximately 1971 to 1975 while a member of the Boys Scouts of America, which "started with touching and wrestling, progress to fondling his genitals, then progress to masturbation, oral contact, and penetration."

12.      In the Trust Claims Questionnaire, there were two options to resolve the claim – Option #1 - Trust Claim Submission (also known as the "Matrix") or Option #2 – Independent Review Option.

13.      In Option #1, a Plaintiff will have his Claim valued by the Trustee in accordance with the range of values that are defined in the settlement papers. Claims that are allowed by the Trustee could be valued at amounts between $3,500 to **$2,700,000** according to criteria that are spelled out in detail in the settlement papers (emphasis added).

14.      In Option #2, a Plaintiff who elects this option will have an independent, neutral third party (a retired judge with tort experience) make a settlement recommendation to the Trustee after participating in a fact-finding process (like a trial). A Plaintiff who elects this option must pay a fee to participate in this process: they must pay $10,000 at the time they elect the option, and an additional $10,000 immediately before the neutral's review process begins.  A Plaintiff who chose this option must fully complete this Questionnaire and pay the fees. Pursuant to the Trust

3

**COMPLAINT**

Distribution Procedures (TDP), "damages **must** be supported by an expert report shall be paid by the Direct Abuse Claimant." See TDP, XIII, G (vi) (emphasis added).

15. On October 18, 2023, Plaintiff, by and through Defendants, selected the Option #2 - Independent Review Option.

16. In October of 2023, according to a declaration dated September 26, 2024 and also the "Response by the Boy Scouts of America Settlement Trust to Claimant's Motion to Continue the IRO Hearing and Related Dates," Defendants were granted access to the Portal and the Document Appendix. The Trust provided Defendants with training materials that demonstrated how to search the Document Repository. Through the Document Repository, Defendants gained access to Plaintiff's alleged abuser IV file and several rosters that contain either the alleged abuser's or Plaintiff's name. Defendants "spent a significant amount of time researching in the Document Repository."

17. On March 22, 2024, Plaintiff, by and through Defendants, filed a Complaint for Sexual Abuse and Negligence in the Superior Court of California, County of Los Angeles.

18. On May 14, 2024, Judge Michael J. Reagan (Ret.), Claims Administrator, on behalf of The Honorable Barbara J. Houser (Ret.), Settlement Trustee, issued an order assigning The Honorable Patricia Cowett (Ret.) as the Neutral since Plaintiff had timely elected the Independent Review Option, paid or received a waiver of the initial $10,000.00 administrative fee, and filed a Complaint.

19. On May 23, 2024, Hon. Patricia Cowett (Ret.) conducted a scheduling conference. Defendants appeared on behalf of Plaintiff. Expert witness disclosure and discovery were as follows - 1st Exchange: July 1, 2024, with discovery thereon by July 12, 2024, 2nd Exchange: July 16, 2024, with discovery thereon by July 26, 2024. All discovery was to be completed by August 22, 2024. The hearing was scheduled for September 17, 2024.

20. On June 25, 2024, The Trust issued a "Response to Claimant's May 16, June 7, and June 10, 2024 Submissions." In pertinent part, the Trust stated that Defendants "inappropriately attempted to serve the Trust with additional discovery requests" and ruled that the parties had no

**COMPLAINT**

less access to the Document Appendix than the Trust, therefore, the discovery requests were denied.

21. On July 9, 2024, Plaintiff, by and through Defendants, served a Request to Continue the Expert Exchange and Discovery Deadlines.

22. On July 10, 2024, Plaintiff, by and through Defendants, submitted a request for documents to the trust.

23. On July 11, 2024, Hon. Patricia Cowett (Ret.) conducted a status conference. Defendants appeared on behalf of Plaintiff and requested a continuance of dates previously set for expert discovery. The dates were reset as follows – August 1, 2024 – first exchange, August 7, 2024 – second exchange, and August 22, 2024 – discovery regarding experts and all discovery to be completed. The Independent Review Option hearing date remained set for September 17, 2024.

24. On July 17, 2024, Plaintiff, by and through Defendants, submitted deposition notices seeking to depose a representative from the Boy Scouts of America and a Local Council representative.

25. On July 20, 2024, an order was issued granted Claimant an extension to provide expert discovery.

26. On July 25, 2024, The Trust issued a "Response to Claimant July 10 and July 17 Requests." The Trust denied the discovery request from July 10th and denied the request for depositions on July 17th.

27. On July 30, 2024, Plaintiff, by and through Defendants, submitted a Notice of Expert Designation. Plaintiff designated Francesca Luizza, PsyD.

28. On July 31, 2024, Plaintiff, by and through Defendants, submitted an "Objection to IRO Process." Defendants objected, among other things, that "compensation offered through the independent review process is insufficient compared to what could be achieved through litigation or other means."

29. On August 13, 2024, Plaintiff, by and through Defendants, submitted a Motion to Continue the IRO Hearing and Related Dates.

///

5

**COMPLAINT**

30.    On August 22, 2024, Defendants participated in a telephone conversation with Hon. Michael Reagan (Ret.), Claims Administrator of the BSA Settlement Trust, wherein he emphasized the need for Defendants to read the Attorney's Guide and the TDP.  Judge Reagan stated that "Defendants' requests, by and large, were not permitted."

31.    On August 22, 2024, Plaintiff, by and through Defendants, submitted a "Motion to Continue Discovery Deadline."  Defendants stated that discovery cutoff was on August 22, 2024, but Plaintiff's deposition was scheduled for August 28, 2024 and other depositions needed to be completed.  In addition, Defendants stated in their motion that the "expert needs additional time to prepare her report."  Defendants requested an order continuing the discovery cutoff for a period of 14 days.

32.    On August 23, 2024, Defendants sent a letter confirming that the agreement to continue the discovery deadline to September 5, 2024.

33.    On August 26, 2024, Defendants sent an email requesting "the status of Claimant's claim status be changed from 'pending second $10k payment' to 'discovery.'"

34.    On August 26, 2024, Hon. Michael J. Reagan (Ret.), Claims Administrator of the BSA Settlement Trust, issued a "Claimant's Administrator's Responses to Attorney Kimberly Ahren's August 26, 2024 Email."  The request for a status change was denied.  Judge Reagan ordered that the second $10,000 payment for this claim was due by 5:00 pm ET on September 3, 2024.  He further stated that if the Trust does not receive the second $10,000 payment for this claim by 5:00 pm ET on September 3, 2024, this claim will revert to a Matrix claim.  Under the Option #1 and the Matrix, Plaintiff still would have likely recovered $2,700,000.00 in damages.

35.    On August 26, 2024, Defendants' expert, Francesca Luizza, PsyD., had her first meeting with Plaintiff, according to her deposition testimony.

36.    On August 27, 2024, Hon. Patricia Cowett (Ret.) issued an Order Extension of Discovery stating that the discovery date deadline will be September 5, 2024 and the IRO Hearing will be October 1, 2024.

37.    On August 28, 2024, the deposition of Plaintiff went forward.

///

6

**COMPLAINT**

38.    On September 9, 2024, Plaintiff, by and through Defendants, filed a "Motion to Continue the IRO Hearing and Related Dates" alleging the Trust had not cooperated with discovery requests.

39.    On September 10, 2024, which was one-week late, Plaintiff, by and through Defendants, paid the second $10,000 administrative fee.  During the one-week delay, Boy Scouts of America was told to hold off on its research since there was a possibility the Trust would transfer his claim to the Matrix or if granted an extension he might fail to timely pay, rendering the research unnecessary. This delay was self-inflicted by the Plaintiff, by and through his attorney. An extension was granted, and payment was received within the revised deadline.

40.    On September 23, 2024, Plaintiff, by and through Defendants, filed a "Request to Extent [sic] the Expert Discovery Deadline to 9/26/24."  Defendants stated that "Expert Luizza will have her report finished by 9/26/2024."

41.    On September 13, 2024, Hon. Michael J. Reagan (Ret.), Claims Administrator of the BSA Settlement Trust, issued a "Response by the Boy Scouts of America Settlement Trust to Claimant's Motion to Continue the IRO Hearing and Related Dates."  Judge Reagan stated that the response was submitted solely for the purpose of clarifying the Trust's obligations under the Document Appendix and correcting mischaracterizations made in the motion by Defendants. Judge Reagan concluded the four-page response stating, "the Settlement Trust has complied with its obligations under the TDP and Attorneys Guide and continues to work with the BSA regarding her improper requests."

42.    On September 17, 2024, Plaintiff, by and through Defendants, submitted an Amended Independent Review Option Complaint for Faud, Constructive Fraud, and Negligence.

43.    On September 17, 2024, the Participating Insurers opposed the request to continue the IRO Hearing and Related Dates.  They argued that the prejudice to Plaintiff, by and through his attorneys, was "self-inflicted."

44.    On September 18, 2024, Plaintiff, by and through Defendants submitted an "Availability of Claimant's Expert for a Deposition," which was on September 29, 2024 or September 30, 2024.

**COMPLAINT**

45. On September 18, 2024, Hon. Patricia Cowett (Ret.) conducted the final prehearing conference. Her Order stated as follows – "Motion to Extend Discovery to September 26, 2024 and Motion to Continue the Hearing are denied, good cause not having been established. The expert Luissa can create a report to be uploaded by 6 pm PACIFIC September 19, 2024 with 3 dates and times she is available for an interview. Any report not filed by this deadline is untimely and will not be received. The amended complaint filed September 17, 2024 is untimely and will be stricken. Claimants brief must be filed by noon PACIFIC September 18, 2024."

46. On September 18, 2024, Plaintiff, by and through his attorneys, filed an "IRO Prehearing Brief," which was 14 pages and "incomplete." Under damages, Defendants stated they were seeking, on behalf of Plaintiff, **"$6-12 million in compensatory plus $20-30 million in punitive [damages]"** (emphasis added).

47. On or before September 19, 2024, Plaintiff, by and through Defendants, did **not** file a report disclosing expert Dr. Luizza's anticipated expert testimony, as ordered to do so by Judge Cowett on September 18, 2024.

48. On September 20, 2024, Plaintiff, by and through Defendants, proffered a declaration dated the same date from another abused victim. However, the existence of the victim and his interactions with the abuser were known to Defendants at least as early as August 28, 2024. On September 23, 2024, the Participating Insurers filed a Motion to Dismiss Claim. They cited Article XIII(G)(vi) of the TDP which states, "To obtain a Settlement Recommendation, each Direct Abuse Claimant who proceeds through the Independent Review shall provide . . . evidence regarding the Direct Abuse Claimant's damages." Subsection (vi) further provides, "Damages **must** be supported by an expert report (the cost of which shall be paid by the Direct Abuse Claimant)." (emphasis added). The Participating Insurers argued that Plaintiff, by and through Defendants, **failed** to submit a report when Plaintiff first identified Dr. Luizza as his expert on July 30, 2024, **failed** to provide any information concerning Dr. Luizza's anticipated testimony by August 22, 2024 (the established cutoff for expert discovery), **failed** again to provide information by September 5, 2024 (the subsequently extended general discovery cutoff), and **failed** to file a report disclosing Dr. Luizza's anticipated expert testimony by the deadline of September 19, 2024.

**COMPLAINT**

49.     On September 25, 2024, Plaintiff, by and through Defendants, submitted a "Motion to Continue the Hearing, or in the alternative, Reconsider the September 18, 2024 Order."  In the accompanying declaration, Defendants **admitted** knowing that the "expert report [would be] excluded from evidence if not completed by 6 pm [on September 19, 2024]."

50.     On September 27, 2024, the Participating Insurers filed an "Opposition to Claimant's Motion to Continue the Hearing or Reconsider the September 18, 2024 Order."  In the Opposition, the Participating Insurers noted that Plaintiff, by and through Defendants, has "twice been afforded extensions in providing his expert discovery" and the "failure to provide an expert report is self-inflicted."

51.     On September 29, 2024, in the "Claimant's Prehearing Brief," Plaintiff, by and through Defendants, stated that a jury "awarded A.H. damages of $10 million" and that "verdict analysis from 2018 shows the expected verdict range for this case is in the range of '$6 million to $12 million, plus punitive damages, with punitive damages leading to verdicts averaging $20 million to $130 million or more,' each."

52.     On September 30, 2024, in the deposition of Defendants' retained expert, Francesca Luizza, PsyD.  She testified that, as of the time of her deposition, she did NOT prepare a written report of her forensic valuation of Plaintiff.  Page 63:11-13.  She further stated, "I was not asked to do a report" and "I wasn't asked to do a report."  Page 70:4-8.

53.     On October 1, 2024, during the Independent Review Option hearing, Defendants requested to continue the expert discovery "to permit [Francesca Luizza, PsyD.,] time to finish her report, which she would have had done by September 26th."  Defendants stated "the report is not ready," and acknowledge that moving papers were supposed to be due by September 26th."  The attorney for the Participating Insurers argued that Plaintiff, by and through Defendants "had ample time having retained Dr. Louisa back in July to conduct the testing that needed to be conducted to provide the documents Dr. Louisa need and to formulate the opinions in an report and to file all of those by the August 22nd deadline."

///

///

**COMPLAINT**

54.     On October 1, 2024, Defendants requested an immediate and full accounting of "Any IRO Services charges Against Claimant." The request was denied the same day by The Trust.

55.     On October 7, 2024, Hon. Patricia Cowett (Ret.) issued an order dismissing Plaintiff's claim on the grounds that he had "failed to prove damages which are a necessary and indispensable element of his case." Her order explained her reasoning as follows –

"even as of today October 1, 2024, **there still is no expert report** and the expert is not available to testify at today's hearing at any time, even out of order, claimant being given the opportunity to contact the expert to check again for her availability. Article XIII G of the Trust Distribution Procedures for Abuse Claims titled "Requirements for Obtaining a Settlement Recommendation" provides: "To Obtain a Settlement Recommendation, each Direct Abuse Claimant who proceeds through the Independent Review shall provide the following:" Direct Abuse Claimant provides evidence that one or more of the BSA, Local Council or Chartered Organization was negligent or is otherwise liable on account of a Direct Abuse Claim, and evidence regarding the Direct Abuse Claimant's damages (such as medical and counseling records and/or a sworn statement from a family member, significant other, or relative who, in each case, will agree to a deposition by the Neutral) or benchmark judgments or settlements relevant to the damages claimed. **Damages must be supported by an expert report** (the cost of which shall be paid by the Direct Abuse Claimant);" Defense did have an opportunity to interview the expert yesterday September 30, 2024, but have **no formal transcript as of yet**. Defense counsel all opposed a further continuance of discovery and continuance of the hearing for the lack of any written report as the rules clearly require the undersigned to recommend to the Settlement Trustee that the requested dismissal be granted. In this matter the hearing was set and then continued as well as the deadlines for completion of discovery. Claimant's counsel leaves me with no

10

**COMPLAINT**

alternative but to recommend dismissal of this IRO hearing in order to comply with applicable rules and in fairness to the parties" (emphasis added).

56. On November 22, 2024, the Hon. Barbara J. Houser (Ret.), Trustee Scouting Settlement Trust, issued a "Decision on Settlement Recommendation: Accepted." She stated that "based upon [her] detailed review of the Settlement Recommendation, along with other relevant submissions by those parties given the opportunity to participate in the IRO hearing, [she has] determined that the Settlement Recommendation is reasonable and consistent with the Trust Distribution Procedures (the "TDP"), and therefore is accepted."

57. On December 6, 2024, Plaintiff, by and through Defendants, submitted a Notice of Dispute, which included Claimant's Response and Objection to Neutral's Settlement Recommendation, Neutral's Order/Decision on Motion to Dismiss, Official Transcript of Expert Francesca Luizza PsyD, and a Declaration of Expert Francesca Luizza PsyD with her Opinions. Defendants attempted to invoke the dispute resolution procedures of Section 8.16 of the Trust Agreement and requested that the Trustee "vacate the dismissal and fairly and reasonably compensate Claimant."

58. On December 20, 2024, the Hon. Barbara J. Houser (Ret.), Trustee Scouting Settlement Trust, issued an Amended Decision on Settlement Recommendation. She ruled as follows – "Based upon my detailed review of the Settlement Recommendation, along with other relevant submissions by those parties given the opportunity to participate in the IRO hearing, I have determined that the Settlement Recommendation is reasonable and consistent with the Trust Distribution Procedures (the "TDP"), and therefore is accepted." The case was dismissed and no compensation was provided to Plaintiff.

59. Article XIII (D) of TDP states as follows - "if the Neutral makes an Accepted Settlement Recommendation of $0 due to the statute of limitations or a finding of no liability, the Direct Abuse Claimant **shall receive nothing from the Trust** and **shall remain barred** from proceeding against any Protected Party on account of their claim" (emphasis added).

///

///

**COMPLAINT**

60. On February 27, 2025, according to Defendants' "Notice of Lien for Attorney Fees and Costs," Defendants were dismissed as Plaintiff's attorney of record for purposes of the BSA Scouting Settlement Trust.

61. As a direct result of Defendants' substandard advice, representation, and prosecution of the claim, Plaintiff's case was dismissed and he is completely barred from proceeding on any claim. As set forth in the neutral's Settlement Recommendation, Plaintiff failed to fulfill the most basic requirements for compensability via the IRO process and the Trustee's Decision is final.

62. As a direct result of Defendants' substandard advice, representation, and prosecution of the claim, Plaintiff has no mechanism to seek reconsideration of the Trustee's acceptance of a neutral's settlement recommendation and there is no mechanism by which Plaintiff re-open the record after their IRO proceedings have concluded.

63. The failure to produce a damages expert report in support of his claim was a failure to satisfy the express language of the TDP, which requires such a report as a precondition to the entitlement to a settlement recommendation.

## FIRST CAUSE OF ACTION

### Legal Malpractice

(Against Defendants, AHRENS LAW, APC and DOES 1-20)

64. Plaintiff incorporates herein by reference, as though fully set forth herein, each and every allegation contained in paragraphs 1 through 62, inclusive of this Complaint.

65. Defendants had an attorney-client relationship with Plaintiff and thus had a duty to zealously represent Plaintiff.

66. For the reasons set forth above, among others, Defendants' advice, representation, and prosecution on behalf of Plaintiff fell below the applicable standard of care for the following reasons –

    a. Failing to competently read, understand, and comply with the Trust Distribution Procedures, Attorney's Guide, and IRO procedural requirements, despite repeated admonitions from the Claims Administrator and Neutral that Defendants' requests

**COMPLAINT**

and conduct were improper and not permitted under the TDP;

b. Advising Plaintiff to elect the Independent Review Option without ensuring Plaintiff could meet its mandatory prerequisites, including the timely preparation and submission of a damages expert report, despite knowing or having reason to know that such a report was indispensable to obtaining any recovery;

c. Failing to timely retain, instruct, supervise, and request a damages expert to prepare the required report ("I was not asked to do a report" and "I wasn't asked to do a report." Page 70:4-8 of the deposition of Defendants' Expert);

d. Designating an expert in July 2024 while failing to ensure that the expert was instructed to prepare a report, complete necessary testing, or meet mandatory disclosure deadlines;

e. Allowing the expert's first substantive meeting with Plaintiff to occur on August 26, 2024, which was after discovery deadlines were imminent or had already passed;

f. Failing to submit a damages expert report by the original expert discovery cutoff, the extended discovery deadlines, or the express deadline of September 19, 2024 as imposed by the Neutral;

g. Proceeding to hearing knowing that the absence of an expert report would require dismissal under Article XIII (G)(vi) of the TDP;

h. Failure to timely pay the second $10,000 IRO administrative fee late;

i. Filing an untimely amended complaint that was stricken;

j. Filing an incomplete and inadequate pre-hearing brief that failed to comply with IRO requirements.

k. Repeatedly seeking discovery expressly prohibited by the TDP, including deposition notices and discovery requests denied multiple times by the Trust;

l. Mischaracterizing the Trust's discovery obligations in written motions, prompting corrective responses from the Claims Administrator;

m. Failing to take the most basic steps required to preserve Plaintiff's eligibility for

**COMPLAINT**

compensation, including the submission of admissible damages evidence;

n. Proceeding through the IRO process in a manner that guaranteed dismissal for failure of proof;

o. Asserting unsupported and inflated damages figures in filings (including claims of $6–12 million in compensatory damages and $20–30 million in punitive damages) without admissible damages expert support, undermining credibility before the Neutral, the Trust, and Participating Insurers;

p. Attempting to cure fatal evidentiary defects only after dismissal, despite the TDP barring reopening of the record and rendering the Trustee's acceptance of the Neutral's recommendation final.

67. As a direct and proximate cause of Defendants' negligent advice, representation, and prosecution, Plaintiff's IRO claim was dismissed for failure to prove damages, which is an expressly required element under the TDP, the Neutral recommended dismissal with a $0 settlement recommendation, the Trustee accepted the recommendation rendering it final and binding, and Plaintiff is permanently barred from pursuing compensation from the Trust or from any Protected Party on account of his abuse claim.

68. But for Defendants' negligence, Plaintiff would have submitted a timely and compliant damages expert report, proceeded through the IRO process on the merits, and obtained a favorable settlement recommendation and monetary compensation.

69. As a direct and proximate cause of Defendants' negligent advice, representation, and prosecution of the claim, Plaintiff suffered damages in an amount to be established at trial, including but not limited to loss of the entire value of his abuse claim, loss of the right to recover any compensation from the Boy Scouts of America Settlement Trust, loss of the ability to pursue any further claims against Protected Parties, out-of-pocket costs, administrative fees paid in reliance on Defendants' advice, emotional distress, and re-traumatization caused by Defendants' mishandling of his abuse claim.

///

///

14

**COMPLAINT**

## SECOND CAUSE OF ACTION

### Breach of Contract

(Against Defendants AHRENS LAW, APC and DOES 1-20)

70.     Plaintiff incorporates herein by reference, as though fully set forth herein, each and every allegation contained in paragraphs 1 through 68, inclusive of this Complaint.

71.     Plaintiff and Defendants entered into a written and/or oral attorney-client agreement whereby Defendants agreed, in exchange for fees and costs, to represent Plaintiff in connection with his sexual abuse claims, including prosecution of his claim through the Boy Scouts of America Settlement Trust and, specifically, the Independent Review Option ("IRO").

72.     Under the terms of the agreement, Defendants expressly and impliedly promised to do the following -

   a.   Timely and competently prosecute Plaintiff's claim in accordance with all applicable procedural rules, deadlines, and governing trust documents;

   b.   Perform the services required to preserve Plaintiff's eligibility for compensation, including compliance with mandatory prerequisites and deadlines imposed by the Trust Distribution Procedures ("TDP");

   c.   Retain, instruct, and manage damages experts to support Plaintiff's claim;

   d.   Meet all filing deadlines, payment deadlines, and evidentiary requirements necessary to avoid dismissal or forfeiture of Plaintiff's claim;

   e.   Keep Plaintiff reasonably informed of material developments, risks, and defects affecting the viability of his claim; and

   f.   Act solely in Plaintiff's interests while performing the contracted legal services.

73.     Defendants breached the attorney-client agreement by failing to perform the promised services, including but not limited to:

   a.   Failing to submit a damages expert report required by Article XIII(G)(vi) of the TDP as a condition precedent to recovery under the IRO process;

   b.   Failing to timely retain, instruct, supervise, and request a damages expert to prepare the required report ("I was not asked to do a report" and "I wasn't asked to do a

report." Page 70:4-8 of the deposition of Defendants' Expert);

    c.  Missing mandatory deadlines and filing untimely and procedurally defective pleadings;

    d.  Failing to timely pay required administrative fees, jeopardizing Plaintiff's claim status;

    e.  Failing to perform the agreed-upon services in a manner that preserved Plaintiff's right to compensation;

    f.  Proceeding with the IRO hearing despite knowing that Defendants had not performed the essential contractual tasks necessary to prosecute the claim.

74.    Defendants' failures constituted a material breach of the attorney-client agreement and a failure of consideration.

75.    As a direct and proximate cause of Defendants' breach of contract, Plaintiff's IRO claim was dismissed with a $0 settlement recommendation, the Trustee accepted the recommendation as final and binding, Plaintiff lost all rights to compensation from the Settlement Trust and from any Protected Party, and Plaintiff received none of the benefit of the bargain for which he retained Defendants

76.    Had Defendants performed as promised, Plaintiff would have satisfied the contractual and procedural prerequisites for compensation and would have obtained a substantial settlement or settlement recommendation.  Under the Option #1 and the Matrix, Plaintiff would have likely recovered $2,700,000.00 in damages.

77.    As a direct and proximate cause of Defendants' breach of contract, Plaintiff suffered damages including but not limited to the value of the lost settlement or recovery Plaintiff would have obtained but for Defendants' breach, fees and costs paid to Defendants for services that were not competently or fully performed, administrative fees and expenses incurred in reliance on Defendants' contractual promises, and consequential damages flowing from the loss of Plaintiff's claim and remedies.

///

///

**COMPLAINT**

## THIRD CAUSE OF ACTION

### Breach of Fiduciary Duty

(Against Defendants AHRENS LAW, APC and DOES 1-20)

78.     Plaintiff incorporates herein by reference, as though fully set forth herein, each and every allegation contained in paragraphs 1 through 76, inclusive of this Complaint.

79.     At all relevant times, Defendants stood in a fiduciary relationship with Plaintiff arising from the attorney-client relationship. As Plaintiff's attorneys, Defendants owed Plaintiff the highest duties of loyalty, honesty, full disclosure, undivided allegiance, and the obligation to act at all times in Plaintiff's best interests.

80.     Defendants further owed Plaintiff a duty to provide candid and accurate advice regarding material risks, procedural requirements, deadlines, and the consequences of strategic decisions, including the election of the Independent Review Option ("IRO") under the Boy Scouts of America Settlement Trust Distribution Procedures ("TDP").

81.     Defendants breached their fiduciary duties to Plaintiff by, among other acts and omissions:

A. Failing to fully and fairly disclose that the IRO process imposes mandatory, non-waivable requirements, including the timely submission of an expert report pertaining to damages, without which Plaintiff's claim would be dismissed with prejudice and permanently barred.

B. Advising Plaintiff to proceed through the IRO process despite Defendants' lack of preparation, lack of familiarity with the TDP, and inability or unwillingness to timely marshal required expert evidence—thereby prioritizing Defendants' desire to pursue a high-value claim over Plaintiff's interest in preserving compensability.

C. Continuing to prosecute Plaintiff's IRO claim while knowing that no damages expert report had been prepared, that discovery deadlines had passed, and that dismissal was inevitable under Article XIII(G)(vi) of the TDP.

///

///

17

**COMPLAINT**

D. Failing to timely inform Plaintiff that no expert had been instructed to prepare a report, the expert had not completed testing or analysis, the absence of an expert report would result in mandatory dismissal and a $0 settlement recommendation, and that Plaintiff would be forever barred from pursuing compensation if the IRO claim were dismissed.

E. Misrepresenting and overstating the viability and potential value of Plaintiff's claim by asserting multimillion-dollar compensatory and punitive damages figures without admissible expert support, thereby inducing Plaintiff to continue with the IRO process to his detriment.

F. Failing to obtain Plaintiff's informed written or oral consent to proceed with the IRO process despite known procedural noncompliance and known risks of irreversible claim forfeiture.

G. Creating and compounding procedural defaults—including missed deadlines, late fee payments, untimely filings, and improper discovery requests—and then attributing the resulting prejudice to external actors rather than disclosing Defendants' own responsibility.

82.    As a direct and proximate result of Defendants' breaches of fiduciary duty: Plaintiff's IRO claim was dismissed for failure to prove damages, the Neutral issued a $0 settlement recommendation, the Trustee accepted the recommendation as final and binding, and Plaintiff is permanently barred from pursuing any compensation from the Settlement Trust or from any Protected Party.

83.    Had Defendants fulfilled their fiduciary duties of loyalty, candor, and full disclosure, Plaintiff would not have elected or would have withdrawn from the IRO process, and would have preserved his right to monetary compensation.

84.    As a result of Defendants' breaches of fiduciary duty, Plaintiff suffered damages including, but not limited to loss of the entire value of his sexual abuse claim, loss of the right to seek compensation through the Trust or by any other means, out-of-pocket costs, administrative

**COMPLAINT**

fees paid in reliance on Defendants' advice, emotional distress, and re-traumatization caused by Defendants' disloyal and misleading conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays judgment against Defendants as follows:

1. For damages for breach of contract;

2. For damages for tortious breach of the implied covenant of good faith and fair dealing;

3. For punitive and exemplary damages sufficient to deter Defendants;

4. For compensatory damages in an amount according to proof;

5. For disgorgement of fees according to proof;

6. For reasonable attorney's fees according to proof;

7. For costs of suit, according to proof;

8. For legal interest on all sums awarded, according to proof;

9. For any other and further relief as the court deems just and proper.

Dated:  February 13, 2026

**STALWART LAW GROUP**

By: _____
**DYLAN RUGA**
**N. BEN CRAMER**
Attorneys for Plaintiff, J.G.B.

19

**COMPLAINT**

## DEMAND FOR JURY TRIAL

Plaintiff, J.G.B. hereby demands a trial by jury on every issue to which he is so entitled.


Dated:  February 13, 2026                    **STALWART LAW GROUP**

By:_____
**DYLAN RUGA**
**N. BEN CRAMER**
Attorneys for Plaintiff, J.G.B.

20

**COMPLAINT**

# **EXHIBIT 8**

**Attorney's Guide to Independent Review Option ("IRO")**
**Version 7, Effective Date: August 30, 2024**

**I.    Purpose**

    a.  The Independent Review Option ("IRO") provides Direct Abuse Claimants ("Claimants") with the opportunity to have an independent, neutral third party, selected from a panel of retired judges with tort experience maintained by the Settlement Trust, make a Settlement Recommendation (the "Settlement Recommendation") to the Settlement Trustee. The Settlement Recommendation is intended to replicate, to the extent possible, the amount a reasonable jury might award for the particular Direct Abuse Claim, taking into account the relative shares of fault that may be attributed to any parties potentially responsible for the Direct Abuse Claim "under applicable law and applying the same standard of proof that would apply under applicable law." *TDP Article XIII A.*

    b.  The purpose of the IRO is consistent with that of the Trust Distribution Procedures ("TDP"), which is to achieve maximum fairness and efficiency in resolving Abuse Claims by applying the following guiding principles:

        i.   objective claim eligibility criteria;

        ii.  clear and reliable proof requirements;

        iii. administrative transparency;

        iv.  a rigorous review and evidentiary process that requires the Settlement Trustee to determine Allowed Claim Amounts in accordance with applicable law;

        v.   prevention and detection of fraud; and

        vi.  independence of the Settlement Trust and the Settlement Trustee. *TDP Article I B.*

    c.  The IRO is described in Article XIII of the TDP, which can be found at this link.

**II.    Definitions[1]**

    a.  **"Claims Administrator"** means the Hon. Michael J. Reagan (Ret.), or any other person acting on behalf of the Settlement Trust, to oversee the IRO Process and the Claims processed through it.

    b.  **"Complaint"** means the pleading filed[2] by the Claimant setting forth the claims on which a Settlement Recommendation shall be made by the Neutral following the IRO Hearing.

---

[1] Capitalized terms not defined in the Attorney's Guide to IRO shall have the same meaning ascribed to them in the TDP.

[2] When a pleading or other document is required to be "filed" in accordance with the terms of the Attorney's Guide to IRO, the filing is to occur in the Claimant's Portal. Filing instructions are available on Settlement Trust website.

c. **"IRO"** means the Independent Review Option.

d. **"IRO Hearing"** means the virtual or in-person evidentiary hearing conducted by the Neutral through which the Claimant's claims are determined.  In order to minimize Claimants' travel costs, virtual IRO Hearings are recommended by the Settlement Trust.  In-person IRO Hearings will be conducted in the county of residence of the Neutral.

e. **"IRO Process"** means the entire hearing process involving a Claimant electing the IRO.

f. **"Initial Submission Date"** means the date on which the Claimant and Responsible Insurers must file their initial evidentiary submissions in cases where the Claimant has elected to proceed solely on the written record.

g. **"Neutral"** means an independent, neutral third party, selected from a panel of retired judges with tort experience maintained by the Settlement Trust, who will preside over the IRO Process.

h. **"Party"** means any individual or entity making an appearance in the IRO Process, including, without limitation, the Claimant, and the Responsible Insurer(s).

i. **"Proceeding on the Written Record"** means the Claimant's claim will be presented to and determined by the Neutral by the submission of documentary and/or electronic evidence in lieu of an in-person, virtual, or hybrid hearing.

j. **"Trust Claims Questionnaire"** means the questionnaire that must be submitted by the Claimant in the claims processing portal in order to initiate a Claim against the Settlement Trust.

**III.   IRO Election and Payment of First $10,000 Administrative Fee**

a. On or before February 16, 2024, at 5:00 pm ET, Claimant shall have:
   i. submitted a completed Trust Claims Questionnaire with the IRO election box checked; and
   ii. Paid $10,000 to the Settlement Trust in the manner set forth on the Settlement Trust's website.

b. The Settlement Trustee has the authority to waive this administrative fee "in appropriate cases, based on the circumstances of the Direct Abuse Claimant." *TDP Article XIII G(ii)*.
   i. A separate fee waiver request, supported by another Affidavit and related financial information, will be needed to request a waiver of the second $10,000 administrative fee.
   ii. If the Claimant is dissatisfied with the Settlement Trustee's decision on the requested waiver of the first $10,000 administrative fee, the Claimant can request a review of this decision by the Bankruptcy Court. If the Bankruptcy Court waives the fee, the claim will proceed in the IRO Process without payment of the first $10,000 administrative fee.  If the Bankruptcy Court denies the fee waiver, the Claimant must pay the first $10,000 administrative fee promptly after the denial or the Claimant will not be permitted to proceed further with the IRO Process.

**IV.   Filing of a Complaint**

2

a. Within 7 days of (1) the payment of the initial $10,000 administrative fee to the Settlement Trust (or the waiver of such fee if it has been waived by either the Settlement Trustee or the Bankruptcy Court, but note the time has passed for a waiver of the first $10,000 administrative fee) and (2) the submission of the Claims Questionnaire (whichever comes last), the Claimant shall file a Complaint that contains at least the following:

    i. a clear, plain statement of the claims asserted;

    ii. the facts alleged to support each pled claim, including the relevant dates of the acts supporting each pled claim;

    iii. the entity or entities whom the Claimant alleges would be liable in the tort system for each pled claim; and

    iv. any other specific requirements set forth in Article XIII, G of the TDP.

b. If there are any inconsistencies between the Trust Claims Questionnaire and the Complaint, the Complaint shall be deemed the controlling document in the IRO Process.

c. The Complaint shall also contain a statement either consenting to a virtual IRO Hearing or requesting an in-person IRO Hearing. Electing a virtual IRO hearing is irrevocable and cannot be converted to an in-person hearing since a neutral who accepts only virtual hearings may be assigned the IRO claim. Irrespective of whether an in-person or virtual hearing is elected, the Claimant may still elect to proceed solely on the written record as described in Section XVII of the Attorney's Guide to the Independent Review Option.

d. Every Complaint must be accompanied by a completed IRO Complaint Cover Page Form, which is a fillable form that can be found at this [link](#).

e. If a Claimant has previously filed a lawsuit in state or federal court asserting these claims, the Claimant may file the same complaint as his IRO Complaint, so long as it satisfies the requirements set forth in paragraph IV a above and is accompanied by a completed IRO Complaint Cover Page Form.

## V. Notice to Chartered Organizations and Responsible Insurers

a. Within 28 days of the filing of the Complaint, the Settlement Trust, acting through the Claims Administrator, shall provide written notice to the applicable Responsible Insurers that issued policies to the Debtors or Local Councils based upon the allegations set forth in the Complaint.

b. Within 7 days of the filing of the Complaint, the Settlement Trust, acting through the Claims Administrator, shall (i) provide written notice to any applicable Chartered Organization that may have liability for the claim based upon the allegations set forth in the Complaint, and (ii) request that such Chartered Organization provide written notice to any applicable Responsible Insurer that issued policies directly to that Chartered Organization with 28 days of receiving such notice.

## VI. Deferral Request by Claimant

a. A Claimant's attorney (or an unrepresented Claimant) can request a deferral of the IRO Process after payment of the first administrative fee for good cause. Such deferral request shall be filed in the Claimant's Portal. In the case of a represented Claimant, no request for deferral should be made without the Claimant's consent

and the request shall include a representation that the Claimant agrees with the request.

b.  If a request for deferral is filed, the request must set forth, in detail, the factual basis upon which the Settlement Trust can determine if good cause has been shown.  Any such facts shall be supported by written Declaration signed under penalty of perjury by the declarant.  Upon the filing of a deferral request and supporting Declaration, all subsequent deadlines set forth herein shall be suspended until the request for deferral is determined by the Settlement Trust.

c.  The Settlement Trust will promptly consider requests for deferral and provide notice to the Claimant and any Responsible Insurers of the disposition of the deferral request by a filing in the Claimant's Portal.

d.  If a deferral is granted, all subsequent deadlines shall recommence immediately upon the conclusion of the deferral period.

VII.   **Selection of, and Communications with, the Neutral**

a.  Within 14 days following the provision of notice of the filing of the Complaint to the applicable Responsible Insurers, the Settlement Trust shall select the Neutral. If, for any reason, the Neutral who is selected is unable to fulfill the Neutral's duties, a successor Neutral will be assigned by the Settlement Trust.

b.  Upon the Neutral's selection, the Settlement Trust, acting through the Claims Administrator, shall provide written notice to the Claimant and the Responsible Insurers of the Neutral's name.

c.  All communications to the Neutral by a Party, and from the Neutral to a Party, shall be via the Claimant's Portal and shall be available for viewing by any other Party participating in the IRO Process. *Ex parte* communications outside of the Claimant's Portal is prohibited.

d.  If an in-person IRO Hearing was requested in the Complaint, the Claims Administrator will provide the location where it will be held through the Claimant's Portal prior to the Virtual IRO Scheduling Conference (*see* section XI, below).

e.  If a Party believes the Neutral is not qualified to serve as the Neutral or should be disqualified from serving as the Neutral, a challenge to the Neutral shall be filed within 7 days following the later of (i) the deadline to file the Notice of Intent to Participate, Answer or other responsive pleading by the Responsible Insurers, or (ii) the provision of notice in the Claimant's portal of the selection of the Neutral.

   i.   A challenge to the Neutral shall:
      1.  state the specific grounds justifying the challenge, and
      2.  be supported by a factual Declaration signed under penalty of perjury establishing the facts underlying the grounds for the challenge.

   ii.  Any other Party may join in the challenge or oppose the challenge by filing a written statement in support of, or opposition to, the challenge within 7 days following the filing of the challenge.

   iii. The Settlement Trust shall consider the issues raised by the challenge and either confirm the Neutral's appointment or appoint a successor Neutral to preside over the IRO Process within 14 days from the filing of the initial challenge.

iv. Any challenge not made in accordance with this section shall be deemed waived.

**VIII. Notice of Intent to Participate, Answer, or Other Responsive Pleading by Responsible Insurers**

a. If a Responsible Insurer elects to participate in the IRO Process, it must file either: (i) a notice of intent to participate in the IRO Process; (ii) an answer to the Complaint, or (iii) some other responsive pleading to the Complaint (a "**Responsible Insurer Filing**") within 21 days of it being put on notice of the filing of the Complaint. To the extent its Responsible Insurer Filing is an answer or other responsive pleading, the Responsible Insurer shall assert substantive defenses that would otherwise be available in the tort system to the pled claims.

b. To the extent possible, Responsible Insurers shall file joint or consolidated responses or other pleadings where their interests are aligned throughout the IRO Process.

c. If the Responsible Insurer(s)'s defenses rely on or intend to rely on evidence not produced by the Claimant, the Claimant may take discovery related to any such supporting evidence in accordance with Section XII.

**IX. Statement of Other Issues by the Claims Administrator**

a. In the absence of a Responsible Insurer Filing, the Claims Administrator shall file a statement of the issues that may affect the Neutral's Settlement Recommendation within 28 days after the Responsible Insurers were put on notice of the filing of the Complaint. Each such issue shall be considered by the Neutral in formulating her Settlement Recommendation.

  i. Issues that may be identified by the Claims Administrator in his statement of the issues include, without limitation, standing, statute of limitations, prior settlements with other parties, relative liability of other non-settling parties, and any other issue identified for consideration by the Neutral in the TDP.

  ii. To be clear, this statement is intended to highlight issues that must be addressed by the Neutral in her Settlement Recommendation, not to influence the outcome of the IRO Hearing.

b. If a Responsible Insurer Filing is filed, the Claims Administrator may still file a statement of the issues he believes should be addressed by the Neutral in formulating her Settlement Recommendation, and each such issue shall be so considered. This statement, if filed, shall be filed within 7 days of the deadline for the Responsible Insurers to file the Responsible Insurers Filing.

**X. Deferral Request by Responsible Insurer**

a. A Responsible Insurer may seek a deferral of the IRO Process for good cause following its Responsible Insurer Filing. Such deferral request shall be filed in the Claimant's Portal and supported by a written Declaration (signed under penalty of perjury) setting forth the factual basis for the requested deferral.

b. Upon the filing of a deferral request and supporting Declaration, all subsequent

5

deadlines set forth herein shall be suspended until the request for deferral is determined by the Settlement Trust.

c.  The Claimant shall have 7 days to respond to the deferral request by a filing in the Claimant's Portal.

d.  The Settlement Trust will promptly consider requests for deferral and provide notice to the Claimant, the Neutral, and all Responsible Insurers of the disposition of the deferral request by a filing in the Claimant's Portal.

e.  If a deferral is granted, all subsequent deadlines shall recommence immediately upon the conclusion of the deferral period.

f.  All Responsible Insurers are expected to adequately staff their participation in the IRO Process so that deferral requests are not based upon counsel unavailability except under extraordinary circumstances.

## XI.  Virtual IRO Scheduling Conference

a.  Within 14 days after the deadline for the filing of a statement of the issues by the Claims Administrator, the Neutral shall hold a virtual scheduling conference with the Claimant, the participating Responsible Insurers, and the Claims Administrator (if the Claims Administrator chooses to participate) addressing:

  i.  Discovery must be conducted in compliance with the terms of the Document Appendix, which does **NOT** allow the service of discovery requests upon the Trust.

  ii.  Timing and logistics of the IRO Hearing or cases submitted on the written record; and

  iii.  Any other issue raised by a Party or the Neutral.

b.  Following the conclusion of the Scheduling Conference, the Neutral will enter a scheduling order, in the form approved by the Trustee.

c.  If the Hearing in an IRO case or the Initial Submission Date in a case to be submitted on the written record is changed, Claimant's counsel shall upload a notice in the Claimant's portal as follows:

  "The [IRO Hearing Date] [Initial Submission Date] has been changed to MM/DD/YYYY"

## XII.  Discovery

a.  Discovery in the IRO Process is governed by the Document Appendix. *TDP Article XIII H.* For more information on the Document Appendix and supplemental discovery, please refer to Section 12, *Discovery, Document Requests, and the Document Appendix,* within the Frequently Asked Questions on the Scouting Settlement Trust website.

b.  Except as set forth below, all discovery shall be completed within 90 days of the conclusion of the IRO Scheduling Conference (the "Discovery Period").

  i.  Upon the reasonable request of a Responsible Insurer or in the discretion of the Neutral, a Claimant "shall be subject to up to a single sworn six-hour interview, mental health examination, or supplemental signed and dated interrogatory responses." *TDP Article XIII G (vii).* Only one of these methods of Claimant discovery is allowed even if multiple Responsible

6

Insurers are participating in the IRO process. The interview of the Claimant may be recorded stenographically, by videography, or both, subject to objection to be considered by the Neutral.

c. Only the Neutral, for good cause shown, may extend the Discovery Period.

    i. Any party may seek an extension of the Discovery Period by filing a written motion prior to the expiration of the Discovery Period and it shall be supported by a factual Declaration (signed under penalty of perjury) establishing the required "good cause" for the requested extension.

    ii. Within 7 days of the filing of such motion, any party or the Claims Administrator may file a written response supporting or objecting to the requested extension.

    iii. The Neutral shall issue a decision granting or denying the requested extension within 7 days following the deadline for the filing of any party's or the Claims Administrator's response.

    iv. To the extent the extension of the Discovery Period causes the date for the IRO Hearing to be rescheduled, the Neutral shall announce the new IRO Hearing date when issuing the discovery extension decision.

d. To the extent discovery is sought from a Local Council or Chartered Organization in accordance with the provisions of the Document Appendix, the Discovery Period will be extended for a reasonable period of time determined by the Settlement Trust, acting through the Claims Administrator, in order to account for any delays associated with compliance with the terms of the Document Appendix.

    i. The Settlement Trust shall give notice to all Parties of the length of the initial extension in the Claimant's Portal. Further extensions may be granted by the Settlement Trust as reasonably necessary to permit the requested discovery to be completed. Notice of any further extension shall be given to all Parties in the Claimant's Portal.

    ii. To the extent this extension(s) of the Discovery Period causes the date for the IRO Hearing to be rescheduled, the Settlement Trust shall consult with the Neutral and a new IRO Hearing date will be established with notice provided to all Parties in the Claimant's Portal.

e. Following the close of the Discovery Period, the Claimant has the option of electing to proceed with a hearing or to submit solely on the written record.

f. After pursuing discovery, the Claimant can elect not to have the Neutral review his claim under the IRO process and may switch to the Trust Distribution ("Matrix") process. *TDP Article XIII G(ii)*. At that point the Claimant's order of claim processing will be based on the date he informed the Trust of his decision to switch to the Matrix process.

    i. If the Claimant chooses to switch to the Matrix process, he does not need to pay the second $10,000 administrative fee. The first $10,000 administrative fee remains non-refundable.

## XIII. Payment of Second $10,000 Administrative Fee

a. Unless the fee has been waived by either the Settlement Trustee or the Bankruptcy Court, the Claimant shall pay the second $10,000 Administrative Fee to the

Settlement Trust no later than 5:00 pm ET 14 days in advance of the initial setting of the IRO Hearing or the Initial Submission Date if proceeding on the written record.   The fee shall be paid to the Settlement Trust in the manner set forth on the Settlement Trust's website or in an email from the Settlement Trust's administrator reminding counsel of the due date.  Failure to timely pay the fee may result in a cancellation fee charged by the Neutral and a transfer of the claim to the matrix procedure.

    i.  The Settlement Trustee has authority to waive this second $10,000 Administrative Fee "in appropriate cases, based on the circumstances of the Direct Abuse Claimant." *TDP Article XIII G(ii).* For fee waiver request instructions, please contact iro_support@scoutingsettlementtrust.com.

    ii.  All fee waiver requests with supporting documentation must be submitted to the Trust no later than 30 days before the second $10,000 Administrative Fee is due.

    iii.  If the Claimant is dissatisfied with the Settlement Trustee's decision on the requested waiver of the second $10,000 administrative fee, the Claimant can request a review of this decision by the Bankruptcy Court. If the Bankruptcy Court waives the fee, the claim will proceed in the IRO Process without the payment of the second $10,000 administrative fee.  If the Bankruptcy Court denies the fee waiver, the Claimant must pay the second $10,000 administrative fee promptly or the Claimant will not be permitted to proceed.

    iv.  If (i) the Settlement Trustee has not decided a waiver request, or (ii) the Bankruptcy Court has not completed its review of a denial of a waiver request in time for a scheduled IRO Hearing to proceed, the Neutral shall have the discretion to continue the IRO Hearing for a reasonable time as determined by the Neutral after consultation with the Claims Administrator.

## XIV. Briefing Requirements for IRO Hearings and Cases Submitted on the Written Record

    a.  The Claimant shall file a brief addressing each pled claim at least 14 days before the commencement of the IRO Hearing or if the case is proceeding on the written record, the initial submission date

        i. The briefing shall include, without limitation:

            1.  A discussion of the elements of each pled claim, the applicable burden of proof, and the governing law;

            2.  The evidence expected to be admitted during the IRO Hearing or Initial Submission Date if the case is proceeding solely on the written record, establishing each element of each pled claim;

            3.  Responsive argument(s) to any defenses raised by either a Responsible Insurer or the Claims Administrator;

            4.  Benchmark judgments or settlements relevant to the damages claimed. *TDP Article XIII G(vi)*.

    b.  A Responsible Insurer may file a brief responding to the issues raised in the Claimant's brief and supporting its defenses no later than 7 days following the filing of the Claimant's brief.  If there are multiple Responsible Insurers, they shall file a

8

consolidated brief unless leave to file separate briefs is given by the Neutral upon a showing of good cause.

c. **The Claimant may file a reply brief no later than 5 days following the filing of a Responsible Insurer brief.**

d. No brief shall exceed 14 pages in length absent leave from the Neutral in advance of the filing of the required brief.  Good cause must be shown in order for leave to be granted.

e. **Determination of Responsible Insurers' Defenses.**

    i. Responsible Insurers' defenses will not be ruled upon prior to the commencement of the IRO Hearing or, if the Claimant elects to proceed solely on the written record, the submission of the written evidentiary materials.  Instead, Responsible Insurers' defenses will be considered in the Neutral's Settlement Recommendation .

XV. **Exchange of Witness Lists Requirements for IRO Hearings and Cases Submitted on the Written Record**

a. A list of witnesses the Claimant intends to present (including a short description of the expected testimony) at the IRO Hearing shall be filed 14 days prior to the commencement of the IRO Hearing or Initial Submission Date if proceeding solely on the written record.  If a witness will testify through the submission of deposition testimony excerpts, the proposed deposition excerpts shall be provided to the participating Responsible Insurer(s) simultaneously with the filing of the witness list.  In cases proceeding to hearing, if the witness will testify live, it shall be so noted on the witness list.

b. The participating Responsible Insurer(s) shall file its witness list (including a short description of the expected testimony and in cases proceeding to IRO Hearing, whether the witness will testify live, through deposition excerpts and/or declaration or affidavit) 7 days following the filing of the Claimant's witness list, along with any objections to the Claimant's proposed deposition excerpts or any cross-designations of deposition excerpts.

c. If the participating Responsible Insurer(s) submits cross-designations of deposition excerpts, the Claimant shall have 2 days from receipt to object to them.

d. If a witness is testifying live at an IRO Hearing, upon receipt of the witness list described in Paragraph XV a and/or b above, the non-tendering party may request contact information for a particular witness, which must be immediately provided so that a voluntary interview or deposition can be scheduled prior to the IRO Hearing.  If the witness refuses to submit to either a voluntary interview or deposition, the Neutral shall have the authority to exclude the witness testimony at the IRO Hearing or recess the IRO Hearing for a reasonable time to allow the non-tendering party adequate time to prepare for cross-examination.

e. If a witness is providing direct testimony by affidavit or declaration, the proposed affidavit or declaration shall be provided to the non-tendering party at least 7 days in advance of the IRO Hearing or 14 days in advance of the Initial Submission Date.

    i. In cases other than those submitted on the written record, upon request of the non-tendering party, the affiant or declarant shall be available for cross-examination and re-direct examination at the IRO Hearing, or by agreement, in a prehearing deposition, or the affidavit or declaration,

9

absent extraordinary circumstances, will not be considered by the Neutral. If the parties have agreed to utilize a prehearing deposition, the non-tendering party may submit deposition excerpts at the hearing in lieu of live cross-examination.

    ii. In cases submitted on the written record, upon request of the non-tendering party, the affiant or declarant shall be made available for deposition prior to the Initial Submission Date and in sufficient time for the transcript to be available on the Initial Submission Date, or the affidavit or declaration, absent extraordinary circumstances, will not be considered by the Neutral.

**XVI. Exchange of Exhibit Lists Requirements for IRO Hearings and Cases Submitted on the Written Record**

    a. A list of exhibits the Claimant and the Responsible Insurer(s) intends to introduce at the IRO Hearing, or Initial Submission Date if proceeding on the written record, shall be filed 14 days before the commencement of the IRO Hearing or Initial Submission Date.

        i. Materials used solely for impeachment on cross-examination are not subject to the 14-day disclosure requirement.

        ii. Electronic copies of all listed exhibits shall be provided to all non-tendering parties within 24 hours of the filing of the Exhibit List.

    b. Any objection to any such exhibit shall be filed 7 days in advance of the commencement of the IRO Hearing or Initial Submission Date if proceeding on the written record.

    c. Any exhibit to which no objection was timely filed shall be provided to the Neutral by upload to the Claimant's Portal at least 2 days before the commencement of the IRO Hearing or Initial Submission Date if proceeding on the written record.

    d. There is a 2GB per upload limit to the Claimants portal but no limit on the aggregate number of uploads.

    e. The admissibility of an exhibit or deposition testimony to which an objection was lodged timely shall be determined by the Neutral at the IRO Hearing, along with the admissibility of any other written exhibit. If an objection is overruled, the introducing party must be prepared to provide an electronic copy of the exhibit to the Neutral by upload to the Claimant's Portal immediately following the Neutral's ruling. In cases submitted on the written record, the Neutral will rule on objections as part of the Settlement Recommendation.

**XVII. The Burden of Proof**

    a. The burden of proof applies equally to cases involving an IRO Hearing as well as those proceeding on the written record.

        i. The Claimant bears the burden of proof to establish each claim pled consistent with applicable state law requirements. The Responsible Insurers bear the burden of proof to establish each defense pled consistent with applicable state law requirements

        ii. The Claimant must satisfy the requirements set forth in Article XIII, G of the TDP.

        iii. The Claimant shall introduce competent evidence, which shall be admitted

by the Neutral under the Federal Rules of Evidence subject to the provisions below:

1. The Neutral shall assess the admissibility of all evidence even if no other Party participates in the IRO Hearing.
2. The Neutral shall admit evidence that would otherwise be inadmissible under the Federal Rules of Evidence if the Neutral finds that the evidence is probative and material to any element of any claim or defense pled.  In determining the probative and material value of the evidence, the Neutral shall accord the evidence such weight as is appropriate.
3. With respect to a document that was obtained by any Party from the Document Repository, a rebuttable presumption shall exist that the document is admissible in evidence without further foundation testimony being introduced.
   a. If the presumption is rebutted, the burden will be on the Party seeking the document's admission to lay a proper foundation for its admission.
   b. Documents obtained from the Document Repository shall be identified in the Party's exhibit list with its unique document identifier from the Document Repository.

**XVIII.  Administration of IRO Hearings**
   a. Virtual IRO Hearings will be conducted over Zoom and will be recorded.
   b. If a Party chooses to have a stenographer transcribe the proceedings, they are entitled to do so at their own expense. If the Parties agree, the stenographic transcript will be the official record, and the proceedings do not need to be recorded via Zoom. If the Parties do not agree, the Zoom record will be the official record. At least 14 days before the commencement of the IRO Hearing counsel shall file a statement in the Claimant's portal indicating whether a stenographer will be reporting the proceedings and whether that will be the official record of the **IRO Hearing**.
   c. Participation in the IRO Hearing
      i. Claimant and Claimant's counsel, in addition to any witnesses called by Claimant, shall be deemed participants on behalf of Claimant.
      ii. The participating Responsible Insurer and its counsel, in addition to any witnesses called by the participating Responsible Insurer, shall be deemed participants on behalf of the participating Responsible Insurer.  However, the Neutral shall have the discretion to determine how many participants per Responsible Insurer shall be allowed to participate in the event there are multiple participating Responsible Insurers.
      iii. The Neutral shall have the discretion to limit or stop the examination of any witness, including the Claimant, if the Neutral determines that the examination is being conducted in a harassing or unprofessional manner.
      iv. The Neutral shall have the discretion to limit the presentation time for all participating Parties.
   d. Close of the Evidentiary Record
      i. Each Party participating in the IRO Hearing shall state on the record when

11

it has concluded its presentation of evidence to the Neutral.

e. Closing Arguments

   i. Each Party participating in the IRO Hearing shall have no more than 60 minutes to make its closing argument to the Neutral in support of its legal position, unless for good cause, the Neutral extends the time limits for closing arguments.

      1. If the Claimant wishes to reserve time for a rebuttal argument, it shall announce the amount of time being reserved at the commencement of its opening argument.  The aggregate of both opening and rebuttal arguments cannot exceed 60 minutes, unless extended by the Neutral.

f. Duration

   i. The IRO Hearing shall not exceed 8 hours in length, including breaks, absent a showing of good cause.

   ii. If an IRO Hearing is continued and such continuance results in a cancellation fee charged by the Neutral, the party causing the continuance (and not the Settlement Trust) will be responsible for paying the cancellation fee. Neutrals have varying cancellation fees that will be disclosed on request.

**XIX.   Administration of Cases Proceeding on the Written Record**

a. If a Claimant elects to proceed solely on the written record, the participating Responsible Insurer(s) shall proceed solely on the written record as well.

b. Within 14 days after the close of discovery, the Claimant shall upload in his portal his intention to proceed solely on the written record. If discovery has closed at the time these rules become effective, Claimant shall have 14 days from the effective date to upload in his portal his intention to proceed solely on the written record. If an IRO Hearing date was set in the initial scheduling order, unless changed by the Neutral, that date will be the Initial Submission Date for the simultaneous filings by the Claimant and Responsible Insurers of their initial written evidentiary submissions. If no IRO Hearing date was included in the initial scheduling conference, the Neutral will set an Initial Submission Date for the initial filings.

c. 14 days after the Initial Submission Date, the Claimant and Responsible Insurers may file their opposition evidentiary responses to their opponent's initial evidentiary submissions.

d. Seven days after the filing of the opposition evidentiary responses to the initial evidentiary submissions the parties may, but are not required, file written evidentiary reply submissions. No sur-replies will be permitted unless solicited by the Neutral.

e. The written submissions should address, at a minimum, the topics outlined in Article XIII G (iii) of the TDP and Article XIV.a  of these rules.

f. Closing arguments, not to exceed 14 pages in length, may be simultaneously filed by the Claimant and Responsible Insurers within 14 days of the last evidentiary submissions.

g. The time for the Neutral to review the written submissions is limited to 8 hours so counsel is wise to use indexes for written documents and upload organized snippets of videography rather than large, unindexed video files.

12

h. Duration
   i. The time for the Neutral to review all evidentiary submissions shall not exceed 8 hours in length, absent a showing of good cause.
   ii. If a case submitted on the written record is continued and such continuance results in a cancellation fee charged by the Neutral, the party causing the continuance (and not the Settlement Trust) will be responsible for paying the cancellation fee. Neutrals have varying cancellation fees that will be disclosed on request.
i. The Neutral shall make a Settlement Recommendation based upon the written submissions of the participating parties within 30 days of the closing argument deadline unless counsel agrees to extend the deadline an additional 30 days.
j. The Claimant's counsel shall upload a "Notice" in the Claimant's portal as follows: "The deadline for the Neutral to make a Settlement Recommendation to the Settlement Trustee is: [•]"

XX.    **Settlement Recommendation to the Settlement Trustee**
   a. Cases proceeding to IRO Hearing
      i. In cases involving **IRO Hearings** where a stenographer is transcribing the proceedings:
         1. In order to have access to the stenographic record prior to writing the Settlement Recommendation, the Neutral will set a date certain, after conferring with the stenographer, no later than 60 days after the closing of the **IRO Hearing** for uploading the Settlement Recommendation to the Claimant's portal. If the transcript will not be completed in time for the Neutral to meet the 60-day deadline, an additional 14 days is permitted, but no additional extensions are appropriate. Counsel for the Claimant shall upload a notice in the Claimant's portal as follows:
            "The deadline for the Neutral to make a Settlement Recommendation to the Settlement Trustee is: [•]"
      ii. In cases involving **IRO Hearings** where the official record is the Zoom recording and there is no stenographic transcript:
         1. Absent agreement of the Parties who participated in the IRO Hearing, the Neutral shall have 30 days following the conclusion of the IRO Hearing to make a Settlement Recommendation to the Settlement Trustee. With the agreement of all parties who participated in the IRO Hearing, the Neutral may have an additional 30 days within which to make a Settlement Recommendation. Counsel for the Claimant shall upload a notice in the Claimant's portal as follows:
            "The deadline for the Neutral to make a Settlement Recommendation to the Settlement Trustee is: [•]"
   b. In Cases Proceeding to IRO Hearing and Cases Submitted on the Written Record
      i. The Settlement Recommendation shall replicate, to the extent possible, the amount a reasonable jury might award for the Direct Abuse Claim, taking into account the relative shares of fault that may be attributed to

13

any parties potentially responsible for the Direct Abuse Claim under applicable law and applying the same standard of proof that would apply under applicable law.

ii. The Settlement Recommendation of a Neutral in one case is not precedential, nor relevant to, any other Neutral's exercise of discretion in making a Settlement Recommendation to the Settlement Trustee. Settlement Recommendations made by Neutrals may not be cited in other cases and since the proceedings are confidential, may not be disseminated, even with redaction.

iii. Within 7 days of the Settlement Trustee's receipt of the Settlement Recommendation, the Settlement Trustee shall provide written notice to the Responsible Insurers and request, within 21 days, their consent or refusal to consent. Failure to respond timely will be deemed a refusal to consent to the Settlement Recommendation.

iv. The Settlement Trustee shall review all Settlement Recommendations and either accept or reject such recommendations. The Settlement Trustee maintains an inventory of settlement recommendations that are ripe for consideration and addresses them as promptly as time permits. Notice of the Settlement Trustee's decision shall be given in writing to all Parties who participated in the IRO Hearing.

v. If the Settlement Trustee accepts the Settlement Recommendation:

1. The Accepted Settlement Recommendation shall become the allowed amount of the Claimant's claim against the Debtors, other Protected Parties and Chartered Organization;

2. The Claimant shall assign its claim against any Chartered Organization and all other rights and claims arising out of its claim to the Settlement Trust as a condition to receiving the Accepted Settlement Recommendation.

3. The Settlement Trust shall have the right and power to assert and/or resolve any such claims assigned to it consistent with the Plan.

vi. If the Settlement Trustee rejects the Settlement Recommendation:

1. The Claimant may commence a lawsuit in any court of competent jurisdiction against the Settlement Trust to recover on its claims within 45 days.

   a. If the lawsuit is dismissed or the claim is denied, the Claimant's Allowed Claim Amount will be zero.

   b. If the matter is litigated, the Allowed Claim Amount shall be equal to the settlement or final judgment amount obtained in the tort system less any payments actually received and retained by the Direct Abuse Claimant.

vii. Notwithstanding the above, any amount of an Accepted Settlement Recommendation or Allowed Claim Amount for an Abuse Claim that proceeds under this IRO in excess of a multiple of five times the Maximum Matrix Value in the applicable tier set forth in the Claims Matrix shall be subordinate and junior in right for distribution from the Settlement Trust to

14

the prior payment by the Settlement Trust in full of all Direct Abuse Claims that are Allowed Abuse Claims as liquidated under the TDP (excluding Claims liquidated under the Article XIII of the TDP (regarding the IRO) or under Article XII of the TDP (regarding Tort Election Claims)).

**XXI.    Ramifications for Failure to Comply**

    a.  If, after notice and a reasonable opportunity to be heard, the Settlement Trustee determines that an attorney or a Claimant has repeatedly failed to comply with the terms governing the IRO Process as set forth herein, the Settlement Trustee may file a motion with the Bankruptcy Court seeking the imposition of appropriate sanctions, including, without limitation, disallowance of the claim, for such failures.  In addition, with respect to an attorney's repeated failures, the Settlement Trustee may report such failures to the applicable licensing authorities.

**XXII.    Amendment of the Attorney's Guide to IRO**

    a.  The Settlement Trustee may amend the requirements set forth in the Attorney's Guide to IRO without notice.  When an amendment is made, a subsequent version of the Attorney's Guide to IRO will be posted on the Settlement Trust website. Parties participating in the IRO Process shall comply with the latest version of the Attorney's Guide to IRO from its Effective Date through the remainder of the IRO Process.

15

# **EXHIBIT 9**

**BOY SCOUTS OF AMERICA**

**TRUST DISTRIBUTION PROCEDURES FOR ABUSE CLAIMS**

**ARTICLE I**
**PURPOSE AND GENERAL GUIDELINES**

A.    **Purpose**. The purpose of the Settlement Trust is to, among other things, assume liability for all Abuse Claims, to hold, preserve, maximize and administer the Settlement Trust Assets, and to employ procedures to allow valid Abuse Claims as further set forth herein in accordance with section 502 of the Bankruptcy Code and/or applicable law (each, an "**Allowed Abuse Claim**"), determine an allowed liability amount for each Allowed Abuse Claim (the "**Allowed Claim Amount**"), determine payment methodology and direct payment of all Allowed Abuse Claims, and obtain insurance coverage for the Allowed Claim Amount of such Allowed Abuse Claims that are Insured Abuse Claims (as defined below). These Trust Distribution Procedures (the "**TDP**") are adopted pursuant to the Settlement Trust Agreement by the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").  These TDP are intended to provide substantially similar treatment for Allowed Abuse Claims, including Future Abuse Claims. These TDP, inclusive of the various options and elections set forth herein, including the Expedited Distribution Election, the Tort System Alternative and the Independent Review Option, provide the means for resolving all Abuse Claims for which the Protected Parties have or are alleged to have legal responsibility as provided in and required by the Plan, the Confirmation Order, and the Settlement Trust Agreement. The Settlement Trustee shall implement and administer these TDP in consultation with the Claims Administrators, Future Claimants' Representative, and Trust Professionals with the goals of securing the just, speedy, and cost- efficient determination of every Abuse Claim, providing substantially similar treatment to holders of similar, legally valid and supported Allowed Abuse Claims in accordance with the procedures set forth herein, and obtaining and maximizing the benefits of the Settlement Trust Assets.

B.    **General Principles**. To achieve maximum fairness and efficiency, and recoveries for holders of Allowed Abuse Claims, these TDP are founded on the following principles:

1.    objective Claim eligibility criteria;

2.    clear and reliable proof requirements;

3.    administrative transparency;

4.    a rigorous review and evidentiary process that requires the Settlement Trustee to determine Allowed Claim Amounts in accordance with applicable law;

5.    prevention and detection of any fraud; and

6.    independence of the Settlement Trust and Settlement Trustee.

C.    **Payment of Allowed Abuse Claims and Insurance Recoveries**. Pursuant to the terms of the Plan, the Settlement Trust has assumed the Debtors' legal liability for, and

1

obligation to pay, Allowed Abuse Claims. The Settlement Trust Assets, including the proceeds of the assigned insurance rights, shall be used to fund distributions to Abuse Claimants under these TDP. The amounts that Abuse Claimants will ultimately be paid on account of their Allowed Abuse Claims will depend on, among other things, the Settlement Trust's ability to liquidate and recover the proceeds of the assigned insurance rights and other causes of action. The amount of any installment payments, initial payments, or payment percentages established under these TDP or the Settlement Trust Agreement are not the equivalent of (i) any Abuse Claimant's Allowed Claim Amount or (ii) the right to payment that the holder of an Allowed Abuse Claim has against the Debtors and/or Protected Parties, as assumed by the Settlement Trust.

**D.**       **Sole and Exclusive Method**. These TDP and any procedures designated in these TDP, including the Independent Review Option, shall be the sole and exclusive methods by which an Abuse Claimant may seek allowance and distribution on an Abuse Claim that is subject to the Channeling Injunction with respect to the Protected Parties.

**E.**       **Interpretation**. The terms of the Plan and Confirmation Order shall prevail if there is any discrepancy between the terms of the Plan or Confirmation Order and the terms of these TDP.

**F.**       **Confidentiality**. All submissions to the Settlement Trust by an Abuse Claimant shall be treated as confidential and shall be protected by all applicable state and federal privileges, including those directly applicable to settlement discussions. The Settlement Trust will preserve the confidentiality of such submissions, and shall disclose the contents thereof only to such persons as authorized by the Abuse Claimant, or in response to a valid subpoena of such materials issued by the Bankruptcy Court, a Delaware state court, the United States District Court for the District of Delaware or any other court of competent jurisdiction. Notwithstanding anything in the foregoing to the contrary, the Settlement Trust may disclose information, documents, or other materials (i) reasonably necessary in the Settlement Trust's judgment to preserve, obtain, litigate, resolve, or settle insurance coverage, or to comply with an applicable obligation under an Insurance Policy, indemnity, or settlement agreement, or to pursue any other claims transferred or assigned to the Settlement Trust by the holder of the Abuse Claim or operation of the Plan and (ii) subject to the consent of a Direct Abuse Claimant or with redactions or other mechanism to preserve the confidentiality of a Direct Abuse Claimant, where the submission contains non-privileged information that is relevant to the Allowed Claim Amount of another Direct Abuse Claimant's Claim. Nothing in these TDP shall be construed to authorize the Settlement Trustee to waive privilege or disseminate documents or other information to any Abuse Claimants or their respective counsel, except as provided for in the Document Appendix.

## ARTICLE II
## DEFINITIONS AND RULES OF INTERPRETATION

**A.**       **Incorporation of Plan Definitions**. Capitalized terms used but not defined in these TDP have the meanings ascribed to them in the Plan or the Settlement Trust Agreement

and such definitions are incorporated in these TDP by reference. To the extent that a term is defined in these TDP and the Plan and/or the Settlement Trust Agreement, the definition contained in these TDP controls.

B.    **Definitions**. The following terms have the respective meanings set forth below:

1.    "**Abuse Claim**" shall have the meaning ascribed to it in the Plan, which definition includes Direct Abuse Claims, Indirect Abuse Claims, and Future Abuse Claims.

2.    "**Abuse Claimants**" shall mean the holder of a Direct Abuse Claim, an Indirect Abuse Claim, or a Future Abuse Claim.

3.    "**Base Matrix Value**" shall mean the base case value for each tier of Abuse Type (labeled as such in the Claims Matrix and more specifically defined and described in Article VIII.A) to be used to value Abuse Claims and that may be identified in connection with the description of the Scaling Factors in Article VIII.B.

4.    "**Claims Matrix**" shall mean (as specifically defined and described in Article VIII.A) a table scheduling the six tiers of Abuse Types, and identifying the Base Matrix Value, and Maximum Matrix Value for each tier.

5.    "**CPI-U**" shall mean the Consumer Price Index For All Urban Consumers: All Items Less Food & Energy, published by the United States Department of Labor, Bureau of Labor Statistics.

6.    "**Direct Abuse Claimant**" or "**Survivor**" shall mean the holder of a Direct Abuse Claim or a Future Abuse Claim.

7.    "**Indirect Abuse Claimant**" shall mean the holder of an Indirect Abuse Claim.

8.    "**Exigent Health Claim**" shall mean a Direct Abuse Claim for which the Direct Abuse Claimant has provided a declaration under penalty of perjury from a physician who has examined the Direct Abuse Claimant within one hundred and twenty (120) days of the declaration in which the physician states that there is substantial medical doubt that the Direct Abuse Claimant will survive beyond six (6) months from the date of the declaration.

9.    "**FIFO**" shall mean "**first-in-first-out**" and refers to the impartial basis for establishing a sequence pursuant to which Abuse Claims shall be determined and paid by the Settlement Trust.

10.    "**FIFO Processing Queue**" shall mean the FIFO line-up on which the Settlement Trust reviews Trust Claims Submissions.

11.    "**Maximum Matrix Value**" shall mean the value for each tier of Abuse Type (labeled as such in the Claims Matrix and more specifically defined and described in Article VIII.A) that represents the maximum Allowed Claim Amount achievable through the

matrix calculation for an Allowed Abuse Claim assigned to a given tier after application of the Scaling Factors described in Article VIII.B.

12.    "**Mixed Claim**" shall have the meaning ascribed to it in the Plan.

13.    "**Non-BSA Sourced Assets**" shall mean Settlement Trust Assets that represent assets received as a result of or in connection with a global settlement between the Debtors or the Settlement Trust, on the one hand, and a Chartered Organization that is or becomes a Protected Party, on the other hand. For the avoidance of doubt, Non -BSA Sourced Assets shall not include any assets received from the Debtors, the Local Councils, or any Settling Insurance Companies.

14.    "**Scaling Factors**" shall mean (as specifically defined and described in Article VIII.B) the factors identified to consider with respect to each Abuse Claim and to apply to the Base Matrix Value for the applicable tier of Abuse Type for such Abuse Claim to arrive at its Proposed Allowed Claim Amount.

**C.    Interpretation; Application of Definitions and Rules of Construction**. For purposes of these TDP, unless otherwise provided herein: (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference to a person as a holder of a Claim includes that person's successors and assigns; (3) the words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to these TDP as a whole and not to any particular article, section, subsection, or clause; (4) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation and shall be deemed to be followed by the words "without limitation;" (5) any effectuating provisions of these TDP may be reasonably interpreted by the Settlement Trustee in such a manner that is consistent with the overall purpose and intent of these TDP without further notice to or action, order, or approval of the Bankruptcy Court; (6) the headings in these TDP are for convenience of reference only and shall not limit or otherwise affect the provisions hereof; (7) in computing any period of time prescribed or allowed by these TDP, unless otherwise expressly provided herein, the provisions of Bankruptcy Rule 9006(a) shall apply; (8) "or" is not exclusive; and (9) all provisions requiring the consent of a person shall be deemed to mean that such consent shall not be unreasonably withheld.

**ARTICLE III**
**TDP ADMINISTRATION**

**A.    Administration**. Pursuant to the Plan and the Settlement Trust Agreement, the Settlement Trust and these TDP shall be administered by the Settlement Trustee in consultation with the STAC, which represents the interests of holders of present Abuse Claims in the administration of the Settlement Trust, and the Future Claimants' Representative, who represents the interests of holders of Future Abuse Claims. The Claims Administrators shall assist the Settlement Trustee in the resolution of Abuse Claims in accordance with these TDP and provide information necessary for the Settlement Trustee to implement these TDP.

4

**B.** **Powers and Obligations**. The powers and obligations of the Settlement Trustee, the STAC, the Future Claimants' Representative, and the Claims Administrators are set forth in the Settlement Trust Agreement. The STAC and the Future Claimants' Representative shall have no authority or ability to modify, reject, or influence any claim allowance or Allowed Claim Amount determination under these TDP.

**C.** **Consent Procedures**. The Settlement Trustee shall obtain the consent of the STAC and the Future Claimants' Representative on any amendments to these TDP pursuant to Article XIV.B below, and on such matters as are otherwise required below and in Section 5.14 of the Settlement Trust Agreement. Such consent shall not be unreasonably withheld.

**ARTICLE IV**
**CLAIMANT ELIGIBILITY**

**A.** **Direct Abuse Claims**. To be eligible to potentially receive compensation from the Settlement Trust on account of a Direct Abuse Claim, a Direct Abuse Claimant, other than holders of Future Abuse Claims must:

    (1)    have a Direct Abuse Claim;

    (2)    have timely submitted an Abuse Claim Proof of Claim or Trust Claim Submission to the Settlement Trust as provided below; and

    (3)    submit supporting documentation and evidence to the Settlement Trust as provided below.

Direct Abuse Claims can only be timely submitted as follows:

(i)    a Direct Abuse Claim for which a Proof of Claim was filed in the Chapter 11 Cases before the Bar Date or if determined timely by the Bankruptcy Court (each a "**Chapter 11 POC**") shall, without any further action by the Abuse Claimant, be deemed a timely submitted Abuse Proof of Claim to the Settlement Trust;

(ii)    a Direct Abuse Claim alleging abuse against a Local Council (a) for which, as of the time the Claim is submitted to the Settlement Trust in accordance with the Settlement Trustee's designated procedures, a pending state court action had been timely filed under state law naming the Local Council as a defendant or (b) which is submitted to the Settlement Trust at a time when the Claim would be timely under applicable state law if a state court action were filed against the Local Council on the date on which the Direct Abuse Claim is submitted to the Settlement Trust, shall be deemed a timely submitted Abuse Claim Proof of Claim to the Settlement Trust; or

(iii)    a Direct Abuse Claim alleging abuse against any Protected Party other than a Local Council (a) for which, as of the time the Claim is submitted to the Settlement Trust in accordance with the Settlement Trustee's designated procedures, a pending state court action had been timely filed under state law naming the Protected Party as a defendant or (b) which is submitted to the Settlement Trust at a time when the Claim and would be (x) timely under applicable state law if a state court action were filed against the Protected Party on the date on

5

which the Direct Abuse Claim is submitted to the Settlement Trust and (y) meets any applicable deadline that may be set by the Bankruptcy Court in connection with such Protected Party becoming a Protected Party in accordance with the Plan and Confirmation Order, shall be deemed a timely submitted Abuse Proof of Claim to the Settlement Trust.

Any Direct Abuse Claim that is not timely submitted based on the foregoing shall be deemed untimely and Disallowed.

**B.    Indirect Abuse Claims**.[1]    To be eligible to receive compensation from the Settlement Trust, an Indirect Abuse Claimant:

(1)    must have an Indirect Abuse Claim that satisfies the requirements of the Bar Date Order (to the extent applicable);

(2)    must have an Indirect Abuse Claim that is not subject to (a) disallowance under section 502 of the Bankruptcy Code, including subsection (e) thereof, (subject to the right of the holder of the Indirect Abuse Claim to seek reconsideration by the Settlement Trustee under section 502(j) of the Bankruptcy Code), or is not otherwise legally invalid, or (b) subordination under sections 509(c) or 510 of the Bankruptcy Code, or otherwise under applicable law; and

(3)    must establish to the satisfaction of the Settlement Trustee or, to the extent applicable, by a final determination in an Insurance Action that:

(a)    such Indirect Abuse Claimant has paid in full all or the Claim holder's total share of the liability and/obligation of the Settlement Trust to a Direct Abuse Claimant to whom the Settlement Trust would otherwise have had a liability or obligation under these TDP (as to which the holder of the Allowed Indirect Abuse Claim seeks payment);

(b)    the Indirect Abuse Claimant has forever and fully released the Settlement Trust and the Protected Parties from all liability for or related to the subject Direct Abuse Claim (other than the Indirect Abuse Claimant's assertion of its Indirect Abuse Claim); and

(c)    the Indirect Abuse Claim is not otherwise subject to a valid defense, including, without limitation, that such Indirect Abuse

---

[1] Indirect Abuse Claims may include claims for the payment of defense costs, deductibles or indemnification obligations; provided that the Plan's Discharge Injunction, Channeling Injunction, Insurance Entity Injunction and Plan Documents shall not be deemed to preclude a Non-Settling Insurance Company from exercising its rights of setoff and recoupment (to the extent setoff and recoupment are permitted under applicable law) against the Settlement Trust as to any deductible obligation on account of an Abuse Claim that has been or could have been asserted against any Protected Party but for the Discharge Injunction, Channeling Injunction or the Insurance Entity Injunction; provided that, the Settlement Trust and Protected Parties reserve all rights to dispute the ability for a Non-Settling Insurance Company to exercise such rights pursuant to the applicable Insurance Policy, related deductible agreement, the Plan Documents as amended by this section, and any applicable law.

Claim is barred by a statute of limitations or repose or by other applicable law.

In no event shall any Indirect Abuse Claimant have any rights against the Settlement Trust superior to the rights that the Direct Abuse Claimant to whose claim the Indirect Abuse Claim relates, would have against the Settlement Trust, including any rights with respect to timing, amount, percentage, priority, or manner of payment. No Indirect Abuse Claim may be liquidated and paid in an amount that exceeds what the Indirect Abuse Claimant has paid to the related Direct Abuse Claimant or to the Settlement Trust in respect of such claim for which the Settlement Trust would have liability, and in no event shall any Indirect Abuse Claim exceed the Allowed Claim Amount of the related Direct Abuse Claim, provided that an Indirect Abuse Claimant may assert against the Settlement Trust an Indirect Abuse Claim for the recovery of defense costs solely to the extent permitted under applicable law.

**C.** **Future Abuse Claims**. To be eligible to potentially receive compensation from the Settlement Trust on account of a Future Abuse Claim, a holder of a Future Abuse Claim (a "**Future Abuse Claimant**") must:

(1)    have a Direct Abuse Claim that arises from Abuse that occurred prior to the Petition Date;

(2)    as of the date immediately preceding the Petition Date, had not attained eighteen (18) years of age or was not aware of such Direct Abuse Claim as a result of "repressed memory," to the extent the concept of repressed memory is recognized by the highest appellate court of the state or territory where the claim arose;

(3)    submit the Future Abuse Claim to the Settlement Trust in accordance with these TDP, (i) at a time when the Claim would be timely under applicable state law if a state court action were filed on the date on which the Future Abuse Claim is submitted to the Settlement Trust, or (ii), if the Future Abuse Claim is not timely under (i) above, it will be eliminated or decreased in accordance with Article VIII.D(iii) below; and

(4)    have not filed a Chapter 11 POC.

Future Abuse Claims that meet the foregoing eligibility criteria shall be treated as Direct Abuse Claims hereunder.

### ARTICLE V
### GENERAL TRUST PROCEDURES

**A.** **Document Appendix**. As more fully described in the Document Appendix, the Settlement Trustee may require other parties to the Document Appendix and third parties to provide the Settlement Trust with documents, witnesses, or other information as provided therein (the "**Document Obligations**").

**B.**     **Document Access**. The Settlement Trust shall afford access for Direct Abuse Claimants to relevant, otherwise discoverable non-privileged information and documents obtained by the Settlement Trust pursuant to the Document Appendix to facilitate their submissions with respect to their Direct Abuse Claims. Such access shall include IV files (the Volunteer Screening Database), Troop Rosters, and non-privileged information and documents provided to the Settlement Trust by Direct Abuse Claimants that are not confidential and are relevant to the Allowed Amount of other Direct Abuse Claimants' Claims.  A court of competent jurisdiction shall be able to determine whether allegedly privileged documents should be required to be produced by the Settlement Trust. The Settlement Trust also may perform any and all obligations necessary to recover assigned proceeds under the assigned insurance rights in connection with the administration of these TDP.

**C.**     **Assignment of Insurance Rights**. The Bankruptcy Court has authorized the Insurance Assignment pursuant to the Plan and the Confirmation Order, and the Settlement Trust has received the assignment and transfer of the Insurance Actions, the Insurance Action Recoveries, the Insurance Settlement Agreements (if applicable), the Insurance Coverage, and all other rights or obligations under or with respect to the Insurance Policies (but not the policies themselves) in accordance with the Bankruptcy Code. Nothing in these TDP shall modify, amend, or supplement, or be interpreted as modifying, amending, or supplementing, the terms of any Insurance Policy or rights and obligations under any Insurance Policy assigned to the Settlement Trust to the extent such rights and obligations are otherwise available under applicable law and subject to the Plan and Confirmation Order. The rights and obligations, if any, of any Non-Settling Insurance Company relating to these TDP, or any provision hereof, shall be determined pursuant to the terms and provisions of the Insurance Policies and applicable law. Notwithstanding the foregoing, the Settlement Trust, rather than any Protected Party, shall satisfy, to the extent required under the relevant policies and applicable law, any retrospective premiums, deductibles, and self- insured retentions arising out of any Abuse Claims under the Abuse Insurance Policies. In the event that a Non-Settling Insurance Company pays such self - insured retention and is entitled to reimbursement from the Settlement Trust under applicable law, such Non-Settling Insurance Company shall receive that reimbursement in the form of a set-off against any claim for coverage by the Settlement Trust against that Non-Settling Insurance Company with respect to the relevant Abuse Claim. Nothing herein shall obligate any Non-Settling Insurance Company to advance any deductible or self-insured retention, unless otherwise required by applicable law.

**D.**     **Deceased Abuse Survivor**. The Settlement Trustee shall consider, and if an Allowed Claim Amount is determined, pay under these TDP, the claim of a deceased Direct Abuse Claimant without regard to the Direct Abuse Claimant's death, except that the Settlement Trustee may require evidence that the person submitting the claim on behalf of the decedent is authorized to do so.

**E.**     **Statute of Limitations or Repose**. The statute of limitations, statute of repose, and the choice of law determination applicable to an Abuse Claim against the Settlement Trust shall be determined by reference to the jurisdiction where such Abuse Claim was pending on the Petition Date (so long as the Protected Party was subject to personal jurisdiction in that location), or where such Abuse Claim could have been timely and properly filed as asserted by the Abuse Claimant under applicable law.

8

## ARTICLE VI
## EXPEDITED DISTRIBUTIONS

A.      **Minimum Payment Criteria**. A Direct Abuse Claimant who meets the following criteria may elect to resolve his or her Direct Abuse Claim for an expedited distribution of $3,500 (the "**Expedited Distribution**"): (i) the Direct Abuse Claimant elects to resolve his or her Direct Abuse Claim for the Expedited Distribution in accordance with the Plan and Confirmation Order (the "**Expedited Distribution Election**"); (ii) in connection with the Expedited Distribution Election, the Direct Abuse Claimant has timely submitted to the Settlement Trust a properly and substantially completed, non-duplicative Chapter 11 POC or Future Abuse Claim; and (iii) the Direct Abuse Claimant (or an executor) has personally signed his or her Proof of Claim or Future Abuse Claim attesting to the truth of its contents under penalty of perjury, or supplements his or her Abuse Claim Proof of Claim to so provide such verification. Direct Abuse Claimants that make the Expedited Distribution Election will not have to submit any additional information to the Settlement Trust to receive payment of the Expedited Distribution from the Settlement Trust.

B.      **Process and Payment of Expedited Distributions**. Direct Abuse Claimants who have properly made the Expedited Distribution Election and who met the criteria set forth in Article VI.A(ii) and (iii) above, shall be entitled to receive their Expedited Distribution upon executing an appropriate release, which shall include a release of the Settlement Trust, the Protected Parties, and all Chartered Organizations. The form of release agreement that a Direct Abuse Claimant who makes the Expedited Distribution Election must execute is attached as **Exhibit A**. A Direct Abuse Claimant who does not make the Expedited Distribution Election and a Future Abuse Claimant who does not elect to receive the Expedited Distribution in accordance with the deadlines and procedures established by the Settlement Trust may not later elect to receive the Expedited Distribution. A Direct Abuse Claimant who makes the Expedited Distribution Election (or Future Abuse Claimant who elects to receive the Expedited Distribution) shall have no other remedies with respect to any Direct Abuse Claim he or she has against the Settlement Trust, Protected Parties, Chartered Organizations, or any Non-Settling Insurance Company. Direct Abuse Claimants that make the Expedited Distribution Election (or Future Abuse Claimant who elects to receive the Expedited Distribution) will not be eligible to receive any further distribution on account of their Direct Abuse Claim pursuant to these TDP. The Settlement Trustee shall not seek reimbursement for any Expedited Distribution from any Non-Settling Insurance Company. An Abuse Claim resolved via Expedited Distribution shall not be considered an Insured Abuse Claim (as defined below).

## ARTICLE VII
## CLAIMS ALLOWANCE PROCESS

A.      **Trust Claim Submissions**. Each Abuse Claimant that does not make the Expedited Distribution Election may instead elect (1) to pursue recovery from the Settlement Trust pursuant to these TDP must submit his or her Abuse Claim for allowance and potential valuation and determination of insurance status by the Settlement Trustee pursuant to the requirements set forth herein (each, a "**Trust Claim Submission**") or (2) to pursue the Independent Review Option, as set forth therein. In order to properly make a Trust Claim Submission, each submitting Abuse Claimant must (i) complete under oath a questionnaire to be

9

developed by the Settlement Trustee and such signature and oath must be of the Abuse Claimant individually (or of an executor); (ii) produce all records and documents in his or her possession, custody or control related to the Abuse Claim, including all documents pertaining to all settlements, awards, or contributions already received or that are expected to be received from a Protected Party or other sources; and (iii) execute an agreement to be provided or made available by the Settlement Trust with the questionnaire (1) to produce any further records and documents in his or her possession, custody or control related to the Abuse Claim reasonably requested by the Settlement Trustee, (2) consent to and agree to cooperate in any examinations requested by the Settlement Trustee (including by healthcare professionals selected by the Settlement Trustee) (a "**Trustee Interview**"); and (3) consent to and agree to cooperate in a written and/or oral examination under oath if requested to do so by the Settlement Trustee. The questionnaire shall be approved by the STAC and the Future Claims Representative but, at a minimum, will require Direct Abuse Claimants to confirm his/her name, date of birth, home address, dates of abuse, frequency of abuse, and level of abuse. The date on which an Abuse Claimant submits (i), (ii) and (iii) above to the Settlement Trust shall be the "**Trust Claim Submission Date**". No recovery will be provided to an Abuse Claimant that does not timely submit a questionnaire. The Abuse Claimant's breach or failure to comply with the terms of his or her agreement made in connection with his or her Trust Claim Submission shall be grounds for disallowance or significant reduction of his or her Abuse Claim. To complete the evaluation of each Abuse Claim submitted through a Trust Claim Submission (each a " **Submitted Abuse Claim**"), the Settlement Trustee also may, but is not required to, obtain additional evidence from the Abuse Claimant or from other parties pursuant to the Document Obligations and shall consider supplemental information timely provided by the Abuse Claimant, including information obtained pursuant to the Document Obligations. Non-material changes to the claims questionnaire may be made by the Settlement Trustee without the consent of the STAC and the Future Claimants' Representative.

B.      **Claims Evaluation**. The Settlement Trustee shall evaluate each Trust Claim Submission individually and will follow the uniform procedures and guidelines set forth below to determine, based on the evidence obtained by the Settlement Trust, whether or not a Submitted Abuse Claim should be allowed. After a review of the documentation provided by the Abuse Claimant in his or her Proof of Claim, Trust Claim Submission, materials received pursuant to the Document Obligations, and any follow-up materials or examinations (including, without limitation, any Settlement Trustee Interview), the Settlement Trustee will either find the Abuse Claim to be legally valid and an Allowed Abuse Claim, or legally invalid and disallowed (a "**Disallowed Claim**").

C.      **Settlement Trustee Review Procedures**. The Settlement Trustee must evaluate each Submitted Abuse Claim, including the underlying Proof of Claim, the Trust Claim Submission and/or the Settlement Trustee Interview or any other follow-up, and documents obtained through the Document Obligations, and determine whether such Claim is a legally valid Allowed Abuse Claim, based on the following criteria:

1.      **Initial Evaluation Criteria**. The Settlement Trustee shall perform an initial evaluation (the "**Initial Evaluation**") of a Submitted Abuse Claim to determine whether:

10

(a)     the Abuse Claimant's Proof of Claim or Trust Claim Submission is substantially and substantively completed and signed under penalty of perjury;

(b)     the Direct Abuse Claim was timely submitted to the Settlement Trust under Article IV.A; and

(c)     the Submitted Abuse Claim had not previously been resolved by litigation and/or settlement involving all Protected Parties.

If any of these criteria are not met after such notice and opportunity as the Settlement Trustee deems appropriate to permit any defects in the Submitted Abuse Claim to be corrected, then the Submitted Abuse Claim shall be a Disallowed Claim.

2.     **General Criteria for Evaluating Submitted Abuse Claims**. To the extent a Submitted Abuse Claim is not disallowed based on the Initial Evaluation, then the Settlement Trustee will evaluate the following factors to determine if the evidence related to the Submitted Abuse Claim is credible and demonstrates, by a preponderance of the evidence, that the Submitted Abuse Claim is entitled to a recovery and should be allowed (the "**General Criteria**"):

(a)     Alleged Abuse. The Abuse Claimant has identified alleged acts of Abuse that he or she suffered;

(b)     Alleged Abuser Identification.  The Abuse Claimant has either (i) identified an alleged abuser (e.g., by the full name or last name) or (ii) provided specific information (e.g., a physical description of an alleged abuser combined with the name or location of the Abuse Claimant's troop) about the alleged abuser such that the Settlement Trustee can make a reasonable determination that the alleged abuser was an employee, agent or volunteer of a Protected Party, the alleged abuser was a registered Scout, or the alleged abuser participated in Scouting or a Scouting activity and the Abuse was directly related to Scouting activities;

(c)     Connection to Scouting. The Abuse Claimant has provided information showing (or the Settlement Trustee otherwise determines) (i) that the Abuse Claimant was abused during a Scouting activity or that the Abuse resulted from involvement in Scouting activities, and(ii) that a Protected Party may be negligent or may otherwise bear legal responsibility.

(d)     Date and Age. The Abuse Claimant has either: (i) identified the date of the alleged abuse and/or his or her age at the time of the alleged Abuse, or (ii) provided additional facts (e.g., the approximate date and/or age at the time of alleged Abuse coupled with the names of additional scouts or leaders in the troop) sufficient for the Settlement Trustee to determine the date of the alleged Abuse and age of the Abuse Claimant at the time of such alleged Abuse; and

(e)     <u>Location of Abuse</u>. The Abuse Claimant has identified the venue or location of the alleged Abuse.

3.     **Submitted Abuse Claims That Satisfy the General Criteria**. To the extent that a Submitted Abuse Claim meets the evidentiary standard set forth in the General Criteria and the Settlement Trustee has verified such information and determined that no materials submitted or information received in connection with the Submitted Abuse Claim are deceptive or fraudulent, the Submitted Abuse Claim will be, and will be deemed to be, an Allowed Abuse Claim.

4.     **Submitted Abuse Claims That Do Not Satisfy the General Criteria**. If the Settlement Trustee determines that any Submitted Abuse Claim materials provided by an Abuse Claimant include fraudulent and/or deceptive information, the Submitted Abuse Claim will be, and will be deemed to be, a Disallowed Claim. To the extent that a Submitted Abuse Claim – after an opportunity for the Abuse Claimant to discover information from the Settlement Trust as provided in these TDP – does not meet the evidentiary standard set forth in the General Criteria, the Settlement Trustee can disallow such Claim, or request further information from the Abuse Claimant in question necessary to satisfy the General Criteria requirements. If the Settlement Trustee finds that any of the factors set forth in Article VII.C.2(a)-(c) with respect to any Submitted Abuse Claim are not satisfied, the Claim will be per se disallowed and will be, and will be deemed to be, a Disallowed Claim.

D.     <u>Disallowed Claims</u>. If the Settlement Trustee finds that a Submitted Abuse Claim is a Disallowed Claim, the Settlement Trustee shall provide written notice of its determination to the relevant Abuse Claimant (a "**Disallowed Claim Notice**"). If the Settlement Trustee finds that a Submitted Abuse Claim is a Disallowed Claim, the Settlement Trustee will not perform the Allowed Abuse Claim valuation analysis described below in Article VIII. Abuse Claimants shall have the ability to seek reconsideration of the Settlement Trustee's determination set forth in the Disallowed Claim Notice as described in Article VII.G below.

E.     <u>Allowed Abuse Claims</u>. If the Settlement Trustee finds that a Submitted Abuse Claim is an Allowed Abuse Claim, the Settlement Trustee shall utilize the procedures described below in Article VIII to determine the proposed Claims Matrix tier and Scaling Factors for such Abuse Claim (the "**Proposed Allowed Claim Amount**"), and provide written notice of allowance and the Proposed Allowed Claim Amount to the Abuse Claimant (an "**Allowed Claim Notice**" and together with the Disallowed Claim Notice, a "**Claim Notice**") as set forth in Article VII.F below.

F.     <u>Claims Determination</u>. If the Abuse Claimant accepts the Proposed Allowed Claim Amount in the Allowed Claim Notice or the reconsideration process set forth below in Article VII.G has been exhausted (and no further action has been taken by the Abuse Claimant in the tort system pursuant to Article XII below), the Proposed Allowed Claim Amount shall become the Allowed Claim Amount for such Claim (a "**Final Determination**"), and the holder of such Allowed Abuse Claim shall receive payment in accordance with Article IX, subject to the Abuse Claimant executing the form of release set forth in Article IX.D, and subject to any further adjustment if the Direct Abuse Claimant exercises the Independent Review Option.

**G.** **Reconsideration of Settlement Trustee's Determination**. An Abuse Claimant may make a request for reconsideration of (i) the disallowance of his or her Submitted Abuse Claim, or (ii) the Proposed Allowed Claim Amount (a "**Reconsideration Request**") within thirty (30) days of receiving a Disallowed Claim Notice or an Allowed Claim Notice (the "**Reconsideration Deadline**"). Any Abuse Claimant who fails to submit a Reconsideration Request to the Settlement Trust by the Reconsideration Deadline shall be deemed to accept the disallowance of the Abuse Claim or the Proposed Allowed Claim Amount. Each Reconsideration Request must be accompanied by payment of $1,000 as an administrative fee for reconsideration. The Settlement Trustee shall have the authority to waive the administrative fee in appropriate cases, based on the circumstances of the Abuse Claimant. The Abuse Claimant may submit further evidence in support of the Submitted Abuse Claim with the Reconsideration Request. The Settlement Trustee will have sole discretion whether to grant the Reconsideration Request. The decision to grant the Reconsideration Request does not guarantee that the Settlement Trustee will reach a different result after reconsideration.

If the Reconsideration Request is denied, the administrative fee will not be returned, and the Settlement Trustee will notify the Abuse Claimant within thirty (30) days of receiving the request that it will not reconsider the Abuse Claimant's Submitted Abuse Claim. The Abuse Claimant shall retain the ability to pursue the Settlement Trust in the tort system as described in Article XII below.

If the Reconsideration Request is granted, the Settlement Trustee will provide the Abuse Claimant written notice within thirty (30) days of receiving the Reconsideration Request that it is reconsidering the Abuse Claimant's Submitted Abuse Claim. The Settlement Trustee will then reconsider the Submitted Abuse Claim—including all new information provided by the Abuse Claimant in the Reconsideration Request and any additional Settlement Trustee Interview—and will have the discretion to maintain the prior determination or find that the Submitted Abuse Claim in question is an Allowed Abuse Claim or should receive a new Proposed Allowed Claim Amount.

If the Settlement Trustee determines upon reconsideration that a Submitted Abuse Claim is an Allowed Abuse Claim and/or should receive a new Proposed Allowed Claim Amount, the Settlement Trustee will deliver an Allowed Claim Notice and return the administrative fee to the relevant Abuse Claimant. If the Settlement Trustee determines upon reconsideration that the totality of the evidence submitted by the Abuse Claimant does not support changing the earlier finding that the Submitted Abuse Claim is a Disallowed Claim, or that the Claim in question is not deserving of a new Proposed Allowed Claim Amount, the Settlement Trustee's earlier allowance determination and/or Proposed Allowed Claim Amount shall stand and the Settlement Trustee will provide a Claim Notice to the Abuse Claimant of either result within ninety (90) days of the Settlement Trust having sent notice that it was reconsidering the Abuse Claimant's Submitted Abuse Claim. Thereafter, the Abuse Claimant shall retain the ability to pursue the Settlement Trust in the tort system as described below in Article XII.

**H.** **Claim Determination Deferral**. For a period of up to twelve (12) months from the Effective Date, and by an election exercised at the time of the Trust Claim Submission, Direct Abuse Claimants whose Direct Abuse Claims may be substantially reduced by the Scaling

Factor described below in Article VIII.D.(iii) (statute of limitations defense) may elect to defer the determination of their Proposed Allowed Claim Amounts to see if statute of limitations revival legislation occurs, provided, however, that this claim determination deferral window shall close for all Direct Abuse Claims twelve (12) months from the Effective Date at which time such Submitted Abuse Claims shall be determined based on then applicable Scaling Factors.

**I.** **Prevention and Detection of Fraud**. The Settlement Trustee shall propose procedures to identify fraudulent claims, taking into account factors the Settlement Trustee deems appropriate (and which may include a cost/benefit analysis) to the Bankruptcy Court for approval. The Settlement Trustee shall work with the Claims Administrators to institute auditing and other procedures to detect and prevent the allowance of Abuse Claims based on fraudulent Trust Claim Submissions. Among other things, such procedures will permit the Settlement Trustee or Claims Administrators to conduct random audits to verify supporting documentation submitted in randomly selected Trust Claim Submissions, as well as targeted audits of individual Trust Claim Submissions or groups of Trust Claim Submissions, any of which may include Settlement Trustee Interviews. Trust Claim Submissions must be signed under the pains and penalties of perjury and to the extent of applicable law, the submission of a fraudulent Trust Claim Submission may violate the criminal laws of the United States, including the criminal provisions applicable to Bankruptcy Crimes, 18 U.S.C. § 152, and may subject those responsible to criminal prosecution in the Federal Courts.

## ARTICLE VIII
## CLAIMS MATRIX AND SCALING FACTORS

**Claims Matrix and Scaling Factors**. These TDP establish certain criteria for unliquidated claims seeking compensation from the Settlement Trust, a claims matrix below (the "**Claims Matrix**") that schedules six types of Abuse (the "**Abuse Types**") and designates for each Abuse Type a Base Matrix Value, and Maximum Matrix Value, and certain scaling factors (the "**Scaling Factors**") identified below to apply to the Base Matrix Values to determine the liquidated values for certain unliquidated Abuse Claims. The Abuse Types, Scaling Factors, Base Matrix Values, and Maximum Matrix Values that are set forth in the Claims Matrix have all been selected and derived with the intention of achieving a fair and reasonable Abuse Claim valuation range in light of the best available information, considering the settlement, verdict and/or judgments that Abuse Claimants would receive in the tort system against the Protected Parties absent the bankruptcy. The Settlement Trustee shall utilize the Claims Matrix and Scaling Factors as the basis to determine a Proposed Allowed Claim Amount for each Allowed Abuse Claim that does not receive an Expedited Distribution or become a STAC Tort Election Claim. The Proposed Allowed Claim Amount agreed to by the Direct Abuse Claimant as the Allowed Claim Amount for an Allowed Abuse Claim shall be deemed to be the Protected Parties' liability for such Direct Abuse Claim (i.e., the claimant's right to payment for his or her Direct Abuse Claim), irrespective of how much the holder of such Abuse Claim actually receives from the Settlement Trust pursuant to the payment provisions set forth in Article IX. In no circumstance shall the amount of a Protected Party's legal obligation to pay any Direct Abuse Claim be determined to be any payment percentages hereunder or under the Settlement Trust Agreement (rather than the liquidated value of such Direct Abuse Claim as determined under the TDP).

14

**A.**      **Claims Matrix**. The Claims Matrix establishes six tiers of Abuse Types, and provides the range of potential Allowed Claim Amounts assignable to an Allowed Abuse Claim in each tier. The first two columns of the Claims Matrix delineate the six possible tiers to which an Allowed Abuse Claim can be assigned based on the nature of the abuse. The Base Matrix value column for each tier represents the default Allowed Claim Amount for an Allowed Abuse Claim assigned to a given tier prior to application of the Scaling Factors described in Article VIII.B (the "**Base Matrix Value**"). The maximum Claims Matrix value column for each tier represents the maximum Allowed Claim Amount for an Allowed Abuse Claim assigned to a given tier after Claims Matrix review and application of the Scaling Factors described in Article VIII.B (the "**Maximum Matrix Value**"). The ultimate distribution(s) to the holder of an Allowed Abuse Claim that has received a Final Determination may vary upward (in the case of a larger-than- expected Settlement Trust corpus) or downward (in the case of a smaller-than-expected Settlement Trust corpus) from the holder's Allowed Claim Amount based on the payment percentages determined by the Settlement Trustee. If an Allowed Abuse Claim would fall into more than one tier, it will be placed in the highest applicable tier. An Abuse Claimant cannot have multiple Allowed Abuse Claims assigned to different tiers. Commencing on the second anniversary of the Effective Date, the Settlement Trust shall adjust the valuation amounts for yearly inflation based on the CPI-U. The CPI-U adjustment may not exceed 3% annually, and the first adjustment shall not be cumulative.

| Tier | Type of Abuse | Base Matrix Value | Maximum Matrix Value |
|---|---|---|---|
| 1 | Anal or Vaginal Penetration by Adult Perpetrator—includes anal or vaginal sexual intercourse, anal or vaginal digital penetration, or anal or vaginal penetration with a foreign, inanimate object. | $600,000 | $2,700,000 |
| 2 | Oral Contact by Adult Perpetrator—includes oral sexual intercourse, which means contact between the mouth and penis, the mouth and anus, or the mouth and vulva or vagina.<br><br>Anal or Vaginal Penetration by a Youth Perpetrator—includes anal or vaginal sexual intercourse, anal or vaginal digital penetration, or anal or vaginal penetration with a foreign, inanimate object. | $450,000 | $2,025,000 |
| 3 | Masturbation by Adult Perpetrator—includes touching of the male or female genitals that involves masturbation of the abuser or claimant.<br><br>Oral Contact by a Youth Perpetrator—includes | $300,000 | $1,350,000 |

| | | | |
|---|---|---|---|
| | oral sexual intercourse, which means contact between the mouth and penis, the mouth and anus, or the mouth and vulva or vagina. | | |
| 4 | Masturbation by Youth Perpetrator—includes touching of the male or female genitals that involves masturbation of the abuser or claimant.<br><br>Touching of the Sexual or Other Intimate Parts (unclothed) by Adult Perpetrator. | $150,000 | $675,000 |
| 5 | Touching of the Sexual or Other Intimate Parts (unclothed) by a Youth Perpetrator.<br><br>Touching of the Sexual or Other Intimate Parts (clothed), regardless of who is touching whom and not including masturbation.<br><br>Exploitation for child pornography | $75,000 | $337,500 |
| 6 | Sexual Abuse-No Touching.<br><br>Adult Abuse Claims. | $3,500 | $8,500 |

**B.**    **Scaling Factors**. After the Settlement Trustee has assigned an Allowed Abuse Claim to one of the six tiers in the Claims Matrix, the Settlement Trustee will utilize the Scaling Factors described below to determine the Proposed Allowed Claim Amount for each Allowed Abuse Claim.  Each Allowed Abuse Claim will be evaluated for each factor by the Settlement Trustee through his or her review of the evidence obtained through the relevant Proof of Claim, Trust Claim Submission and any related or follow-up materials, interviews or examinations, as well as materials obtained by the Settlement Trust or the Direct Abuse Claimant through the Document Obligations. These scaling factors can increase or decrease the Proposed Allowed Claim Amount for an Allowed Abuse Claim depending on the severity of the facts underlying the Claim. By default, the value of each scaling factor is one (1), meaning that in the absence of the application of the scaling factor, the Base Matrix Value assigned to a Claim is not affected by that factor. In contrast, if the Settlement Trustee determines that a particular scaling factor as applied to a given Allowed Abuse Claim is 1.5, the Proposed Allowed Claim Amount for the Allowed Abuse Claim will be increased by 50%, the result of multiplying the Base Matrix Value of the Allowed Abuse Claim by 1.5. The combined effect of all scaling factors is determined by multiplying the scaling factors together then multiplying the result by the Base Matrix Value of the Allowed Abuse Claim. See Article VIII.E for illustrative example.

**C.**    **Aggravating Scaling Factors**. The Settlement Trustee may assign upward Scaling Factors to each Allowed Abuse Claim based on the following categories:

16

(i)      **Nature of Abuse and Circumstances**. To account for particularly severe Abuse or aggravating circumstances, the Settlement Trustee may assign an upward Scaling Factor of up to 1.5 to each Allowed Abuse Claim. The hypothetical base case scenario for this scaling factor would involve a single incident of Abuse with a single perpetrator with such perpetrator having accessed the victim as an employee or volunteer within BSA-sponsored scouting. The hypothetical base case is incorporated into the Base Matrix Value in the Claims Matrix' tiers and would not receive an increase on account of this factor. By way of example, aggravating factors that can give rise to a higher scaling factor include the following factors:

(a)      Extended duration and/or frequency of the Abuse;

(b)      Exploitation of the Abuse Claimant for child pornography;

(c)      Coercion or threat or use of force or violence, stalking; and

(d)      Multiple perpetrators involved in sexual misconduct.

(ii)     **Abuser Profile**. To account for the alleged abuser's profile, the Settlement Trustee may assign an upward Scaling Factor of up to 2.0 to an Allowed Abuse Claim. This factor is to be evaluated relative to a hypothetical base case scenario involving a perpetrator as to whom there is no other known allegations of Abuse. The hypothetical base case is incorporated into the Base Matrix Value in the Claims Matrix' tiers and would not receive an increase on account of this factor. An upward Scaling Factor may be applied for this category as follows (the Settlement Trustee may only apply the scaling factor of the single highest applicable category listed below):

(a)      1.25 if the abuser was accused by at least one (1) other alleged victim of Abuse;

(b)      1.5 if the abuser was accused by five (5) or more other alleged victims of Abuse;

(c)      2.0 if the abuser was accused by ten (10) or more other alleged victims of Abuse; and

(d)      1.25 to 2.0 if there is evidence that the Protected Party knew or should have known (i) the abuser had previously committed or may commit Abuse and failed to take reasonable steps to protect the survivor from that danger, or

(iii)    of the prior Abuse or the foreseeability of the risk of Abuse and failed to take reasonable steps to protect the survivor from that danger.

(iv)     Impact of the Abuse. To account for the impact of the alleged Abuse on the Abuse Claimant's mental health, physical health, inter-personal relationships, vocational capacity or success, academic capacity or success, and whether the alleged Abuse at issue resulted in legal difficulties for the Abuse Claimant, the Settlement Trustee may assign an upward Scaling Factor of up to 1.5. This factor is to be evaluated relative to a hypothetical base case scenario of a

17

victim of Abuse who suffered the typical level of Abuse-related distress within the tier to which the Allowed Abuse Claim was assigned. The hypothetical base case is incorporated into the Base Matrix Values in the Claims Matrix' tiers and would not receive an increase on account of this factor. The Settlement Trustee will consider, along with any and all other relevant factors, whether the Abuse at issue manifested or otherwise led the Abuse Claimant to experience or engage in behaviors resulting from:

(a) <u>Mental Health Issues</u>: This includes anxiety, depression, post-traumatic stress disorder, substance abuse, addiction, embarrassment, fear, flashbacks, nightmares, sleep issues, sleep disturbances, exaggerated startle response, boundary issues, self -destructive behaviors, guilt, grief, homophobia, hostility, humiliation, anger, isolation, hollowness, regret, shame, isolation, sexual addiction, sexual problems, sexual identity confusion, low self-esteem or self-image, bitterness, suicidal ideation, suicide attempts, and hospitalization or receipt of treatment for any of the foregoing.

(b) <u>Physical Health Issues</u>: This includes physical manifestations of emotional distress, gastrointestinal issues, headaches, high blood pressure, physical manifestations of anxiety, erectile dysfunction, heart palpitations, sexually- transmitted diseases, physical damage caused by acts of Abuse, reproductive damage, self-cutting, other self-injurious behavior, and hospitalization or receipt of treatment for any of the foregoing.

(c) <u>Interpersonal Relationships</u>: This includes problems with authority figures, hypervigilance, sexual problems, marital difficulties, problems with intimacy, lack of trust, isolation, betrayal, impaired relations, secrecy, social discreditation and isolation, damage to family relationships, and fear of children or parenting.

(d) <u>Vocational Capacity</u>: This includes under- and un-employment, difficulty with authority figures, difficulty changing and maintaining employment, feelings of unworthiness, or guilt related to financial success.

(e) <u>Academic Capacity</u>: This includes school behavior problems.

(f) <u>Legal Difficulties</u>: This includes criminal difficulties, bankruptcy, and fraud.

**D.** **Mitigating Scaling Factors**. The Settlement Trustee may assign a mitigating Scaling Factor in the range of 0 to 1.0 except as specifically provided below to each Allowed Abuse Claim to eliminate or decrease the Proposed Allowed Claim Amount for such Claim. Each mitigating factor is to be evaluated relative to a hypothetical base case scenario of a timely asserted Abuse Claim with supporting evidence that demonstrates, by a preponderance of the evidence, Abuse by a perpetrator that accessed the victim as an employee, agent or volunteer of a Protected Party, as a registered Scout or as a participant in Scouting within BSA-sponsored Scouting. If statute of limitations revival legislation occurs in a particular jurisdiction, the

18

Settlement Trustee may modify the applicable Scaling Factor (as described below) relevant thereto on a go-forward basis and determine Proposed Allowed Claim Amounts for Abuse Claims in such jurisdiction thereafter based on such modified Scaling Factor. Included in the hypothetical base case scenario is that the applicable period under a statute of limitations or repose for timely asserting such Abuse Claim against any potentially responsible party will not have passed. The hypothetical base case is incorporated into the Base Matrix Values in the Claims Matrix tiers and would not receive a decrease on account of these factors. Such factors may include the following:

(i) **Absence of Protected Party Relationship or Presence of a Responsible Party that Is Not a Protected Party**.

     (a)     <u>Familial Relationship</u>. A Protected Party's responsibility for a perpetrator may be factually or legally attenuated or mitigated where the perpetrator also had a familial relationship with the Abuse Claimant. Familial Abuse—even if the perpetrator was an employee, agent or volunteer of a Protected Party, and the Abuse occurred in connection with BSA-related Scouting—should result in a significant reduction of the Proposed Allowed Claim Amount.

     (b)     <u>Other Non-Scouting Relationship</u>. A Protected Party's responsibility for a perpetrator may be factually or legally attenuated or mitigated where the perpetrator also maintained a non-familial relationship with the Abuse Claimant through a separate affiliation, such as a school, or a religious organization, even if the perpetrator was an employee, agent or volunteer of a Protected Party, or the Abuse occurred in settings where a Protected Party did not have the ability or responsibility to exercise control. Factors to consider include how close the relationship was between the perpetrator and the victim outside of their Scouting-related relationship, whether Abuse occurred and the extent of such Abuse outside of their Scouting relationship, and applicable law related to apportionment of liability. In such event, the Settlement Trustee shall determine and apply a mitigating Scaling Factor that accounts for such other relationship and the related Abuse. By way of example, if the Settlement Trustee determines after evaluation of an Allowed Abuse Claim and application of all of the other Scaling Factors that the perpetrator, who was an employee, agent or volunteer of a Protected Party for BSA-related Scouting, also was the primary teacher (at a non- Protected Party entity or institution) of the Abuse Claimant outside of BSA- related Scouting, and if numerous incidents of Abuse occurred outside of Scouting before one incident of BSA-related Scouting Abuse occurred, the Settlement Trustee shall apply a mitigating Scaling Factor as a material reduction of the Proposed Allowed Claim Amount.

     (c)     <u>Other Responsible Non-Protected Party</u>. The Abuse Claimant may have a cause of action under applicable law for a portion of his or her Direct Abuse Claim against a responsible entity, such as a Chartered

19

Organization, that is not a Protected Party. By way of example, if the Settlement Trustee determines after evaluation of a Submitted Abuse Claim that (i) a Chartered Organization that is not a Protected Party is responsible under applicable law for a portion of the liability and (ii) a Protected Party(ies) are not also liable for the same portion of the liability) (taking into account the relevant jurisdiction's prevailing law on apportionment of damages), the Settlement Trustee shall apply a final Scaling Factor to account for such non-Protected Party's portion of the liability.

(ii)   **Other Settlements, Awards, Contributions, or Limitations**. The Settlement Trustee may consider any further limitations on the Abuse Claimant's recovery in the tort system. The Settlement Trustee also should consider the amounts of any settlements or awards already received by the Abuse Claimant from other, non- Protected Party sources as well as agreed and reasonably likely to be received contributions from other, non-Protected Party sources that are related to the Abuse. By way of example, the Settlement Trustee should assign an appropriate Scaling Factor to Allowed Abuse Claims capped by charitable immunity under the laws of the jurisdiction where the Abuse occurred. Notwithstanding the foregoing, where an Abuse Claimant has obtained a recovery based on the independent liability of a third party for separate instances of Abuse that occurred without connection to Scouting activities, or on the non-Scouting portion of a Mixed Claim, no mitigating factor or reduction in value will be applied based on that recovery.

(iii)   **Statute of Limitations or Repose**. If the evidence provided by the Abuse Claimant or otherwise obtained by the Settlement Trustee results in the Settlement Trustee concluding that the subject Direct Abuse Claim could be dismissed or denied in the tort system as to all Protected Parties against whom the Direct Abuse Claim was timely submitted (as set forth in Article IV.A) due to the passage of a statute of limitations or a statute of repose, the Settlement Trustee shall apply an appropriate Scaling Factor based on the ranges set forth in Schedule 1 hereof and giving due consideration to any changes in the applicable law; provided, however, the Settlement Trustee will weigh the strength of any relevant evidence submitted by the Abuse Claimant to determine whether the statute of limitations could be tolled or deemed timely under applicable law, and may apply a higher Scaling Factor if such evidence demonstrates to the Settlement Trustee that tolling or a finding of timeliness would be appropriate under applicable state law.

(iv)   **Absence of a Putative Defendant**. If the Direct Abuse Claim could be diminished because such claim was not timely submitted against BSA or another Protected Party (as set forth in Article IV.A) (a "**Missing Party**"), such that in a suit in the tort system, such Direct Abuse Claim would be burdened by an "empty chair" defense due to the absence of a Missing Party(ies), the Settlement Trustee shall apply a mitigating Scaling Factor to account for a Missing Party's absence. By way of example, where a timely submitted Direct Abuse Claim was not timely submitted against BSA (i.e., the Abuse Claimant failed to timely file a Chapter 11 POC) but was only timely submitted against the Local Council and/or another Protected Party (as set forth in Articles IV.A(ii) and (iii)), such absence of the BSA due to BSA's discharge would be the basis for such a substantial reduction. Any Direct Abuse Claim that is reduced due to the absence of the BSA under this mitigating Scaling Factor shall only be payable, as reduced, from

20

Settlement Trust Assets contributed by the applicable Local Council or Chartered Organization, pro rata with all other Direct Abuse entitled to share in the Settlement Trust Assets contributed by such Local Council or Chartered Organization.

**E.**      **Allowed Abuse Claim Calculus**. After the Settlement Trustee assigns an Allowed Abuse Claim to a Claims Matrix tier and determines the appropriate Scaling Factors that apply to the Claim, the Proposed Allowed Claim Amount for the Allowed Abuse Claim is the product of the Base Matrix Value of the Claim and the Scaling Factors applied to the Claim. In no event can an Allowed Abuse Claim's Proposed Allowed Claim Amount (or Allowed Claim Amount) exceed the Maximum Matrix Value for the Claim's assigned Claims Matrix tier. By way of example, if an Allowed Abuse Claim is determined by the Settlement Trustee to be a tier 1 claim (Base Matrix Value of $600,000) with a Scaling Factor of 1.5 for the nature and circumstances of the abuse, and a mitigating Scaling Factor of 0.75, and no other Scaling Factors, the Proposed Allowed Claim Amount for the Allowed Abuse Claim would be $675,000, calculated as $600,000 x 1.5 x 0.75 = $675,000. As a further example, if, in addition to the above Scaling Factors, the same Allowed Abuse Claim had an additional aggravating Scaling Factor of 2.0 on account of the abuser's profile, the Proposed Allowed Claim Amount for the Allowed Abuse Claim would be $1,350,000 (calculated as $600,000 x 1.5 x .75 x 2.0).

**F.**      **Optional Chartered Organization Release**. To have the opportunity to exclusively share in any settlement proceeds received from a Chartered Organization that becomes a Protected Party as provided below in Article IX.F, a Direct Abuse Claimant must execute either (i) the conditional release of the Chartered Organization(s) against whom the Abuse Claimant has an Abuse Claim, that will become effective as to that Abuse Claimant if the Chartered Organization(s) against whom the Abuse Claimant conditionally released becomes a Protected Party(ies), in the form attached as **Exhibit B** (the "**Settling Chartered Organizations Release**"), or (ii) the non-conditional release of all Chartered Organizations in the form attached as **Exhibit C** (the "**Voluntary Chartered Organization Release**").

## ARTICLE IX
## PAYMENT OF FINAL DETERMINATION ALLOWED ABUSE CLAIM

**A.**      **Payment Upon Final Determination**. Only after the Settlement Trustee has established an Initial Payment Percentage in accordance with Section 4.1 of the Settlement Trust Agreement, then once there is a Final Determination of an Abuse Claim pursuant to Article VII.F, the Claimant will receive a payment of such Final Determination based on the Payment Percentage then in effect as described in Article IX.B and IX.C (unless such Claimant has exercised the Independent Review Option, in which case payment will be withheld until that determination is complete). For the purpose of payment by the Settlement Trust, a Final Judicial Determination (as defined in Article XII.I hereof) shall constitute a Final Determination.

**B.**      **Initial Payment Percentage**. After the Claimant accepts the Proposed Allowed Claim Amount and there is a Final Determination of the Abuse Claim, the Settlement Trust shall pay an initial distribution ("**Initial Distribution**") based on the Initial Payment Percentage established by the Settlement Trustee in accordance with the Settlement Trust Agreement.

C.      **Supplemental Payment Percentage**. When the Settlement Trustee determines that the then-current estimates of the Settlement Trust's assets and its liabilities, as well as then-estimated value of then-pending Abuse Claims (including estimated Future Abuse Claims), warrant additional distributions on account of the Final Determinations, the Settlement Trustee shall set a Supplemental Payment Percentage in accordance with the Settlement Trust Agreement. Such Supplemental Payment Percentages shall be applied to all Final Determinations that became final prior to the establishment of such Supplemental Payment Percentage. Claimants whose Abuse Claim becomes a Final Determination after a Supplemental Payment Percentage is set shall receive an Initial Distribution equal to the then existing payment percentage. For the avoidance of doubt, the Allowed Claim Amount of each Allowed Abuse Claim after Final Determination shall be deemed to be the Protected Parties' liability for such Allowed Abuse Claim irrespective of how much the holder of such Abuse Claim actually receives from the Settlement Trust pursuant to the payment provisions set forth in this Article IX. For example if the Allowed Claim Amount for an Allowed Abuse Claim that has received a Final Determination is $1,350,000, even if the Settlement Trust distributes less than $1,350,000 to the Abuse Claimant on account of such Allowed Abuse Claim based on application of the Initial Payment Percentage and any Subsequent Payment Percentage(s), the Allowed Claim Amount for the Abuse Claim is still $1,350,000.

D.      **Release**. In order for an Allowed Abuse Claim to receive a Final Determination and for the relevant Abuse Claimant to receive any payment from the Settlement Trust, the Abuse Claimant must submit, as a precondition to receiving any payment from the Settlement Trust, an executed release in the form attached hereto. The form of release agreement that a Direct Abuse Claimant who makes the Expedited Distribution Election must execute is attached as **Exhibit A** hereto. The form of the Settling Chartered Organization Release applicable to an Abuse Claimant who has elected to provide a conditional release to certain Chartered Organizations shall be substantially in the form of **Exhibit B** hereto. The form of the Voluntary Chartered Organization Release applicable to an Abuse Claimant who has selected a Final Determination based on the Proposed Allowed Claim Amount shall be substantially in the form of **Exhibit C** hereto. The form of the release applicable to an Abuse Claimant who has selected a Final Determination based on the Proposed Allowed Claim Amount but who does not elect to execute the Voluntary Chartered Organization Release shall be substantially in the form of **Exhibit D** hereto.

E.      **FIFO Claims Process Queuing and Exigent Health Claims**. The Settlement Trust shall review all Trust Claim Submissions for processing purposes on a FIFO basis as set forth below, except as otherwise provided herein with respect to Expedited Distributions, Exigent Health Claims, or Submitted Abuse Claims electing to defer determination of their Allowed Claim Amounts for up to twelve (12) months from the Effective Date pursuant to Article VII.H above. An Abuse Claimant's position in the FIFO Processing Queue shall be determined as of the Abuse Claimant's Trust Claim Submission Date. If any Trust Claim Submissions are filed on the same date, an Abuse Claimant's position in the applicable FIFO Processing Queue vis-à-vis such other same-day claims shall be determined by the claimant's date of birth, with older Abuse Claimants given priority over younger Abuse Claimants. An Abuse Claimant that seeks recovery on account of an Exigent Health Claim based on an Allowed Claim Amount determined through the matrix shall be moved in front of the FIFO Processing Queue no matter what the order of processing otherwise would have been under these TDP.

22

Following receipt of a Final Determination on account of an Exigent Health Claim, the holder of an Exigent Health Claim shall receive an Initial Distribution from the Settlement Trust (subject to the payment percentages then in effect), within thirty (30) days of executing the release as set forth in Article IX.D above.

### F.    Source Affected Weighting.

1.    Notwithstanding the Initial Payment Percentage and the Supplemental Payment Percentages applied hereunder, Non-BSA Sourced Assets shall be allocated (after deducting an estimated pro rata share of Settlement Trust expenses and direct expenses related to the collection of such Non-BSA Sourced Assets) all or in part (the "**Source Allocated Portion**") only among the holders of Allowed Abuse Claims that (1) could have been satisfied from the source of such Non-BSA Assets absent the Plan's Discharge and Channeling Injunction and (2) are held by Direct Abuse Claimants that execute a conditional release, the form of which is attached as **Exhibit B**, releasing all claims against all Chartered Organizations if the Settlement Trust enters into a global settlement making such Chartered Organization a Protected Party. The Settlement Trustee shall establish separate payment percentages (each, a "**Source Allocated Payment Percentage**") in accordance with the Settlement Trust Agreement to effectuate the distribution of the Source Allocated Portions of any Non-BSA Sourced Assets.

2.    Solely for purposes of allocating Non-BSA Sourced Assets, if a Direct Abuse Claimant exercises the Independent Review Option, then the claim amount for such Claimant for purposes of allocating the Source Allocated Portion of the United Methodist Settlement shall be based on the lesser of (i) the Allowed Claim Amount determined through the matrix calculation for the applicable tier and after application of the Scaling Factors under Article VIII or (ii) the amount of the Accepted Settlement Recommendation (the "**UMS ASR Source Allocated Portion Claim**"). For all other Direct Abuse Claims with Allowed Abuse Claims against the United Methodist Entities, the claim amount for such Claimant for purposes of allocating the Source Allocated Portion of the United Methodist Settlement shall be based on the amount of Final Determination.

3.    Solely for purposes of allocating Non-BSA Sourced Assets, if an Accepted Settlement Recommendation (as defined in Article XIII.A) results in a Direct Abuse Claimant having an Excess Award Share claim under Article XIII.E that identifies a Chartered Organization (or an affiliate that becomes a Protected Party by virtue of such settlement, together an "**Applicable Chartered Organization**", but in any case excluding the United Methodists Entities) that provides Non-BSA Sourced Funds, the portion of such Claim to be satisfied from the Source Allocated Portion funded by such settlement shall be based on the lesser of (i) $2,700,000 or (ii) the amount of the Accepted Settlement Recommendation (the "**ASR Source Allocated Portion Claim**"). For all other Direct Abuse Claims with Allowed Abuse Claims against the Applicable Chartered Organization, the claim amount for such Claimant for purposes of allocating the Source Allocated Portion shall be based on the amount of Final Determination.

4.    Once the Settlement Trust has paid in full all (i) Final Determination Allowed Abuse Claim Amounts of Direct Abuse Claimants with a claim against the Applicable Chartered Organization, and (ii) ASR Source Allocated Portion Claims, and UMS ASR Source Allocated Portion Claims, as applicable, then the remainder, if any, of the Source Allocated

23

Portion shall be used to pay Excess Award Shares that identify the Applicable Chartered Organization until all such Accepted Settlement Recommendations are paid in full. If there is a remainder of a Source Allocated Portion after payment of the foregoing amounts, then that remainder shall be distributed to all holders of Allowed Abuse Claims pursuant to the applicable payment percentage. Amounts received by Direct Abuse Claimants on account of the and UMS ASR Source Allocated Portion Claims or the ASR Source Allocated Portion Claims, as applicable, shall not reduce the Excess Award Share; provided, however, that in no event shall a Direct Abuse Claimant receive greater than payment in full of the Excess Award Share.

## ARTICLE X
## RIGHTS OF SETTLEMENT TRUST AGAINST NON-SETTLING INSURANCE COMPANIES

Pursuant to the Plan, the Settlement Trust has taken an assignment of BSA's and any other Protected Party's (to the extent provided for in the Plan) rights and obligations under the Insurance Policies. For any Abuse Claim that the Settlement Trustee determines is an Allowed Abuse Claim pursuant to Article VII above, the Settlement Trustee will determine, based on the relevant Trust Claim Submission and any other information submitted in connection with that submission and in the materials obtained through the Document Obligations, whether any Non-Settling Insurance Company issued coverage that is available to respond to such Claim (an "**Insured Abuse Claim**"). The Settlement Trustee may determine that multiple Non-Settling Insurance Companies have responsibility for an Insured Abuse Claim. The Settlement Trustee shall seek reimbursement for each Insured Abuse Claim that is an Insured Abuse Claim, including the Proposed Allowed Claim Amount, from the applicable Non-Settling Insurance Company(ies) pursuant to the Insurance Policies and applicable law. The Settlement Trustee shall have the ability to exercise all of the rights and interests in the Insurance Policies assigned to the Settlement Trust as set forth in the Plan, including the right to resolve any disputes with a Non-Settling Insurance Company regarding their obligation to pay some or all of an Insured Abuse Claim, and any all rights with respect to a Responsible Insurer in connection with the Independent Review Option, and to enter into agreements with any Non-Settling Insurance Company to become a Settling Insurance Company, subject to the terms and limitations set forth in the Trust Agreement and Article XIII herein. The Settlement Trustee will exercise those rights consistent with their duty to preserve and maximize the assets of the Settlement Trust. The Settlement Trustee will have the ability to request further information from Abuse Claimants in connection with seeking reimbursement for Insured Abuse Claims.

## ARTICLE XI
## INDIRECT ABUSE CLAIMS

A.    **Indirect Abuse Claims**. To be eligible to receive compensation from the Settlement Trust, the holder of an Indirect Abuse Claim must satisfy Article IV.B hereof. Indirect Abuse Claims that become Allowed Indirect Abuse Claims shall receive distributions in accordance with Article IX hereof and shall be subject to the same liquidation and payment procedures as the Settlement Trust would have afforded the holders of the underlying valid Direct Abuse Claims pursuant to Articles VIII and IX hereof.

24

**B.**     **Offset**. The liquidated value of any Indirect Abuse Claim paid by the Settlement Trust shall be treated as an offset to or reduction of the full liquidated value of any related Direct Abuse Claim that might be subsequently asserted against the Settlement Trust as being against any Protected Party(ies) whose liability was paid by the Indirect Abuse Claimant.

**C.**     **Court Review**. Within thirty (30) days after an Indirect Abuse Claimant receives written notice from the Settlement Trust of the proposed allowed amount of its Indirect Abuse Claim or denial thereof (the "**Judicial Review Election Deadline**"), an Indirect Abuse Claimant may notify the Settlement Trust of its intention to seek a de novo review of the Trustee's determination of its Indirect Abuse Claim in accordance with this TDP (including Article IV.B hereof) by a court of competent jurisdiction (a "**Judicial Review Election**"). Such notification shall be made by submitting a written notice to the Settlement Trustee (a "**Judicial Review Election Notice**") by the Judicial Review Election Deadline. Unless the Settlement Trustee agrees to extend the Judicial Review Election Deadline, an Indirect Abuse Claimant who fails to so submit a Judicial Review Election Notice by the Judicial Review Election Deadline shall be deemed to accept the disallowance of its Indirect Abuse Claim or the Proposed Allowed Claim Amount (as applicable) and shall have no right to seek any further review of its Indirect Abuse Claim. An Indirect Abuse Claimant that makes a Judicial Review Election may not seek costs or expenses against the Settlement Trust in any judicial proceeding commenced on account of its Judicial Review Election and the Settlement Trust may not seek costs or expenses against the Indirect Abuse Claimant. In no event shall the submission and/or filing of a Judicial Review Election Notice entitle the holder of an Indirect Abuse Claim to request or receive treatment different than the treatment provided for under this TDP (including Article IV.B hereof). The de novo review provided for herein shall be to determine the allowed amount of the Indirect Abuse Claim under and in accordance with this TDP. All defenses (including, with respect to the Settlement Trust, all defenses that could have been asserted by the Debtors or Protected Parties, except as otherwise provided in the Plan) shall be available to both sides (which may include any Non -Settling Insurance Company) at any judicial proceeding commenced on account of the Indirect Abuse Claimant's Judicial Review Election. Upon entry of final non-appealable order of a court competent jurisdiction fixing the allowed amount of the Indirect Abuse Claim, if any, such Indirect Abuse Claim shall be deemed an "**Allowed Indirect Abuse Claim**" and paid in accordance with Article IX hereof.

## ARTICLE XII
## TORT SYSTEM ALTERNATIVE

**A.**     **Remedies after Disallowance or Exhaustion of Claims Allowance Procedures**. Within thirty (30) days after a Direct Abuse Claimant receives an Allowed Claim Notice or Claim Notice on its Proof of Claim following a Reconsideration Request in accordance with Article VII.G (the "**Tort Election Deadline**"), an Abuse Claimant may notify the Settlement Trust of its intention to seek a de novo determination of its Abuse Claim by a court of competent jurisdiction (a "**TDP Tort Election Claim**"), subject to the limitations set forth in this Article XII (the "**Tort System Alternative**"). Such notification shall be made by submitting a written notice to the Settlement Trustee (a "**Judicial Election Notice**") by the Tort Election Deadline. Unless the Settlement Trustee agrees to extend the Tort Election Deadline, Claimants who fail to so submit and/or file a Judicial Election Notice by the Tort Election Deadline shall be deemed to accept the disallowance of their Abuse Claims or the Proposed Abuse Claim Amounts (as

25

applicable) and shall have no right to seek any further review of their Abuse Claims. An Abuse Claimant that asserts a TDP Tort Election Claim may not seek costs or expenses against the Settlement Trust in the lawsuit filed and the Settlement Trust may not seek costs or expenses against the Abuse Claimant. Any recoveries for a TDP Tort Election Claim from outside the Settlement Trust in respect of a Protected Party's liability are payable to the Settlement Trust and the Abuse Claimant shall be paid in accordance with Articles XII.G and IX hereof.

B. **Supporting Evidence for TDP Tort Election Claims**. TDP Tort Election Claims in the federal courts shall be governed by the rights and obligations imposed upon parties to a contested matter under the Federal Rules of Bankruptcy Procedure, provided, however, that an Abuse Claimant that prosecutes in any court a TDP Tort Election Claim after seeking reconsideration from the Settlement Trust shall not have the right to introduce into evidence to the applicable court any information or documents that (i) were requested by the Settlement Trustee and (ii) were in the possession, custody or control of the Abuse Claimant at the time of a request by the Settlement Trust, but which the Abuse Claimant failed to or refused to provide to the Settlement Trust in connection with the claims evaluation process in these TDP. The Abuse Claimant's responses to requests by the Settlement Trustee for documents or information shall be subject to Rule 37 of the Federal Rules of Civil Procedure, as applicable under the Federal Rules of Bankruptcy Procedure, and/or any comparable State Rule of Civil Procedure. An Abuse Claimant shall not have the right to disclose any Proposed Abuse Claim Amount received from the Settlement Trust to any court in connection with a Tort Election Claim. Subject to the terms of any protective order entered by a court, the Settlement Trustee shall be permitted to introduce as evidence before a court all information and documents submitted to the Settlement Trust under these TDP, and the Abuse Claimant may introduce any and all information and documents that he or she submitted to the Settlement Trust under these TDP.

C. **Authorization of Settlement Trustee and Settlement Trust Advisory Committee**. The Settlement Trustee may authorize the commencement or continuation of a lawsuit by a Direct Abuse Claimant in any court of competent jurisdiction against the Settlement Trust to obtain the Allowed Claim Amount of a Direct Abuse Claim (a "**STAC Tort Election Claim**" and together with a TDP Tort Election Claim, "**Tort Election Claims**"). STAC Tort Election Claims shall not be required to exhaust any remedies under these TDP before commencing or continuing such lawsuit. No Abuse Claimant may pursue a STAC Tort Election Claim without the prior written approval of the Settlement Trustee in accordance with the Settlement Trust Agreement. Fifty percent (50%) (or less if determined by the Settlement Trustee) of any amounts paid with respect to a judgment for, or a settlement of, a STAC Tort Election Claim by a Non-Settling Insurance Company, as to a policy as to which a Protected Party has assigned relevant insurance rights to the Settlement Trust, shall be paid over to the Settlement Trust.

D. **Tender to Non-Settling Insurance Company**. If an Abuse Claimant is authorized to file suit against the Settlement Trust as provided in Article XII.A and XII.C herein, the Settlement Trustee shall determine, based on the Trust Claim Submission and any other information obtained in connection with that submission and materials received in connection with the Document Obligations, whether any Non-Settling Insurance Company issued coverage that is available to respond to the lawsuit (an "**Insured Lawsuit**"). The Settlement Trustee may determine that there are multiple Non-Settling Insurance Companies that have responsibility to

26

defend an Insured Lawsuit. The Settlement Trustee shall provide notice, and if applicable, seek defense, of any Insured Lawsuit to each Non-Settling Insurance Company from whom the Settlement Trustee determines insurance coverage may be available in accordance with the terms of each applicable Insurance Policy.

E.      **Parties to Lawsuit**. Any lawsuit commenced under Article XII of these TDP must be filed by the Abuse Claimant in his or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit. The Abuse Claimant may assert its Abuse Claim against the Settlement Trust as if the Abuse Claimant were asserting such claim against either the Debtors or another Protected Party and the discharge and injunctions in the Plan had not been issued. The Abuse Claimant may name any person or entity that is not a Protected Party, including Non-Settling Insurance Companies to the extent permitted by applicable law. Abuse Claimants may pursue in any manner or take any action otherwise permitted by law against persons or entities that are not Protected Parties so long as they are not an additional insured or an Insurance Company as to an Insurance Policy issues to the BSA.

F.      **Defenses**. All defenses (including, with respect to the Settlement Trust, all defenses that could have been asserted by the Debtors or Protected Parties, except as otherwise provided in the Plan) shall be available to both sides (which may include any Non-Settling Insurance Company) at trial.

G.      **Settlement Trust Liability for Tort Election Claims**. An Abuse Claimant who pursues a Tort Election Claim shall have an Allowed Claim Amount equal to zero if the litigation is dismissed or claim denied. If the matter is litigated, the Allowed Claim Amount shall be equal to the settlement or final judgment amount obtained in the tort system less any payments actually received and retained by the Abuse Claimant, provided that, exclusive of amounts payable pursuant to Article XII.C (in the event such amounts exceed the Maximum Matrix Value in the applicable tier set forth in the Claims Matrix), any amount of such Allowed Claim Amount for a Tort Election Claim in excess of the Maximum Matrix Value in the applicable tier set forth in the Claims Matrix shall be subordinate and junior in right for distribution from the Settlement Trust to the prior payment by the Settlement Trust in full of all Abuse Claims that are Allowed Abuse Claims as liquidated under these TDP (excluding this Article XII). By way of example, presume (1) there is an Abuse Claimant asserting tier one abuse that achieves a $5 million verdict for his or her STAC Tort Election Claim against the Settlement Trust, and (2) a Non-Settling Insurance Company pays $750,000 in coverage under a policy providing primary coverage, $375,000 of which is paid directly to the Abuse Claimant and $375,000 of which is paid over to the Settlement Trust pursuant to Article XII.C. Although the unpaid amount of such Allowed Abuse Claim would be $4,625,000, the maximum total payment that the Abuse Claimant can recover from the Settlement Trust (before the non-subordinated portion of all other Abuse Claims that are Allowed Abuse Claims are paid in full) is $2,700,000 (the Maximum Matrix Value in tier one), or an additional $2,325,000, paid pursuant to the terms of Article IX hereof. For the avoidance of doubt, the limit on the Settlement Trust liability under this Article XII.G shall not apply or inure to the benefit of any Non-Settling Insurance Company, and the Settlement Trust shall be able to obtain coverage, subject to Article X hereof, for the full Allowed Claim Amount obtained by the Abuse Claimant through a Tort Election Claim.

**H.** **Settlement or Final Judgment**. If the Settlement Trust reaches a global settlement making a Protected Party of a Non-Settling Insurance Company or other person or entity involved in a Tort Election Claim or obtains a final judgment in a suit against such person or entity terminating liability for such person or entity to the Abuse Claimant, the Abuse Claimant shall be entitled to proceed with the Tort Election Claim for any reason (e.g., if there are persons or entities that are not Protected Parties to collect from). Alternatively, the Abuse Claimant can elect to terminate the Tort Election Claim without prejudice and have its Abuse Claim determined through these TDP (i.e., as if no STAC Tort Election Claim had been made), in which event the Abuse Claimant may submit relevant evidence from the Tort Election Claim that the Settlement Trustee shall take into account in evaluating the Abuse Claim under these TDP. Such Abuse Claimant may be provided other alternatives by the Settlement Trust if it had been pursuing a STAC Tort Election Claim.

**I.** **Payment of Judgments by the Settlement Trust**. Subject to Article XII.G hereof, if and when an Abuse Claimant obtains a final judgment or settlement against the Settlement Trust in the tort system (a "**Final Judicial Determination**"), such judgment or settlement amount shall be treated for purposes of distribution under these TDP as the Abuse Claimant's Final Determination, and such Allowed Claim Amount shall also constitute the applicable Protected Parties' liability for such Abuse Claim. Within thirty (30) days of executing the release as set forth in Article IX.D above, the Abuse Claimant shall receive an Initial Distribution from the Settlement Trust (assuming an Initial Payment Percentage has been established by the Settlement Trust at that time). Thereafter, the Abuse Claimant shall receive any subsequent distributions based on any applicable Payment Percentage as determined by the Settlement Trust.

**J.** **Litigation Results and Other Abuse Claims**. To the extent that a Final Judicial Determination of an Abuse Claim or changes in applicable law implicate the appropriateness of the Scaling Factors or General Criteria, the Settlement Trustee, subject to the terms of these TDP and the Settlement Trust Agreement and the approval of the Bankruptcy Court or District Court, after appropriate notice and opportunity to object, may appropriately modify the Scaling Factors or General Criteria on a go-forward basis for use in evaluation of Future Abuse Claims and other Abuse Claims as to which no Allowed Claim Amount Final Determination had previously been made.

**K.** **Tolling of Limitations Period**. The running of the relevant statute of limitation shall be tolled as to each Abuse Claimant's Abuse Claim from the earliest of (A) as to a Protected Party, the actual filing of the claim against the Protected Party, whether in the tort system or by submission of the claim to the Protected Party pursuant to an administrative settlement agreement; or (B) as to the Debtor, the Petition Date or prior to the Petition Date by an agreement or otherwise.

## ARTICLE XIII
### INDEPENDENT REVIEW OPTION

**A.** **Direct Abuse Claimant's Independent Review Option**. Direct Abuse Claimants shall have the opportunity for a Direct Abuse Claimant to have an independent, neutral third party (selected from a panel of retired judges with tort experience maintained by the Settlement

Trust) (a "**Neutral**") make a settlement recommendation (the "**Settlement Recommendation**") to the Settlement Trustee seeking to replicate to the extent possible the amount a reasonable jury might award for the Direct Abuse Claim, taking into account the relative shares of fault that may be attributed to any parties potentially responsible for the Direct Abuse Claim under applicable law and applying the same standard of proof that would apply under applicable law (the "**Independent Review Option**"). The Settlement Recommendation determined by the Neutral, if accepted by the Settlement Trustee (an "**Accepted Settlement Recommendation**"), shall be the allowed amount of the Direct Abuse Claim in accordance with the Plan against (i) the Debtors, (ii) other Protected Parties, and (iii) Chartered Organizations. The Direct Abuse Claimant must assign its Direct Abuse Claim against any Chartered Organization and all other rights and claims arising out of its Direct Abuse Claim to the Settlement Trust as a condition to receiving the Accepted Settlement Recommendation, and the Settlement Trust shall have the right and power to assert and/or resolve any such claims assigned to it consistent with the Plan. If the Settlement Trustee declines to follow the Neutral's recommendation as to the Allowed Claim Amount for an Independent Review Claim (a "**Recommendation Rejection**"), within forty-five (45) days after the holder being served notice of the Recommendation Rejection, the holder of such Direct Abuse Claim may commence a lawsuit in any court of competent jurisdiction against the Settlement Trust to obtain the Allowed Claim Amount of the Direct Abuse Claim. Such Direct Abuse Claimant shall have an Allowed Claim Amount equal to zero if the litigation is dismissed or claim denied. If the matter is litigated, the Allowed Claim Amount shall be equal to the settlement or final judgment amount obtained in the tort system less any payments actually received and retained by the Direct Abuse Claimant. Notwithstanding the foregoing, any amount of an Accepted Settlement Recommendation or Allowed Claim Amount for an Abuse Claim that proceeds under this Independent Review Option in excess of a multiple of five (5) times the Maximum Matrix Value in the applicable tier set forth in the Claims Matrix shall be subordinate and junior in right for distribution from the Settlement Trust to the prior payment by the Settlement Trust in full of all Direct Abuse Claims that are Allowed Abuse Claims as liquidated under the TDP (excluding Claims liquidated under this provision or under Article XII (regarding Tort Election Claims)).

B.      **Time to Select Independent Review Option**. Direct Abuse Claimants, other than Future Abuse Claimants, shall initially have until six (6) months after the Effective Date, to elect to participate in the Independent Review Option. In addition, in order to participate in the Independent Review Option, the Direct Abuse Claimant must complete and submit the Trust Claim Submission by six (6) months after the Effective Date to enable the Settlement Trust to establish reserves. If a Direct Abuse Claimant pursues a non-channeled Chartered Organization and the Settlement Trust settles with the Chartered Organization in question such that claims against it become channeled (a) the Settlement Trust shall provide notice of such settlement to any Direct Abuse Claimants that are pursuing any non-channeled Chartered Organizations and (b) such Direct Abuse Claimants shall have thirty (30) days from notice of the effectiveness of the Settlement Trust's settlement to select the Independent Review Option at that time.

C.      **Excess Award Fund**. The Settlement Trust shall maintain a fund for the sole purpose of funding the portion of Accepted Settlement Recommendations that are in excess of $1 million (the "**Excess Award Fund**"). The Excess Award Fund shall be funded with certain

29

proceeds from the Trust's collection of insurance policy proceeds from non-settling insurers as set forth below.[2]

**D.** **Accepted Settlement Recommendation of Less Than $1 Million**. If the Neutral makes an Accepted Settlement Recommendation of $0 due to the statute of limitations or a finding of no liability, the Direct Abuse Claimant shall receive nothing from the Trust and shall remain barred from proceeding against any Protected Party on account of their claim. The Accepted Settlement Recommendation shall supersede the determination of the amount of the claim under the TDP, whether higher or lower, subject to limitations set forth in Article XIII.E below. If the Neutral makes an Accepted Settlement Recommendation of $1 million or less but greater than zero, then the Settlement Recommendation shall be paid by the Settlement Trust in accordance with Article IX, including any applicable payment percentage, and the Direct Abuse Claimant shall receive nothing from the Excess Award Fund.

**E.** **Accepted Settlement Recommendation of $1 Million or More**. If the Neutral makes an Accepted Settlement Recommendation of $1 million or more, then the Direct Abuse Claimant shall receive (i) an allowed claim against the Settlement Trust equal to $1 million (the "**Trust Share**"), to be paid pursuant to Article IX and subject to any applicable payment percentage from Settlement Trust Assets other than the Excess Award Fund (the "**General Trust**"), and (ii) an allowed claim against the Settlement Trust equal to the amount of the Settlement Recommendation in excess of the Trust Share (the "**Excess Award Share**") which shall be paid solely and exclusively from the Excess Award Fund as set forth below.

**F.** **Costs Paid By Direct Abuse Claimants**. The costs associated with the independent review shall be paid by the Direct Abuse Claimant and not the Settlement Trust, including the cost of any deposition and mental health exam and the valuation by the Neutral. Such obligation shall be offset by the administrative fee paid by the Direct Abuse Claimant. Recovery of such costs may be sought from any insurer subject to the applicable terms and conditions of any insurer's policy, to the extent such costs constitute reasonable and necessary costs payable under an applicable non-settled insurance policy, and the Settlement Trust may reimburse the Direct Abuse Claimant for such costs to the extent that the non-settled insurance policy reimburses the Settlement Trust. Any recoveries by the Settlement Trust on account of its own costs will be distributed to Direct Abuse Claimants as set forth below. If the cost to the Settlement Trustee of processing the Independent Review Option is less than the administrative fees charged, the Settlement Trustee shall reimburse the unused balance to the Direct Abuse Claimant.

**G.** **Requirements for Obtaining a Settlement Recommendation**. To obtain a Settlement Recommendation, each Direct Abuse Claimant who proceeds through the Independent Review shall provide the following:

(i)     Sexual Abuse Survivor Proof of Claim signed and dated by the Direct Abuse Claimant, with completion of all applicable fields, including the substantive narrative of the

---

[2] The sources of recovery for the fund or Direct Abuse Claimants are (i) the Debtors' or Local Counsels' non-settled shared insurance policies excess of the primary layer of coverage, and (ii) in the absence of a global settlement making a Chartered Organization a Protected Party, certain Chartered Organizations' separate non-settled insurance rights, collectively referred as Responsible Insurers, as defined below.

Abuse and damages (to be completed at the time of submission to the Neutral or after the completion of discovery);

(ii)     Payment to the Settlement Trust of an administrative fee in the amount of $ 10,000 at the time of the election for Independent Review Option and a further additional administrative fee in the amount of $10,000 immediately prior to the Neutral's review. The Settlement Trustee shall have the authority to waive administrative fees in appropriate cases, based on the circumstances of the Direct Abuse Claimant. To the extent a Direct Abuse Claimant is dissatisfied with the Settlement Trustee's decision on waiver of fees, such decision will be reviewable by the Bankruptcy Court. Any Direct Abuse Claimant that elects not to proceed with the Neutral's review after the opportunity to pursue discovery shall not be required to pay the second $10,000 and shall not be precluded from pursuing their claim under the TDP (as if no election to pursue an Independent Review Option had been made);

(iii)    Confirmation that the Direct Abuse Claimant was in a Scouting unit or attended a Scouting related event where the Abuse occurred by:

(a)     Direct Abuse Claimant's name on a roster;

(b)     evidence that the Direct Abuse Claimant was in a Scouting unit or attended a Scouting-related event where the Abuse occurred (a non-exclusive list of ways of satisfying the showing are: a photograph, a membership card, or document that reflects the Direct Abuse Claimant's rank in a Scouting unit); or

(c)     a sworn statement by a third-party witness (who will agree to a deposition by the Neutral, if requested) that the Direct Abuse Claimant was in a Scouting unit or attended a Scouting-related event where the Abuse occurred.

(iv)    Direct Abuse Claimant must provide evidence that the perpetrator was in a Scouting unit, worked or volunteered with a Scouting unit, worked or volunteered with a Local Council, Chartered Organization or the BSA, or worked or volunteered at a Scouting-related event where the Abuse occurred (a non-exclusive list of ways of satisfying the showing are: the perpetrator's name being on a Scouting roster, a photograph of the perpetrator, or a sworn statement by a third party witness who will agree to a deposition if requested by the Neutral);

(v)     Direct Abuse Claimants must provide evidence that the claim is timely under the applicable statute of limitations, including satisfying any recognized exception to the relevant statute of limitation under the applicable state law;

(vi)    Direct Abuse Claimant provides evidence that one or more of the BSA, Local Council or Chartered Organization was negligent or is otherwise liable on account of a Direct Abuse Claim, and evidence regarding the Direct Abuse Claimant's damages (such as medical and counseling records and/or a sworn statement from a family member, significant other, or relative who, in each case, will agree to a deposition by the Neutral) or benchmark judgments or settlements relevant to the damages claimed. Damages must be supported by an expert report (the cost of which shall be paid by the Direct Abuse Claimant); and

(vii)   Direct Abuse Claimant shall be subject to up to a single sworn six-hour interview, mental health examination or supplemental signed and dated interrogatory responses at the discretion of the Neutral or upon the reasonable request of a Responsible Insurer.

**H.   Discovery**. The Direct Abuse Claimant shall be entitled to discovery from the Settlement Trust (as successor to the BSA and Local Councils) and from third parties in accordance with the Document Appendix.

**I.   Other Defenses**. In making her determination, the Neutral will consider and apply any defense that would otherwise be available in the tort system.

**J.   Insurer Participation**.

(i)   The Settlement Trust will provide prompt notice to any potentially responsible non-settling insurer(s) ("**Responsible Insurers**") of any claim for which the Direct Abuse Claimant has elected the Independent Review Option.

(ii)   Any Responsible Insurer shall be given a reasonable opportunity to participate in the Independent Review. Any Responsible Insurer who chooses to participate may review and comment on the Neutral's evaluation, including attending any interview or deposition. Any Responsible Insurer may raise and present any potentially applicable defenses to the Abuse Claim to the Neutral, at their own expense. Such defenses must be considered and evaluated, as reasonably appropriate, by the Neutral.

(iii)   Upon the Settlement Trustee's receipt of the Settlement Recommendation from the Neutral, the Settlement Trustee shall provide notice and seek consent from any applicable Responsible Insurer.

(iv)   If the Settlement Trustee determines that the Settlement Recommendation is reasonable and the Responsible Insurer refuses to pay all or a portion of the Accepted Settlement Recommendation for which it is responsible, then the Settlement Trustee may exercise any and all rights available to it under applicable law, and the Settlement Trustee expressly reserves any and all rights against the Responsible Insurer, including but not limited to agreeing to the Settlement Recommendation and pursuing the Responsible Insurer for any available remedy including, but not limited to breach of contract and bad-faith.

(v)   The Settlement Trust shall have the right to pursue the Accepted Settlement Recommendation through any appropriate legal mechanisms.

**K.   Collection of the Independent Award**. The Trust (as assignee) shall be free to collect on the basis of the Accepted Settlement Recommendation, and associated costs of the Independent Review Option, from any Responsible Insurer that refuses to pay all or a portion of the Accepted Settlement Recommendation for which it is responsible in such a manner as it sees fit, including by seeking coverage for one or more Accepted Settlement Recommendations on a consolidated basis and to enter into comprehensive settlements with any Responsible Insurer. To the extent allowed under applicable state law, the BSA and Local Councils shall reasonably cooperate with the Settlement Trustee in the foregoing (it being understood that the foregoing cooperation shall not require the expenditure of funds), including consenting to entry of a non-

recourse judgment limited solely to the recovery of insurance proceeds from any Responsible Insurer to the extent doing so would not violate the terms of the applicable policy or applicable law. In addition, the Settlement Trustee may seek the cooperation of the applicable Chartered Organization. Funds collected from the Responsible Insurer shall be allocated to the survivor and the Excess Award Fund as follows:

    (i)    Collections Applicable to Identified Excess Award Shares:

        (1)    Amounts awarded that are applicable to the expenses incurred by Direct Abuse Claimants in pursuing the Independent Review Option, or that are awarded for any bad faith claim will be allocated 100% to the Direct Abuse Claimant.

        (2)    Amounts awarded from any policy of a Responsible Insurer that does not have applicable aggregate limits will be allocated 100% to the Direct Abuse Claimant.

        (3)    Amounts collected in satisfaction of the Accepted Settlement Recommendation from any policy that has applicable aggregate limits shall be awarded 80% to the Direct Abuse Claimant, with the balance contributed to the General Trust until the Direct Abuse Claimant has collected 80% of the Excess Award Share. Thereafter policy proceeds shall be divided 70% to the Direct Abuse Claimant and 30% to the General Trust until the Direct Abuse Claimant has received the full amount of the Excess Award Share.

    (ii)    Settlement with Potentially Responsible Insurers that Fully Release a Policy or Policies:

        (a)    80% of the proceeds derived from a comprehensive settlement with a Responsible Insurer shall be contributed to the Excess Award Fund and 20% of the proceeds derived from a comprehensive settlement with an Responsible Insurer shall be General Trust funds available to pay all Direct Abuse Claimants; provided that once all holders of Excess Award Shares (other than holders of Late Claims (as defined below)) have received (or been reserved for an amount equal to) 80% on account of their Excess Award Shares, 70% shall be contributed to the Excess Award Fund and 30% shall be General Trust funds available to pay all Direct Abuse Claimants.

For the avoidance of doubt, collections from separate insurance of a Chartered Organization received as part of a comprehensive Chartered Organization settlement shall go to the General Trust, for distribution to Direct Abuse Claimants with Direct Abuse Claims pursuant to Article IX.F.

**L.**    **Payment of Excess Independent Awards**. The Excess Award Fund shall be used to pay the Excess Award Shares. The Excess Award Fund will be allocated and paid on account of such Excess Award Shares subject to a payment percentage calculated specifically for the

Excess Award Fund. Once the Excess Award Shares are paid in full, the remaining funds in the Excess Award Fund shall become General Trust funds available to pay all Allowed Direct Abuse Claims.

> ### M.     Administrative Guidelines.

(i)     Direct Abuse Claimants (other than holders of Future Abuse Claims and except as provided immediately below) will have until January 1, 2023, to pay the initial administrative fee and elect to submit their claim for the Independent Review Option.

(ii)     After January 1, 2023, a Direct Abuse Claimant (other than a Future Abuse Claimant) may still elect the Independent Review Option (other than with respect to a Direct Abuse Claimant that was pursuing a Chartered Organization with respect to a Direct Abuse Claim that was not subject to the Channeling Injunction) but shall only be entitled to recover (a) against a Responsible Insurer to the same degree as the Direct Abuse Claimants that filed claims prior to January 1, 2023, (b) from any Excess Award Fund reserved from any settled insurance applicable to their Direct Abuse Claims, or (c) share in a pro rata basis to the same degree as any Direct Abuse Claim submitted prior to January 1, 2023 in any recovery from an insurer that is not settled at the time a determination is made by the Neutral on the Direct Abuse Claim. The Settlement Trustee shall establish a reserve in the Excess Award Fund for Future Abuse Claims that may elect the Independent Review Option and for possible Claims against the Settlement Trust that may arise as a result of a Claimant being enjoined from continuing to seek recovery from a Chartered Organization with respect to a Claim that was not subject to the Channeling Injunction as a result of a comprehensive settlement between the Settlement Trust and the Chartered Organization. Other than reserving for and paying Future Abuse Claims and Direct Abuse Claims that become subject to the Channeling Injunction as a result of a comprehensive settlement between the Settlement Trust and a Chartered Organization on the basis described above, the Settlement Trust will have no duty to reserve or make distributions to any Direct Abuse Claimants who file claims after January 1, 2023 ("**Late Claims**") except that should the Late Claim be timely pursuant to Section IV.A. ii or iii and exercise the Independent Review Option, the Excess Award Share attributable to such Late Claim may share on a pro rata basis to the same degree as any Direct Abuse Claim submitted prior to January 1, 2023 in any recovery from an insurer that is not settled at the time a Settlement Recommendation is made by the Neutral on the Late Claim. The last date to file a Late Claim for the Independent Review Option shall be January 1, 2026.

(iii)     If a Neutral's Settlement Recommendation determines that a Chartered Organization not protected by the Channeling Injunction is responsible for all or a portion of liability for a Direct Abuse Claim assigned to the Settlement Trust, at the request of the claimant, the Settlement Trustee may in its discretion, assign back to the claimant all rights to pursue the Chartered Organization and its insurers for the allocated portion of liability established through the Independent Review Option. The Direct Abuse Claimant in his discretion may then bring an action in any Court of competent jurisdiction against the Chartered Organization and its insurers to recover the allocated portion of liability and any additional damages, including punitive damages against the Chartered Organization and extracontractual damages against the affected insurers that may be assessed by the Court. Any recovery by way of judgment or settlement will be first applied to reimburse the Direct Abuse Claimant for his fees and expenses in prosecuting

34

the Direct Abuse Claims and the remainder will be allocated in accordance with the Independent Review Option, provided that any punitive or extra-contractual damages shall be awarded solely to the Direct Abuse Claimant.

## ARTICLE XIV
## MISCELLANEOUS PROVISIONS

**A.** **Non-Binding Effect of Settlement Trust and/or Litigation Outcome**. Notwithstanding any other provision of these TDP, the outcome of litigation against the Debtors by the holder of an Indirect Abuse Claim shall not be used in, be admissible as evidence in, binding in or have any other preclusive effect in connection with the Settlement Trust's resolution or valuation of an Indirect Abuse Claim.

**B.** **Amendments**. Except as otherwise provided herein, the Settlement Trustee may not amend, modify, delete, or add to any provisions of these TDP without the written consent of the STAC and the Future Claimants' Representative, as provided in the Settlement Trust Agreement, including amendments to modify the system for Tort Election Claims. Nothing herein is intended to preclude the STAC and/or the Future Claimants' Representative from proposing to the Settlement Trustee, in writing, amendments to these TDP. Notwithstanding the foregoing, absent Bankruptcy Court or District Court approval after appropriate notice and opportunity to object, neither the Settlement Trustee nor the STAC or Future Claimants' Representative may amend these TDP in a material manner, including (i) to provide for materially different treatment for Abuse Claims, (ii) to materially change the system for Tort Election Claimants, (iii) to add an opportunity to make an Expedited Distribution Election for a claim represented by a Chapter 11 POC after the Voting Deadline, (iv) to materially alter the Independent Review Option, or (v) in a manner that is otherwise inconsistent with the Confirmation Order or Plan. Notwithstanding the foregoing, neither the Settlement Trustee nor the STAC or the Future Claimants' Representative may amend any of the forms of release set forth in Article IX.D without the consent of Reorganized BSA, or remove the requirement of a release in connection with an Expedited Distribution.

**C.** **Severability**. Should any provision contained in these TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of these TDP.

**D.** **Offsets**. The Settlement Trust shall have the right to offset or reduce the Allowed Claim Amount of any Allowed Abuse Claim, without duplication as to the mitigating factors (e.g., as to other responsible parties) on a dollar for dollar basis based on any amounts paid, agreed, or reasonably likely to be paid to the holder of such Claim on account of such Claim as against a Protected Party (or that reduces the liability thereof under applicable law) from any source other than the Settlement Trust.

**E.** **Governing Law**. These TDP shall be interpreted in accordance with the laws of the State of Delaware. Notwithstanding the foregoing, the evaluation of Abuse Claims under these TDP and the law governing litigation in the tort system shall be the law of the jurisdiction in which the Abuse Claimant files the lawsuit as described in Article XII or the jurisdiction where such Abuse Claim could have been filed under applicable law.

## Schedule 1

**Mitigating Scaling Factor Ranges for Statutes of Limitation or Repose by State**

| Legend | |
|---|---|
| **Tier** | **Scaling Factor** |
| Open | 1.0 |
| Gray 1 | .50-.70 |
| Gray 2 | .30-.45 |
| Gray 3 | .10-.25 |
| Closed | .01-.10 |

| State | Tier |
|---|---|
| Alabama | Closed |
| Kansas | Closed |
| Oklahoma | Closed |
| Puerto Rico | Closed |
| South Dakota | Closed |
| Utah | Closed |
| Wyoming | Closed |
| ZZ / Federal | Closed |
| Connecticut | Gray 1 |
| DC | Gray 1 |
| Delaware | Gray 1 |
| Georgia | Gray 1 |
| Illinois | Gray 1 |
| Massachusetts | Gray 1 |
| New Mexico | Gray 1 |
| Oregon | Gray 1 |
| Washington | Gray 1 |
| Iowa | Gray 2 |
| Minnesota | Gray 2 |
| New Hampshire | Gray 2 |
| North Dakota | Gray 2 |
| Ohio | Gray 2 |
| Pennsylvania | Gray 2 |
| South Carolina | Gray 2 |
| Tennessee | Gray 2 |
| West Virginia | Gray 2 |
| Alaska | Gray 3 |
| Florida | Gray 3 |
| Idaho | Gray 3 |
| Indiana | Gray 3 |
| Kentucky | Gray 3 |

| | |
|---|---|
| Maryland | Gray 3 |
| Michigan | Gray 3 |
| Mississippi | Gray 3 |
| Missouri | Gray 3 |
| Nebraska | Gray 3 |
| Nevada | Gray 3 |
| Rhode Island | Gray 3 |
| Texas | Gray 3 |
| Virgin Islands | Gray 3 |
| Virginia | Gray 3 |
| Wisconsin | Gray 3 |
| Arizona | Open |
| Arkansas | Open |
| California | Open |
| Colorado | Open |
| Guam | Open |
| Hawaii | Open |
| Louisiana | Open |
| Maine | Open |
| Montana | Open |
| New Jersey | Open |
| New York | Open |
| North Carolina | Open |
| Vermont | Open |

<u>**EXHIBIT A**</u>

**EXPEDITED DISTRIBUTION**

**CLAIMANT RELEASE AND INDEMNIFICATION
IN CONNECTION WITH EXPEDITED DISTRIBUTION
FROM THE BOY SCOUTS OF AMERICA SETTLEMENT TRUST**

To receive payment of an Expedited Award (as defined below) from the Boy Scouts Settlement Trust (the "**Trust**"), an eligible Claimant must execute and submit to the Trustee (as defined below) this Release and Indemnification (the "**Release**"). This Release must be signed by the Claimant or the Claimant's Legal Representative (as defined below). A signature by an attorney for the Claimant or by an attorney for the Claimant's Legal Representative is not sufficient.

If you need assistance, please contact the Claims Administrator by email at ClaimsAdministration@scoutingsettlementtrust.com. You may also visit the Trust Website for additional information.

**DEFINITIONS**

The definitions set forth above for the terms "**Trust**" and "**Release**" are specifically incorporated herein by reference as if fully set forth in this section.

All capitalized terms not otherwise defined herein shall have the same meaning ascribed to them in the Chapter 11 Plan (as defined below).

"**Abuse**" means sexual conduct or misconduct, sexual abuse or molestation, sexual exploitation, indecent assault or battery, rape, pedophilia, ephebophilia, sexually related psychological or emotional harm, humiliation, anguish, shock, sickness, disease, disability, dysfunction, or intimidation, any other sexual misconduct or injury, contacts or interactions of a sexual nature, including the use of photography, video, or digital media, or other physical abuse or bullying or harassment without regard to whether such physical abuse or bullying is of a sexual nature, between a child and an adult, between a child and another child, or between a non-consenting adult and another adult, in each instance without regard to whether such activity involved explicit force, whether such activity involved genital or other physical contact, and whether there is or was any associated physical, psychological, or emotional harm to the child or non-consenting adult.

"**Abuse Claim**" means a liquidated or unliquidated Claim against a Protected Party (including the Settling Insurance Companies), a Limited Protected Party, or an Opt-Out Chartered Organization or any of their respective Representatives (in their capacities as such) that is attributable to, arises from, is based upon, relates to, or results from, directly, indirectly, or derivatively, alleged Scouting-related Abuse that occurred prior to the Petition Date, including any such Claim that seeks monetary damages or other relief, under any theory of law or equity whatsoever, including vicarious liability, alter ego, respondeat superior, conspiracy, fraud, including fraud in the inducement, any negligence-based or employment-based theory, including

1

negligent hiring, selection, supervision, retention or misrepresentation, any other theory based upon, or directly or indirectly related to any insurance relationship, the provision of insurance or the provision of insurance services to or by any Protected Parties, or misrepresentation, concealment, or unfair practice, breach of fiduciary duty, public or private nuisance, gross negligence, willful misconduct, or any other theory, including any theory based on or related to public policy or any act or failure to act, or failure to warn by a Protected Party, a Limited Protected Party, an Opt-Out Chartered Organization, any of their respective Representatives (in their capacities as such) or any other Person for whom any Protected Party, Limited Protected Party, or Opt-Out Chartered Organization is alleged to be responsible (including any such Claim that has been asserted or may be amended to assert in a proof of claim alleging Abuse, whether or not timely filed, in the Chapter 11 Cases, or any such Claim that has been asserted against the Settlement Trust), including any proportionate or allocable share of liability based thereon. Abuse Claims include any Future Abuse Claims, any Indirect Abuse Claims, any Opt-Out Chartered Organization Abuse Claim and any other Claim that is attributable to, arises from, is based upon, relates to, or results from, alleged Scouting- related Abuse regardless of whether, as of the Petition Date, such Claim was barred by any applicable statute of limitations. For the avoidance of doubt, (i) a Claim alleging Abuse shall not be an "**Abuse Claim**" against a Protected Party, Limited Protected Party, or Opt-Out Chartered Organization or any of their respective Representatives if such Claim is unrelated to Scouting (except as provided in (iii) below, including the portion of any Mixed Claim that is unrelated to Scouting); (ii) a Claim alleging Abuse shall be an "**Abuse Claim**" against a Protected Party, Limited Protected Party, or Opt-Out Chartered Organization or any of their respective Representatives (in their capacity as such) if such Claim is related to Scouting (including the portion of any Mixed Claim that is related to Scouting); (iii) any portion of a Mixed Claim alleging Abuse involving the Debtors, Reorganized BSA, Non-Debtor Entities, Local Councils, or their respective Representatives (in their capacities as such) is necessarily Scouting-related and shall be considered an Abuse Claim; and (iv) any Claim against the Debtors, Reorganized BSA, Non- Debtor Entities, Local Councils, or their respective Representatives (in their capacities as such) alleging Abuse is necessarily Scouting-related and shall be considered an Abuse Claim.

"**Abuse Insurance Policies**" means, collectively, the BSA Insurance Policies and the Local Council Insurance Policies. Abuse Insurance Policies do not include Non-Abuse Insurance Policies or Postpetition Insurance Policies.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware, having subject matter jurisdiction over the Chapter 11 Cases and, to the extent of any reference withdrawal made under section 157(d) of title 28 of the United States Code, the District Court.

"**BSA Insurance Policies**" means any and all known and unknown contracts, binders, certificates or Insurance Policies currently or previously in effect at any time on or before the Petition Date naming the Debtors, or either of them, or any predecessor, subsidiary, or past or present Affiliate of the Debtors, as an insured (whether as the primary or an additional insured), or otherwise alleged to afford the Debtors insurance coverage, upon which any claim could have been, has been, or may be made with respect to any Abuse Claim, including the policies listed on Schedule 2 to the Chapter 11 Plan. Notwithstanding the foregoing, BSA Insurance Policies shall not include: (a) any policy providing reinsurance to any Insurance Company; (b) any Non-Abuse

2

Insurance Policy; (c) any Local Council Insurance Policy; or (d) any Postpetition Insurance Policy.

"**Channeling Injunction**" means the permanent injunction provided for in Article X.F of the Chapter 11 Plan with respect to (a) Abuse Claims against the Protected Parties, (b) Post-1975 Chartered Organization Abuse Claims against the Limited Protected Parties, (c) Abuse Claims against the Limited Protected Parties that are covered under any insurance policy issued by the Settling Insurance Companies (as determined pursuant to Section X.F.3 of the Chapter 11 Plan), and (d) Opt-Out Chartered Organization Abuse Claims against the Opt-Out Chartered Organizations, to be issued pursuant to the Confirmation Order.

"**Chapter 11 Cases**" means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court and currently styled In re Boy Scouts of America and Delaware BSA, LLC, Bankruptcy Case No. 20-10343 (LSS) (Jointly Administered).

"**Chapter 11 Plan**" or "**Plan**" means the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC*, filed September 6, 2022, in the Chapter 11 Cases (as the same may be amended or modified), and confirmed by the Bankruptcy Court.

"**Chartered Organizations**" means each and every civic, faith-based, educational or business organization, governmental entity or organization, other entity or organization, or group of individual citizens, in each case presently or formerly authorized by the BSA to operate, sponsor or otherwise support one or more Scouting units.

"**Claimant**" means the holder of an Abuse Claim who (i) elected to resolve his or her Abuse Claim for the Expedited Distribution in accordance with the Chapter 11 Plan and Confirmation Order, (ii) timely submitted to the Trust a properly and substantially completed, non-duplicative proof of claim or Future Abuse Claim, and (iii) personally signed his or her proof of claim or Future Abuse Claim attesting to the truth of its contents under penalty of perjury, or supplemented his or her proof of claim to so provide such verification.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance acceptable to (a) the Debtors, the Ad Hoc Committee, the Coalition, Tort Claimants' Committee, the Future Claimants' Representative, the Settling Insurance Companies (in accordance with their respective Insurance Settlement Agreement), and the Contributing Chartered Organizations, and (b) the Creditors' Committee and JPM in accordance with their respective consent rights under the JPM / Creditors' Committee Term Sheet, as incorporated by reference in Article I.D of the Chapter 11 Plan.

"**Contributing Chartered Organizations**" means the current or former Chartered Organizations listed on **Exhibit D** to the Plan and any Chartered Organization made a Protected Party under a Post-Effective Date Chartered Organization Settlement approved by the Bankruptcy Court in accordance with Article IV.J in the Plan. No Participating Chartered Organization shall be

3

considered a Contributing Chartered Organization based solely on the Participating Chartered Organization Insurance Assignment. Without limiting the foregoing, subject to Confirmation of the Plan and approval of the United Methodist Settlement Agreement by an order of the Bankruptcy Court (including in the Confirmation Order), the United Methodist Entities are Contributing Chartered Organizations and shall be designated as such in the Confirmation Order and the Affirmation Order. No Chartered Organization shall be a Contributing Chartered Organization unless it agrees to provide the assignments and releases as set forth in Sections 9 and 10 of the Century and Chubb Companies Insurance Settlement Agreement.

"**Debtors**" means Boy Scouts of America and Delaware BSA, LLC, the debtors and debtors-in-possession in the Chapter 11 Cases.

"**Direct Abuse Claim**" means an Abuse Claim that is not an Indirect Abuse Claim-i.e., is not a liquidated or unliquidated Abuse Claim for contribution, indemnity, reimbursement, or subrogation, whether contractual or implied by law (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), and any other derivative Abuse Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law or equity whatsoever, including any indemnification, reimbursement, hold-harmless or other payment obligation provided for under any prepetition settlement, insurance policy, program agreement or contract; provided, however, that any retrospective premiums and self-insured retentions arising out of any Abuse Claims under the Abuse Insurance Policies shall not constitute an Indirect Abuse Claim.

"**District Court**" means the United States District Court for the District of Delaware, having jurisdiction in the Chapter 11 Cases.

"**Expedited Award**" means the compensation a Claimant receives on behalf of the Claimant's Abuse Claim as a result of the election to receive the Expedited Distribution in accordance with the Plan and Confirmation Order.

"**Insurance Settlement Agreement**" means (a) any settlement agreement entered into after the Petition Date and before the Effective Date by and among (i) any Insurance Company, on the one hand, and (ii) one or more of the Debtors and/or any other Protected Party or Limited Protected Party, on the other hand, under which an Insurance Policy and/or the Debtors' and/or other Protected Parties' or Limited Protected Parties' rights thereunder with respect to Abuse Claims or Non-Abuse Litigation Claims are, subject to Confirmation of the Plan and the entry of a Final Order approving such settlement agreement (which order may be the Confirmation Order), released; and (b) any Post-Effective Date Insurance Settlement entered into during the Insurance Settlement Period by and between (i) any Insurance Company, on the one hand, and (ii) the Settlement Trustee (or the Settlement Trustee and any other Protected Party), on the other hand, under which an Insurance Policy that is subject to the Insurance Assignment and/or the Settlement Trustee's and/or Protected Parties' or Limited Protected Parties' rights thereunder with respect to Abuse Claims or Non-Abuse Litigation Claims are released. All Insurance Settlement Agreements entered into before the Effective Date related to Specified Primary Insurance Policies that release the applicable Insurance Company from liability arising from Non-Abuse Litigation Claims must be acceptable to the Creditors' Committee in accordance

4

with the terms of the JPM / Creditors' Committee Term Sheet; provided, however, that with respect to proposed settlements of any Specified Excess Insurance Policy entered into before the Effective Date, the Creditors' Committee shall have consultation rights.

"**Legal Representative**" means a personal representative, guardian, conservator, parent (on behalf of a minor), executor of an estate or a similar representative who has been appointed by a court or has other legal authorization to file a proof of claim and/or an Abuse Claim and execute this Release on behalf of the Claimant.

"**Limited Protected Parties**" means the Participating Chartered Organizations and all of such Persons' Representatives when acting in such representative capacity; provided, however, that no Perpetrator is or shall be a Limited Protected Party.

"**Local Councils**" means, collectively, each and every current or former local council of the BSA, including each and every current local council of the BSA as listed on **Exhibit G** to the Plan, "**supporting organizations**" within the meaning of 26 U.S.C. § 509 with respect to any Local Council, Scouting units (including "troops," "dens," "packs," "posts," "clubs," "crews," "ships," "tribes," "labs," "lodges," "councils," "districts," "areas," "regions," and "territories") associated with any Local Council, and all Entities that hold, own, or operate any camp or other property that is operated in the name of or for the benefit of any of the foregoing.

"**Local Council Insurance Policies**" means any and all known and unknown contracts, binders, certificates or insurance policies currently or previously in effect at any time on or before the Petition Date naming the Local Councils, or any of them, or any predecessor, subsidiary, or past or present Affiliate of any Local Council, as an insured (whether as the primary or an additional insured), or otherwise alleged to afford any Local Council insurance coverage, upon which any claim could have been, has been or may be made with respect to any Abuse Claim, including the policies identified on Schedule 3 to the Chapter 11 Plan. Notwithstanding the foregoing, Local Council Insurance Policies shall not include: (a) any policy providing reinsurance to any Settling Insurance Company; (b) any Non-Abuse Insurance Policy; (c) any BSA Insurance Policy; or (d) any Postpetition Insurance Policy.

"**Mixed Claim**" means a claim that makes allegations of Abuse related to or arising from Scouting as well as Abuse that occurred prior to the Petition Date unrelated to or not arising from Scouting. A claim shall not be treated as a Mixed Claim unless and until Scouting-related Abuse allegations have been asserted through a Proof of Claim, the complaint, sworn discovery or testimony (including by affidavit).

"**Participating Chartered Organization**" means a Chartered Organization (other than a Contributing Chartered Organization, including the United Methodist Entities) that does not (a) object to confirmation of the Plan or (b) inform Debtors' counsel in writing on or before the confirmation objection deadline that it does not wish to make the Participating Chartered Organization Insurance Assignment. Notwithstanding the foregoing, with respect to any Chartered Organization that is a debtor in bankruptcy as of the Confirmation Date, such Chartered Organization shall be a Participating Chartered Organization only if it advises Debtors' counsel in writing that it wishes to make the Participating Chartered Organization

5

Insurance Assignment, and, for the avoidance of doubt, absent such written advisement, none of such Chartered Organization's rights to or under the Abuse Insurance Policies shall be subject to the Participating Chartered Organization Insurance Assignment. A list of Chartered Organizations that are debtors in bankruptcy and may not be Participating Chartered Organizations is attached as **Exhibit K** to the Plan. For the avoidance of doubt, any Chartered Organization that is a member of an ad hoc group or committee that objects to the confirmation of the Plan shall not be a Participating Chartered Organization.

"**Perpetrator**" means any individual who personally committed or is alleged to have personally committed an act of Abuse that forms the basis for an Abuse Claim; provided for the avoidance of doubt that the term "**Perpetrator**" shall only include natural persons and not The Church of Jesus Christ of Latter-day Saints, a Utah corporation sole. The term "**Perpetrator**" does not include any individual who did not personally commit or is not alleged to have personally committed an act of Abuse that forms the basis for an Abuse Claim, against whom an Abuse Claim is nevertheless asserted or may be asserted, including by virtue of such individual's position or service as an employee or volunteer of the Debtors or as a Scout participant, or by virtue of such individual's position or service as an employee or volunteer of a Local Council or a Chartered Organization or as a Scout participant.

"**Protected Parties**" means the following Persons: (a) the Debtors; (b) Reorganized BSA; (c) the Related Non-Debtor Entities; (d) the Local Councils; (e) the Contributing Chartered Organizations; (f) the Settling Insurance Companies; and (g) all of such Persons' Representatives; provided, however, that no Perpetrator is or shall be a Protected Party. Notwithstanding the foregoing, a Contributing Chartered Organization shall be a Protected Party with respect to Abuse Claims only as set forth in the definition of "**Abuse Claim**."

"**Released Parties**" means the Trust, the Trustee, the STAC, the FCR, the Claims Administrator, the Protected Parties, the Chartered Organizations, including all Chartered Organizations that are not Protected Parties or Limited Protected Parties, and each of their respective predecessors, successors, assigns, assignors, representatives, members, officers, employees, agents, consultants, lawyers, advisors, professionals, trustees, insurers, beneficiaries, administrators, and any natural, legal, or juridical person or entity acting on behalf of or having liability in respect of the Trust, the Trustee, the STAC, the FCR, the Claims Administrator, the Protected Parties, or the Chartered Organizations.

"**Scouting-related**" means anything that is attributable to, arises from, is based upon, results from, or relates to, in whole or in part, directly, indirectly, or derivatively, Scouting.

"**Settling Insurance Company**" means any Insurance Company that contributes funds, proceeds or other consideration to or for the benefit of the Settlement Trust pursuant to an Insurance Settlement Agreement that is approved by (a) an order of the Bankruptcy Court (including the Confirmation Order) and is designated as a Settling Insurance Company in the Confirmation Order or the Affirmation Order or (b) the Settlement Trust. Without limiting the foregoing, subject to Confirmation of the Plan and approval of the applicable Insurance Settlement Agreement by an order or orders of the Bankruptcy Court (including in the Confirmation Order), Century, the Chubb Companies, Clarendon, the Hartford Protected Parties, the Zurich Affiliated

6

Insurers and the Zurich Insurers are each Settling Insurance Companies and shall be designated as such in the Confirmation Order and the Affirmation Order.

"**STAC**" means the Settlement Trust Advisory Committee appointed to oversee the Trust in accordance with the Chapter 11 Plan and the Trust Agreement.

"**TDP**" means the Boy Scouts of America Trust Distribution Procedures for Abuse Claims, substantially in the form attached as **Exhibit A** to the Chapter 11 Plan and filed in the Chapter 11 Cases on September 6, 2022, as may be amended and supplemented thereafter from time to time.

"**Trust Agreement**" means the Settlement Trust Agreement dated as of the Effective Date, substantially in the form attached to the Chapter 11 Plan as **Exhibit B**, as the same may be amended or modified from time to time in accordance with the terms thereof.

"**Trustee**" means Hon. Barbara J. Houser (Ret.) or any other person appointed to serve as trustee under and in accordance with the Trust Agreement.

## RELEASE AND INDEMNIFICATION

A.      In consideration of the benefit of an Expedited Award from the Trust, and without limiting any of the Releases or Injunctions in the Plan, which remain in full force and effect in favor of the Protected Parties, the Limited Protected Parties, and Opt-Out Chartered Organizations (as set forth in the Plan), I, on my own behalf and on behalf of my respective predecessors, successors, assigns, assignors, representatives, attorneys, agents, trustees, insurers, heirs, next of kin, estates, beneficiaries, executors, administrators, and any natural, legal, or juridical person or entity to the extent he, she, or it is entitled to assert any claim on my behalf, including, but not limited to, a Legal Representative, (hereafter "**I**", "**my**" or "**me**"), do hereby voluntarily, intentionally, knowingly, absolutely, unconditionally, irrevocably, and fully waive, release, remit, acquit, forever discharge, and covenant not to knowingly sue or continue prosecution against the Released Parties, or any of them, from and with respect to any and all claims, including, but not limited to, all claims as defined in section 101(5) of the Bankruptcy Code, charges, complaints, demands, obligations, causes of action, losses, expenses, suits, awards, promises, agreements, rights to payment, right to any equitable remedy, rights of any contribution, indemnification, reimbursement, subrogation or similar rights, demands, debts, liabilities, express or implied contracts, obligations of payment or performances, rights of offset or recoupment, costs, expenses, attorneys' and other professional fees and expenses, compensation or other relief, and liabilities of any nature whatsoever whether present or future, known or unknown, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, absolute or contingent, direct or derivative and whether based on contract, tort, statutory, or any other legal or equitable theory of recovery (collectively, "**Released Claims**") arising from, relating to, resulting from or in any way connected to, in whole or in part, my Abuse Claim (solely to the extent asserted against any of the Protected Parties and the Chartered Organizations) and the discharge of the Released Parties' duties and responsibilities under the Trust Agreement, including any agreement, document, instrument or certification contemplated by the Trust Agreement, the TDP, the Chapter 11 Plan, the formulation, preparation, negotiation, execution or consummation of the Trust Agreement, the TDP and the Chapter 11 Plan, and any and all other orders of the District Court or Bankruptcy Court relating to the Released Parties

7

and/or their duties and responsibilities, from the beginning of time through the execution date of this Release. I covenant and agree that I will honor the release as set forth in the preceding sentence and, further, that I will not (i) knowingly institute or continue prosecution of a lawsuit or other action against any Released Party based upon, arising out of, or relating to any Released Claims released hereby, (ii) knowingly participate, assist, or cooperate in any such action, or (iii) knowingly encourage, assist and/or solicit any third party to institute any such action.

B.      Without limiting the foregoing, and notwithstanding anything to the contrary in this Release, the release set forth herein shall not apply in favor of the Trust as to my right to payment of my Award due from the Trust.

C.      Without limiting the foregoing, and notwithstanding anything to the contrary in this Release, in consideration of the benefit of the contribution made by each Settling Insurance Company to the Trust pursuant to an Insurance Settlement Agreement and the payment by the Trust to me of the Expedited Award, I do hereby voluntarily, intentionally, knowingly, absolutely, unconditionally, irrevocably, and fully waive, release, remit, acquit, forever discharge, and covenant not to knowingly sue or continue prosecution against (i) each Settling Insurance Company and (ii) any insured, co-insured or other third party (including any Local Council, any other Protected Party, any Limited Protected Party, and any other Chartered Organization) under any Abuse Insurance Policy issued by any Settling Insurance Company or any other insurance policy issued by any Settling Insurance Company, including a policy issued to a Chartered Organization (any such third party, an "**Insured Party Releasee**"), in the case of (i) or (ii) from and with respect to any Abuse Claim.

D.      I, as assignor, hereby transfer and assign to the Trust, as assignee, any rights, claims, benefits, or Causes of Action arising out of or related to my Abuse Claim that are not released herein, (i) and that are against Non-Settling Insurance Companies or (ii) to the extent my Abuse Claim is resolved pursuant to the Independent Review Option under the TDP.

E.      I hereby acknowledge that, pursuant to the Chapter 11 Plan, the Channeling Injunction, and the Confirmation Order, the Debtors have been fully and completely discharged and released, including their respective property and successors and assigns, from any and all liability arising from or related to my Abuse Claim, which liability shall be assumed by the Trust pursuant to the Plan.

F.      I hereby acknowledge that, pursuant to the Chapter 11 Plan, the Channeling Injunction, and the Confirmation Order, the sole recourse of any holder of an Abuse Claim against a Protected Party (or any holder of a Post-1975 Chartered Organization Abuse Claim or Pre-1976 Chartered Organization Abuse Claim against a Limited Protected Party, or any holder of an Opt-Out Chartered Organization Abuse Claim against an Opt-Out Chartered Organization) on account of such Abuse Claim (or Post-1975 Chartered Organization Abuse Claim, Pre-1976 Chartered Organization Abuse Claim, or Opt-Out Chartered Organization Abuse Claim) on account of such Abuse Claim (or Post-1975 Chartered Organization Abuse Claim, Pre-1976 Chartered Organization Abuse Claim, or Opt-Out Chartered Organization Abuse Claim) shall be to and against the Trust and such holder shall have no right whatsoever at any time to assert such Abuse Claim against any Protected Party or any property or interest in property of any Protected Party (or to assert any Post-1975 Chartered Organization Abuse Claim or Pre-1976 Chartered

Organization Abuse Claim against a Limited Protected Party or any property or interest in property of any Limited Protected Party, or to assert any Opt-Out Chartered Organization Abuse Claim against an Opt-Out Chartered Organization or any property or interest in property of any Opt-Out Chartered Organization).

G.        I hereby acknowledge that, pursuant to this Release, I am voluntarily providing a release to all Insured Party Releasees and Chartered Organizations, including all Chartered Organizations that are not Protected Parties or Limited Protected Parties, and I shall have no remedies with respect to my Abuse Claim against any Insured Party Releasees and Chartered Organizations, including those that are not Protected Parties and Limited Protected Parties. This Release does not release claims that have been assigned to the Trust and I acknowledge I will have no personal rights in such assigned claims.

H.        In further consideration of the benefit of an Expedited Award, I shall indemnify and forever hold harmless, and pay all final judgments, damages, costs, expenses, fines, penalties, interest, multipliers, or liabilities in whatsoever nature, including costs of defense and attorneys' fees of, the Trust, the Trustee, the STAC, the FCR, and the Claims Administrator arising from my failure to comply with the terms of this Release.

I.        I acknowledge that the Trust is not providing any tax advice with respect to the receipt of the Expedited Award or any component thereof, and I understand and agree that I shall be solely responsible for compliance with all tax laws with respect to the Expedited Award, to the extent applicable.

Claimant or Legal Representative Printed Name:        _____

Claimant or Legal Representative Signature:        _____

Date:   _____

9

## EXHIBIT B

**CONDITIONAL RELEASE OF CHARTERED ORGANIZATIONS**

**CLAIMANT RELEASE AND INDEMNIFICATION IN CONNECTION WITH DISTRIBUTION FROM THE BOY SCOUTS OF AMERICA SETTLEMENT TRUST**

To receive payment of an Award (as defined below) from the Boy Scouts Settlement Trust (the "**Trust**") and have the opportunity to share in any settlement proceeds received from a Chartered Organization (as defined below) that is or becomes a Protected Party (as defined below), an eligible Claimant must execute and submit to the Trustee (as defined below) this Release and Indemnification (the "**Release**"). This Release must be signed by the Claimant or the Claimant's Legal Representative (as defined below). A signature by an attorney for the Claimant or by an attorney for the Claimant's Legal Representative is not sufficient.

If you need assistance, please contact the Claims Administrators by email at ClaimsAdministration@scoutingsettlementtrust.com. You may also visit the Trust Website for additional information.

### DEFINITIONS

The definitions set forth above for the terms "**Trust**" and "**Release**" are specifically incorporated herein by reference as if fully set forth in this section.

All capitalized terms not otherwise defined herein shall have the same meaning ascribed to them in the Chapter 11 Plan (as defined below).

"**Abuse**" means sexual conduct or misconduct, sexual abuse or molestation, sexual exploitation, indecent assault or battery, rape, pedophilia, ephebophilia, sexually related psychological or emotional harm, humiliation, anguish, shock, sickness, disease, disability, dysfunction, or intimidation, any other sexual misconduct or injury, contacts or interactions of a sexual nature, including the use of photography, video, or digital media, or other physical abuse or bullying or harassment without regard to whether such physical abuse or bullying is of a sexual nature, between a child and an adult, between a child and another child, or between a non-consenting adult and another adult, in each instance without regard to whether such activity involved explicit force, whether such activity involved genital or other physical contact, and whether there is or was any associated physical, psychological, or emotional harm to the child or non-consenting adult.

"**Abuse Claim**" means a liquidated or unliquidated Claim against a Protected Party (including the Settling Insurance Companies), a Limited Protected Party, or an Opt-Out Chartered Organization or any of their respective Representatives (in their capacities as such) that is attributable to, arises from, is based upon, relates to, or results from, directly, indirectly, or derivatively, alleged Scouting-related Abuse that occurred prior to the Petition Date, including any such Claim that seeks monetary damages or other relief, under any theory of law or equity whatsoever, including vicarious liability, alter ego, respondeat superior, conspiracy, fraud, including fraud in the inducement, any negligence-based or employment-based theory, including

1

negligent hiring, selection, supervision, retention or misrepresentation, any other theory based upon, or directly or indirectly related to any insurance relationship, the provision of insurance or the provision of insurance services to or by any Protected Parties, or misrepresentation, concealment, or unfair practice, breach of fiduciary duty, public or private nuisance, gross negligence, willful misconduct, or any other theory, including any theory based on or related to public policy or any act or failure to act, or failure to warn by a Protected Party, a Limited Protected Party, an Opt-Out Chartered Organization, any of their respective Representatives (in their capacities as such) or any other Person for whom any Protected Party, Limited Protected Party, or Opt-Out Chartered Organization is alleged to be responsible (including any such Claim that has been asserted or may be amended to assert in a proof of claim alleging Abuse, whether or not timely filed, in the Chapter 11 Cases, or any such Claim that has been asserted against the Settlement Trust), including any proportionate or allocable share of liability based thereon. Abuse Claims include any Future Abuse Claims, any Indirect Abuse Claims, any Opt-Out Chartered Organization Abuse Claim and any other Claim that is attributable to, arises from, is based upon, relates to, or results from, alleged Scouting- related Abuse regardless of whether, as of the Petition Date, such Claim was barred by any applicable statute of limitations. For the avoidance of doubt, (i) a Claim alleging Abuse shall not be an "**Abuse Claim**" against a Protected Party, Limited Protected Party, or Opt-Out Chartered Organization or any of their respective Representatives if such Claim is unrelated to Scouting (except as provided in (iii) below, including the portion of any Mixed Claim that is unrelated to Scouting); (ii) a Claim alleging Abuse shall be an "**Abuse Claim**" against a Protected Party, Limited Protected Party, or Opt-Out Chartered Organization or any of their respective Representatives (in their capacity as such) if such Claim is related to Scouting (including the portion of any Mixed Claim that is related to Scouting); (iii) any portion of a Mixed Claim alleging Abuse involving the Debtors, Reorganized BSA, Non-Debtor Entities, Local Councils, or their respective Representatives (in their capacities as such) is necessarily Scouting-related and shall be considered an Abuse Claim; and (iv) any Claim against the Debtors, Reorganized BSA, Non- Debtor Entities, Local Councils, or their respective Representatives (in their capacities as such) alleging Abuse is necessarily Scouting-related and shall be considered an Abuse Claim.

"**Abuse Insurance Policies**" means, collectively, the BSA Insurance Policies and the Local Council Insurance Policies. Abuse Insurance Policies do not include Non-Abuse Insurance Policies or Postpetition Insurance Policies.

"**Award**" means the compensation a Claimant receives on behalf of the Claimant's Abuse Claim. "**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware, having subject matter jurisdiction over the Chapter 11 Cases and, to the extent of any reference withdrawal made under section 157(d) of title 28 of the United States Code, the District Court.

"**BSA Insurance Policies**" means any and all known and unknown contracts, binders, certificates or Insurance Policies currently or previously in effect at any time on or before the Petition Date naming the Debtors, or either of them, or any predecessor, subsidiary, or past or present Affiliate of the Debtors, as an insured (whether as the primary or an additional insured), or otherwise alleged to afford the Debtors insurance coverage, upon which any claim could have been, has been, or may be made with respect to any Abuse Claim, including the policies listed on Schedule 2 to the Chapter 11 Plan. Notwithstanding the foregoing, BSA Insurance Policies shall

not include: (a) any policy providing reinsurance to any Insurance Company; (b) any Non-Abuse Insurance Policy; (c) any Local Council Insurance Policy; or (d) any Postpetition Insurance Policy.

"**Channeling Injunction**" means the permanent injunction provided for in Article X.F of the Plan with respect to (a) Abuse Claims against the Protected Parties, (b) Post-1975 Chartered Organization Abuse Claims against the Limited Protected Parties, (c) Abuse Claims against the Limited Protected Parties that are covered under any insurance policy issued by the Settling Insurance Companies (as determined pursuant to Section X.F.3 of the Plan), and (d) Opt-Out Chartered Organization Abuse Claims against the Opt-Out Chartered Organizations, to be issued pursuant to the Confirmation Order.

"**Chapter 11 Cases**" means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court and currently styled In re Boy Scouts of America and Delaware BSA, LLC, Bankruptcy Case No. 20-10343 (LSS) (Jointly Administered).

"**Chapter 11 Plan**" or "**Plan**" means the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC*, filed September 6, 2022, in the Chapter 11 Cases (as the same may be amended or modified), and confirmed by the Bankruptcy Court.

"**Chartered Organizations**" means each and every civic, faith-based, educational or business organization, governmental entity or organization, other entity or organization, or group of individual citizens, in each case presently or formerly authorized by the BSA to operate, sponsor or otherwise support one or more Scouting units.

"**Claimant**" means the holder of a Abuse Claim who (i) timely submitted an Abuse Claim Proof of Claim or Trust Claim Submission to the Settlement Trust, (ii) has had his or her Abuse Claim channeled to the Trust for evaluation, resolution, and payment pursuant to the Plan and the Channeling Injunction, and (iii) is signing and executing this Release (or on whose behalf this Release is being signed and executed by a Legal Representative).

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance acceptable to (a) the Debtors, the Ad Hoc Committee, the Coalition, Tort Claimants' Committee, the Future Claimants' Representative, the Settling Insurance Companies (in accordance with their respective Insurance Settlement Agreement), and the Contributing Chartered Organizations, and (b) the Creditors' Committee and JPM in accordance with their respective consent rights under the JPM / Creditors' Committee Term Sheet, as incorporated by reference in Article I.D of the Chapter 11 Plan.

"**Contributing Chartered Organizations**" means the current or former Chartered Organizations listed on **Exhibit D** to the Plan and any Chartered Organization made a Protected Party under a Post-Effective Date Chartered Organization Settlement approved by the Bankruptcy Court in accordance with Article IV.J of the Plan. No Participating Chartered Organization shall be

3

considered a Contributing Chartered Organization based solely on the Participating Chartered Organization Insurance Assignment. Without limiting the foregoing, subject to Confirmation of the Plan and approval of the United Methodist Settlement Agreement by an order of the Bankruptcy Court (including in the Confirmation Order), the United Methodist Entities are Contributing Chartered Organizations and shall be designated as such in the Confirmation Order and the Affirmation Order.   No Chartered Organization shall be a Contributing Chartered Organization unless it agrees to provide the assignments and releases as set forth in Sections 9 and 10 of the Century and Chubb Companies Insurance Settlement Agreement .

"**Debtors**" means Boy Scouts of America and Delaware BSA, LLC, the debtors and debtors-in-possession in the Chapter 11 Cases.

"**Direct Abuse Claim**" means an Abuse Claim that is not an Indirect Abuse Claim-i.e., is not a liquidated or unliquidated Abuse Claim for contribution, indemnity, reimbursement, or subrogation, whether contractual or implied by law (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), and any other derivative Abuse Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law or equity whatsoever, including any indemnification, reimbursement, hold-harmless or other payment obligation provided for under any prepetition settlement, insurance policy, program agreement or contract; provided, however, that any retrospective premiums and self-insured retentions arising out of any Abuse Claims under the Abuse Insurance Policies shall not constitute an Indirect Abuse Claim.

"**District Court**" means the United States District Court for the District of Delaware, having jurisdiction in the Chapter 11 Cases.

"**Insurance Settlement Agreement**" means (a) any settlement agreement entered into after the Petition Date and before the Effective Date by and among (i) any Insurance Company, on the one hand, and (ii) one or more of the Debtors' and/or any other Protected Party or Limited Protected Party, on the other hand, under which an Insurance Policy and/or the Debtors and/or other Protected Parties' or Limited Protected Parties' rights thereunder with respect to Abuse Claims or Non-Abuse Litigation Claims are, subject to Confirmation of the Plan and the entry of a Final Order approving such settlement agreement (which order may be the Confirmation Order), released; and (b) any Post-Effective Date Insurance Settlement entered into during the Insurance Settlement Period by and between (i) any Insurance Company, on the one hand, and (ii) the Settlement Trustee (or the Settlement Trustee and any other Protected Party), on the other hand, under which an Insurance Policy that is subject to the Insurance Assignment and/or the Settlement Trustee's and/or Protected Parties' or Limited Protected Parties' rights thereunder with respect to Abuse Claims or Non-Abuse Litigation Claims are released. All Insurance Settlement Agreements entered into before the Effective Date related to Specified Primary Insurance Policies that release the applicable Insurance Company from liability arising from Non-Abuse Litigation Claims must be acceptable to the Creditors' Committee in accordance with the terms of the JPM / Creditors' Committee Term Sheet; provided, however, that with respect to proposed settlements of any Specified Excess Insurance Policy entered into before the Effective Date, the Creditors' Committee shall have consultation rights.

4

"**Legal Representative**" means a personal representative, guardian, conservator, parent (on behalf of a minor), executor of an estate or a similar representative who has been appointed by a court or has other legal authorization to file a proof of claim and/or an Abuse Claim and execute this Release on behalf of the Claimant.

"**Limited Protected Parties**" means the Participating Chartered Organizations and all of such Persons' Representatives when acting in such representative capacity; provided, however, that no Perpetrator is or shall be a Limited Protected Party.

"**Local Councils**" means, collectively, each and every current or former local council of the BSA, including each and every current local council of the BSA as listed on **Exhibit G** to the Plan, "**supporting organizations**" within the meaning of 26 U.S.C. § 509 with respect to any Local Council, Scouting units (including "troops," "dens," "packs," "posts," "clubs," "crews," "ships," "tribes," "labs," "lodges," "councils," "districts," "areas," "regions," and "territories") associated with any Local Council, and all Entities that hold, own, or operate any camp or other property that is operated in the name of or for the benefit of any of the foregoing.

"**Local Council Insurance Policies**" means any and all known and unknown contracts, binders, certificates or insurance policies currently or previously in effect at any time on or before the Petition Date naming the Local Councils, or any of them, or any predecessor, subsidiary, or past or present Affiliate of any Local Council, as an insured (whether as the primary or an additional insured), or otherwise alleged to afford any Local Council insurance coverage, upon which any claim could have been, has been or may be made with respect to any Abuse Claim, including the policies identified on Schedule 3 to the Chapter 11 Plan. Notwithstanding the foregoing, Local Council Insurance Policies shall not include: (a) any policy providing reinsurance to any Settling Insurance Company; (b) any Non-Abuse Insurance Policy; (c) any BSA Insurance Policy; or (d) any Postpetition Insurance Policy.

"**Mixed Claim**" means a claim that makes allegations of Abuse related to or arising from Scouting as well as Abuse that occurred prior to the Petition Date unrelated to or not arising from Scouting. A claim shall not be treated as a Mixed Claim unless and until Scouting-related Abuse allegations have been asserted through a Proof of Claim, the complaint, sworn discovery or testimony (including by affidavit).

"**Non-BSA Sourced Assets**" shall mean Settlement Trust Assets that represent assets received as a result of or in connection with a global settlement between the Debtors or the Trust, on the one hand, and a Chartered Organization that is or becomes a Protected Party, on the other hand, and the proceeds of such assets. For the avoidance of doubt, Non-BSA Sourced Assets shall not include any assets received from the Debtors, the Local Councils, or any Settling Insurance Company.

"**Participating Chartered Organization**" means a Chartered Organization (other than a Contributing Chartered Organization, including the United Methodist Entities) that does not (a) object to confirmation of the Plan or (b) inform Debtors' counsel in writing on or before the confirmation objection deadline that it does not wish to make the Participating Chartered Organization Insurance Assignment. Notwithstanding the foregoing, with respect to any

5

Chartered Organization that is a debtor in bankruptcy as of the Confirmation Date, such Chartered Organization shall be a Participating Chartered Organization only if it advises Debtors' counsel in writing that it wishes to make the Participating Chartered Organization Insurance Assignment, and, for the avoidance of doubt, absent such written advisement, none of such Chartered Organization's rights to or under the Abuse Insurance Policies shall be subject to the Participating Chartered Organization Insurance Assignment. A list of Chartered Organizations that are debtors in bankruptcy and may not be Participating Chartered Organizations is attached as **Exhibit K** to the Plan. For the avoidance of doubt, any Chartered Organization that is a member of an ad hoc group or committee that objects to the confirmation of the Plan shall not be a Participating Chartered Organization.

"**Perpetrator**" means any individual who personally committed or is alleged to have personally committed an act of Abuse that forms the basis for an Abuse Claim; provided for the avoidance of doubt that the term "**Perpetrator**" shall only include natural persons and not The Church of Jesus Christ of Latter-day Saints, a Utah corporation sole. The term "**Perpetrator**" does not include any individual who did not personally commit or is not alleged to have personally committed an act of Abuse that forms the basis for an Abuse Claim, against whom an Abuse Claim is nevertheless asserted or may be asserted, including by virtue of such individual's position or service as an employee or volunteer of the Debtors or as a Scout participant, or by virtue of such individual's position or service as an employee or volunteer of a Local Council or a Chartered Organization or as a Scout participant.

"**Protected Parties**" means the following Persons: (a) the Debtors; (b) Reorganized BSA; (c) the Related Non-Debtor Entities; (d) the Local Councils; (e) the Contributing Chartered Organizations; (f) the Settling Insurance Companies; and (g) all of such Persons' Representatives; provided, however, that no Perpetrator is or shall be a Protected Party. Notwithstanding the foregoing, a Contributing Chartered Organization shall be a Protected Party with respect to Abuse Claims only as set forth in the definition of "**Abuse Claim**."

"**Release Date**" means the later of (1) the date of execution hereof or (2) the date of (i) a "**Final Determination**" of my Abuse Claim under the TDP or (ii) the fixing of the liability amount for my Abuse Claim under the TDP, provided, however, the Release Date as to Contributing Chartered Organizations and their related Released Parties shall be the later of the date of execution or the date they become a Contributing Chartered Organization.

"**Released Parties**" means the Trust, the Trustee, the STAC, the FCR, the Claims Administrators, the Protected Parties, the Contributing Chartered Organizations (including any Chartered Organization that becomes a Contributing Chartered Organization as of such date after the execution of this Release), Participating Chartered Organizations with respect to Post-1975 Chartered Organization Claims and Abuse Claims covered under insurance policies issued by Settling Insurance Companies, Opt-Out Chartered Organizations with respect to Abuse Claims covered under insurance policies issued by Settling Insurance Companies, and each of their respective predecessors, successors, assigns, assignors, representatives, members, officers, employees, agents, consultants, lawyers, advisors, professionals, trustees, insurers, beneficiaries, administrators, and any natural, legal, or juridical person or entity acting on behalf of or having

6

liability in respect of the Trust, the Trustee, the STAC, the FCR, the Claims Administrators, the Protected Parties, or the Contributing Chartered Organizations.

"**Scouting-related**" means anything that is attributable to, arises from, is based upon, results from, or relates to, in whole or in part, directly, indirectly, or derivatively, Scouting.

"**Settling Insurance Company**" means any Insurance Company that contributes funds, proceeds or other consideration to or for the benefit of the Settlement Trust pursuant to an Insurance Settlement Agreement that is approved by (a) an order of the Bankruptcy Court (including the Confirmation Order) and is designated as a Settling Insurance Company in the Confirmation Order or the Affirmation Order or (b) the Settlement Trust. Without limiting the foregoing, subject to Confirmation of the Plan and approval of the applicable Insurance Settlement Agreement by an order or orders of the Bankruptcy Court (including in the Confirmation Order), Century, the Chubb Companies, Clarendon, the Hartford Protected Parties, the Zurich Affiliated Insurers and the Zurich Insurers are each Settling Insurance Companies and shall be designated as such in the Confirmation Order and the Affirmation Order.

"**STAC**" means the Settlement Trust Advisory Committee appointed to oversee the Trust in accordance with the Chapter 11 Plan and the Trust Agreement.

"**TDP**" means the Boy Scouts of America Trust Distribution Procedures for Abuse Claims, substantially in the form attached as **Exhibit A** to the Chapter 11 Plan and filed in the Chapter 11 Cases on September 6, 2022, as may be amended and supplemented thereafter from time to time.

"**Trust Agreement**" means the Settlement Trust Agreement dated as of the Effective Date, substantially in the form attached to the Chapter 11 Plan as **Exhibit B**, as the same may be amended or modified from time to time in accordance with the terms thereof.

"**Trustee**" means Hon. Barbara J. Houser (Ret.) or any other person appointed to serve as trustee under and in accordance with the Trust Agreement.

## RELEASE AND INDEMNIFICATION

A.      In consideration of the benefit of an Award from the Trust, and without limiting any of the Releases or Injunctions in the Plan, which remain in full force and effect in favor of the Protected Parties, the Limited Protected Parties, and Opt-Out Chartered Organizations (as set forth in the Plan), I, on my own behalf and on behalf of my respective predecessors, successors, assigns, assignors, representatives, attorneys, agents, trustees, insurers, heirs, next of kin, estates, beneficiaries, executors, administrators, and any natural, legal, or juridical person or entity to the extent he, she, or it is entitled to assert any claim on my behalf, including, but not limited to, a Legal Representative, (hereafter "**I**", "**my**" or "**me**"), do hereby as of the Release Date voluntarily, intentionally, knowingly, absolutely, unconditionally, irrevocably, and fully waive, release, remit, acquit, forever discharge, and covenant not to knowingly sue or continue prosecution against the Released Parties, or any of them, from and with respect to any and all claims, including, but not limited to, all claims as defined in section 101(5) of the Bankruptcy Code, charges, complaints, demands, obligations, causes of action, losses, expenses, suits, awards, promises, agreements, rights to payment, right to any equitable remedy, rights of any

7

contribution, indemnification, reimbursement, subrogation or similar rights, demands, debts, liabilities, express or implied contracts, obligations of payment or performances, rights of offset or recoupment, costs, expenses, attorneys' and other professional fees and expenses, compensation or other relief, and liabilities of any nature whatsoever whether present or future, known or unknown, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, absolute or contingent, direct or derivative and whether based on contract, tort, statutory, or any other legal or equitable theory of recovery (collectively, "**Released Claims**") arising from, relating to, resulting from or in any way connected to, in whole or in part, my Abuse Claim (solely to the extent asserted against any of the Protected Parties or any Chartered Organizations that become a Protected Party after the execution of this Release) and the discharge of the Released Parties' duties and responsibilities under the Trust Agreement, including any agreement, document, instrument or certification contemplated by the Trust Agreement, the TDP, the Chapter 11 Plan, the formulation, preparation, negotiation, execution or consummation of the Trust Agreement, the TDP and the Chapter 11 Plan, and any and all other orders of the District Court or Bankruptcy Court relating to the Released Parties and/or their duties and responsibilities, from the beginning of time through the execution date of this Release. I covenant and agree that I will honor the release as set forth in the preceding sentence and, further, that I will not (i) knowingly institute or continue prosecution of a lawsuit or other action against any Released Party based upon, arising out of, or relating to any Released Claims released hereby, (ii) knowingly participate, assist, or cooperate in any such action, or (iii) knowingly encourage, assist and/or solicit any third party to institute any such action.

B.      Without limiting the foregoing, and notwithstanding anything to the contrary in this Release, the release set forth herein shall not apply in favor of the Trust as to my right to full payment of my allowed Direct Abuse Claim, provided means for such payment by the Trust are available under the Plan and the Trust Distribution Procedures.

C.      Without limiting the foregoing, and notwithstanding anything to the contrary in this Release, in consideration of the benefit of the contribution made by each Settling Insurance Company to the Trust pursuant to an Insurance Settlement Agreement and the payment by the Trust to me of the Award, I do hereby as of the Release Date voluntarily, intentionally, knowingly, absolutely, unconditionally, irrevocably, and fully waive, release, remit, acquit, forever discharge, and covenant not to knowingly sue or continue prosecution against (i) each Settling Insurance Company and (ii) any insured, co-insured or other third party (including any Local Council, any other Protected Party, any Limited Protected Party, and any other Chartered Organization) under any Abuse Insurance Policy issued by any Settling Insurance Company or any other insurance policy issued by any Settling Insurance Company, including a policy issued to a Chartered Organization (any such third party, an "**Insured Party Releasee**"), in the case of (i) or (ii) from and with respect to any Abuse Claim.

D.      I, as assignor, hereby transfer and assign to the Trust, as assignee, any rights, claims, benefits, or Causes of Action arising out of or related to my Abuse Claim that are not released herein, (i) and that are against Non-Settling Insurance Companies or (ii) to the extent my Abuse Claim is resolved pursuant to the Independent Review Option under the TDP.

E.      I hereby acknowledge that, pursuant to the Chapter 11 Plan, the Channeling Injunction, and the Confirmation Order, the Debtors have been fully and completely discharged and released, including their respective property and successors and assigns, from any and all liability arising from or related to my Abuse Claim, which liability shall be assumed by the Trust pursuant to the Plan.

F.      I hereby acknowledge that, pursuant to the Chapter 11 Plan, the Channeling Injunction, and Confirmation Order, the sole recourse of any holder of an Abuse Claim against a Protected Party on account of such Abuse Claim shall be to and against the Trust and such holder shall have no right whatsoever at any time to assert such Abuse Claim against any Protected Party or any property or interest in property of any Protected Party.

G.      I hereby acknowledge that, pursuant to the Chapter 11 Plan, the Channeling Injunction, and the Confirmation Order, the sole recourse of (i) any holder of a Post-1975 Chartered Organization Abuse Claim or pre-1976 Chartered Organization Abuse Claim against a Limited Protected Party on account of such Post-1975 Chartered Organization Abuse Claim or pre-1976 Chartered Organization Abuse Claim shall be to and against the Trust and such holder shall have no right whatsoever at any time to assert such Post-1975 Chartered Organization Abuse Claim or pre-1976 Chartered Organization Abuse Claim against any Limited Protected Party or any property or interest in property of any Limited Protected Party, and (ii) any holder of an Opt-Out Chartered Organization Abuse Claim against an Opt-Out Chartered Organization on account of such Opt-Out Chartered Organization Abuse Claim shall be to and against the Trust and such holder shall have no right whatsoever at any time to assert such Opt-Out Chartered Organization Abuse Claim against any Opt-Out Chartered Organization or any property or interest in property of any Opt-Out Chartered Organization.

H.      I hereby acknowledge that, pursuant to this Release, I am voluntarily providing a release as of the Release Date to any Chartered Organization that is currently a Protected Party or becomes a Protected Party after the execution of this Release (or that is an Insured Party Releasee as provided in paragraph C above) and that this Release will not become effective against any Chartered Organization that is not a Contributing Chartered Organization (or Insured Party Releasee) as of the Release Date unless and until such Chartered Organization becomes a Protected Party.

I.      I hereby acknowledge that by executing this Release, I will have the opportunity to share in any settlement proceeds received from a Chartered Organization that is or becomes a Protected Party, provided, however, that under the Trust Distribution Procedures, Non-BSA Sourced Assets (which include proceeds received from Chartered Organizations) shall be allocated (after deducting an estimated pro rata share of Trust expenses and direct expenses related to the collection of such Non-BSA Sourced Assets) all or in part only among the holders of Allowed Abuse Claims that (1) could have been satisfied from the source of such Non-BSA Sourced Assets absent the Plan's discharge and Channeling Injunction and (2) are held by Claimants that execute this or a similar Release. This Release does not release claims that have been assigned to the Trust and I acknowledge I will have no personal rights in such assigned claims.

9

J.      In further consideration of the benefit of an Award, as of the Release Date, I shall indemnify and forever hold harmless, and pay all final judgments, damages, costs, expenses, fines, penalties, interest, multipliers, or liabilities in whatsoever nature, including costs of defense and attorneys' fees of, the Trust, the Trustee, the STAC, the FCR, and the Claims Administrators arising from my failure to comply with the terms of this Release.

K.      I acknowledge that the Trust is not providing any tax advice with respect to the receipt of the Award or any component thereof, and I understand and agree that I shall be solely responsible for compliance with all tax laws with respect to the Award, to the extent applicable.


Claimant or Legal Representative Printed Name:        _____


Claimant or Legal Representative Signature:        _____


Date:    _____

**EXHIBIT C**

**NON-CONDITIONAL RELEASE OF CHARTERED ORGANIZATIONS**

**CLAIMANT RELEASE AND INDEMNIFICATION IN CONNECTION WITH DISTRIBUTION FROM THE BOY SCOUTS OF AMERICA SETTLEMENT TRUST**

To receive payment of an Award (as defined below) from the Boy Scouts Settlement Trust (the "**Trust**") and have the opportunity to share in any settlement proceeds received from a Chartered Organization (as defined below) that is or becomes a Protected Party (as defined below), an eligible Claimant must execute and submit to the Trustee (as defined below) this Release and Indemnification (the "**Release**"). This Release must be signed by the Claimant or the Claimant's Legal Representative (as defined below). A signature by an attorney for the Claimant or by an attorney for the Claimant's Legal Representative is not sufficient.

If you need assistance, please contact the Claims Administrators by email at ClaimsAdministration@scoutingsettlementtrust.com. You may also visit the Trust Website for additional information.

**DEFINITIONS**

The definitions set forth above for the terms "**Trust**" and "**Release**" are specifically incorporated herein by reference as if fully set forth in this section.

All capitalized terms not otherwise defined herein shall have the same meaning ascribed to them in the Chapter 11 Plan (as defined below).

"**Abuse**" means sexual conduct or misconduct, sexual abuse or molestation, sexual exploitation, indecent assault or battery, rape, pedophilia, ephebophilia, sexually related psychological or emotional harm, humiliation, anguish, shock, sickness, disease, disability, dysfunction, or intimidation, any other sexual misconduct or injury, contacts or interactions of a sexual nature, including the use of photography, video, or digital media, or other physical abuse or bullying or harassment without regard to whether such physical abuse or bullying is of a sexual nature, between a child and an adult, between a child and another child, or between a non-consenting adult and another adult, in each instance without regard to whether such activity involved explicit force, whether such activity involved genital or other physical contact, and whether there is or was any associated physical, psychological, or emotional harm to the child or non-consenting adult.

"**Abuse Claim**" means a liquidated or unliquidated Claim against a Protected Party (including the Settling Insurance Companies), a Limited Protected Party, or an Opt-Out Chartered Organization or any of their respective Representatives (in their capacities as such) that is attributable to, arises from, is based upon, relates to, or results from, directly, indirectly, or derivatively, alleged Scouting-related Abuse that occurred prior to the Petition Date, including any such Claim that seeks monetary damages or other relief, under any theory of law or equity whatsoever, including vicarious liability, alter ego, respondeat superior, conspiracy, fraud,

1

including fraud in the inducement, any negligence-based or employment-based theory, including negligent hiring, selection, supervision, retention or misrepresentation, any other theory based upon, or directly or indirectly related to any insurance relationship, the provision of insurance or the provision of insurance services to or by any Protected Parties, or misrepresentation, concealment, or unfair practice, breach of fiduciary duty, public or private nuisance, gross negligence, willful misconduct, or any other theory, including any theory based on or related to public policy or any act or failure to act, or failure to warn by a Protected Party, a Limited Protected Party, an Opt-Out Chartered Organization, any of their respective Representatives (in their capacities as such) or any other Person for whom any Protected Party, Limited Protected Party, or Opt-Out Chartered Organization is alleged to be responsible (including any such Claim that has been asserted or may be amended to assert in a proof of claim alleging Abuse, whether or not timely filed, in the Chapter 11 Cases, or any such Claim that has been asserted against the Settlement Trust), including any proportionate or allocable share of liability based thereon. Abuse Claims include any Future Abuse Claims, any Indirect Abuse Claims, any Opt-Out Chartered Organization Abuse Claim and any other Claim that is attributable to, arises from, is based upon, relates to, or results from, alleged Scouting- related Abuse regardless of whether, as of the Petition Date, such Claim was barred by any applicable statute of limitations. For the avoidance of doubt, (i) a Claim alleging Abuse shall not be an "**Abuse Claim**" against a Protected Party, Limited Protected Party, or Opt-Out Chartered Organization or any of their respective Representatives if such Claim is unrelated to Scouting (except as provided in (iii) below, including the portion of any Mixed Claim that is unrelated to Scouting); (ii) a Claim alleging Abuse shall be an "**Abuse Claim**" against a Protected Party, Limited Protected Party, or Opt-Out Chartered Organization or any of their respective Representatives (in their capacity as such) if such Claim is related to Scouting (including the portion of any Mixed Claim that is related to Scouting); (iii) any portion of a Mixed Claim alleging Abuse involving the Debtors, Reorganized BSA, Non-Debtor Entities, Local Councils, or their respective Representatives (in their capacities as such) is necessarily Scouting-related and shall be considered an Abuse Claim; and (iv) any Claim against the Debtors, Reorganized BSA, Non- Debtor Entities, Local Councils, or their respective Representatives (in their capacities as such) alleging Abuse is necessarily Scouting-related and shall be considered an Abuse Claim.

"**Abuse Insurance Policies**" means, collectively, the BSA Insurance Policies and the Local Council Insurance Policies. Abuse Insurance Policies do not include Non-Abuse Insurance Policies or Postpetition Insurance Policies.

"**Award**" means the compensation a Claimant receives on behalf of the Claimant's Abuse Claim.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware, having subject matter jurisdiction over the Chapter 11 Cases and, to the extent of any reference withdrawal made under section 157(d) of title 28 of the United States Code, the District Court.

"**BSA Insurance Policies**" means any and all known and unknown contracts, binders, certificates or Insurance Policies currently or previously in effect at any time on or before the Petition Date naming the Debtors, or either of them, or any predecessor, subsidiary, or past or present Affiliate of the Debtors, as an insured (whether as the primary or an additional insured), or otherwise alleged to afford the Debtors insurance coverage, upon which any claim could have

2

been, has been, or may be made with respect to any Abuse Claim, including the policies listed on Schedule 2 to the Chapter 11 Plan. Notwithstanding the foregoing, BSA Insurance Policies shall not include: (a) any policy providing reinsurance to any Insurance Company; (b) any Non-Abuse Insurance Policy; (c) any Local Council Insurance Policy; or (d) any Postpetition Insurance Policy.

"**Channeling Injunction**" means the permanent injunction provided for in Article X.F of the Chapter 11 Plan with respect to (a) Abuse Claims against the Protected Parties, (b) Post-1975 Chartered Organization Abuse Claims against the Limited Protected Parties, (c) Abuse Claims against the Limited Protected Parties that are covered under any insurance policy issued by the Settling Insurance Companies (as determined pursuant to Section X.F.3 of the Chapter 11 Plan), and (d) Opt-Out Chartered Organization Abuse Claims against the Opt-Out Chartered Organizations, to be issued pursuant to the Confirmation Order.

"**Chapter 11 Cases**" means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court and currently styled In re Boy Scouts of America and Delaware BSA, LLC, Bankruptcy Case No. 20-10343 (LSS) (Jointly Administered).

"**Chapter 11 Plan**" or "**Plan**" means the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC*, filed September 6, 2022, in the Chapter 11 Cases (as the same may be amended or modified), and confirmed by the Bankruptcy Court.

"**Chartered Organizations**" means each and every civic, faith-based, educational or business organization, governmental entity or organization, other entity or organization, or group of individual citizens, in each case presently or formerly authorized by the BSA to operate, sponsor or otherwise support one or more Scouting units.

"**Claimant**" means the holder of an Abuse Claim who (i) timely submitted an Abuse Claim Proof of Claim or Trust Claim Submission to the Settlement Trust, (ii) has had his or her Abuse Claim channeled to the Trust for evaluation, resolution, and payment pursuant to the Plan and the Channeling Injunction, and (iii) is signing and executing this Release (or on whose behalf this Release is being signed and executed by a Legal Representative).

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance acceptable to (a) the Debtors, the Ad Hoc Committee, the Coalition, Tort Claimants' Committee, the Future Claimants' Representative, the Settling Insurance Companies (in accordance with their respective Insurance Settlement Agreement), and the Contributing Chartered Organizations, and (b) the Creditors' Committee and JPM in accordance with their respective consent rights under the JPM / Creditors' Committee Term Sheet, as incorporated by reference in Article I.D of the Chapter 11 Plan.

"**Contributing Chartered Organizations**" means the current or former Chartered Organizations listed on **Exhibit D** to the Plan and any Chartered Organization made a Protected Party under a

3

Post-Effective Date Chartered Organization Settlement approved by the Bankruptcy Court in accordance with Article IV.J in the Plan. No Participating Chartered Organization shall be considered a Contributing Chartered Organization based solely on the Participating Chartered Organization Insurance Assignment. Without limiting the foregoing, subject to Confirmation of the Plan and approval of the United Methodist Settlement Agreement by an order of the Bankruptcy Court (including in the Confirmation Order), the United Methodist Entities are Contributing Chartered Organizations and shall be designated as such in the Confirmation Order and the Affirmation Order.  No Chartered Organization shall be a Contributing Chartered Organization unless it agrees to provide the assignments and releases as set forth in Sections 9 and 10 of the Century and Chubb Companies Insurance Settlement Agreement.

"**Debtors**" means Boy Scouts of America and Delaware BSA, LLC, the debtors and debtors-in-possession in the Chapter 11 Cases.

"**Direct Abuse Claim**" means an Abuse Claim that is not an Indirect Abuse Claim-i.e., is not a liquidated or unliquidated Abuse Claim for contribution, indemnity, reimbursement, or subrogation, whether contractual or implied by law (as those terms are defined by the applicable non-bankruptcy law of the relevant jurisdiction), and any other derivative Abuse Claim of any kind whatsoever, whether in the nature of or sounding in contract, tort, warranty or any other theory of law or equity whatsoever, including any indemnification, reimbursement, hold-harmless or other payment obligation provided for under any prepetition settlement, insurance policy, program agreement or contract; provided, however, that any retrospective premiums and self-insured retentions arising out of any Abuse Claims under the Abuse Insurance Policies shall not constitute an Indirect Abuse Claim.

"**District Court**" means the United States District Court for the District of Delaware, having jurisdiction in the Chapter 11 Cases.

"**Insurance Settlement Agreement**" means (a) any settlement agreement entered into after the Petition Date and before the Effective Date by and among (i) any Insurance Company, on the one hand, and (ii) one or more of the Debtors and/or any other Protected Party or Limited Protected Party, on the other hand, under which an Insurance Policy and/or the Debtors' and/or other Protected Parties' or Limited Protected Parties' rights thereunder with respect to Abuse Claims or Non-Abuse Litigation Claims are, subject to Confirmation of the Plan and the entry of a Final Order approving such settlement agreement (which order may be the Confirmation Order), released; and (b) any Post-Effective Date Insurance Settlement entered into during the Insurance Settlement Period by and between (i) any Insurance Company, on the one hand, and (ii) the Settlement Trustee (or the Settlement Trustee and any other Protected Party), on the other hand, under which an Insurance Policy that is subject to the Insurance Assignment and/or the Settlement Trustee's and/or Protected Parties' or Limited Protected Parties' rights thereunder with respect to Abuse Claims or Non-Abuse Litigation Claims are released. All Insurance Settlement Agreements entered into before the Effective Date related to Specified Primary Insurance Policies that release the applicable Insurance Company from liability arising from Non-Abuse Litigation Claims must be acceptable to the Creditors' Committee in accordance with the terms of the JPM / Creditors' Committee Term Sheet; provided, however, that with

respect to proposed settlements of any Specified Excess Insurance Policy entered into before the Effective Date, the Creditors' Committee shall have consultation rights.

"**Legal Representative**" means a personal representative, guardian, conservator, parent (on behalf of a minor), executor of an estate or a similar representative who has been appointed by a court or has other legal authorization to file a proof of claim and/or an Abuse Claim and execute this Release on behalf of the Claimant.

"**Limited Protected Parties**" means the Participating Chartered Organizations and all of such Persons' Representatives when acting in such representative capacity; provided, however, that no Perpetrator is or shall be a Limited Protected Party.

"**Local Councils**" means, collectively, each and every current or former local council of the BSA, including each and every current local council of the BSA as listed on **Exhibit G** to the Plan, "**supporting organizations**" within the meaning of 26 U.S.C. § 509 with respect to any Local Council, Scouting units (including "troops," "dens," "packs," "posts," "clubs," "crews," "ships," "tribes," "labs," "lodges," "councils," "districts," "areas," "regions," and "territories") associated with any Local Council, and all Entities that hold, own, or operate any camp or other property that is operated in the name of or for the benefit of any of the foregoing.

"**Local Council Insurance Policies**" means any and all known and unknown contracts, binders, certificates or insurance policies currently or previously in effect at any time on or before the Petition Date naming the Local Councils, or any of them, or any predecessor, subsidiary, or past or present Affiliate of any Local Council, as an insured (whether as the primary or an additional insured), or otherwise alleged to afford any Local Council insurance coverage, upon which any claim could have been, has been or may be made with respect to any Abuse Claim, including the policies identified on Schedule 3 to the Chapter 11 Plan. Notwithstanding the foregoing, Local Council Insurance Policies shall not include: (a) any policy providing reinsurance to any Settling Insurance Company; (b) any Non-Abuse Insurance Policy; (c) any BSA Insurance Policy; or (d) any Postpetition Insurance Policy.

"**Mixed Claim**" means a claim that makes allegations of Abuse related to or arising from Scouting as well as Abuse that occurred prior to the Petition Date unrelated to or not arising from Scouting. A claim shall not be treated as a Mixed Claim unless and until Scouting-related Abuse allegations have been asserted through a Proof of Claim, the complaint, sworn discovery or testimony (including by affidavit).

"**Non-BSA Sourced Assets**" shall mean Settlement Trust Assets that represent assets received as a result of or in connection with a global settlement between the Debtors or the Trust, on the one hand, and a Chartered Organization that is or becomes a Protected Party, on the other hand, and the proceeds of such assets. For the avoidance of doubt, Non-BSA Sourced Assets shall not include any assets received from the Debtors, the Local Councils, or any Settling Insurance Company.

"**Participating Chartered Organization**" means a Chartered Organization (other than a Contributing Chartered Organization, including the United Methodist Entities) that does not (a)

5

object to confirmation of the Plan or (b) inform Debtors' counsel in writing on or before the confirmation objection deadline that it does not wish to make the Participating Chartered Organization Insurance Assignment. Notwithstanding the foregoing, with respect to any Chartered Organization that is a debtor in bankruptcy as of the Confirmation Date, such Chartered Organization shall be a Participating Chartered Organization only if it advises Debtors' counsel in writing that it wishes to make the Participating Chartered Organization Insurance Assignment, and, for the avoidance of doubt, absent such written advisement, none of such Chartered Organization's rights to or under the Abuse Insurance Policies shall be subject to the Participating Chartered Organization Insurance Assignment. A list of Chartered Organizations that are debtors in bankruptcy and may not be Participating Chartered Organizations is attached as **Exhibit K** to the Plan. For the avoidance of doubt, any Chartered Organization that is a member of an ad hoc group or committee that objects to the confirmation of the Plan shall not be a Participating Chartered Organization.

"**Perpetrator**" means any individual who personally committed or is alleged to have personally committed an act of Abuse that forms the basis for an Abuse Claim; provided for the avoidance of doubt that the term "**Perpetrator**" shall only include natural persons and not The Church of Jesus Christ of Latter-day Saints, a Utah corporation sole. The term "**Perpetrator**" does not include any individual who did not personally commit or is not alleged to have personally committed an act of Abuse that forms the basis for an Abuse Claim, against whom an Abuse Claim is nevertheless asserted or may be asserted, including by virtue of such individual's position or service as an employee or volunteer of the Debtors or as a Scout participant, or by virtue of such individual's position or service as an employee or volunteer of a Local Council or a Chartered Organization or as a Scout participant.

"**Protected Parti**es" means the following Persons: (a) the Debtors; (b) Reorganized BSA; (c) the Related Non-Debtor Entities; (d) the Local Councils; (e) the Contributing Chartered Organizations; (f) the Settling Insurance Companies; and (g) all of such Persons' Representatives; provided, however, that no Perpetrator is or shall be a Protected Party. Notwithstanding the foregoing, a Contributing Chartered Organization shall be a Protected Party with respect to Abuse Claims only as set forth in the definition of "**Abuse Claim**."

"**Release Date**" means the later of (1) the date of execution hereof or (2) the date of (i) a "**Final Determination**" of my Abuse Claim under the TDP or (ii) the fixing of the liability amount for my Abuse Claim under the TDP, provided, however, the Release Date as to Contributing Chartered Organizations and their related Released Parties shall be the later of the date of execution or the date they become a Contributing Chartered Organization.

"**Released Parties**" means the Trust, the Trustee, the STAC, the FCR, the Claims Administrators, the Protected Parties, the Chartered Organizations, including all Chartered Organizations that are not Protected Parties or Limited Protected Parties, and each of their respective predecessors, successors, assigns, assignors, representatives, members, officers, employees, agents, consultants, lawyers, advisors, professionals, trustees, insurers, beneficiaries, administrators, and any natural, legal, or juridical person or entity acting on behalf of or having liability in respect of the Trust, the Trustee, the STAC, the FCR, the Claims Administrators, the Protected Parties, or the Contributing Chartered Organizations.

6

"**Scouting-related**" means anything that is attributable to, arises from, is based upon, results from, or relates to, in whole or in part, directly, indirectly, or derivatively, Scouting.

"**Settling Insurance Company**" means any Insurance Company that contributes funds, proceeds or other consideration to or for the benefit of the Settlement Trust pursuant to an Insurance Settlement Agreement that is approved by (a) an order of the Bankruptcy Court (including the Confirmation Order) and is designated as a Settling Insurance Company in the Confirmation Order or the Affirmation Order or (b) the Settlement Trust. Without limiting the foregoing, subject to Confirmation of the Plan and approval of the applicable Insurance Settlement Agreement by an order or orders of the Bankruptcy Court (including in the Confirmation Order), Century, the Chubb Companies, Clarendon, the Hartford Protected Parties, the Zurich Affiliated Insurers and the Zurich Insurers are each Settling Insurance Companies and shall be designated as such in the Confirmation Order and the Affirmation Order.

"**STAC**" means the Settlement Trust Advisory Committee appointed to oversee the Trust in accordance with the Chapter 11 Plan and the Trust Agreement.

"**TDP**" means the Boy Scouts of America Trust Distribution Procedures for Abuse Claims, substantially in the form attached as **Exhibit A** to the Chapter 11 Plan and filed in the Chapter 11 Cases on September 6, 2022, as may be amended and supplemented thereafter from time to time.

"**Trust Agreement**" means the Settlement Trust Agreement dated as of the Effective Date, substantially in the form attached to the Chapter 11 Plan as **Exhibit B**, as the same may be amended or modified from time to time in accordance with the terms thereof.

"**Trustee**" means Hon. Barbara J. Houser or any other person appointed to serve as trustee under and in accordance with the Trust Agreement.

## RELEASE AND INDEMNIFICATION\

A.      In consideration of the benefit of an Award from the Trust, and without limiting any of the Releases or Injunctions in the Plan, which remain in full force and effect in favor of the Protected Parties, the Limited Protected Parties, and Opt-Out Chartered Organizations (as set forth in the Plan), I, on my own behalf and on behalf of my respective predecessors, successors, assigns, assignors, representatives, attorneys, agents, trustees, insurers, heirs, next of kin, estates, beneficiaries, executors, administrators, and any natural, legal, or juridical person or entity to the extent he, she, or it is entitled to assert any claim on my behalf, including, but not limited to, a Legal Representative (hereafter "**I**", "**my**" or "**me**"), do hereby as of the Release Date voluntarily, intentionally, knowingly, absolutely, unconditionally, irrevocably, and fully waive, release, remit, acquit, forever discharge, and covenant not to knowingly sue or continue prosecution against the Released Parties, or any of them, from and with respect to any and all claims, including, but not limited to, all claims as defined in section 101(5) of the Bankruptcy Code, charges, complaints, demands, obligations, causes of action, losses, expenses, suits, awards, promises, agreements, rights to payment, right to any equitable remedy, rights of any contribution, indemnification, reimbursement, subrogation or similar rights, demands, debts,

7

liabilities, express or implied contracts, obligations of payment or performances, rights of offset or recoupment, costs, expenses, attorneys' and other professional fees and expenses compensation or other relief and liabilities of any nature whatsoever whether present or future, known or unknown, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, absolute or contingent, direct or derivative and whether based on contract, tort, statutory, or any other legal or equitable theory of recovery (collectively, "**Released Claims**") arising from relating to, resulting from or in any way connected to, in whole or in part, my Abuse Claim (solely to the extent asserted against any of the Protected Parties or any Chartered Organizations) and the discharge of the Released Parties' duties and responsibilities under the Trust Agreement, including any agreement, document, instrument or certification contemplated by the Trust Agreement, the TDP, the Chapter 11 Plan, the formulation, preparation, negotiation, execution or consummation of the Trust Agreement, the TDP and the Chapter 11 Plan, and any and all other orders of the District Court or Bankruptcy Court relating to the Released Parties and/or their duties and responsibilities, from the beginning of time through the execution date of this Release. I covenant and agree that I will honor the release as set forth in the preceding sentence and, further, that I will not knowingly (i) institute or continue prosecution of a lawsuit or other action against any Released Party based upon, arising out of, or relating to any Released Claims released hereby, (ii) knowingly participate, assist, or cooperate in any such action, or (iii) knowingly encourage, assist and/or solicit any third party to institute any such action.

B.     Without limiting the foregoing, and notwithstanding anything to the contrary in this Release, the release set forth herein shall not apply in favor of the Trust as to my right to full payment of my allowed Direct Abuse Claim, provided means for such payment by the Trust are available under the Plan and the Trust Distribution Procedures.

C.     Without limiting the foregoing, and notwithstanding anything to the contrary in this Release, in consideration of the benefit of the contribution made by each Settling Insurance Company to the Trust pursuant to an Insurance Settlement Agreement and the payment by the Trust to me of the Award, I do hereby as of the Release Date voluntarily, intentionally, knowingly, absolutely, unconditionally, irrevocably, and fully waive, release, remit, acquit, forever discharge, and covenant not to knowingly sue or continue prosecution against (i) each Settling Insurance Company and (ii) any insured, co-insured or other third party (including any Local Council, any other Protected Party, any Limited Protected Party, and any other Chartered Organization) under any Abuse Insurance Policy issued by any Settling Insurance Company or any other insurance policy issued by any Settling Insurance Company, including a policy issued to a Chartered Organization (any such third party, an "**Insured Party Releasee**"), in the case of (i) or (ii) from and with respect to any Abuse Claim.

D.     I, as assignor, hereby transfer and assign to the Trust, as assignee, any rights, claims, benefits, or Causes of Action arising out of or related to my Abuse Claim that are not released herein, (i) and that are against Non-Settling Insurance Companies or (ii) to the extent my Abuse Claim is resolved pursuant to the Independent Review Option under the TDP.

E.     I hereby acknowledge that, pursuant to the Chapter 11 Plan, the Channeling Injunction, and the Confirmation Order, the Debtors have been fully and completely discharged and released, including their respective property and successors and assigns, from any and all

8

liability arising from or related to my Abuse Claim, which liability shall be assumed by the Trust pursuant to the Plan.

F.      I hereby acknowledge that, pursuant to the Chapter 11 Plan, the Channeling Injunction, and the Confirmation Order, the sole recourse of any holder of an Abuse Claim against a Protected Party (or any holder of a Post-1975 Chartered Organization Abuse Claim or Pre-1976 Chartered Organization Abuse Claim against a Limited Protected Party, or any holder of an Opt-Out Chartered Organization Abuse Claim against an Opt-Out Chartered Organization) on account of such Abuse Claim (or Post-1975 Chartered Organization Abuse Claim, Pre-1976 Chartered Organization Abuse Claim, or Opt-Out Chartered Organization Abuse Claim) shall be to and against the Trust and such holder shall have no right whatsoever at any time to assert such Abuse Claim against any Protected Party or any property or interest in property of any Protected Party (or to assert any Post-1975 Chartered Organization Abuse Claim or Pre-1976 Chartered Organization Abuse Claim against a Limited Protected Party or any property or interest in property of any Limited Protected Party, or to assert any Opt-Out Chartered Organization Abuse Claim against an Opt-Out Chartered Organization or any property or interest in property of any Opt-Out Chartered Organization).

G.      I hereby acknowledge that, pursuant to this Release, I am voluntarily providing a release as of the Release Date to all Insured Party Releasees and Chartered Organizations, including all Chartered Organizations that are not Protected Parties or Limited Protected Parties, and as of the Release Date I shall have no remedies with respect to my Abuse Claim against any Insured Party Releasees or Chartered Organizations, including those that are not Protected Parties and Limited Protected Parties. This Release does not release claims that have been assigned to the Trust and I acknowledge I will have no personal rights in such assigned claims.

H.      I hereby acknowledge that by executing this Release, I will have the opportunity to share in any settlement proceeds received from a Chartered Organization that is or becomes a Protected Party (and to any Chartered Organization that is an Insured Party Releasee), provided, however, that under the Trust Distribution Procedures Non-BSA Sourced Assets (which include proceeds received from Chartered Organizations) shall be allocated (after deducting an estimated pro rata share of Trust expenses and direct expenses related to the collection of such Non-BSA Sourced Assets) all or in part only among the holders of Allowed Abuse Claims that (1) could have been satisfied from the source of such Non-BSA Sourced Assets absent the Plan's discharge and Channeling Injunction and (2) execute this or a similar Release. For the avoidance of doubt, nothing in this Release shall limit or impair my rights to share in any settlement proceeds received by the Trust from a Chartered Organization.

I.      In further consideration of the benefit of an Award, as of the Release Date, I shall indemnify and forever hold harmless, and pay all final judgments, damages, costs, expenses, fines, penalties, interest, multipliers, or liabilities in whatsoever nature, including costs of defense and attorneys' fees of, the Trust, the Trustee, the STAC, the FCR, and the Claims Administrators arising from my failure to comply with the terms of this Release.

9

J.      I acknowledge that the Trust is not providing any tax advice with respect to the receipt of the Award or any component thereof, and I understand and agree that I shall be solely responsible for compliance with all tax laws with respect to the Award, to the extent applicable.

Claimant or Legal Representative Printed Name:      _____

Claimant or Legal Representative Signature:      _____

Date:   _____

**EXHIBIT D**

**FINAL DETERMINATION**

**CLAIMANT RELEASE AND INDEMNIFICATION IN CONNECTION WITH DISTRIBUTION FROM THE BOY SCOUTS OF AMERICA SETTLEMENT TRUST**

To receive payment of an Award (as defined below) from the Boy Scouts Settlement Trust (the "**Trust**"), an eligible Claimant must execute and submit to the Trustee (as defined below) this Release and Indemnification (the "**Release**"). This Release must be signed by the Claimant or the Claimant's Legal Representative (as defined below). A signature by an attorney for the Claimant or by an attorney for the Claimant's Legal Representative is not sufficient.

If you need assistance, please contact the Claims Administrators by email at ClaimsAdministration@scoutingsettlementtrust.com. You may also visit the Trust Website for additional information.

**DEFINITIONS**

The definitions set forth above for the terms "**Trust**" and "**Release**" are specifically incorporated herein by reference as if fully set forth in this section.

All capitalized terms not otherwise defined herein shall have the same meaning ascribed to them in the Chapter 11 Plan (as defined below).

"**Abuse**" means sexual conduct or misconduct, sexual abuse or molestation, sexual exploitation, indecent assault or battery, rape, pedophilia, ephebophilia, sexually related psychological or emotional harm, humiliation, anguish, shock, sickness, disease, disability, dysfunction, or intimidation, any other sexual misconduct or injury, contacts or interactions of a sexual nature, including the use of photography, video, or digital media, or other physical abuse or bullying or harassment without regard to whether such physical abuse or bullying is of a sexual nature, between a child and an adult, between a child and another child, or between a non-consenting adult and another adult, in each instance without regard to whether such activity involved explicit force, whether such activity involved genital or other physical contact, and whether there is or was any associated physical, psychological, or emotional harm to the child or non-consenting adult.

"**Abuse Claim**" means a liquidated or unliquidated Claim against a Protected Party (including the Settling Insurance Companies), a Limited Protected Party, or an Opt-Out Chartered Organization or any of their respective Representatives (in their capacities as such) that is attributable to, arises from, is based upon, relates to, or results from, directly, indirectly, or derivatively, alleged Scouting-related Abuse that occurred prior to the Petition Date, including any such Claim that seeks monetary damages or other relief, under any theory of law or equity whatsoever, including vicarious liability, alter ego, respondeat superior, conspiracy, fraud, including fraud in the inducement, any negligence-based or employment-based theory, including negligent hiring, selection, supervision, retention or misrepresentation, any other theory based

1

upon, or directly or indirectly related to any insurance relationship, the provision of insurance or the provision of insurance services to or by any Protected Parties, or misrepresentation, concealment, or unfair practice, breach of fiduciary duty, public or private nuisance, gross negligence, willful misconduct, or any other theory, including any theory based on or related to public policy or any act or failure to act, or failure to warn by a Protected Party, a Limited Protected Party, an Opt-Out Chartered Organization, any of their respective Representatives (in their capacities as such) or any other person for whom any Protected Party, Limited Protected Party, or Opt-Out Chartered Organization is alleged to be responsible (including any such Claim that has been asserted or may be amended to assert in a proof of claim alleging Abuse, whether or not timely filed, in the Chapter 11 Cases, or any such Claim that has been asserted against the Settlement Trust), including any proportionate or allocable share of liability based thereon. Abuse Claims include any Future Abuse Claims, any Indirect Abuse Claims, any Opt-Out Chartered Organization Abuse Claim and any other Claim that is attributable to, arises from, is based upon, relates to, or results from, alleged Scouting- related Abuse regardless of whether, as of the Petition Date, such Claim was barred by any applicable statute of limitations. For the avoidance of doubt, (i) a Claim alleging Abuse shall not be an "**Abuse Claim**" against a Protected Party, Limited Protected Party, or Opt-Out Chartered Organization or any of their respective Representatives if such Claim is unrelated to Scouting (except as provided in (iii) below, including the portion of any Mixed Claim that is unrelated to Scouting); (ii) a Claim alleging Abuse shall be an "**Abuse Claim**" against a Protected Party, Limited Protected Party, or Opt-Out Chartered Organization or any of their respective Representatives (in their capacity as such) if such Claim is related to Scouting (including the portion of any Mixed Claim that is related to Scouting); (iii) any portion of a Mixed Claim alleging Abuse involving the Debtors, Reorganized BSA, Non-Debtor Entities, Local Councils, or their respective Representatives (in their capacities as such) is necessarily Scouting-related and shall be considered an Abuse Claim; and (iv) any Claim against the Debtors, Reorganized BSA, Non- Debtor Entities, Local Councils, or their respective Representatives (in their capacities as such) alleging Abuse is necessarily Scouting-related and shall be considered an Abuse Claim.

"**Abuse Insurance Policies**" means, collectively, the BSA Insurance Policies, and the Local Council Insurance Policies. Abuse Insurance Policies do not include Non-Abuse Insurance Policies or Postpetition Insurance Policies.

"**Award**" means the compensation a Claimant receives on behalf of the Claimant's Abuse Claim. "**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware, having subject matter jurisdiction over the Chapter 11 Cases and, to the extent of any reference withdrawal made under section 157(d) of title 28 of the United States Code, the District Court.

"**BSA Insurance Policies**" means any and all known and unknown contracts, binders, certificates or Insurance Policies currently or previously in effect at any time on or before the Petition Date naming the Debtors, or either of them, or any predecessor, subsidiary, or past or present Affiliate of the Debtors, as an insured (whether as the primary or an additional insured), or otherwise alleged to afford the Debtors insurance coverage, upon which any claim could have been, has been, or may be made with respect to any Abuse Claim, including the policies listed on Schedule 2 to the Chapter 11 Plan. Notwithstanding the foregoing, BSA Insurance Policies shall not include: (a) any policy providing reinsurance to any Insurance Company; (b) any Non-Abuse

2

Insurance Policy; (c) any Local Council Insurance Policy; or (d) any Postpetition Insurance Policy.

"**Channeling Injunction**" means the permanent injunction provided for in Article X.F of the Chapter 11 Plan with respect to (a) Abuse Claims against the Protected Parties, (b) Post-1975 Chartered Organization Abuse Claims against the Limited Protected Parties, (c) Abuse Claims against the Limited Protected Parties that are covered under any insurance policy issued by the Settling Insurance Companies (as determined pursuant to Section X.F.3 of the Chapter 11 Plan), and (d) Opt-Out Chartered Organization Abuse Claims against the Opt-Out Chartered Organizations, to be issued pursuant to the Confirmation Order.

"**Chapter 11 Cases**" means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court and currently styled In re Boy Scouts of America and Delaware BSA, LLC, Bankruptcy Case No. 20-10343 (LSS) (Jointly Administered).

"**Chapter 11 Plan**" or "**Plan**" means the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC*, filed September 6, 2022, in the Chapter 11 Cases (as the same may be amended or modified), and confirmed by the Bankruptcy Court.

"**Chartered Organizations**" means each and every civic, faith-based, educational or business organization, governmental entity or organization, other entity or organization, or group of individual citizens, in each case presently or formerly authorized by the BSA to operate, sponsor or otherwise support one or more Scouting units.

"**Claimant**" means the holder of an Abuse Claim who (i) has satisfied the eligibility criteria section forth in Articles IV and XIII of the Trust Distribution Procedures, (ii) has had his or her Abuse Claim channeled to the Trust for evaluation, resolution, and payment pursuant to the Plan and the Channeling Injunction, and (iii) is signing and executing this Release (or on whose behalf this Release is being signed and executed by a Legal Representative).

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance acceptable to (a) the Debtors, the Ad Hoc Committee, the Coalition, Tort Claimants' Committee, the Future Claimants' Representative, the Settling Insurance Companies (in accordance with their respective Insurance Settlement Agreement), and the Contributing Chartered Organizations, and (b) the Creditors' Committee and JPM in accordance with their respective consent rights under the JPM / Creditors' Committee Term Sheet, as incorporated by reference in Article I.D of the Plan.

"**Contributing Chartered Organizations**" means the current or former Chartered Organizations listed on **Exhibit D** to the Plan and any Chartered Organization made a Protected Party under a Post-Effective Date Chartered Organization Settlement approved by the Bankruptcy Court in accordance with Article IV.J in the Plan. No Participating Chartered Organization shall be considered a Contributing Chartered Organization based solely on the Participating Chartered

Organization Insurance Assignment. Without limiting the foregoing, subject to Confirmation of the Plan and approval of the United Methodist Settlement Agreement by an order of the Bankruptcy Court (including in the Confirmation Order), the United Methodist Entities are Contributing Chartered Organizations and shall be designated as such in the Confirmation Order and the Affirmation Order. No Chartered Organization shall be a Contributing Chartered Organization unless it agrees to provide the assignments and releases as set forth in Sections 9 and 10 of the Century and Chubb Companies Insurance Settlement Agreement.

"**Debtors**" means Boy Scouts of America and Delaware BSA, LLC, the debtors and debtors-in-possession in the Chapter 11 Cases.

"**District Court**" means the United States District Court for the District of Delaware, having jurisdiction in the Chapter 11 Cases.

"**Insurance Settlement Agreement**" means (a) any settlement agreement entered into after the Petition Date and before the Effective Date by and among (i) any Insurance Company, on the one hand, and (ii) one or more of the Debtors and/or any other Protected Party or Limited Protected Party, on the other hand, under which an Insurance Policy and/or the Debtors and/or other Protected Parties' or Limited Protected Parties' rights thereunder with respect to Abuse Claims or Non-Abuse Litigation Claims are, subject to Confirmation of the Plan and the entry of a Final Order approving such settlement agreement (which order may be the Confirmation Order), released; and (b) any Post-Effective Date Insurance Settlement entered into during the Insurance Settlement Period by and between (i) any Insurance Company, on the one hand, and (ii) the Settlement Trustee (or the Settlement Trustee and any other Protected Party), on the other hand, under which an Insurance Policy that is subject to the Insurance Assignment and/or the Settlement Trustee's and/or Protected Parties' or Limited Protected Parties' rights thereunder with respect to Abuse Claims or Non-Abuse Litigation Claims are released. All Insurance Settlement Agreements entered into before the Effective Date related to Specified Primary Insurance Policies that release the applicable Insurance Company from liability arising from Non-Abuse Litigation Claims must be acceptable to the Creditors' Committee in accordance with the terms of the JPM / Creditors' Committee Term Sheet; provided, however, that with respect to proposed settlements of any Specified Excess Insurance Policy entered into before the Effective Date, the Creditors' Committee shall have consultation rights.

"**Legal Representative**" means a personal representative, guardian, conservator, parent (on behalf of a minor), executor of an estate or a similar representative who has been appointed by a court or has other legal authorization to file a proof of claim and/or an Abuse Claim and execute this Release on behalf of the Claimant.

"**Limited Protected Parties**" means the Participating Chartered Organizations and all of such Persons' Representatives when acting in such representative capacity; provided, however, that no Perpetrator is or shall be a Limited Protected Party.

"**Local Councils**" means, collectively, each and every current or former local council of the BSA, including each and every current local council of the BSA as listed on **Exhibit G** to the Plan, "**supporting organizations**" within the meaning of 26 U.S.C. § 509 with respect to any

4

Local Council, Scouting units (including "troops," "dens," "packs," "posts," "clubs," "crews," "ships," "tribes," "labs," "lodges," "councils," "districts," "areas," "regions," and "territories") associated with any Local Council, and all Entities that hold, own, or operate any camp or other property that is operated in the name of or for the benefit of any of the foregoing.

"**Local Council Insurance Policies**" means any and all known and unknown contracts, binders, certificates or insurance policies currently or previously in effect at any time on or before the Petition Date naming the Local Councils, or any of them, or any predecessor, subsidiary, or past or present Affiliate of any Local Council, as an insured (whether as the primary or an additional insured), or otherwise alleged to afford any Local Council insurance coverage, upon which any claim could have been, has been or may be made with respect to any Abuse Claim, including the policies identified on Schedule 3 to the Chapter 11 Plan. Notwithstanding the foregoing, Local Council Insurance Policies shall not include: (a) any policy providing reinsurance to any Settling Insurance Company; (b) any Non-Abuse Insurance Policy; (c) any BSA Insurance Policy; or (d) any Postpetition Insurance Policy.

"**Mixed Claim**" means a claim that makes allegations of Abuse related to or arising from Scouting as well as Abuse that occurred prior to the Petition Date unrelated to or not arising from Scouting. A claim shall not be treated as a Mixed Claim unless and until Scouting-related Abuse allegations have been asserted through a Proof of Claim, the complaint, sworn discovery or testimony (including by affidavit).

"**Non-BSA Sourced Assets**" shall mean Settlement Trust Assets that represent assets received as a result of or in connection with a global settlement between the Debtors or the Trust, on the one hand, and a Chartered Organization that is or becomes a Protected Party, on the other hand, and the proceeds of such assets. For the avoidance of doubt, Non-BSA Sourced Assets shall not include any assets received from the Debtors, the Local Councils, or any Settling Insurance Company.

"**Participating Chartered Organization**" means a Chartered Organization (other than a Contributing Chartered Organization, including the United Methodist Entities) that does not (a) object to confirmation of the Plan or (b) inform Debtors' counsel in writing on or before the confirmation objection deadline that it does not wish to make the Participating Chartered Organization Insurance Assignment. Notwithstanding the foregoing, with respect to any Chartered Organization that is a debtor in bankruptcy as of the Confirmation Date, such Chartered Organization shall be a Participating Chartered Organization only if it advises Debtors' counsel in writing that it wishes to make the Participating Chartered Organization Insurance Assignment, and, for the avoidance of doubt, absent such written advisement, none of such Chartered Organization's rights to or under the Abuse Insurance Policies shall be subject to the Participating Chartered Organization Insurance Assignment. A list of Chartered Organizations that are debtors in bankruptcy and may not be Participating Chartered Organizations is attached as **Exhibit K** to the Plan. For the avoidance of doubt, any Chartered Organization that is a member of an ad hoc group or committee that objects to the confirmation of the Plan shall not be a Participating Chartered Organization.

5

"**Perpetrator**" means any individual who personally committed or is alleged to have personally committed an act of Abuse that forms the basis for an Abuse Claim. The term "**Perpetrator**" does not include any individual who did not personally commit or is not alleged to have personally committed an act of Abuse that forms the basis for an Abuse Claim, against whom an Abuse Claim is nevertheless asserted or may be asserted, including by virtue of such individual's position or service as an employee or volunteer of the Debtors or as a Scout participant, or by virtue of such individual's position or service as an employee or volunteer of a Local Council or a Chartered Organization or as a Scout participant.

"**Protected Parties**" means the following Persons: (a) the Debtors; (b) Reorganized BSA; (c) the Related Non-Debtor Entities; (d) the Local Councils; (e) the Contributing Chartered Organizations; (f) the Settling Insurance Companies; and (g) all of such Persons' Representatives; provided, however, that no Perpetrator is or shall be a Protected Party. Notwithstanding the foregoing, a Contributing Chartered Organization shall be a Protected Party with respect to Abuse Claims only as set forth in the definition of "**Abuse Claim**."

"**Release Date**" means the later of (1) the date of execution hereof or (2) the date of (i) a "**Final Determination**" of my Abuse Claim under the TDP or (ii) the fixing of the liability amount for my Abuse Claim under the TDP, provided, however, the Release Date as to Contributing Chartered Organizations and their related Released Parties shall be the later of the date of execution or the date they become a Contributing Chartered Organization.

"**Released Parties**" means the Trust, the Trustee, the STAC, the FCR, the Claims Administrators, the Protected Parties, the Contributing Chartered Organizations (including any Chartered Organization that becomes a Contributing Chartered Organization as of such date after the execution of this Release), Participating Chartered Organizations with respect to Post-1975 Chartered Organization Claims and Abuse Claims covered under insurance policies issued by Settling Insurance Companies, Opt-Out Chartered Organizations with respect to Abuse Claims covered under insurance policies issued by Settling Insurance Companies, and each of their respective predecessors, successors, assigns, assignors, representatives, members, officers, employees, agents, consultants, lawyers, advisors, professionals, trustees, insurers, beneficiaries, administrators, and any natural, legal, or juridical person or entity acting on behalf of or having liability in respect of the Trust, the Trustee, the STAC, the FCR, the Claims Administrators, the Protected Parties, or the Contributing Chartered Organizations.

"**Scouting-related**" means anything that is attributable to, arises from, is based upon, results from, or relates to, in whole or in part, directly, indirectly, or derivatively, Scouting.

"**Settling Insurance Company**" means any Insurance Company that contributes funds, proceeds or other consideration to or for the benefit of the Settlement Trust pursuant to an Insurance Settlement Agreement that is approved by (a) an order of the Bankruptcy Court (including the Confirmation Order) and is designated as a Settling Insurance Company in the Confirmation Order or the Affirmation Order or (b) the Settlement Trust. Without limiting the foregoing, subject to Confirmation of the Plan and approval of the applicable Insurance Settlement Agreement by an order or orders of the Bankruptcy Court (including in the Confirmation Order), Century, the Chubb Companies, Clarendon, the Hartford Protected Parties, the Zurich Affiliated

Insurers and the Zurich Insurers are each Settling Insurance Companies and shall be designated as such in the Confirmation Order and the Affirmation Order.

"**STAC**" means the Settlement Trust Advisory Committee appointed to oversee the Trust in accordance with the Chapter 11 Plan and the Trust Agreement.

"**TDP**" means the Boy Scouts of America Trust Distribution Procedures for Abuse Claims, substantially in the form attached as **Exhibit A** to the Chapter 11 Plan and filed in the Chapter 11 Cases on September 6, 2022, as may be amended and supplemented thereafter from time to time.

"**Trust Agreement**" means the Settlement Trust Agreement dated as of the Effective Date, substantially in the form attached to the Chapter 11 Plan as **Exhibit B**, as the same may be amended or modified from time to time in accordance with the terms thereof.

"**Trustee**" means Hon. Barbara J. Houser (Ret.) or any other person appointed to serve as trustee under and in accordance with the Trust Agreement.

### RELEASE AND INDEMNIFICATION

A.      In consideration of the benefit of an Award from the Trust, and without limiting any of the Releases or Injunctions in the Plan, which remain in full force and effect in favor of the Protected Parties, the Limited Protected Parties, and Opt-Out Chartered Organizations (as set forth in the Plan), I, on my own behalf and on behalf of my respective predecessors, successors, assigns, assignors, representatives, attorneys, agents, trustees, insurers, heirs, next of kin, estates, beneficiaries, executors, administrators, and any natural, legal, or juridical person or entity to the extent he, she, or it is entitled to assert any claim on my behalf, including, but not limited to, a Legal Representative, (hereafter "**I**", "**my**" or "**me**"), do hereby as of the Release Date voluntarily, intentionally, knowingly, absolutely, unconditionally, irrevocably, and fully waive, release, remit, acquit, forever discharge, and covenant not to knowingly sue or continue prosecution against the Released Parties, or any of them, from and with respect to any and all claims, including, but not limited to, all claims as defined in section 101(5) of the Bankruptcy Code, charges, complaints, demands, obligations, causes of action, losses, expenses, suits, awards, promises, agreements, rights to payment, right to any equitable remedy, rights of any contribution, indemnification, reimbursement, subrogation or similar rights, demands, debts, liabilities, express or implied contracts, obligations of payment or performances, rights of offset or recoupment, costs, expenses, attorneys' and other professional fees and expenses, compensation or other relief, and liabilities of any nature whatsoever whether present or future, known or unknown, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, absolute or contingent, direct or derivative and whether based on contract, tort, statutory, or any other legal or equitable theory of recovery (collectively, "**Released Claims**") arising from, relating to, resulting from or in any way connected to, in whole or in part, my Abuse Claim (solely to the extent asserted against any of the Protected Parties) and the discharge of the Released Parties' duties and responsibilities under the Trust Agreement, including any agreement, document, instrument or certification contemplated by the Trust Agreement, the TDP, the Chapter 11 Plan, the formulation, preparation, negotiation, execution or consummation of the Trust Agreement, the TDP and the Chapter 11 Plan, and any and all other orders of the

District Court or Bankruptcy Court relating to the Released Parties and/or their duties and responsibilities, from the beginning of time through the execution date of this Release. I covenant and agree that I will honor the release as set forth in the preceding sentence and, further, that I will not knowingly (i) institute or continue prosecution of a lawsuit or other action against any Released Party based upon, arising out of, or relating to any Released Claims released hereby, (ii) knowingly participate, assist, or cooperate in any such action, or (iii) knowingly encourage, assist and/or solicit any third party to institute any such action.

B.      Without limiting the foregoing, and notwithstanding anything to the contrary in this Release, the release set forth herein shall not apply in favor of the Trust as to my right to full payment of my allowed Direct Abuse Claim, provided means for such payment by the Trust are available under the Plan and the Trust Distribution Procedures.

C.      Without limiting the foregoing, and notwithstanding anything to the contrary in this Release, in consideration of the benefit of the contribution made by each Settling Insurance Company to the Trust pursuant to an Insurance Settlement Agreement and the payment by the Trust to me of the Award, I do hereby as of the Release Date voluntarily, intentionally, knowingly, absolutely, unconditionally, irrevocably, and fully waive, release, remit, acquit, forever discharge, and covenant not to knowingly sue or continue prosecution against (i) each Settling Insurance Company and (ii) any insured, co-insured or other third party (including any Local Council, any other Protected Party, any Limited Protected Party, and any other Chartered Organization) under any Abuse Insurance Policy issued by any Settling Insurance Company or any other insurance policy issued by any Settling Insurance Company, including a policy issued to a Chartered Organization (any such third party, an "**Insured Party Releasee**"), in the case of (i) or (ii) from and with respect to any Abuse Claim.

D.      I, as assignor, hereby transfer and assign to the Trust, as assignee, any rights, claims, benefits, or Causes of Action arising out of or related to my Abuse Claim that are not released herein, (i) and that are against Non-Settling Insurance Companies or (ii) to the extent my Abuse Claim is resolved pursuant to the Independent Review Option under the TDP.

E.      I hereby acknowledge that, pursuant to the Chapter 11 Plan, the Channeling Injunction and the Confirmation Order, the Debtors have been fully and completely discharged and released, including their respective property and successors and assigns, from any and all liability arising from or related to my Abuse Claim, which liability shall be assumed by the Trust pursuant to the Plan.

F.      I hereby acknowledge that, pursuant to the Chapter 11 Plan, the Channeling Injunction and the Confirmation Order, the sole recourse of any holder of an Abuse Claim against a Protected Party on account of such Abuse Claim shall be to and against the Trust and such holder shall have no right whatsoever at any time to assert such Abuse Claim against any Protected Party or any property or interest in property of any Protected Party.

G.      I hereby acknowledge that, pursuant to the Chapter 11 Plan, the Channeling Injunction and the Confirmation Order, the sole recourse of any (i) holder of a Post-1975 Chartered Organization Abuse Claim or Pre-1976 Chartered Organization Abuse Claim against a

8

Limited Protected Party on account of such Post-1975 Chartered Organization Abuse Claim or Pre-1976 Chartered Organization Abuse Claim shall be to and against the Trust and such holder shall have no right whatsoever at any time to assert such Post-1975 Chartered Organization Abuse Claim or Pre-1976 Chartered Organization Abuse Claim against any Limited Protected Party or any property or interest in property of any Limited Protected Party, and (ii) holder of an Opt-Out Chartered Organization Abuse Claim against an Opt-Out Chartered Organization on account of such Opt-Out Chartered Organization Abuse Claim shall be to and against the Trust and such holder shall have no right whatsoever at any time to assert such Opt-Out Chartered Organization Abuse Claim against any Opt-Out Chartered Organization or any property or interest in property of any Opt-Out Chartered Organization.

H.     In further consideration of the benefit of an Award, as of the Release Date, I shall indemnify and forever hold harmless, and pay all final judgments, damages, costs, expenses, fines, penalties, interest, multipliers, or liabilities in whatsoever nature, including costs of defense and  attorneys' fees of, the Trust, the Trustee, the STAC, the FCR, and the Claims Administrators arising from my failure to comply with the terms of this Release.

I.     I acknowledge that the Trust is not providing any tax advice with respect to the receipt of the Award or any component thereof, and I understand and agree that I shall be solely responsible for compliance with all tax laws with respect to the Award, to the extent applicable.

Claimant or Legal Representative Printed Name:     _____

Claimant or Legal Representative Signature:     _____

Date:   _____

65001756 v2-WorkSiteUS-036293/0006

9

# EXHIBIT 10

Case 20-10342-LSS    Doc 707-1    Filed 08/03/26    Page 140 of 143

8.11 What happens to my claim if I change my mind and decide not to pursue the IRO?

# SCOUTING SETTLEMENT TRUST
# Help Center

Home (/s/)    News And Key Documents (/s/news-and-key-links)    FAQs (/s/help-center)

Answers to frequently asked questions and resources about the Scouting Settlement Trust

Contact Us (/s/contactsupport)    User Registration (/s/registration)    **LOGIN**

and Claims Process. Can't find what you're looking for? Please **contact us (/s/contactsupport)**.

## 8.11 What happens to my claim if I change my mind and decide not to pursue the IRO?

🕐  Feb 12, 2025 Knowledge

### Title
8.11 What happens to my claim if I change my mind and decide not to pursue the IRO?

### URL Name
What-happens-to-my-claim-if-I-change-my-mind-and-decide-not-to-pursue-the-IRO

**1. Basic Bankruptcy Related Information (/s/topic/0TODp0000001KZBOA2/1-basic-bankruptcy-related-information)**

**2. Basic Scouting Settlement Trust (Trust) Information (/s/topic/0TODp0000001KZGOA2/2-basic-scouting-settlement-trust-trust-information)**

**3. Timeline For Processing Abuse Claim Payments**

8.11 What happens to my claim if I change my mind and decide not to pursue the IRO?

Case 20-10342-LSS    Doc 707-1    Filed 08/03/26    Page 141 of 143

## Answer ⓘ

<mark>You may change your mind at any time up to the due date for your second $10,000 administrative fee payment and your claim will return to the TDP Matrix process as though no IRO election had been made</mark>.

## Last Published Date

2/12/2025, 12:49 PM

8. Independent Review Op...
(/s/topic/0TODp0000001KZQOA...

[(/s/topic/0TODp000000 1KZCOA2/3-timeline-for-processing-abuse-claim-payments)](/s/topic/0TODp0000001KZCOA2/3-timeline-for-processing-abuse-claim-payments)

**4. General Claims Administration (/s/topic/0TODp000000 1KZXOA2/4-general-claims-administration)**

**5. Claims Processing Portal Information (/s/topic/0TODp000000 1KZEOA2/5-claims-processing-portal-information)**

**6. Completing The Expedited Claims Questionnaire (/s/topic/0TODp000000 1KZFOA2/6-completing-the-expedited-claims-questionnaire)**

**7. Trust ("Matrix") Claims Submission, Processing, and Calculation (/s/topic/0TODp000000 1KZLOA2/7-trust-matrix-claims-submission-processing-and-calculation)**

# **EXHIBIT 11**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

In re:

DELAWARE BSA, LLC,

      Reorganized Debtor.

Chapter 11

Case No. 20-10342 (LSS)

**EXHIBIT 11**

**REDACTED IN FULL**